## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MAIKER ALEJANDRO ESPINOZA ESCALONA,
El Paso Processing Center
8915 Montana Ave.
El Paso, TX 79925;

JACKSON MANUEL VILLA WILHELM,
El Paso Processing Center
8915 Montana Ave.
El Paso, TX 79925;

JORGE ALBERTO CASTILLO CERRANO,
El Paso Processing Center
8915 Montana Ave.
El Paso, TX 79925;

JANFRANK BERRIOS LAGUNA,
T. Don Hutto Detention Center
1001 Welch Street
Taylor, TX 76574;

ALEJANDRO JOSE PULIDO CASTELLANO,
El Paso Processing Center
8915 Montana Ave.
El Paso, TX 79925;

JOSUE DE JESUS TORCATI SEBRIAN,
T. Don Hutto Detention Center
1001 Welch Street
Taylor, TX 76574;

WALTER ESTIVER SALAZAR,
Farmville Detention Center
508 Waterworks Road
Farmville, VA 23901;

Case No.

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF AND
PETITION FOR A WRIT OF
HABEAS CORPUS**

1

HIJRAN MALIK,
Eloy Detention Center
1705 E. Hanna Road
Eloy, AZ 85131;

GHULAM MUHAMMAD,
Eloy Detention Center
1705 E. Hanna Road
Eloy, AZ 85131; and

MD RAYHAN,
Florence Correctional Center
1100 Bowling Road
Florence, AZ 85132
                                    *Plaintiffs-Petitioners*,


                          v.


KRISTI NOEM, Secretary of the U.S. Department of
Homeland Security, in her official capacity,
245 Murray Lane, SW
Washington, DC 20528;

U.S. DEPARTMENT OF HOMELAND
SECURITY,
245 Murray Lane, SW
Washington, DC 20528;

MADISON SHEAHAN, Acting Director and Senior
Official Performing the Duties of the Director of
U.S. Immigration and Customs Enforcement, in her
official capacity,
500 12th Street, SW
Washington, DC 20536;

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,
500 12th Street, SW
Washington, DC 20536;

PETE HEGSETH, Secretary of Defense, in his
official capacity,
1000 Defense Pentagon
Washington, DC 20301; and

U.S. DEPARTMENT OF DEFENSE,
1000 Defense Pentagon
Washington, DC 20301;

*Defendants-
Respondents.*

## INTRODUCTION

1.      Plaintiffs-Petitioners ("Plaintiffs") are noncitizens in immigration custody who are at imminent risk of transfer from the United States to the U.S. Naval Station at Guantánamo Bay, Cuba ("Guantánamo"). These transfers to Guantánamo and detention on the island are occurring without statutory authority because the Immigration and Nationality Act ("INA") does not allow for transfers to or detention at Guantánamo. The transfers are also arbitrary and capricious in violation of the Administrative Procedure Act ("APA"). The transfers and detention additionally violate due process under the Fifth Amendment because the transfers are undertaken for punitive, illegitimate reasons and the conditions in which the detainees are housed are unconstitutional.

2.      Plaintiffs do not challenge the government's authority to detain them on U.S. soil or to directly remove them to their home country or another statutorily authorized country. What they challenge is the government's unprecedented and unlawful decision to transfer and detain them at Guantánamo, which under the INA is Cuba. That is *per se* illegal, even apart from the horrific detention conditions and the lack of meaningful access to counsel or the outside world.

3.      Never before has the federal government moved noncitizens apprehended and detained in the United States on civil immigration charges to Guantánamo. Nor is there any legitimate reason to do so now. The government has ample detention capacity inside the United

States, which is far less costly and poses none of the logistical hurdles attendant to detaining people on Guantánamo.

4.      The government initially held immigration detainees at Guantánamo incommunicado, without access to attorneys, family, or the outside world. Only after legal organizations and family members of the detained individuals filed a lawsuit challenging their complete isolation were the detainees permitted limited and plainly insufficient access to counsel. That lawsuit, directed at ensuring access to counsel for people detained at Guantánamo, remains pending in this Court. *See Las Americas Immigr. Advoc. Ctr. v. Noem*, No. 25-cv-418 (D.D.C. filed Feb. 12, 2025) (Nichols, J.) ("*Las Americas*").

5.      In attempting to justify the transfers, the government has claimed that the individuals it sent to Guantánamo are members of gangs and dangerous criminals—the "worst of the worst." That characterization is patently false. It is also legally irrelevant because the government lacks statutory authority to send *any* immigration detainees from the United States to Guantánamo.

6.      The government is devoting massive military and immigration enforcement resources to move detainees to an offshore base that does not have the infrastructure to accommodate these individuals—let alone the 30,000 people that the administration aspires to detain there. The reason for doing so is solely to try and instill fear in the immigrant population.

7.      And while the government refuses to provide the public with information about the people being transferred, their conditions of confinement, or the government's treatment of and plans for these individuals going forward, it has paraded them in the public (despite longstanding privacy laws, especially for asylum seekers), further endangering them upon their ultimate removal to another country. Meanwhile, Plaintiffs, their family members, and attorneys, live in daily fear

of imminent transfers to Guantánamo's notorious base.

8.     What has been revealed thus far by people who have been transferred to Guantánamo is disturbing. Detainees are confined in solitary, windowless cells for at least 23 hours per day, if not more. They are allowed extremely limited time outside of their cells, are constantly shackled and invasively strip searched, and are never permitted to contact family members. Guards engage in verbal and physical abuse, including restraining people to a "punishment chair" for hours, withholding water as retaliation, threatening to shoot detainees, and fracturing an individual's hand by slamming a radio into it. People lost 10-20 pounds over the span of several weeks and cannot sleep because of what they endured. These degrading conditions and extreme isolation have led to several suicide attempts.

9.     Plaintiffs seek this Court's intervention to put a stop to these cruel, unnecessary, and illegal transfers to and detention at Guantánamo.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 2241 *et seq.* (habeas corpus), art. I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 1361 (mandamus), and 28 U.S.C. § 1651 (All Writs Act). Defendants have waived sovereign immunity for purposes of this suit. 5 U.S.C. §§ 702, 706.

11.     The Court may grant relief pursuant to 28 U.S.C. § 2241; 28 U.S.C. § 2243; the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*; 28 U.S.C. § 1331; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States or officers of agencies of the United States,

Defendants reside in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

### A.    Plaintiffs-Petitioners

13.    Plaintiff Maiker Alejandro Espinoza Escalona is a Venezuelan national with a final order of removal currently detained at the El Paso Processing Center, who is at risk of being transferred to Guantánamo. Mr. Espinoza Escalona entered the United States around May 14, 2024, to seek asylum, along with his partner and their daughter. Mr. Espinoza Escalona and his partner remain in U.S. Immigration and Customs Enforcement ("ICE") custody to this day, while their two-year-old daughter is in the custody of the Office of Refugee Resettlement. He is at risk of transfer to Guantánamo because of his nationality, final order, and his tattoos, even though they are not gang-related. In fact, Mr. Espinoza Escalona was nearly transferred with the first group of men to Guantánamo.

14.    Plaintiff Jackson Manuel Villa Wilhelm is a Venezuelan national with a final order of removal currently detained at the El Paso Processing Center, who is at risk of being transferred to Guantánamo. Mr. Villa Wilhelm entered the United States in December 2023, to seek asylum and reunite with his family and has remained in immigration custody since that time. His wife and their four-year-old daughter live in El Paso, Texas, near the detention center. Mr. Villa Wilhelm is at risk of transfer to Guantánamo because of his nationality, final order, and his one tattoo, which is of a rosary and not gang-related.

15.    Plaintiff Jorge Alberto Castillo Cerrano is a Venezuelan national with a final order of removal currently detained at the El Paso Processing Center, who is at risk of being transferred to Guantánamo. He entered the United States to seek asylum in December 2023 but received a

final order of removal in June 2024. His mother, sister, and U.S. citizen girlfriend all live in El Paso, Texas. Mr. Castillo Cerrano was in ICE custody briefly in November 2024 but was released thereafter on an order of supervision. However, in early February 2025, he was detained without any explanation, and he has been in ICE custody since. Mr. Castillo Cerrano is at risk of transfer to Guantánamo because of his nationality, final order, and tattoos, which are not gang related. In addition, when he was processed into ICE custody in February 2025, an ICE official asked him about being a gang member and took photos of his tattoos.

16.    Plaintiff Janfrank Berrios Laguna is a Venezuelan national with a final order of removal currently detained at the T. Don Hutto Detention Center, in Taylor, Texas, who is at risk of being transferred to Guantánamo. He entered the United States around May 2023 to seek asylum and was initially released from detention. However, in July 2024, he was taken back into custody and has been in immigration detention since. Mr. Berrios Laguna is at risk of transfer to Guantánamo because of his nationality and his final order of removal. Moreover, on February 6, 2025, ICE officers went around his housing unit asking Venezuelans to consent to deportation to Mexico; ICE told him and other individuals who refused to sign that they would be transferred to Guantánamo if they did not agree to be deported to Mexico.

17.    Plaintiff Alejandro Luis Pulido Castellano is a Venezuelan national with a final order of removal currently detained at the El Paso Processing Center, who is at risk of being transferred to Guantánamo. When he entered the United States in August 2024 to seek asylum, he was told by Border Patrol officials that he looked like a gang member because of his tattoos. He received a removal order shortly thereafter and has been in immigration detention since. Mr. Pulido Castellano is at risk of transfer to Guantánamo because of his nationality and final order. In addition, he has been questioned by ICE officials from an anti-gang division, even though he has

no gang affiliation.

18.    Plaintiff Josue De Jesus Torcati is a Venezuelan national with a final order of removal currently detained at the T. Don Hutto Detention Center, who is at risk of being transferred to Guantánamo. He entered the United States in February 2023 to seek asylum after being arrested and tortured in Venezuela for his political views. In May 2024, he was detained in ICE custody and he received a final order of removal on August 6, 2024. Although his Temporary Protected Status application remains pending, ICE officers have pressured him to sign a deportation order to Mexico, warning that if he refuses, he could be sent to Guantánamo. Mr. Torcati is at risk of transfer due to his final order and ICE's unfounded claim that he is a danger to society.

19.    Plaintiff Walter Estiver Salazar is a Venezuelan national with a final order of removal detained, as of February 27, at Farmville Detention Center, who is at risk of being transferred to Guantánamo. He sought asylum in the United States in 2023 after being kidnapped and tortured by government officials. Mr. Salazar was taken into ICE custody in November 2023 and was represented by pro bono counsel in his immigration proceedings. He eventually withdrew his appeal because he could no longer stand being in detention. Mr. Salazar is at risk of transfer to Guantánamo because of his nationality and final order. In fact, on February 27, his commissary account at Farmville was shut down, a signal that he was going to be transferred.

20.    Plaintiff Hijran Malik is an Afghan national with a final order of removal detained, as of February 28, at the Eloy Detention Center, who is at risk of being transferred to Guantánamo. He sought asylum in the United States in July 2024 due to threats from the Taliban. Mr. Malik hoped to join his cousin in Michigan. Mr. Malik was taken into ICE custody in July 2024 and received a final order of removal on January 6, 2025. Mr. Malik is at risk of transfer to Guantánamo because of his nationality and final order.

21.     Plaintiff Ghulam Muhammad is a Pakistani national with a final order of removal detained, as of February 28, at the Eloy Detention Center, who is at risk of being transferred to Guantánamo. Mr. Muhammad came to the United States in 2024 to seek asylum due to threats from the Taliban. He was taken into ICE custody in August 2024 and received a final order in February 2025. Mr. Muhammad is at risk of transfer to Guantánamo because of his nationality and his final order.

22.     Plaintiff MD Rayhan is a Bangladeshi national with a final order of removal detained, as of February 28, at Florence Correctional Center, who is at risk of being transferred to Guantánamo. Mr. Rayhan sought asylum in the United States in 2024 after receiving threats in Bangladesh based on his membership in the Liberal Democratic Party. He has been in ICE detention since November 2024. Mr. Rayhan received a final order of removal in December 2024. He is at risk of transfer to Guantánamo because of his nationality and his final order.

**B.    Defendants-Respondents**

23.     Defendant Kristi Noem is the Secretary of DHS. In this capacity, Defendant Noem is the legal custodian of Plaintiffs. Defendant Noem is sued in her official capacity.

24.     Defendant U.S. Department of Homeland Security ("DHS") is a federal executive agency responsible for, among other things, enforcing federal immigration laws and overseeing lawful immigration to the United States. Defendant DHS is a legal custodian of Plaintiffs.

25.     Defendant Madison Sheahan is Acting Director and Senior Official Performing the Duties of the Director of ICE. Defendant Sheahan is responsible for ICE's policies, practices, and procedures, including those relating to the detention of immigrants during their removal procedures. Defendant Sheahan is a legal custodian of Plaintiffs. Defendant Sheahan is sued in her official capacity.

26.    Defendant U.S. Immigration and Customs Enforcement ("ICE") is a federal law enforcement agency within DHS. Defendant ICE is responsible for the enforcement of immigration laws, including the detention and removal of immigrants. Defendant ICE is a legal custodian of Plaintiffs.

27.    Defendant Pete Hegseth is the United States Secretary of Defense. In this capacity, Defendant Hegseth maintains custody and control over Plaintiffs. Defendant Hegseth is sued in his official capacity.

28.    Defendant U.S. Department of Defense ("DOD") is a federal agency responsible for the Naval Station at Guantánamo Bay. Defendant DOD is a legal custodian of Plaintiffs.

## STATEMENT OF FACTS

29.    The Guantánamo Bay Naval Station is a U.S. military base in Guantánamo Bay, Cuba. It is the site of a U.S. military prison at which the U.S. government has asserted law of war detention authority since 2001. It has also been used to hold migrants, particularly Haitians, interdicted on the high seas, outside of U.S. territorial waters.

30.    Guantánamo contains two different areas capable of detaining people. On the Windward side of the base, there is a maximum-security prison that houses the government's military detainees and includes what is known as "Camp 6." On the separate Leeward side of the base is the Migrant Operations Center ("MOC"), where migrants apprehended on the high seas have traditionally been held.

31.    Until this month, the government had never used Guantánamo to detain immigrants who were first apprehended and detained on U.S. soil.

32.    On January 29, 2025, President Trump issued a Memorandum directing the Secretary of Defense and Secretary of Homeland Security "to take all appropriate actions to expand

the Migrant Operations Center at Naval Station Guantanamo Bay to full capacity and to provide additional detention space for high-priority criminal aliens unlawfully present in the United States," and declared his intention to house as many as 30,000 immigrants at Guantánamo. *See* White House, "Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity" (Jan. 29, 2025), https://perma.cc/D2P3-45SN ("Memorandum"). The Memorandum did not direct the agencies to hold detainees on the military side of the base or to transfer detainees who are not "high-priority criminal aliens."

33. Government officials have recognized that it will be an immense practical undertaking to prepare the isolated Navy base at Guantánamo for the arrival of tens of thousands of immigrants, potentially ballooning the base's population by five or more times. Numerous reports confirm that there is not enough water, food, or other supplies on the base to accommodate tens of thousands of new people, and most supplies must be brought in by barge. The government was reportedly erecting tents with basic sleeping pads, as well as makeshift latrines and outdoor showers. Recently, however, the plan to erect more tents appears to have halted given concerns that the tents would not meet ICE's detention standards.

34. Despite the lack of preparation, the government transferred ten immigration detainees from Fort Bliss, Texas, to Guantánamo on February 4, 2025. U.S. Customs and Border Protection ("CBP") posted photos and a video of the transfer of these ten individuals on a military plane to Guantánamo on social media. The government placed the initial ten individuals in Guantánamo's military detention complex, at Camp 6.

35. The government has since transferred more people apprehended and detained in the United States to Guantánamo. Over the course of about two weeks, between February 4 and 20, the government transferred 178 individuals. These individuals were transferred from facilities

around the country, first to a detention center in El Paso, then from El Paso to the Fort Bliss military base, and finally to Guantánamo. 127 individuals were taken to the military complex side of the base to be held there, while 51 were held at the MOC. The government continued to post frequently about the transfers on social media. Secretary Noem and Secretary Hegseth have both traveled to Guantánamo and commented on X and other media outlets about the detainees.

36.    The government has referred to the transferees as "the worst of the worst," and "high-threat" criminals who had crossed the border to bring "violence and mayhem to our communities." Secretary Noem, for instance, stated that these individuals are murderers, rapists, pedophiles, child traffickers, and drug traffickers.

37.    It is now clear that many detainees lacked any criminal record at all, and some were apprehended on immigration charges immediately upon entering the United States.

38.    All of the individuals transferred to Guantánamo in this "first wave" were Venezuelan nationals.

39.    Individuals formerly detained at Guantánamo report that the conditions at both Camp 6 and the MOC are far worse than those they experienced in ICE detention in the United States.

40.    People at both the MOC and Camp 6 are primarily guarded by military personnel.

41.    People who previously had relatively free movement around large-bay shared housing units while detained in the United States have been housed at the Camp 6 military prison facility and held in what is essentially solitary confinement. They spend at least 23 hours a day in windowless two-by-four meter cells, unable to see the sun and forbidden from talking to one another. They are shackled when escorted outside their cell, with just five minutes' reprieve for one shower every couple of days. Detainees are permitted only very limited recreation time—up

to one hour every day or few days—which occur in a small cage within a larger cage in an enclosed yard. People are subject to invasive strip searches upon leaving or entering their cells. Those who spoke out about their conditions or treatment are tied to a chair for hours. Detainees report how guards withheld water as punishment and one officer slammed a radio against a detainee's hand, fracturing it. One individual was reportedly beaten up so badly that he tried to harm himself twice in two weeks.

42.     Detainees at the MOC are also confined in small, barracks-style units, with several detainees in each room. They are permitted to leave their units for at most one 15-20-minute period per day in the evenings and are generally shackled when outside the room. They are also invasively strip searched and subject to excessive force. Detainees endure insults and taunting by guards, who threaten to shoot them, all the while without any information of how much longer they would be subjected to these conditions.

43.     In addition to derogative and abusive treatment, people are denied basic necessities at Guantánamo. People do not receive enough food. People are also denied medical treatment and subject to extreme temperatures. People previously detained at Guantánamo reported losing as many as 10-20 pounds in the matter of about two weeks and being unable to sleep even after leaving the base.

44.     Detainees at Guantánamo are entirely cut off from communicating with their families. After regularly speaking to their families while detained in the United States, the detainees cannot make a phone call to let their families know where they are. Some families learned that their relatives might be at Guantánamo when photos and video footage circulated on social media, and eventually a news outlet published a list of 53 names of the initial group.

45.     Until very recently, no protocols were in place for immigration detainees to access

attorneys while at Guantánamo. After counsel filed a complaint and motion for temporary restraining order seeking basic access to counsel protections for the detainees, the government implemented a barebones attorney access system. That system is wholly deficient and falls short of standards governing U.S.-based detention centers. The barriers preventing access to counsel are the subject of the *Las Americas* lawsuit.

46.    ICE maintains a webpage, called the ICE Detainee Locator, where attorneys and loved ones can look up where an individual is detained through personal identifying information, but not if the individual has been transferred to Guantánamo. There is no way to confirm which individuals are at Guantánamo, and counsel who somehow know or suspect their clients have been transferred there have no way of initiating contact with them. Even if counsel can locate their clients, coordinating a call requires assistance from multiple agencies and it is unclear how long this process could take.

47.    For detainees who do not already have counsel when they arrive at Guantánamo—which is the majority—there are no accommodations for pre-representational consultation. Yet, in contrast to the protocols in ICE facilities in the United States, the Guantánamo protocols do not permit attorneys to speak with detainees without first entering a formal appearance on a "G-28 Notice of Appearance Form," which obligates the attorney to represent the detainee. But prior to speaking with the detainee the attorney will have no idea what rights if any the detainee wishes to assert, or if the detainee wants their representation.

48.    There is supposedly a hotline with limited functionality and operational hours that individuals may call to request an attorney, but it is unclear whether the hotline is even running or whether detainees know how to access it. Moreover, at the MOC, only five detainees per day can have a phone call, and for only 20 minutes. Thus, when there are 51 detainees at the MOC, as there

were initially, a detainee may have to wait 10 days just to make a 20-minute call, assuming he has somehow been able to secure counsel. No calls to or from family members are permitted. To date, the only known legal phone calls have occurred in the context of the *Las Americas* lawsuit, where the government agreed to allow undersigned counsel to speak only with the three named individual plaintiffs.

49.     In-person visits are prohibited, and there is no process to facilitate the timely exchange of legal documents.

50.     At least one attorney with pre-existing security clearance who was already present on the island attempted to visit the detainees and was not allowed to do so.

51.     In light of the degrading conditions at Guantánamo, lack of information about when their confinement would end, and isolation from the world, it is not surprising that several detainees have attempted suicide at Guantánamo.

52.     Following the filing of the *Las Americas* lawsuit, the government abruptly emptied the facilities. On February 20, the government moved 177 of the 178 detainees to Venezuela by flying the detainees to Honduras, where the Venezuelan government retrieved them.

53.     The government returned one detainee to the United States. That detainee had a motion to reopen granted, allowing him to pursue his asylum case, and thus had to be transferred back to the United States from Guantánamo.

54.     The government has not explained why it could not have deported the first wave of 177 Venezuelans from within the United States, without transferring them to Guantánamo and subjecting them to detention there. In fact, on February 10, that is precisely what ICE did, when it flew another group of 190 Venezuelans directly to Venezuela on a deportation flight that left from the El Paso area. Yet, in the aftermath of this flight, ICE continued to transfer Venezuelans to

Guantánamo: 15 detainees on February 10, and over 80 over the following week.

55.    Days after the first wave of detainees was removed from Guantánamo, the government resumed transfers to the island, with a planeload of about 17 detainees arriving on February 23, 2025. This time, the transfers reportedly included individuals from Honduras, Colombia, El Salvador, Guatemala, and Ecuador with final orders of removal.

56.    The government has since sent several planeloads of more detainees to Guantánamo, of several different nationalities.

57.    The decision to transfer detainees to Guantánamo cannot be justified from an operational standpoint.

58.    Detention at Guantánamo is not necessary to meet ICE's detention capacity needs. There is no shortage of detention capacity in the United States.

59.    Even if additional capacity was necessary, ICE has numerous less expensive and more straightforward avenues for increasing detention capacity. Expanding detention capacity at Guantánamo is particularly expensive and logistically complex due to the island's remote location and unique staffing needs. The government recently entered into several contracts for even more bed space within the United States—adding detention capacity to an already-expansive network.

60.    Nor is detention at Guantánamo necessary to properly stage removal flights. Shuttling noncitizens through Guantánamo *adds* expense and logistical complications. Instead of detaining noncitizens in one of the many available facilities near an ICE Air hub in the United States and transporting them via inexpensive ground transportation to removal flights, ICE is opting to pay for an additional flight to Guantánamo as well as the more expensive bedspace at Guantánamo.

61.    Transfer to Guantánamo is also not required to ensure safe and secure detention of

noncitizens. Defendants have grossly overstated the danger posed by detainees, many of whom have either no criminal record beyond immigration violations or only minor criminal convictions. And ICE's detention facilities in the United States are fully equipped to detain any noncitizen, regardless of their risk level.

62.    Defendants' public statements make clear that the reason for the transfers to Guantánamo is to deter would-be migrants from coming to the United States and to coerce those already present in the United States into self-deporting or accepting deportation to a dangerous third country rather than face the terrifying prospect of time at Guantánamo.

63.    The Memorandum directing the Secretary of Defense and the Secretary of Homeland Security to make space at Guantánamo states that it was issued "in order to halt the border invasion." After visiting Guantánamo, DHS Secretary Noem posted a warning on social media that she "was just in Cuba" and noncitizens should "not come to this country or we will hunt you down, find you, and lock you up." And, in explaining the decision to detain immigrants at Guantánamo, President Trump stated, "we don't want them coming back," "[s]o we're going to send them to Guantanamo . . . it's a tough place to get out."

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the INA – Unlawful Removal

64.    Under the INA, Guantánamo is part of Cuba, not the United States. 8 U.S.C. § 1101(a)(38).

65.    The INA provides that individuals with final orders of removal who depart the United States, voluntarily or by government action, are considered to have been removed. *Id.* § 1101(g). The INA further provides that Cuba is not a proper removal destination for Plaintiffs under the INA's specific statutory framework for determining removal destination. *Id.* § 1231(b);

*see also Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005).

66.     The transfer of immigration detainees from the United States to Guantánamo thus

constitutes an unlawful removal in violation of the INA and is contrary to law under the APA. 5

U.S.C. § 706(2)(A). The Court can also grant relief under its equitable powers. *See Armstrong v.*

*Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

## COUNT II
## Violation of the INA – Unlawful Detention

67.     The INA requires a specific statutory authority for detention.

68.     Under the INA, Guantánamo is not part of the United States. 8 U.S.C.

§ 1101(a)(38). No INA provision provides authority to detain Plaintiffs outside the United States.

*See, e.g.*, *id.* §§ 1225(b), 1226(a), 1226(c), 1231(a)(2).

69.     The detention of immigration detainees transferred from the United States to

Guantánamo constitutes unlawful detention in violation of the INA and is contrary to law under

the APA. 5 U.S.C. § 706(2)(A). The Court may also grant relief under its equitable powers. *See*

*Armstrong*, 575 U.S. at 327.

## COUNT III
## Violation of the Administrative Procedure Act

70.     The APA provides that courts "shall . . . hold unlawful and set aside agency

action" that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

71.     Transfer to and detention at Guantánamo is an illogical and unreasonable choice

when considering ICE's detention and operational objectives. It is far more costly and

logistically complex than removing individuals from inside the United States.

72.     Defendants have failed to articulate reasoned explanations for their decisions,

which represent changes in the agencies' policies; considered factors that Congress did not

intend to be considered; entirely failed to consider important aspects of the problem; and offered explanations for their decisions that run counter to the evidence before the agencies.

73.     By transferring individuals who are not "high-risk criminal" detainees to Guantánamo, and detaining them at Camp 6 on the military side of the base (and not solely at the MOC), Defendant agencies have also acted well beyond the scope of the President's Memorandum.

74.     Defendants' actions are arbitrary and capricious under the APA. *See* 5 U.S.C. § 706(2)(A).

## COUNT IV
## Violation of Fifth Amendment Due Process

75.     Immigration detention is subject to the due process constraints applicable to other forms of civil detention, and must therefore be justified by a regulatory, nonpunitive purpose. *See Bell v. Wolfish*, 441 U.S. 520, 535, 538-39 (1979); *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 210 (D.D.C. 2020); *D.A.M. v. Barr*, 474 F. Supp. 3d. 45, 63 (D.D.C. 2020).

76.     The government has identified no legitimate reason for transferring and holding detainees at Guantánamo, rather than at detention facilities inside the United States. Instead, Defendants are using the threat of detention on Guantánamo to frighten immigrants, deter future migration, induce self-deportation, and coerce people in detention to give up claims and accept deportation elsewhere. These are impermissible justifications for civil immigration detention.

77.     The government's detention of immigrants at Guantánamo is also subjecting them to punitive conditions that violate their due process rights as civil detainees. *See Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982); *C.G.B.*, 464 F. Supp. 3d at 210; *D.A.M.*, 474 F. Supp. 3d. at 63. The transfers are designed to isolate detainees and subject them to harsher detention conditions than they would face in U.S. prisons and immigration detention facilities—hallmarks of punitive

19

detention. *Cf. Wong Wing v. United States*, 163 U.S. 228, 237 (1896).

78.     Transfer from the United States to Guantánamo and detention there constitutes an unlawful punishment, in violation of the Fifth Amendment to the U.S. Constitution.

## COUNT V
## VIOLATION OF HABEAS CORPUS

79.     Immigration detainees have the right to challenge the legality of their transfer and detention or raise other claims related to their detention, including their conditions of confinement.

80.     The transfer of immigration detainees from the United States to Guantánamo has violated and continues to violate their right to habeas corpus. *See* U.S. Const. art. I, § 9, cl. 2 (Suspension Clause); 28 U.S.C. § 2241.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs ask the Court to:

81.     Enter judgment for Plaintiffs and against Defendants;

82.     Declare that Defendants' past and future transfers of Plaintiffs and detention at Guantanamo violate the Immigration and Nationality Act, the Administrative Procedure Act, and the Fifth Amendment;

83.     Vacate Defendants' policies and practices of transferring immigration detainees from the United States to Guantánamo and detaining them there;

84.     Grant a writ of habeas corpus to Plaintiffs that enjoins Defendants from transferring them to Guantánamo, or in the event that they have already been transferred, that orders Defendants to return them to an immigration facility inside the United States;

85.     Enjoin Defendants from conducting any and all future transfers to Guantánamo of Plaintiffs from the United States;

86.     Award Plaintiffs reasonable attorneys' fees, costs, and other disbursements

pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 and/or any other applicable law; and

87.    Grant any other and further relief that this Court deems just and proper.

Dated: March 1, 2025

Respectfully submitted,

/s/ Lee Gelernt

Eunice H. Cho (D.C. Bar No. 1708073)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW, 7th floor
Washington, DC 20005
(202) 546-6616
echo@aclu.org

My Khanh Ngo*
Kyle Virgien*
Noelle Smith*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
mngo@aclu.org
kvirgien@aclu.org
nsmith@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Deepa Alagesan (D.D.C. Bar No. NY0261)
Kimberly Grano (D.D.C. Bar No. NY0512)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT

Lee Gelernt (D.D.C. Bar No. NY0408)
Brett Max Kaufman (D.D.C. Bar No.
NY0224)
Judy Rabinovitz*
Noor Zafar*
Omar C. Jadwat*
Wafa Junaid*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
bkaufman@aclu.org
jrabinovitz@aclu.org
nzafar@aclu.org
ojadwat@aclu.org
wjunaid@aclu.org

Baher Azmy*
Shayana D. Kadidal (D.C. Bar No. 454248)
J. Wells Dixon*
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, Floor 7
New York, NY 10012
T: (212) 614-6427
bazmy@ccrjustice.org
shanek@ccrjustice.org
wdixon@ccrjustice.org

Jessica Myers Vosburgh*
Center for Constitutional Rights
P.O. Box 486
Birmingham, AL 35201

21

One Battery Park Plaza, 33rd Floor
New York, New York 10004
Telephone: (516) 838-7044
dalagesan@refugeerights.org
kgrano@refugeerights.org

212.614.6492
jvosburgh@ccrjustice.org

*Attorneys for Plaintiffs-Petitioners*

*\*Pro bono representation certificates
forthcoming*