## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ESPINOZA ESCALONA, *et al.*,

*Plaintiffs–Petitioners*,

v.

NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity, *et al.*,

*Defendants–Respondents*.

Case No: 1:25-cv-00604

## PLAINTIFFS-PETITIONERS' BRIEF IN SUPPORT OF EMERGENCY MOTION FOR STAY OF TRANSFER TO GUANTÁNAMO

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ........................................................ 2

   I.     First Transfers to Guantánamo .............................................................................. 2

   II.    Dangerous Conditions and Restricted Access to Counsel at Guantánamo ................... 4

   III.   Continued Transfers to Guantánamo Despite No Operational Justification ................. 9

   IV.   Plaintiffs at Risk of Transfer to Guantánamo ................................................... 10

LEGAL STANDARD ...................................................................................................... 12

ARGUMENT .................................................................................................................. 12

   I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ................................ 12

      A.    Transferring Individuals from the United States to Guantánamo Is Impermissible Under the INA ................................................................................ 13

        i.   The INA Does Not Permit Removal of Plaintiffs to Guantánamo .......................... 14

        ii.   Detaining Individuals With Final Orders in Guantánamo Is Illegal Under the INA. 16

      B.    Defendants' Implementation of President Trump's Memorandum Is Arbitrary and Capricious ............................................................................................... 17

      C.    Transfer To, And Detention In, Guantánamo Will Violate Plaintiffs' Substantive Due Process Rights. ................................................................................. 21

        i.   Defendants' Policy of Detaining Plaintiffs at Guantánamo Serves No Legitimate Governmental Purpose. ................................................................ 22

        ii.   Defendants Are Transferring to and Detaining at Guantánamo for Illegitimate Purposes. ........................................................................................ 24

        iii.   The Conditions at Guantánamo Are Excessive and Punitive. ............................... 28

   II.   TRANSFER TO GUANTÁNAMO WOULD CAUSE PLAINTIFFS IRREPARABLE HARM ................................................................................................. 34

   III.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN PLAINTIFFS' FAVOR ................................................................................. 36

CONCLUSION ................................................................................................................ 37

# TABLE OF AUTHORITIES

**Cases**

*Ali v. Trump,*
   959 F.3d 364 (D.C. Cir. 2020) ................................................................. 13

*Al-Joudi v. Bush,*
   406 F. Supp. 2d 13 (D.D.C. 2005) ........................................................... 35

*Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.,*
   25 F.4th 1 (D.C. Cir. 2022) ...................................................................... 20

*Am. Wild Horse Pres. Campaign v. Perdue,*
   873 F.3d 914 (D.C. Cir. 2017) ................................................................. 19

*Americans for Immigrant Just. v. U.S. Dep't of Homeland Sec.,*
   No. CV 22-3118 (CKK), 2023 WL 1438376 (D.D.C. Feb. 1, 2023) ............ 34, 35, 36

*Aracely R. v. Nielsen,*
   319 F. Supp. 3d 110 (D.D.C. 2018) ......................................................... 27

*Baker v. Dist. of Columbia,*
   326 F.3d 1302 (D.C. Cir. 2003) ............................................................... 34

*Bell v. Wolfish,*
   441 U.S. 520 (1979) ........................................................................... 21, 31

*Block v. Rutherford,*
   468 U.S. 576 (1984) ................................................................................ 21

*Bush v. Gherebi,*
   542 U.S. 952 (2004) ................................................................................ 13

*C.G.B. v. Wolf,*
   464 F. Supp. 3d 174 (D.D.C. 2020) ............................................... 28, 31, 34

*D.A.M. v. Barr,*
   474 F. Supp. 3d. 45 (D.D.C. 2020) .......................................................... 28

*Demery v. Arpaio,*
   378 F.3d 1020 (9th Cir. 2004) ................................................................. 26

*Estelle v. Gamble,*
   429 U.S. 97 (1976) .................................................................................. 34

*Fred Meyer Stores, Inc. v. NLRB*,
    865 F.3d 630 (D.C. Cir. 2017) ........................................................ 19

*Gomez v. Trump*,
    485 F. Supp. 3d 145 (D.D.C. 2020) ................................................ 18

*Harris v. Ostrout*,
    65 F.3d 912 (11th Cir. 1995) .......................................................... 31

*Houston v. Maricopa Cnty.*,
    116 F.4th 935 (9th Cir. 2024) ......................................................... 26

*In re Guantanamo Bay Detainee Continued Access to Couns.*,
    892 F. Supp. 2d 8 (D.D.C. 2012) .................................................... 33

*In re NTE Conn., LLC*,
    26 F.4th 980 (D.C. Cir. 2022) ......................................................... 12

*Jacinto-Castanon de Nolasco v. U.S.I.C.E.*,
    319 F. Supp. 3d 491 (D.D.C. 2018) ................................................ 27

*Jama v. Immigr. & Customs Enf't*,
    543 U.S. 335 (2005) ........................................................................ 15

*Jicarilla Apache Nation v. U.S. Dep't of Interior*,
    613 F.3d 1112 (D.C. Cir. 2010) ...................................................... 20

*Johnson v. California*,
    207 F.3d 650 (9th Cir. 2000) .......................................................... 33

*Johnson v. Wetzel*,
    209 F. Supp. 3d 766 (M.D. Pa. 2016) ............................................. 35

*Kansas v. Crane*,
    534 U.S. 407 (2002) ........................................................................ 24

*Kingsley v. Hendrickson*,
    576 U.S. 389 (2015) ................................................................. 21, 31

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) .......................................................... 35

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) .......................................................... 36

*Mills v. Dist. of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) ...................................................... 34

*Morgan v. Ward,*
   669 F. Supp. 1025 (N.D.N.Y. 1988) ........................................................... 31

*Nat'l Women's L. Ctr. v. Off. of Mgmt. & Budget,*
   358 F. Supp. 3d 66 (D.D.C. 2019) .............................................................. 20

*Nicusor-Remus v. Sessions,*
   902 F.3d 895 (9th Cir. 2018) .................................................................... 14

*Nken v. Holder,*
   556 U.S. 418 (2009) ................................................................................ 12

*Nunez v. Boldin,*
   537 F. Supp. 578 (S.D. Tex. 1982) ........................................................... 36

*Orantes-Hernandez v. Meese,*
   685 F. Supp. 1488 (C.D. Cal. 1988) ......................................................... 27

*Perez-Funez v. District Director,*
   619 F. Supp. 656 (C.D. Cal. 1985) ........................................................... 27

*Pursuing Am.'s Greatness v. FEC,*
   831 F.3d 500 (D.C. Cir. 2016) ................................................................. 36

*R.I.L-R. v. Johnson,*
   80 F. Supp.3d 164 (D.D.C. 2015)........................................................ 21, 27

*Ruckelshaus v. Monsanto Co.,*
   463 U.S. 1315 (1983) .............................................................................. 35

*Sale v. Haitian Ctrs. Council, Inc.,*
   509 U.S. 155 (1993) ................................................................................ 13

*Senior Executives Ass'n v. United States,*
   891 F. Supp. 2d 745 (D. Md. 2012).......................................................... 35

*TikTok Inc. v. Trump,*
   507 F. Supp. 3d 92 (D.D.C. 2020)............................................................ 20

*Torres v. U.S. Dep't of Homeland Sec.,*
   2020 WL 3124216 (C.D. Cal. Apr. 11, 2020) .......................................... 36

*United States v. Sanchez,*
   604 F.3d 356 (7th Cir. 2010) .................................................................... 14

*Van Colln v. Cnty. of Ventura,*
   189 F.R.D. 583 (C.D. Cal. 1999).............................................................. 31

*Washington v. Reno*,
    35 F.3d 1093 (6th Cir. 1994) ........................................................................ 33

*Wilkinson v. Austin*,
    545 U.S. 209 (2005) ...................................................................................... 30

*Wong Wing v. United States*,
    163 U.S. 228 (1896) ...................................................................................... 34

*Youngberg v. Romeo*,
    457 U.S. 307 (1982) ...................................................................................... 28

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ...................................................................................... 17

**Statutes**

5 U.S.C. § 706(2)(A) ............................................................................................... 17

8 U.S.C. § 1101(a)(38) ............................................................................................ 13

8 U.S.C. § 1101(g) .................................................................................................. 14

8 U.S.C. § 1231(b)(1) .............................................................................................. 15

8 U.S.C. § 1231(b)(2) .............................................................................................. 15

8 U.S.C. § 1231(b)(2)(E)(vii) .......................................................................... 14, 15

**Regulations**

28 C.F.R. § 540.40 .................................................................................................. 33

28 C.F.R. § 540.42 .................................................................................................. 33

28 C.F.R. § 543.13(a) .............................................................................................. 33

28 C.F.R. § 543.13(b) .............................................................................................. 33

28 C.F.R. § 551.115 ............................................................................................ 30

**Other Authorities**

@US-TRANSCOM, X.com (Feb. 23, 2025, 1:14 PM),
    https://x.com/us_transcom/status/1893726139153105198?s=46&t=T83ZueYlz3A6ljIjd74F_g
    [https://perma.cc/WV3F-QCAZ] ............................................................................ 9

Bernd Debusmann Jr. & Will Grant, *Trump Says US Will Send Some Migrants to Guantanamo
    Bay*, BBC (Jan. 29, 2025) [https://perma.cc/NT6J-SXFF]................................... 16, 25

Black's Law Dict. 1409 (9th ed. 2009) ......................................................................... 15

Br. for Pets., 1992 WL 541276, *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993) .......... 13

Caitlyn Burchett, *Hegseth Tours Guantanamo as Lawmakers Question Damage to Military from
    Detaining Migrants There*, Stars and Stripes (Feb. 25, 2025) [https://perma.cc/2SJH-FWJT] 23

Camilo Montoya-Galvez & Eleanor Watson, *Trump Officials Eye Daily Migrant Detainee
    Flights to Guantanamo Bay*, CBS News (Feb. 6, 2025) [https://perma.cc/UCE2-87GK/] ........ 2

Camilo Montoya-Galvez, *U.S. Sending Nonviolent, "Low-Risk" Migrants to Guantánamo,
    Despite Vow to Detain "the Worst" There*, CBS News (Feb. 12, 2025)
    [https://perma.cc/5HM5-VVRM]................................................................................. 3

Carol Rosenberg, *Hegseth Returns to Guantánamo, This Time as Defense Secretary*, N.Y. Times
    (Feb. 25, 2025) [https://perma.cc/SDV4-28AY] ......................................................... 4

Chris Opila, *Sending Migrants to Guantánamo Bay Is a Costly, Abusive Shift in Immigration
    Detention*, Immigr. Impact (Feb. 7, 2025) [ https://perma.cc/6LV9-JEG3] ............................. 22

Claire Healy & Syra Ortiz Blanes, *'Give us back our sons': A look at the Venezuelan migrants
    Trump sent to Guantanamo*, Miami Herald (Feb. 27, 2025) [https://perma.cc/J4LB-GXP9] ... 6,
    29, 30

Courtney Kube, et al., *Trump Admin Plans to Use Notorious Guantánamo Detention Facility and
    Nearby Tents to Hold Immigrants,* NBC News (Feb. 5, 2025) [https://perma.cc/KH4F-
    LQ66?type=image]...................................................................................................... 2

DOD Rapid Response, X.com (Feb. 26, 2025, 4:53 PM PT) [ https://perma.cc/4PGK-HGVE] . 28

DOD Rapid Response, X.com (Feb. 26, 2025, 7:14 PM ET) [ https://perma.cc/ZK42-3VM2] .. 25

Hailey Bullis, *Guantánamo Bay Still Being Used to Detain Migrants Despite Transfers: Tom
    Homan*, Wash. Examiner (Feb. 22, 2025) [https://perma.cc/6QV9-SG5S] ............................... 9

Haley Britzky & Priscilla Alvarez, *US Halts Plan to House Migrants in Tents at Guantanamo Amid Concerns Over Conditions*, CNN.com (Feb. 24, 2025) [https://perma.cc/9NVV-D9U6]20

Hamed Aleaziz & Carol Rosenberg, *Trump Administration Moves More Migrants to Guantánamo Bay,* N.Y. Times (Feb. 23, 2025) [https://perma.cc/5ST9-CKW4].......................... 4

Hamed Aleaziz & Carol Rosenberg, *Trump Says U.S. Will Hold Migrants at Guantánamo*, N.Y. Times (Jan. 29, 2025) [https://perma.cc/S6LN-WQKS] ........................................................... 2

Hamed Aleaziz, et al., *Trump Administration Abruptly Clears Out Migrants It Sent to Guantánamo*, N.Y. Times (Feb. 20, 2025) [https://perma.cc/V6QY-GSZS] ........................... 10

ICE Operations Manual, ICE/DRO Detention Standard (2008) [https://perma.cc/Q9KA-MUEE] ....................................................................................................................................................... 26

Immigr. & Customs Enf't, Performance Based National Detention Standards § 29 [https://perma.cc/7CP3-UCYK] ......................................................................................... 30

Immigr. & Customs Enf't, Performance Based National Detention Standards § 31 [https://perma.cc/X7CG-WVWF] ....................................................................................... 32

Immigr. & Customs Enf't, Performance Based National Detention Standards § 32.J [https://perma.cc/BWY8-VD85] ....................................................................................... 33

Jeff Mason et al., *Trump to Prepare Facility at Guantanamo for 30,000 Migrants*, Reuters (Jan. 29, 2025) [https://perma.cc/2C2X-EX5G] ..................................................................................... 2

Jonathan Hafetz & Rebecca Ingber, *What Just Happened: At Guantanamo's Migrant Operation Center*, Just Security (Feb. 6, 2025) [https://perma.cc/9BU6-6YEN] ..................................... 22

Juan Hernandez, *My Journey From a Maximum to Medium Security Prison*, Prison Journalism Project (Oct. 10, 2023) [https://perma.cc/DD49-6NMV] ......................................................... 30

Matthew Olay, *Hegseth Visits Guantanamo Bay, Engages with Troops*, DOD News (Feb. 26, 2025) [ https://perma.cc/YFY7-ZX46]...................................................................................... 25

Ministry of Foreign Affairs, Republic of Cuba, Statement of the Ministry of Foreign Affairs (Jan. 29, 2025) [https://perma.cc/M6R7-3QKM] ................................................................................. 3

News Release, CoreCivic Announces Four New Contract Modifications to Add Capacity for U.S. Immigration and Customs Enforcement, CoreCivic (Feb. 27, 2025) [https://perma.cc/9HNG-WEGB]............................................................................................ 10

News Release, PHOTO RELEASE: DHS Releases Images of the First Flight of Criminal Aliens to Guantánamo Bay, Dep't of Homeland Sec. (Feb. 4, 2025) [https://perma.cc/2RP3-9WP2] ....................................................................................................................................................... 23, 26

Off. of Legal Counsel, Status of Guantánamo Bay 1 (Oct. 27, 1981) [ https://perma.cc/86DE-CACF] ........................................................................................................................... 13

Pet. for Cert., 2004 WL 424049, *Bush v. Gherebi*, 542 U.S. 952 (2004)...................................... 13

Peter Baker, *Trump Says 'It's Crazy' to Spend $13 Million Per Inmate at Guantánamo*, N.Y. Times (Sept. 19, 2019) [ https://perma.cc/7XCT-BXWD] ......................................................... 23

Sec'y Kristi Noem, X.com (Feb. 9, 2025, 12:12 PM ET) [https://perma.cc/GCY3-DUNB]....... 25

Sergio Martínez-Beltrán, *Venezuelan men allege mistreatment while in detention in Guantánamo Bay*, NPR (Feb. 25, 2025) [https://perma.cc/6GT2-GBJD] ............................................. 5, 31, 32

Silvia Foster-Frau & Ana Vanessa Herrero,
*Invasive Frisks, Suicide Attempts: Three Migrants Describe Guantanamo Detention*, Wash. Post (Feb. 25, 2025) [https://perma.cc/S6JF-S83Y] ..................................................... 29, 30, 32

Silvia Foster-Frau et al., *Relatives and Record Cast Doubt on Guantanamo Migrants Being 'Worst of the Worst'*, Washington Post (Feb. 16, 2025) [https://perma.cc/W3CD-HVNX]........ 3

White House, *Expanding Migrant Operations Center at Naval Station Guantánamo Bay to Full Capacity* (Jan. 29, 2025) ("Guantánamo Memorandum") [https://perma.cc/D2P3-45SN] . 2, 18, 19

Zolan Kanno-Youngs et al., *Trump Plans to Use Military Sites Across the Country to Detain Undocumented Immigrants*, N.Y. Times (Feb. 21, 2025) [ https://perma.cc/4PDY-6DQD]..... 25

## INTRODUCTION

This motion seeks an emergency stay for a group of ten noncitizens detained in immigration custody in the United States to block their transfer to the military base on Guantánamo Bay, Cuba ("Guantánamo"). The transfers could occur imminently and without warning. The motion does not seek to block Plaintiffs-Petitioners' ("Plaintiffs") removal to their home country or any other statutorily authorized destination, nor does the motion seek Plaintiffs' release inside the United States.

Since February 4, 2025, the U.S. government has been unlawfully transferring people it detained for civil immigration violations inside the United States to Guantánamo, offshoring their immigration detention to an extraterritorial site that is synonymous with secrecy, due process violations, and the evasion of judicial scrutiny. The transfer of immigration detainees apprehended and detained in the United States to Guantánamo is unprecedented.

The government has provided almost no information about the people it is sending there, and beyond announcing plans to populate makeshift detention centers at Guantánamo with upwards of 30,000 people, it has disclosed little else about its intentions. There is no operational reason for detention in Guantánamo—as opposed to detention inside the territorial United States—other than to limit access to counsel and rights, and to project a message of deterrence. The transfer to, and detention at, Guantánamo is statutorily unauthorized and thus violates the Immigration and Nationality Act ("INA"); is arbitrary and capricious in violation of the Administrative Procedure Act ("APA"); and violates due process under the Fifth Amendment. Accordingly, Plaintiffs respectfully seek an immediate stay of their transfer to Guantánamo pending resolution of this stay motion, and a permanent stay pending the outcome of the case.

## FACTUAL AND PROCEDURAL BACKGROUND

**I.    First Transfers to Guantánamo**

For the first time in history, the government is using the base at Guantánamo to detain people who were apprehended and detained in immigration custody on U.S. soil. The Trump Administration has announced plans to house upwards of 30,000 noncitizens there. *See* White House, *Expanding Migrant Operations Center at Naval Station Guantánamo Bay to Full Capacity* (Jan. 29, 2025) ("Guantánamo Memorandum").[1] Since the first flight carrying immigrant detainees to Guantánamo took off from Fort Bliss, Texas on February 4, 2025, the government has transferred approximately 200 people, although the government has refused to provide information about the numbers or nearly anything else except under court order. *See* Decl. of Juan Agudelo, ECF No. 14-1, ¶ 10, *Las Americas Immigr. Advocacy Ctr. v. Noem*, No. 25-cv-418 (Feb. 20, 2025) (hereinafter "ECF No. 14-1"); *see also infra* n.8 (describing further transfers).

These transfers took place while government attorneys were still debating the legality of the transfers and who would have custody of the detainees,[2] and officials were scrambling to prepare the isolated naval base for tens of thousands of new detainees—a move that would increase the base's population by fivefold.[3] Cuba, which indisputably has legal sovereignty over Guantánamo, issued an official statement rejecting these transfers to Guantánamo. *See* Ministry of

---

[1] *Available at* https://perma.cc/D2P3-45SN; *see also* Jeff Mason et al., *Trump to Prepare Facility at Guantanamo for 30,000 Migrants*, Reuters (Jan. 29, 2025), *available at* https://perma.cc/2C2X-EX5G.

[2] Courtney Kube, et al., *Trump Admin Plans to Use Notorious Guantánamo Detention Facility and Nearby Tents to Hold Immigrants,* NBC News (Feb. 5, 2025), https://perma.cc/KH4F-LQ66?type=image; Camilo Montoya-Galvez & Eleanor Watson, *Trump Officials Eye Daily Migrant Detainee Flights to Guantanamo Bay*, CBS News (Feb. 6, 2025), https://perma.cc/UCE2-87GK/.

[3] Hamed Aleaziz & Carol Rosenberg, *Trump Says U.S. Will Hold Migrants at Guantánamo*, N.Y. Times (Jan. 29, 2025), https://perma.cc/S6LN-WQKS.

Foreign Affairs, Republic of Cuba, Statement of the Ministry of Foreign Affairs (Jan. 29, 2025) ("Cuba rejects U.S. decision to incarcerate migrants in the Guantánamo Naval Base").[4]

The first wave of transfers included 178 people, reportedly all Venezuelan nationals with final orders of removal. *See* ECF No. 14-1, ¶ 10. Initially, the government characterized these individuals as "the worst of the worst," as criminals who had crossed the border to bring "violence and mayhem to our communities."[5] The Department of Homeland Security ("DHS") even posted photos and a video of the transfer of the initial ten individuals on its website, depicting many of their faces.[6] However, the government later admitted that many among the 178 individuals had no criminal record other than an immigration violation or were apprehended on immigration charges immediately upon entering the United States.[7] *See, e.g.*, Decl. of Jennifer Venghaus, ECF No. 14-3, ¶¶ 12–13, *Las Americas Immigrant Advocacy Center v. Noem*, No. 25-cv-418 (D.D.C. Feb. 20, 2025) (hereinafter "ECF No. 14-3") (acknowledging 51 detainees were classified as "low threat"). Plaintiffs' declarations make clear that none of them are "high risk criminal aliens," and indeed none have gang ties or convictions for serious offenses. Of those transferred in the first wave, 127 people were held in Guantánamo's military detention complex, in a facility known as "Camp 6." *Id*. ¶ 12. The remaining 51 were detained at the Migrant Operations Center ("MOC"), where migrants interdicted on the high seas have historically been held. *Id*. ¶ 13.

---

[4] *Available at* https://perma.cc/M6R7-3QKM.

[5] Camilo Montoya-Galvez, *U.S. Sending Nonviolent, "Low-Risk" Migrants to Guantánamo, Despite Vow to Detain "the Worst" There*, CBS News (Feb. 12, 2025), https://perma.cc/5HM5-VVRM; Silvia Foster-Frau et al., *Relatives and Record Cast Doubt on Guantanamo Migrants Being 'Worst of the Worst'*, Washington Post (Feb. 16, 2025), *available at https://perma.cc/W3CD-HVNX*.

[6] *See, e.g.*, News Release, PHOTO RELEASE: DHS Releases Images of the First Flight of Criminal Aliens to Guantánamo Bay, Dep't of Homeland Sec. (Feb. 4, 2025), https://perma.cc/2RP3-9WP2.

[7] *See supra* n.5.

Since this first wave, there have been at least several more transfers to Guantánamo of several nationalities, including people from Honduras, Colombia, El Salvador, Guatemala, and Ecuador.[8]

## II.    Dangerous Conditions and Restricted Access to Counsel at Guantánamo

The government is holding immigrant detainees in abusive, degrading, and dangerous conditions at Guantánamo, while significantly restricting their access to attorneys and completely cutting them off from the rest of the world.

Although Plaintiffs had previously been held in large-bay, shared housing units while detained in the United States, those held at Camp 6, on the military side of the base, are held in solitary confinement. People detained at Camp 6 are confined in windowless two-by-four-meter cells for at least 23 hours per day, unable to see the sun and forbidden from communicating with each other. Decl. of Luis Alberto Castillo Rivera ("Castillo Decl."), ¶ 8; Decl. of Jonathan Alejandro Alviares Armas ("Alviares Armas Decl."), ¶ 8; Decl. of Jose Daniel Simancas Rodriguez ("Simancas Rodriguez Decl."), ¶ 5; Decl. of Raul David Garcia ("Garcia Decl."), ¶ 10; Decl. of Tilso Ramon Gomez Lugo ("Gomez Lugo Decl."), ¶ 8; Decl. of Jeferson Escalona ("Escalona Decl."), ¶ 5. Those detained at the MOC are confined to a small room nearly all day. Dec. of Yoiker David Sequera ("Sequera Decl."), ¶ 5; Garcia Decl. ¶ 9. Individuals are permitted, at most, one hour of "recreation" every few days and often less. Castillo Decl. ¶ 8; Alviares Armas Decl. ¶ 9; Gomez Lugo Decl. ¶ 8. "Recreation" for those in Camp 6 constitutes moving each individual from their tiny indoor cell into a small cage within a larger cage in an enclosed yard. Castillo Decl. ¶ 8;

---

[8] Hamed Aleaziz & Carol Rosenberg, *Trump Administration Moves More Migrants to Guantánamo Bay,* N.Y. Times (Feb. 23, 2025), https://perma.cc/5ST9-CKW4; Carol Rosenberg, *Hegseth Returns to Guantánamo, This Time as Defense Secretary*, N.Y. Times (Feb. 25, 2025), https://perma.cc/SDV4-28AY.

Alviares Armas Decl. ¶ 9; Escalona Decl. ¶ 6. Those at the MOC were originally not even allowed outside their rooms, Garcia Decl. ¶ 11, and then after some time were allowed just 15 minutes outside each day, *id.*; Sequera Decl. ¶ 5. People at both the MOC and Camp 6 are primarily guarded by military personnel. Castillo Decl. ¶ 6; Simancas Rodriguez Decl. ¶ 7; Gomez Lugo Decl. ¶ 8; Sequera Decl. ¶ 6.

Detainees are subject to degrading and abusive treatment at Guantánamo. Those in Camp 6 are shackled whenever they are escorted outside their cells, with at most five minutes' reprieve for one shower every couple of days. Castillo Decl. ¶ 9; Alviares Armas Decl. ¶ 11. They are also strip searched every time they use the restroom. Castillo Decl. ¶ 9; Alviares Armas Decl. ¶ 6. Those at the MOC were similarly strip-searched and shackled most of the time they were let outside the room. Garcia Decl. ¶ 12; Sequera Decl. ¶ 6. Officers entered at random while people showered, ordered them to spread their buttocks to be searched, and assaulted those who refused. Garcia Decl. ¶ 12. For those who speak out against their conditions or treatment, officers storm their cells and aggressively restrain people to "punishment" chairs, where they are left for multiple hours. Alviares Armas Decl. ¶ 15; Simancas Rodriguez Decl. ¶ 7; Escalona Decl. ¶ 4. People witnessed one officer slam a radio against an individual's hand, fracturing it. Castillo Decl. ¶ 13; Alviares Armas Decl. ¶ 16; Simancas Rodriguez Decl. ¶ 6. Another individual was reportedly beaten up so badly that he tried to harm himself twice in two weeks.[9] Detainees endure insults and taunting by guards, all the while without any information about how much longer they would be subject to these conditions. Castillo Decl. ¶ 12; Alviares Armas Decl. ¶ 16; Simancas Rodriguez Decl. ¶ 6; Garcia Decl. ¶ 12.

---

[9] Sergio Martínez-Beltrán, *Venezuelan men allege mistreatment while in detention in Guantánamo Bay*, NPR (Feb. 25, 2025), https://perma.cc/6GT2-GBJD.

Beyond the abusive treatment by guards, detainees also lack basic necessities. The quantity of food provided is minimal. Castillo Decl. ¶ 7; Alviares Armas Decl. ¶ 12; Simancas Rodriguez Decl. ¶ 8; Escalona Decl. ¶ 7. People detained at Guantánamo have reported losing as many as 10–20 pounds over approximately two weeks.[10] Alviares Armas Decl. ¶ 12; Simancas Rodriguez Decl. ¶ 8; Castillo Decl. ¶ 7. People at Camp 6 only have showers every few days and wear the same clothing throughout their time at Guantánamo. Alviares Armas Decl. ¶ 11. The temperatures in the buildings are unregulated and extreme: people are freezing when the air conditioner was on, because they were not provided enough blankets, and hot and humid when the air conditioner was not working. Castillo Decl. ¶ 10; Alviares Armas Decl. ¶ 8; Garcia Decl. ¶ 10. Prison officials keep the lights on at all hours, making it difficult to sleep. Castillo Decl. ¶ 10; Alviares Armas Decl. ¶ 8; Simancas Rodriguez Decl. ¶ 5. And the guards would often deprive people of water as punishment, for instance, when an individual seemed on the verge of suicide. Alviares Armas Decl. ¶ 13; Castillo Decl. ¶ 13.

Detainees who seek medical treatment for existing conditions are denied care. One individual sought medical treatment for a preexisting leg injury that caused significant pain, but was told that there was nothing medical personnel could do for him because the base "did not have the right tools and [was] waiting for them." Castillo Decl. ¶ 11. When he asked again, medical staff dismissed his concerns and offered only a generic topical cream. *Id.* One individual who was believed to have a brain tumor received no treatment at Guantánamo, other than being given sleeping pills. Simancas Rodriguez Decl. ¶ 9.

The government has imposed restrictive protocols that make it virtually impossible for

---

[10] Claire Healy & Syra Ortiz Blanes, *'Give us back our sons': A look at the Venezuelan migrants Trump sent to Guantanamo*, Miami Herald (Feb. 27, 2025), https://perma.cc/J4LB-GXP9.

immigrants held at Guantánamo to communicate with the outside world, including with counsel and their families. After counsel filed lawsuit seeking basic access to counsel for the people detained at Guantánamo, *see Las Americas Immigrant Advocacy Center v. Noem* ("*Las Americas*"), No. 25-cv-418 (D.D.C. filed Feb. 12, 2025) (Nichols, J.), the government implemented a barebones attorney access system. ECF No. 14-1, ¶¶ 12–17. That system, however, is woefully deficient and falls short of standards governing U.S.-based detention centers and prisons. There is no way for individuals or legal service organizations to confirm with the government whether an individual is at Guantánamo. Decl. of Jennifer Babaie ("Las Americas Decl."), ¶¶ 10–11. Attorneys who suspect or somehow learn—as some have via news reports—that their clients have been transferred to Guantánamo still have no information on how to establish contact with them, whether by phone or otherwise. *Id.* ¶¶ 7, 10–11; *see also* Suppl. Decl. of Jennifer Babaie, ECF No. 17-2, ¶ 3, *Las Americas* (Feb. 24, 2025). Instead, detainees must initiate contact by requesting that the government contact their attorneys for them. ECF No. 14-1, ¶ 13. Coordinating a call requires a lengthy process of coordination with multiple agencies. ECF No. 14-3, ¶¶ 24–25. And, at the MOC, only five individuals per day can have a phone call, at 20 minutes each. ECF No. 14-1, ¶ 16. In-person visits are prohibited, and there is no process to facilitate the timely exchange of legal documents. Las Americas Decl. ¶ 9.

For those who do not already have counsel when they arrive at Guantánamo—which is likely the majority—there are no accommodations for pre-representational consultation. Las Americas Decl. ¶ 8. Counsel cannot request legal calls until they have a G-28 Notice of Entry of Appearance Form on file; but many legal service providers require a legal screening interview to determine whether an individual qualifies for relief and whether the organization is adequately prepared to represent them. *Id.* Entering a G-28 Form obligates the attorney to represent the

detainee. But prior to speaking with the detainee the attorney will have no idea what rights if any the detainee wishes to assert, or if the detainee wants their representation. Requiring a G-28 in advance of first contact effectively precludes organizations from offering services to anyone post-transfer unless an attorney-client relationship existed before the transfer. *Id*.

Instead, detainees can call a hotline to request an attorney. ECF No. 14-1, ¶ 13. But the hotline has limited functionality and operational hours, and it is unclear whether the hotline is running or whether detainees know how to access it. Decl. of Adonia Simpson, ECF No. 17-6, ¶¶ 4–5, *Las Americas* (Feb. 24, 2025). And as described above, people are confined in their cells or rooms for at least 23 hours a day, so it is unclear when or how they would see information about the hotline. *Supra* at pp. 4–6. Detention officers at Guantánamo have repeatedly denied people's requests for legal calls and have distributed information about placing legal calls only hours before deportation flights, telling individuals that no legal call will make any difference. Castillo Decl. ¶ 15; Alviares Armas Decl. ¶ 10; Gomez Lugo Decl. ¶¶ 6, 9; Garcia Decl. ¶ 9; Escalona Decl. ¶ 9; Sequera Decl. ¶ 8. And there is no way *at all* for families and the detainees to contact one another. Castillo Decl. ¶ 14; Alviares Armas Decl. ¶ 10; Garcia Decl. ¶ 15; Escalona Decl. ¶ 9; Gomez Lugo Decl. ¶ 6; Sequera Decl. ¶ 8.

In light of abusive conditions at Guantánamo, lack of information about when their confinement would end, and utter isolation from the world, it is not surprising that several individuals attempted suicide at Guantánamo over the span of a few weeks.[11] Alviares Armas Decl. ¶ 13; Simancas Rodriguez Decl. ¶¶ 5, 10; Garcia Decl. ¶ 14. People previously detained at Guantánamo report psychological and physical trauma, including inability to sleep, nightmares,

---

[11] *See supra* n.9.

scars from self-harm, and severe weight loss.[12] Castillo Decl. ¶¶ 18–20; Alviares Armas Decl. ¶¶ 17–19; Simancas Rodriguez Decl. ¶¶ 13–15; Garcia Decl. ¶ 15.

### III.    Continued Transfers to Guantánamo Despite No Operational Justification

On February 20, only days after counsel filed the *Las Americas* lawsuit seeking attorney access*,* the government abruptly emptied the base by deporting 177 people to Venezuela via Honduras and returning one individual to the United States, whose case was reopened after they were sent to Guantánamo. *See* Notice Regarding Removals, ECF No. 15, *Las Americas* (Feb. 20, 2025); *see also* Escalona Decl. ¶ 10 (describing relief from case being reopened and returning to the United States). However, three days later, the government resumed transfers with another group of 17 people to Guantánamo,[13] followed by another flight two days later.[14] Government officials have stated that the administration intends to continue such transfers.[15]

There is no operational justification for using Guantánamo to detain noncitizens transferred from the United States. As a former ICE Chief of Staff explains, the transfer of immigration detainees to Guantánamo is unnecessary for the operational reasons that typically drive ICE transfers, such as ensuring security, expanding detention capacity, reducing costs, or streamlining removals. *See* Decl. of Deborah Fleischaker ("Fleischaker Decl."), ¶ 42 (use of Guantánamo to detain immigrants "is an inefficient, expensive, and illogical choice when considering ICE's detention and operational objectives"). In fact, all of these objectives are better met by focusing

---

[12] *Id.*

[13] @US-TRANSCOM, X.com (Feb. 23, 2025, 1:14 PM), https://perma.cc/WV3F-QCAZ (confirming arrival of new flight of immigrant detainees).

[14] *See supra* n.8.

[15] Hailey Bullis, *Guantánamo Bay Still Being Used to Detain Migrants Despite Transfers: Tom Homan*, Wash. Examiner (Feb. 22, 2025), https://perma.cc/6QV9-SG5S (President Trump's so-called "Border Czar" confirming that the administration will continue to use Guantánamo to detain noncitizens").

on detention in the United States, where there is already adequate available or readily obtainable capacity. *Id.* ¶¶ 11–24 (discussing detention capacity and costs in United States), 25–35 (added difficulty of facilitating rapid removals through Guantánamo), 36–41 (detention at Guantánamo not necessary to ensure safety and security). Just a few days ago, the government entered into more contracts for even more bed space within the United States—adding detention capacity to an already-expansive network.[16] Rather, Defendants' public statements make clear that the reason for the transfers to Guantánamo is to deter future migration and intimidate noncitizens already present in the United States into self-deporting or accepting removal to a dangerous third country rather than facing the terrifying prospect of detention at Guantánamo. *See infra* Section I.C.ii.

## IV.     Plaintiffs at Risk of Transfer to Guantánamo

Plaintiffs are immigrant detainees who fit the profile of people that the government has targeted for transfers—individuals with final orders of removal, including Venezuelans.[17] In its initial transfer, the government targeted men with tattoos, regardless of whether they were gang-related. The government also claimed to target "criminal aliens," even though many only had immigration-related violations.[18]

Plaintiffs Maiker Alejandro Espinoza Escalona, Jackson Manuel Villa Wilhelm, Jorge Alberto Castillo Cerrano, Janfrank Berrios Laguna, Alejandro Jose Pulido Castellano, Josue de Jesus Torcati Sebrian, Walter Estiver Salazar, Hijran Malik, Ghulam Muhammad, and MD Rayhan

---

[16] News Release, CoreCivic Announces Four New Contract Modifications to Add Capacity for U.S. Immigration and Customs Enforcement, CoreCivic (Feb. 27, 2025), https://perma.cc/9HNG-WEGB.

[17] Hamed Aleaziz, et al., *Trump Administration Abruptly Clears Out Migrants It Sent to Guantánamo*, N.Y. Times (Feb. 20, 2025), https://perma.cc/V6QY-GSZS (noting that "Congressional staff members were told in a briefing that the only criteria to be sent to the base were being Venezuelan with a final removal order.").

[18] *See supra* n.5.

are ten noncitizens detained across Texas, Arizona and Virginia who received final orders of removal after seeking refuge in the United States. Decl. of Maiker Alejandro Espinoza Escalona ("Espinoza Escalona Decl."), ¶¶ 2–3; Decl. of Jackson Manuel Villa Willhelm ("Villa Wilhelm Decl."), ¶¶ 2–3; Decl. of Jorge Alberto Castillo Cerrano ("Castillo Cerrano Decl."), ¶¶ 2, 5, 8; Decl. of Janfrank Berrios Laguna ("Berrios Laguna Decl."), ¶¶ 2–3; Decl. of Alejandro Luis Pulido Castellano ("Pulido Castellano Decl."), ¶¶ 2–4; Decl. of Josue de Jesus Torcati Sebrian ("Torcati Sebrian Decl."), ¶¶ 2–3; Decl. of Walter Estiver Salazar ("Salazar Decl."), ¶¶ 2–4; Decl. of Hijran Malik ("Malik Decl."), ¶¶ 2–3; Decl. of Ghulam Muhammad ("Muhammad Decl."), ¶¶ 2–3; Decl. of MD Rayhan ("Rayhan Decl."), ¶¶ 2–3.

They all are at risk of being transferred to Guantánamo because of a combination of their final orders, nationality, and/or ICE's frequently false allegations of gang membership and criminality based on their tattoos. Espinoza Escalona Decl. ¶¶ 4–5; Villa Wilhelm Decl. ¶¶ 4–5; Castillo Cerrano Decl. ¶¶ 11–12; Berrios Laguna Decl. ¶¶ 4–6; Pulido Castellano Decl. ¶¶ 5–7; Torcati Sebrian Decl. ¶¶ 4–5; Salazar Decl. ¶¶ 5–6; Malik Decl. ¶¶ 4–5; Muhammad Decl. ¶¶ 4–5; Rayhan Decl. ¶¶ 4–5.

As recounted by two Plaintiffs, ICE officers have threatened multiple Venezuelans with transfer to Guantánamo if they do not agree to deportation to Mexico. Berrios Laguna Decl. ¶ 4; Torcati Sebrian Decl. ¶ 5. Among the Plaintiffs includes a father of a two-year-old daughter who is in the custody of the Office of Refugee Resettlement; his attorneys have already had to advocate to prevent his transfer to Guantánamo, leading him to be pulled off the bus just before being transferred with the first group of men sent to the base. Espinoza Escalona Decl. ¶ 7; Decl. of Jennifer Babaie, ECF No. 3-6, ¶ 19, *Las Americas* (Feb. 12, 2025). It also includes several men with family ties in the United States, *see, e.g.*, Villa Wilhelm Decl. ¶¶ 2–3; Castillo Cerrano Decl.

¶ 4, and one with a pending application for Temporary Protected Status, Torcati Sebrian Decl. ¶ 3.

## LEGAL STANDARD

The court has "inherent" power to preserve the status quo while it assesses the legality of a particular action. *Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation and quotation marks omitted). In considering a stay, the court should consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure other parties interested in the proceedings; and (4) where the public interest lies." *Id.* at 424 (citation and quotation marks omitted); *see also In re NTE Conn., LLC*, 26 F.4th 980, 987–88 (D.C. Cir. 2022). The first two factors "are the most critical." *Nken*, 556 U.S. at 434. Under these factors, Plaintiffs are entitled to a stay.

## ARGUMENT

### I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

There is no statutory authority to transfer people with final orders of removal from U.S. soil to Guantánamo, nor to detain them there. *Infra* Section I.A. The government's actions are also arbitrary and capricious under the APA. *Infra* Section I.B. And even apart from the statutory violations, the transfers to, and detention at, Guantánamo additionally violate substantive due process under the Fifth Amendment. *Infra* Section I.C.[19]

---

[19] The government claims that it is only transferring detainees with final orders of removal to Guantánamo, but has not stated that that future transfers will be so limited. Because Plaintiffs here have final orders, this motion does not address the illegality of transferring noncitizens without final orders of removal to Guantánamo.

## A.    Transferring Individuals from the United States to Guantánamo Is Impermissible Under the INA.

The statutory analysis begins with the undisputed point that Cuba maintains legal sovereignty over Guantánamo and the base is not part of the United States for purposes of the Immigration and Nationality Act (INA). The INA's text, and an Office of Legal Counsel opinion interpreting that text, leave no doubt on that point. Indeed, the government's consistent position for decades has been that the military base at Guantánamo is outside the United States for purposes of the INA.

The INA defines the "United States" as "the continental United States, Alaska, Hawaii, Puerto Rico, Guam, the Virgin Islands of the United States, and the Commonwealth of the Northern Mariana Islands." 8 U.S.C. § 1101(a)(38). Guantánamo is not included in the list. *See Ali v. Trump*, 959 F.3d 364, 374 n.3 (D.C. Cir. 2020) (Randolph, J., concurring) ("Guantánamo is not part of the United States under the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(38).").

And the government's consistent position for decades has been that "[b]ecause Guantánamo Bay is not included in this statutory definition," the government "do[es] not believe that it is part of the United States for the purposes of the INA." Off. of Legal Counsel, Status of Guantánamo Bay 1 (Oct. 27, 1981);[20] *see also* Br. for Pets., 1992 WL 541276, at *31, *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993) (United States arguing that Guantánamo is territory "outside the United States"); Pet. for Cert., 2004 WL 424049, at *8, *Bush v. Gherebi*, 542 U.S. 952 (2004) (contending that Guantánamo is not "within any territory over which the United States is sovereign" (citation and quotation marks omitted)).[21]

---

[20] *Available at* https://perma.cc/86DE-CACF.
[21] Unlike this case, *Sale* involved migrants apprehended on the high seas, outside of U.S. territory, and not individuals transferred from inside the United States. 509 U.S. at 159.

Given that Guantánamo is not "the United States" for purposes of the INA, the INA does not permit the government to transfer the detainees to Guantánamo. That is true whether the government characterizes the transfers as effectuating removals to Guantánamo, *infra* Section I.A.i, or as simply detention pending the detainees' ultimate removal to another country, *infra* Section I.A.ii.

      **i.**      **The INA Does Not Permit Removal of Plaintiffs to Guantánamo.**

Under the INA and longstanding case law, transferring an immigration detainee subject to a final order of removal outside the United States constitutes a removal. And the INA requires that for an individual with no ties to a country to be lawfully removed there, the receiving country must agree to accept such individuals into their territory. 8 U.S.C. § 1231(b)(2)(E)(vii). Because Plaintiffs have no ties to Cuba, and Cuba has not agreed to accept non-Cuban nationals with no prior ties to Cuba, *supra* pp. 2–3, Plaintiffs removal to Guantánamo would be illegal under the INA.

A noncitizen with a removal order who departs the United States, whether voluntarily or by the government's actions, has been removed. The INA makes clear that "any [noncitizen] ordered deported or removed . . . who has left the United States, shall be considered to have been deported or removed." *See* 8 U.S.C. § 1101(g). "The plain statutory text clearly envisions that any departure is sufficient to execute a removal order, regardless of how long the alien remains outside the United States or to where the alien departs." *Nicusor-Remus v. Sessions*, 902 F.3d 895, 899 (9th Cir. 2018) ("All the statute requires to execute the removal order is for the alien to 'le[ave] the United States.'" (quoting 8 U.S.C. § 1101(g)); *see also United States v. Sanchez*, 604 F.3d 356, 359 (7th Cir. 2010) ("[R]emoval simply means 'the transfer or moving of a person or thing from

one location, position, or residence to another'" (quoting Black's Law Dict. 1409 (9th ed. 2009)). Accordingly, Plaintiffs have been "removed" from the United States to Guantánamo, Cuba.

Because the transfers constitute a removal, they must comply with the specific statutory framework for where a noncitizen may be removed. 8 U.S.C. § 1231(b)(2); *see also id*. § 1231(b)(1). The Supreme Court has summarized Section 1231(b)(2)'s statutory requirements as follows:

> The statute thus provides four consecutive removal commands: (1) An alien shall be removed to the country of his choice (subparagraphs (A) to (C)), unless one of the conditions eliminating that command is satisfied; (2) otherwise he shall be removed to the country of which he is a citizen (subparagraph (D)), unless one of the conditions eliminating that command is satisfied; (3) otherwise he shall be removed to one of the countries with which he has a lesser connection (clauses (i) to (vi) of subparagraph (E)); or (4) if that is "impracticable, inadvisable, or impossible," he shall be removed to "another country whose government will accept the alien into that country" (clause (vii) of subparagraph (E)).

*Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005). Under this scheme, removal to Guantánamo is plainly unlawful. As set out in § 1231(b)(2), the government must first try to remove an individual to their country of choice, followed by their country of citizenship. *Jama*, 543 U.S. at 341. Plaintiffs have not designated Cuba as their country of choice, nor are Plaintiffs Cuban citizens. Nor do Plaintiffs have any prior connection to Guantánamo (or Cuba). Therefore, to remove Plaintiffs to Guantánamo, the government must first establish that it is "'impracticable, inadvisable, or impossible,'" to remove Plaintiffs to another country with which they have a prior relationship. *Id.* (quoting 8 U.S.C. § 1231(b)(2)(E)(vii)). And *even if* the government could establish that the detainees cannot be removed to their home country or to one of the other countries permissible under the INA, the statutory scheme further requires that the country where they are sent—here, Cuba—accept Plaintiffs. *Id.*

The government does not claim that removal to Plaintiffs' home countries or to some other appropriate country is impracticable, inadvisable, or impossible; indeed, the government can conduct removals to the countries from which Plaintiffs hail. *See, e.g.*, Notice Regarding Removals, *Las Americas*, ECF No. 15 (Feb. 20, 2025). Nor does the government suggest that Cuba has consented to the removal of detainees to that country. In fact, as noted above, Cuba has expressly *rejected* the government's removals. *See supra* pp. 2–3. In short, because the transfers constitute "removals" under the INA, and Cuba has not consented to Plaintiffs' removal, Plaintiffs cannot legally be transferred to Guantanamo.

### ii.    Detaining Individuals With Final Orders in Guantánamo Is Illegal Under the INA.

When pressed in the *Las Americas* litigation, the government has suggested that the transfers to Guantánamo are not removals. Instead, the government claims it is merely detaining noncitizens at Guantánamo under 8 U.S.C. § 1231 until their removals can be accomplished. Specifically, it cites to Section 1231(g), which directs the Attorney General to "arrange for appropriate places for detention for [noncitizens] detained pending removal . . . .). *See* Respondents' Opp. to Mot., ECF. No. 14 at 20, *Las Americas* (Feb. 20, 2025) (hereinafter "ECF No. 14");[22] *see also id*. at 6 ("The actions taken pursuant to the President's Memorandum to transfer and detain immigration detainees, including at NSGB [Naval Station Guantanamo Bay], fall within . . . § 1231(g)."). But as discussed above, these transfers constitute removals under the INA, regardless of how the government chooses to characterize them.[23] In any event, even if these

---

[22] Page citations are to the pagination in the brief.

[23] Public evidence, including comments from the President, also calls that assumption starkly into question as a factual matter. *See* Bernd Debusmann Jr. & Will Grant, *Trump Says US Will Send Some Migrants to Guantanamo Bay*, BBC (Jan. 29, 2025), https://perma.cc/7NBB-W32V ("Some of them are so bad we don't even trust the countries to hold them, because we don't want them coming back. . . . So we're going to send them to Guantanamo . . . it's a tough place to get out.").

transfers were not "removals," detention at Guantánamo would still be illegal because the government lacks statutory authority to detain noncitizens with final orders outside the United States.

No INA provision, including 8 U.S.C. § 1231 on which the government relies, authorizes the government to take noncitizens apprehended in the United States and who have received final orders of removal, and detain them outside of the United States. This omission makes sense because detention is authorized during the removal period to help effectuate the individual's removal from the country, not to detain them in a third country. Nor does any other provision of the INA allow for extraterritorial detention. *See* 8 U.S.C. §§ 1225(b), 1226(a), 1226(c), 1231(a). And this lack of extraterritorial detention authority is consistent with the overall statutory scheme; otherwise, the U.S. government could contract with any foreign government to detain individuals, who have been ordered removed, *after* removal from the United States, even though the *only* two justifications for detention are to prevent flight risk or danger *pending* removal. *See Zadvydas v. Davis*, 533 U.S. 678, 690–91 (2001).

In sum, whether the transfers to Guantánamo are considered removals or detention pending removal, they violate the INA. This case can therefore be decided on narrow statutory or APA grounds, without reaching the constitutional questions.

### B.  Defendants' Implementation of President Trump's Memorandum Is Arbitrary and Capricious

Defendant agencies' policies implementing President Trump's Guantánamo Memorandum are also arbitrary and capricious in violation of the APA. 5 U.S.C. § 706(2)(A).[24] Indeed, not only

---

[24] If Defendants have written guidance on the implementation of the President's Memorandum, they must produce that. But even if the agencies are implementing the Memorandum without written guidance, they must of course comply with the APA. *See Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 387 (D.C. Cir. 2018) (conducting APA review of agency's unwritten "policy and

is Defendants' implementation of the Guantánamo policy arbitrary on its own, but it goes well beyond the President's directive in his Memorandum.

First, the agencies' actions are contrary to the text of the Memorandum because detention at Guantánamo is not limited to the MOC and encompasses low-risk individuals. Second, the agencies started transferring people to Guantánamo without setting up the requisite infrastructure for access to counsel or safe and humane detention conditions. And finally, the agencies provided no explanation for departing—for the first time in history—from their practice of not sending immigration detainees to Guantánamo from facilities inside the United States.

In implementing President Trump's Memorandum, the agencies have arbitrarily departed from its plain text. *See Gomez v. Trump*, 485 F. Supp. 3d 145, 194 (D.D.C. 2020) (finding agency policy arbitrary and capricious where it was not "compelled by the [presidential] Proclamations"). The Memorandum specifically directs the Departments of Defense and Homeland Security to "expand the Migrant Operations Center at [Guantánamo]" to "provide additional detention space for high-priority criminal aliens." *See* Guantánamo Memorandum, *supra* n.1. Yet the agencies are detaining individuals not just at the MOC, but indeed, primarily at Camp 6 in the military prison. ECF No. 14-1, ¶ 10. Defendants have stated that they are only holding "high threat illegal aliens" at Camp 6 while "low and medium threat illegal aliens" are detained at the MOC, ECF No. 14-3, ¶ 11, but the Memorandum is clear: DOD and DHS are only to expand the MOC—not Camp 6— even for "high priority" immigration detainees, *see* Guantánamo Memorandum, *supra* n.1. Moreover—and despite their public statements—Defendants have not limited detention at Guantánamo to "high threat" individuals. They have conceded that they are sending nonviolent,

---

practice"); *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138 (D.D.C. 2018) ("agency action need not be in writing to be judicially reviewable as a final action"); *id*. (collecting cases).

"low-risk" immigrant detainees who lack serious criminal records or any at all. *See supra* n.5. And Defendants themselves have characterized some of the detainees that have been detained at the MOC as "[l]ow . . . threat." ECF No. 14-3, ¶ 11.

The agencies' decision to start transferring immigrants to Guantánamo within days of the President's directive is likewise arbitrary and capricious because it failed to "engage in reasoned decisionmaking" and "entirely fail[ed] to consider an important aspect of the problem"—namely, how they could safely house hundreds, if not thousands, of detainees and provide them with adequate communications and attorney access without first setting up the requisite infrastructure. *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017) (finding agency action arbitrary and capricious where it failed to "grapple with contrary evidence"); *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017) (agency's failure to consider potential environmental significance of its actions was arbitrary and capricious).

Notably, while the Memorandum directs DOD and DHS to "take all appropriate actions to expand" the MOC "to full capacity to provide additional detention space," it nowhere requires them to start transferring individuals to Guantánamo, much less do so prior to such expansion and the establishment of proper detention conditions. Guantánamo Memorandum, *supra* n.1 But that is precisely what the agencies did. They started moving people to Guantánamo before creating adequate detention conditions, access to counsel, and communication with family. ECF No. 14 at 15 (describing transfers to Guantánamo as "developing operation"). As a result, the detainees have been subjected to punitive conditions and wholly inadequate access to counsel. *See supra* pp. 4–9. Initially, they were held under a total blackout, and only after an initial access lawsuit did Defendants implement a barebones and wholly deficient phone system. *See supra* pp. 7–8; *see also* Gomez Lugo Decl. ¶¶ 6–7; Castillo Dec. ¶¶ 14–15; Sequera Decl. ¶ 8. The agencies have offered

no reason as to why transfers to Guantánamo needed to start happening five days after the Memorandum was issued, where the Memorandum itself imposes no such timeline and where agencies did not establish even basic access or detention protocols for the individuals it was transferring.[25] Nor have agencies explained why they must create "additional" detention space at Guantánamo when there is still available space in the United States. Fleischaker Decl. ¶¶ 11–18 (former ICE Chief of Staff explaining why no legitimate rationale can explain the use of Guantánamo given the lack of any security need, the exorbitant cost, and the complicated logistics). Nor, finally, have Defendants ever provided a coherent rationale for why some detainees with final orders are removed directly to their home countries while others are flown to Guantánamo. This failure to engage in "reasoned decisionmaking" and fully "consider an important aspect of the problem" renders their actions arbitrary and capricious. *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121, 1122 (D.C. Cir. 2010); *see also TikTok Inc. v. Trump,* 507 F. Supp. 3d 92, 110, 112 (D.D.C. 2020) (reviewing agency action "effectuat[ing] an executive order" and finding it to be arbitrary and capricious where it failed to consider alternatives).

Finally, agencies "must provide a reasoned explanation for [a] change" in policy. *Nat'l Women's L. Ctr. v. Off. of Mgmt. & Budget*, 358 F. Supp. 3d 66, 89 (D.D.C. 2019) (cleaned up); *see Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*, 25 F.4th 1, 5 (D.C. Cir. 2022) (change "was not sufficiently reasoned"). Yet here, the agencies have offered only illogical and inadequate explanations for their unprecedented departure from the longstanding practice of not

---

[25] *See also* Haley Britzky & Priscilla Alvarez, *US Halts Plan to House Migrants in Tents at Guantanamo Amid Concerns Over Conditions*, CNN.com (Feb. 24, 2025), https://perma.cc/9NVV-D9U6 (noting that Trump administration has halted plans to place immigrant detainees in tent structures because they don't currently meet detention standards set by ICE).

extraterritorially detaining noncitizens at Guantánamo who were apprehended and detained in the United States.

> **C.      Transfer To, And Detention In, Guantánamo Will Violate Plaintiffs' Substantive Due Process Rights.**

The government's policy of transferring immigration detainees to Guantánamo and detaining them under extreme conditions of isolation and deprivation constitutes impermissible punishment in violation of the Due Process Clause. Immigration detention is "undisputedly civil—*i.e.*, non-punitive in nature." *R.I.L-R. v. Johnson*, 80 F. Supp.3d 164, 187 (D.D.C. 2015). Those held in immigration detention therefore have a due process right not to be subjected to any "condition, practice, or policy [that] constitutes punishment." *Block v. Rutherford,* 468 U.S. 576, 583 (1984).

The test of whether civil detention "amount[s] to punishment" is if it is "imposed for the purpose of punishment," or is not "rationally related to a legitimate nonpunitive governmental purpose," or "appears excessive in relation to that purpose." *Bell v. Wolfish*, 441 U.S. 520, 538, 561 (1979); *see also Kingslev v. Hendrickson*, 576 U.S. 389, 398-99 (2015).

Defendants' transfer of immigration detainees to Guantánamo is not justified by any legitimate nonpunitive governmental purpose. Detention on Guantánamo is far more costly, inefficient, and logistically complex than detention in the United States. *See infra* Section I.C.i. Instead, government officials have touted detention at Guantánamo as a way to deter would-be migrants and to punish those already here. But these are impermissible grounds for depriving civil immigration detainees of their liberty, especially in punitive conditions of confinement that are comparable to, if not worse than, conditions for convicted prisoners. *See infra* Section I.C.ii–iii.

i.     **Defendants' Policy of Detaining Plaintiffs at Guantánamo Serves No Legitimate Governmental Purpose.**

Defendants have claimed that transferring Plaintiffs to Guantánamo and detaining them there is necessary to meet detention capacity needs, to facilitate removals, and to ensure safe and secure detention of detainees whom it has labeled as highly dangerous. *See* ECF No. 14 at 6 (detainees were "transferred to NSGB as a staging point in route to completing their removals"); *see also* ECF No. 14-1, ¶ 6 (NSGB detention is "necessary" due to "ever-evolving availability of detention space"); *id.* ¶ 5 (detainees placed in "Camp VI, which houses aliens who are considered to be a high security threat" and many were "believed to be part of the transnational criminal organization 'Tren de Aragua'"). But, as a former ICE Chief of Staff explains, none of these rationales withstand examination. *See generally* Fleischaker Decl. ¶¶ 9–42. ICE has no shortage of detention capacity available in the United States, and numerous avenues to expand detention capacity within the United States.

Moreover, detention at Guantánamo is far more costly and logistically complex than detaining people at facilities inside the U.S. Fleischaker Decl. ¶ 18 ("Operational considerations, like cost and logistics, weigh in favor of using these traditional methods to expand capacity, rather than detaining people on Guantanamo."); Jonathan Hafetz & Rebecca Ingber, *What Just Happened: At Guantanamo's Migrant Operation Center*, Just Security (Feb. 6, 2025) (housing a detainee at Guantánamo is "categorically and exponentially more expensive" than in the United States).[26] The island's remote location requires that most supplies must be brought in at a substantial cost. Fleischaker Decl. ¶ 20. And staffing a detention center on a foreign island takes many more personnel than would be required at an ICE detention facility of a similar size in the

---

[26] *Available at* https://perma.cc/9BU6-6YEN.

United States. *Id.* ¶ 21. All of that adds up to expensive beds. *See* Chris Opila, *Sending Migrants to Guantánamo Bay Is a Costly, Abusive Shift in Immigration Detention*, Immigr. Impact (Feb. 7, 2025)[27]; *see also* Peter Baker, *Trump Says 'It's Crazy' to Spend $13 Million Per Inmate at Guantánamo*, N.Y. Times (Sept. 19, 2019)[28](quoting President Trump saying that "[i]t costs a fortune to operate" Guantánamo). For the same reason, new temporary or permanent construction on Guantánamo is much more expensive and complex than the same projects in the United States. Fleischaker Decl. ¶ 17. Using Guantánamo as a staging area for removal flights, as the government claims it is doing, is also illogical, given the logistical complexity.[29]

Nor is transfer to Guantánamo required to ensure safe and secure detention of noncitizens. Defendants have grossly overstated the danger posed by the detainees—including DHS Secretary Kristi Noem describing them as "the worst of the worst." News Release, PHOTO RELEASE: DHS Releases Images of the First Flight of Criminal Aliens to Guantanamo Bay, Dep't of Homeland Sec., *supra* n.6. As noted, Defendants have admitted that the initial wave of detainees included "low threat" individuals, who have no criminal record other than an immigration violation, as well as those apprehended on immigration charges immediately upon entering the United States *See supra* n.5. Defendants' security rationale is further undermined by their own records, which show

---

[27] *Available at* https://perma.cc/6LV9-JEG3.

[28] *Available at* https://perma.cc/7XCT-BXWD.

[29] The scheme requires additional flights that would be entirely unnecessary if the government staged and removed noncitizens directly from the United States. Fleischaker Decl. ¶¶ 25–35. In fact, ICE did exactly that on February 10, when it removed 190 detainees directly from Texas to Venezuela. ECF No. 14-1, ¶ 11. On the same day, it transferred 15 Venezuelans with final orders of removal from Texas to Guantánamo. *Id.* ¶ 8. The government had to pay for that flight, pay to detain those individuals in Guantánamo's expensive beds for nearly two weeks, then pay for the "deportation" flight out of Guantánamo. *See* Caitlyn Burchett, *Hegseth Tours Guantanamo as Lawmakers Question Damage to Military from Detaining Migrants There*, Stars and Stripes (Feb. 25, 2025), https://perma.cc/2SJH-FWJT (C-17 military planes used to fly detainees to Guantánamo cost "an estimated $28,000 per flight hour compared to $8,577 per flight hour for a civilian aircraft").

that many detainees were housed in the "low threat" MOC. *See* ECF No. 14-3, ¶¶ 11, 13. And even those detainees held at Camp 6 were held in less restrictive ICE detention conditions in El Paso, with access to phones and ability to move freely about their housing unit, prior to transfer. *See* Castillo Decl. ¶ 8; Alviares Armas Decl. ¶ 9; Simancas Rodriguez Decl. ¶ 2. Moreover, according to ICE's former Chief of Staff, ICE detention facilities in the United States are fully equipped to detain any noncitizen, regardless of their security classification. Fleischaker Decl. ¶¶ 38–40. Every ICE detainee is assessed a custody level, and ICE detention contracts require facilities to detain an individual according to their designated custody level. *Id.* ¶ 39. And ICE facilities have Special Management Units designed to house high-risk detainees. *Id.*

At bottom, none of Defendants' rationales can neither explain nor justify the transfer of detainees to Guantánamo. *Id.* ¶ 10. "It is an inefficient, expensive, and illogical choice when considering ICE's detention and operational objectives." *Id.* ¶ 42.

### ii.    Defendants Are Transferring to and Detaining at Guantánamo for Illegitimate Purposes.

Left with no alternative logical reason for detaining noncitizens at Guantánamo, the court must give credence to Defendants' own public statements. Defendants explain that their detention of immigrants at one of the world's most notorious prison sites is to frighten immigrants, deter migration, induce self-deportation, and coerce deportation to dangerous third countries. But these are not legitimate grounds for civil detention. *See Kansas v. Crane*, 534 U.S. 407, 412 (2002) (explaining that civil detention cannot be a "mechanism for retribution or general deterrence – functions properly those of criminal law").

Defendants' purpose in using Guantánamo is evident from their statements and actions. The President's Memorandum expressly states that it was issued "in order to halt the border invasion"—in other words, to deter migration. *See supra* n.1. Secretary Hegseth said that

Guantánamo "represents deterrence," and the Guantánamo mission is "central . . . to the message we're sending to the world – which is that our border is closed." *See* Matthew Olay, *Hegseth Visits Guantanamo Bay, Engages with Troops*, DOD News (Feb. 26, 2025);[30] *see also* DOD Rapid Response, X.com (Feb. 26, 2025, 7:14 PM ET) (quoting Secretary Hegseth: "If you break the law, if you are a criminal, you could find your way to Guantanamo Bay. You don't want to be at Guantanamo Bay.").[31] Likewise, after visiting Guantánamo, DHS Secretary Noem posted a warning on social media that she "was just in Cuba" and noncitizens should "not come to this country or we will hunt you down, find you, and lock you up." Sec'y Kristi Noem, X.com (Feb. 9, 2025, 12:12 PM ET);[32] *see also* Zolan Kanno-Youngs et al., *Trump Plans to Use Military Sites Across the Country to Detain Undocumented Immigrants*, N.Y. Times (Feb. 21, 2025) (quoting Stephen Miller, the President's Deputy Chief of Staff, when discussing Guantánamo as saying: "You do not come here illegally. You will not get in.").[33]

President Trump has been equally explicit. In explaining the decision to detain immigrants at Guantánamo, he stated, "we don't want them coming back," ". . . . [s]o we're going to send them to Guantanamo . . . it's a tough place to get out." Bernd Debusmann Jr. & Will Grant, *Trump Says US Will Send Some Migrants to Guantanamo Bay*, BBC (Jan. 29, 2025).[34] And ICE officers have used the threat of transfer to Guantánamo to coerce Venezuelans to accept deportation to Mexico, telling them that they would be transferred to Guantánamo "if they didn't sign." *See* Berrios Laguna Decl. ¶ 4 ("February 6, 2025, ICE went around asking Venezuelans in my unit to sign off on deportation to Mexico . . . ICE told me and the others who refused to sign that they would

---

[30] *Available at* https://perma.cc/YFY7-ZX46.

[31] *Available at* https://perma.cc/ZK42-3VM2.

[32] *Available at* https://perma.cc/GCY3-DUNB.

[33] *Available at* https://perma.cc/4PDY-6DQD.

[34] *Available at* https://perma.cc/NT6J-SXFF.

transfer us to GTMO if we did not agree to be deported to Mexico."); Torcati Sebrian Decl. ¶ 5 (describing how ICE officers went to housing unit twice "urging us to sign off on deportation to Mexico, or risk being sent to Guantánamo").

The government's barrage of publicity surrounding the transfers (despite the government's longstanding privacy protocols for immigration detainees) is further evidence that it is using Guantánamo for these impermissible purposes. *See* ICE Operations Manual, ICE/DRO Detention Standard 4 (2008) at § V.F.1 (DHS treats any personally identifiable information in its records as subject to the Privacy Act).[35] Defendants have widely circulated photos of detainees—including those showing detainees' faces—arriving in Guantánamo in handcuffs and shackles in press releases and on social media. *See* News Release, PHOTO RELEASE: DHS Releases Images of the First Flight of Criminal Aliens to Guantánamo Bay, Dep't of Homeland Sec., *supra* n.6. Secretary Noem has repeatedly made blanket assertions that detainees are "the worst of the worst" including murderers, rapists, pedophiles, child traffickers, and drug traffickers. Sec'y Kristi Noem, X.com (Feb. 9, 2025, 12:12 PM).[36] The flood of publicity surrounding the transfers, especially publicly identifying detainees and painting them all as gang members and dangerous criminals, is inherently punitive in nature. *See Demery v. Arpaio*, 378 F.3d 1020, 1033 (9th Cir. 2004) (concluding that placing webcams in pretrial detention center subjected detainees to punishment in violation of due process); *Houston v. Maricopa Cnty.*, 116 F.4th 935, 941 (9th Cir. 2024) (online publication of pre-trial detainee mugshots constituted punishment in violation of due process). Moreover, these allegations, intentionally trumpeted by Defendants, expose detainees to a real risk

---

[35] *Available at* https://perma.cc/Q9KA-MUEE.
[36] *Available at* https://perma.cc/F99Z-CMHG.

of harm if they are returned to their home countries, and thus serve to deter future migrants who fear placing themselves at similar risk of harm.

Multiple courts have held that detaining people to send a message of deterrence and to encourage self-deportation are impermissible purposes in the civil context, not rationally related to any non-penological goal. In *R.I.L.-R v. Johnson*, the court struck down a detention policy on due process grounds, explaining that the "justification urged by the Government"—"namely deterrence of mass migration"—was "unprecedented." 80 F. Supp. 3d 164, 188 (D.D.C. 2015). This lack of connection between the nature of that interest (deterrence of others) and the characteristics inherent to the detained person (e.g., whether the individual posed a flight risk or danger), was "out of line with analogous Supreme Court decisions." *Id*. at 188–89.

For similar reasons, the court in *Aracely R.*, concluded that the government's policy of considering immigration deterrence when making parole decisions violated the agency's own directive because "[i]mmigration deterrence, which is directed at third parties[,] . . . does not relate to an *individual* parole applicant's flight risk or danger to the community." 319 F. Supp. 3d at 153. Likewise, a policy of detaining parents away from their children—leading to indefinite family separation—in order to "deter[] immigration" of other migrant families serves no "compelling or legitimate government objective." *Jacinto-Castanon de Nolasco v. U.S.I.C.E.*, 319 F. Supp. 3d 491, 502 (D.D.C. 2018). And a policy of intimidation and pressure that "is designed to free-up scarce detention space" fares no better. *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1505 (C.D. Cal. 1988), *aff'd sub nom. Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990); *see also Perez-Funez v. District Director*, 619 F. Supp. 656, 656–57, 669 (C.D. Cal. 1985) (policy of intimidating unaccompanied minors into accepting voluntary departure violated due process).

In sum, Defendants have justified their detention of immigrants at one of the world's most notorious prison sites to frighten immigrants, deter migration, induce self-deportation, and coerce deportation to dangerous third countries. These are not legitimate grounds for civil detention and thus violate due process.

### iii.    The Conditions at Guantánamo Are Excessive and Punitive.

In addition to the lack of a legitimate motive to send detainees to Guantánamo, the government has subjected immigrant detainees held at Guantánamo to punitive conditions in violation of their due process rights as civil detainees. Civil immigrant detainees "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982); *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 210 (D.D.C. 2020) ("Because civil immigration detainees . . . have not been convicted of any present crime, they may not be subjected to punishment of any description.") (citation and quotation marks omitted); *D.A.M. v. Barr*, 474 F. Supp. 3d. 45, 63 (D.D.C. 2020) (same). But the individuals detained at Guantánamo have been subjected to conditions that are much worse than those at ICE detention facilities in the United States and indeed, those for prisoners serving criminal sentences.

**Maximum Security Conditions.** The day-to-day experience of detention in Camp 6 is similar to or more restrictive than criminal detention at a high-security prison. *See generally* Castillo Decl. ¶¶ 6–17; Alviares Armas Decl. ¶¶ 6–8; Simancas Rodriguez Decl. ¶¶ 5–12; Garcia Decl. ¶ 15; Gomez Lugo Decl. ¶¶ 4, 6, 8; *see also* DOD Rapid Response, X.com (Feb. 26, 2025 4:53 PM PT) (quoting Secretary Hegseth as saying: "No you're not gonna have universal freedom at Guantanamo Bay. It's a prison").[37] Individuals detained on the military side of the base are held

---

[37] *Available at* https://perma.cc/4PGK-HGVE.

in windowless individual cells as small as two-by-four meters for at least 23 hours per day, usually much more. *See* Castillo Decl. ¶¶ 6, 8; Alviares Armas Decl. ¶¶ 8–9; Simancas Rodriguez Decl. ¶¶ 5; Gomez Lugo Decl. ¶ 8; Escalona Decl. ¶ 5. Prison guards lock detainees each in a small cage within a larger cage in an enclosed yard for recreation, and recreation is only permitted at most once a day for a brief period. *See* Castillo Decl. ¶¶ 6, 8; Alviares Armas Decl. ¶¶ 8; Simancas Rodriguez Decl. ¶ 5; Gomez Lugo Decl. ¶ 8; Escalona Decl. ¶ 5; *see also* Silvia Foster-Frau & Ana Vanessa Herrero, *Invasive Frisks, Suicide Attempts: Three Migrants Describe Guantanamo Detention*, Wash. Post (Feb. 25, 2025) (detainees permitted outside once per week in open-air cages).[38] Otherwise, detainees are held in total isolation, unable to see the sun and unable to communicate with one another. Castillo Decl. ¶ 8; Alviares Armas Decl. ¶ 9; Gomez Lugo Decl. ¶ 8; Escalona Decl. ¶ 6; *see also* Foster-Frau, *Invasive Frisks* (detainee held in windowless cell). When permitted to leave their cells for showers or recreation, detainees are subject to a pat-down (or even more invasive) search, shackled and escorted at all times. Castillo Decl. ¶ 8; Alviares Armas Decl. ¶ 9-10; Simancas Rodriguez Decl. ¶ 5; Gomez Lugo Decl. ¶ 8. Inside their cells, detainees sleep on thin mattresses and receive inadequate and often inedible food. Castillo Decl. ¶ 6–7; Alviares Armas Decl. ¶ 8, 12; Simancas Rodriguez Decl. ¶ 8. Some detainees have lost between 10 and 20 pounds while imprisoned. Castillo Decl. ¶ 6–7; Alviares Armas Decl. ¶ 8, 12; Simancas Rodriguez Decl. ¶ 8; *see also* Healy, *'Give us back our sons': A look at the Venezuelan migrants Trump sent to Guantanamo*, *supra* n.10.

The government is detaining immigrants at Guantánamo under conditions indistinguishable from—or worse than—a high-security prison. Castillo Decl. ¶¶ 6–17; Alviares Armas Decl. ¶¶ 6–19; Simancas Rodriguez Decl. ¶¶ 5–12; Gomez Lugo Decl. ¶¶ 4, 8; Garcia Decl.

---

[38] *Available at* https://perma.cc/S6JF-S83Y.

¶ 15; Escalona Decl. ¶ 11. Prisoners at federal maximum-security prisons, like Camp 6 detainees, are largely prohibited from communicating with one another, spend most of their time in tiny cells with the lights always on, are shackled and escorted by guards every time they leave their cells, and receive only a few hours of recreation time in an outdoor cage per week. *Wilkinson v. Austin*, 545 U.S. 209, 214–15 (2005) (describing conditions at federal supermax prisons); *see also* Juan Hernandez, *My Journey From a Maximum to Medium Security Prison*, Prison Journalism Project (Oct. 10, 2023).[39]

Even the detainees held at the MOC, a purportedly "low-security" facility, face similarly punitive conditions. For instance, detainees are not allowed to leave their cells except for at most 15-20 minutes of recreation in the evening. Sequera Decl. ¶ 5; Garcia Decl. ¶ 11. This extremely limited recreation opportunity is worse than that provided in either federal criminal or ICE detention. *See* 28 C.F.R. § 551.115 (requiring a minimum of one hour daily outside recreation or two hours daily of indoor recreation in BOP facilities); Immigr. & Customs Enf't, Performance Based National Detention Standards ("PBNDS") § 29 (2008) (requiring at least one hour of daily physical exercise outside the cell in ICE detention).[40] Moreover, during the little time they are allowed outside of the room, people held in the MOC are always escorted and generally almost always shackled or invasively searched. Sequera Decl. ¶ 6; Garcia Decl. ¶ 12.

**Degrading Treatment.** Detainees at both the MOC and Camp 6 are subject to degrading and abusive treatment. At Camp 6, guards strip search detainees upon leaving and returning to their solitary cells, including opening up their backside and genitals. Foster-Frau*, Invasive Frisks*, *supra* p. 29. Guards also watch detainees as they use the restroom or shower. *Id*.; Escalona Decl.

---

[39] *Available at* https://perma.cc/DD49-6NMV.
[40] *Available at* https://perma.cc/7CP3-UCYK.

¶ 4; Healy, *'Give us back our sons,' supra* n.10. Detainees at the MOC were constantly strip searched. Garcia Decl. ¶ 12. Guards reportedly stripped one detainee at Camp 6 of all clothes except his underwear before forcing him to sleep without a mattress or blanket. Escalona Decl. ¶ 4; Martínez-Beltrán, *Venezuelan men allege mistreatment while in detention in Guantánamo Bay*, *supra* n.9; *see Bell*, 441 U.S. at 559 (strip searches unlawful if unreasonable in scope, manner, justification, and place); *Harris v. Ostrout,* 65 F.3d 912, 916 (11th Cir. 1995) (if strip searches "are devoid of penological merit and imposed simply to inflict pain, the federal courts should intervene"); *Morgan v. Ward*, 669 F. Supp. 1025, 1051–54 (N.D.N.Y. 1988) (strip searches of prisoners in segregation before leaving cell violates Fourth Amendment).

Detainees at both facilities have endured insults and taunting by guards. Detainees who speak out about their treatment are forcefully tackled and restrained to a chair—nicknamed the "punishment chair"—for several hours. Alviares Armas Decl. ¶ 15; Simancas Rodriguez Decl. ¶ 7. Detainees are subject to physical beatings, including one instance where an officer slammed a radio against a detainee's hand, fracturing it. Castillo Decl. ¶ 13; Alviares Armas Decl. ¶ 14; Martínez-Beltrán, *Venezuelan men allege mistreatment while in detention in Guantánamo Bay*, *supra* n.9 (describing beatings). *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) (objectively unreasonable use of force is unconstitutional punishment); *C.G.B.,* 464 F. Supp. at 211 (applying *Kingsley* standard to immigrant detainees); *Van Colln v. Cnty. of Ventura*, 189 F.R.D. 583, 595-97 (C.D. Cal. 1999) (placing detainees in restraint for resistance and "bad attitude" is punitive). Guards even withhold water to punish individuals. Alviares Armas Decl. ¶ 13; Castillo Decl. ¶ 13.

Detainees have endured these abusive conditions with no information of how much longer their detention would go on. Escalona Decl. ¶ 8; Garcia Decl. ¶ 15; *see* Martínez-Beltrán, *Venezuelan men allege mistreatment while in detention in Guantánamo Bay*, *supra* n.9 ("I thought

I was going to stay in Guantánamo forever."). Indeed, the conditions at Guantánamo are so degrading that detainees have gone on hunger strikes, and several detainees have even attempted suicide. Simancas Rodriguez Decl. ¶ 10; Alviares Armas Decl. ¶¶ 12–13; Garcia Decl. ¶ 14; Gomez Lugo Decl. ¶ 5; *see* Foster-Frau, *Invasive Frisks*, *supra* p. 29 (at least three men acknowledged trying to end their own lives); Martínez-Beltrán, *Venezuelan men allege mistreatment while in detention in Guantánamo Bay*, *supra* n.9 ("mistreatment by detention officers got so bad" that detainee attempted suicide).

**Punitive Communications Restrictions.** Immigrants detained at both the MOC and Camp 6 lack not only the protections that they would receive in ICE detention in the United States, but those provided to convicted prisoners in U.S. federal *criminal* custody. For example, immigrants detained at Guantánamo have no contact whatsoever with friends or family in the outside world, either in person or via telephone. *See* Castillo Decl. ¶ 14 ("I also begged the officers to speak to my family. My wife lives in the United States with our 9 year old son . . . All they say is that it is not possible to make calls."); Lugo Decl. ¶ 6 ("To my knowledge, there is no way to talk to . . . family or anyone outside."); Sequera Decl. ¶ 8 ("I asked to speak to my family but was told it was not possible."); *see also* Foster-Frau, *Invasive Frisks, supra* p. 29 (detainees denied calls to loved ones after repeated pleas). This is in stark contrast to their time in ICE detention, where detainees regularly communicated with their families. *See* Escalona Decl. ¶ 7 ("I have had weekly, in-person visits with [ ] daughter"); Gomez Lugo Decl. ¶ 8 (spoke with family every 2-3 days); *see also* PBNDS § 31 (guaranteeing "reasonable and equitable access to telephones during established facility "waking hours").[41]

---

[41] *Available at* https://perma.cc/X7CG-WVWF.

The government must provide prisoners serving criminal sentences with "telephone access" and the ability to "communicate with family and friends," subject to reasonable limitations. *Johnson v. California*, 207 F.3d 650, 656 (9th Cir. 2000); *Washington v. Reno*, 35 F.3d 1093, 1100 (6th Cir. 1994). Even BOP "encourages visiting by family, friends, and community groups" by mandating visiting hours on Saturdays, Sundays, and holidays. 28 C.F.R. §§ 540.40, 540.42. Such visits are not permitted at Guantánamo. ECF No. 14-3, ¶ 29.

**Inadequate Counsel Access.** Similarly, at Guantánamo, contact with attorneys is extremely limited and does not include in-person visitation. *See* ECF No. 14-3, ¶ 29; *see supra* pp. 7–8. This is indisputably worse than the legal access provided in either ICE detention facilities or federal prisons. *See* PBNDS § 32.J., at 8, 11 (requiring ICE facilities to provide in-person legal visitation seven days a week and private consultation rooms for legal meetings)[42]; 28 C.F.R. § 543.13(a)-(b) (prohibiting BOP from limiting the frequency of attorney visits and guaranteeing a "private conference room, if available" for attorney visits). Even military detainees at Guantánamo are entitled to in-person visits with attorneys. *In re Guantanamo Bay Detainee Continued Access to Couns.*, 892 F. Supp. 2d 8, 14 (D.D.C. 2012).

**Lack of Basic Necessities and Medical Care.** Nor do detainees have adequate access to basic necessities and medical care. As discussed above, people detained at Guantánamo are not fed enough food, are deprived of water as punishment for expressing suicidal ideations, are subject to extreme temperatures, and are in unhygienic conditions, like showers just every couple of days and no change of clothing. *See supra* p. 6. The constant lights also prevent them from sleeping. *Id*.

Officers fail to provide even the most basic treatment for serious medical conditions. One detainee, who had a preexisting leg injury causing extreme pain and had previously been advised

---

[42] *Available at* https://perma.cc/BWY8-VD85.

he would need surgery, repeatedly sought medical attention. Castillo Decl. ¶ 11. He was told that there was nothing medical personnel could do for him because the base "did not have the right tools and were waiting for them." *Id.* Another individual who had been tested for a brain tumor while detained in the United States received no treatment other than being fed sleeping pills. Simancas Rodriguez Decl. ¶ 9; *see Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (government has obligation to provide medical care for incarcerated individuals); *Baker v. Dist. of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (deliberate indifference to prisoner's serious medical needs violates Eighth Amendment); *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 211 n.3 (D.D.C. 2020) (constitution requires government to ensure "reasonable safety" of civil immigration detainees).

In short, conditions at Guantánamo for the immigration detainees transferred from the U.S. are either comparable to, or measurably worse than, those for people serving criminal sentences at Bureau of Prisons facilities. And transferring civil immigration detainees to Guantánamo and subjecting them to such conditions cannot be justified by any legitimate detention or removal objective. *Cf. Wong Wing v. United States*, 163 U.S. 228, 237 (1896) (holding that government can detain noncitizens as part of removal process but due process is violated by subjecting immigration detainees to punishment at hard labor).

## II.    TRANSFER TO GUANTÁNAMO WOULD CAUSE PLAINTIFFS IRREPARABLE HARM.

Plaintiffs are likely to suffer irreparable harm in the absence of emergency relief. "It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (citations omitted); *see also Americans for Immigrant Just. v. U.S. Dep't of Homeland Sec.*, No. CV 22-3118 (CKK), 2023 WL 1438376, at *20 (D.D.C. Feb. 1, 2023) ("Because Plaintiff FIRRP has demonstrated a likelihood of success on the merits of its punitive-

detention claim, it has shown irreparable injury. The Court need dwell no further on the question."
(citations omitted)). As detailed above, the government has violated the Plaintiffs' constitutional
rights. *See supra* pp. 21–34.  This harm is irreparable.

The government will also irreparably harm the people it sends to Guantánamo by
subjecting them to harsh detention conditions. These conditions, detailed above, include solitary
confinement, deprivation of basic necessities, abusive and degrading treatment, and serious
limitations on communications with counsel or family. *Supra* pp. 4–9. These conditions constitute
irreparable harm. *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005) (finding harsh conditions
at Guantánamo that forced detainees to go on hunger strikes amounted to irreparable harm);
*Americans for Immigrant Just.*, 2023 WL 1438376, at *20 (finding irreparable harm satisfied for
claims involving a lack of access to counsel); *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 781 (M.D.
Pa. 2016) (finding prolonged solitary confinement to cause irreparable harm). This is already
apparent among the group of people who have shared their experiences at Guantánamo, several of
whom attempted suicide. *Supra* pp. 5, 8.

Plaintiffs would face further irreparable harm if transferred to Guantánamo because the
government has falsely painted those at Guantánamo as "murderers, rapists, child predators and
gangsters"[43]—putting them at risk of negative consequences if they are returned to their home
country. Simancas Rodriguez Decl. ¶ 13; Alviares Armas Decl. ¶ 19. This harm is irreparable: once
these falsehoods about Plaintiffs are made public, they "could not be made secret again."
*Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1317 (1983) (Blackmun, J., denying application for
stay); *Senior Executives Ass'n v. United States*, 891 F. Supp. 2d 745, 755 (D. Md. 2012)
(recognizing that disclosure of information "is a bell that one cannot unring"); *see also Leiva-Perez*

---

[43] Sec'y Kristi Noem, X.com (Feb. 9, 2025, 12:12 PM), https://perma.cc/M6ZP-ARP8.

*v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011) (holding that removal to a country where one faces harm constitutes irreparable injury).

## III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN PLAINTIFFS' FAVOR.

The balance of equities and the public interest merge in cases against the government. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (citations omitted). Where—as here—the challenged governmental conduct deprives Plaintiffs of their constitutional rights and subjects them to irreparable harm, both factors tip in Plaintiffs' favor. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Americans for Immigrant Just.*, 2023 WL 1438376, at *20 (quotation marks and citations omitted); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (same) (citations omitted).

Additionally, the facts of this case demonstrate that both factors sharply favor a preliminary injunction. The public—and therefore the government—has an interest in protecting the rights of people in detention and ensuring the rule of law. *See Nunez v. Boldin*, 537 F. Supp. 578, 587 (S.D. Tex. 1982) (such protection "goes to the very heart of the principles and moral precepts upon which this country and its Constitution were founded"); *Torres v. U.S. Dep't of Homeland Sec.*, 2020 WL 3124216, at *9 (C.D. Cal. Apr. 11, 2020) ("[T]he public has an interest in the orderly administration of justice . . . ."). Plaintiffs seek to prevent the government from holding them without access to counsel or the outside world, which in turn will further the public interest in shedding light on conditions at Guantánamo and preventing more abuses. *E.g.*, *Americans for Immigrant Just.*, 2023 WL 1438376, at *20 (recognizing public interest in access to counsel to pursue "release from civil detention on medical grounds").

The relief sought poses no undue burden for the government. To the contrary, the government's proposed course of transferring immigrants to Guantánamo and holding them there

requires an enormous and unnecessary expenditure of public resources. *Supra* pp. 9–10, 18–19, 22.

## CONCLUSION

For the reasons stated above, the Court should grant Plaintiffs' emergency motion and (1) immediately prohibit their transfer to Guantánamo pending the adjudication of this motion, and (2) issue a permanent stay pending the outcome of this case.

Dated: March 1, 2025

Eunice H. Cho (D.C. Bar No. 1708073)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW, 7th floor
Washington, DC 20005
(202) 546-6616
echo@aclu.org

My Khanh Ngo*
Kyle Virgien*
Noelle Smith*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
mngo@aclu.org
kvirgien@aclu.org
nsmith@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Deepa Alagesan (D.D.C. Bar No. NY0261)
Kimberly Grano (D.D.C. Bar No. NY0512)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, New York 10004
Telephone: (516) 838-7044
dalagesan@refugeerights.org
kgrano@refugeerights.org

Respectfully submitted,

/s/ *Lee Gelernt*
Lee Gelernt (D.D.C. Bar No. NY0408)
Brett Max Kaufman (D.D.C. Bar No.
NY0224)
Judy Rabinovitz*
Noor Zafar*
Omar C. Jadwat*
Wafa Junaid*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
bkaufman@aclu.org
jrabinovitz@aclu.org
nzafar@aclu.org
ojadwat@aclu.org
wjunaid@aclu.org

Baher Azmy*
Shayana D. Kadidal (D.C. Bar No. 454248)
J. Wells Dixon*
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, Floor 7
New York, NY 10012
T: (212) 614-6427
bazmy@ccrjustice.org
shanek@ccrjustice.org
wdixon@ccrjustice.org

Jessica Myers Vosburgh*
Center for Constitutional Rights
P.O. Box 486
Birmingham, AL 35201
212.614.6492
jvosburgh@ccrjustice.org

*Attorneys for Plaintiffs-Petitioners*

*Pro bono representation certificates
forthcoming*

38