**DECLARATION OF DEBORAH FLEISCHAKER**

I, Deborah Fleischaker, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

1. I began working on immigration detention issues in 2011, when I was a career employee at the U.S. Department of Homeland Security's (DHS) Office for Civil Rights and Civil Liberties (CRCL). I was employed by CRCL from March 2011 until September 2021. One year of this (May 2019 - May 2020) was spent on a temporary detail to Senator Patrick J. Leahy's Judiciary Committee staff. An additional four months was spent on a temporary detail at the DHS Office of Policy and three months at U.S. Immigration and Customs Enforcement (ICE). I worked on immigration issues in all of these temporary assignments.

2. Between September 2021 and November 2023, I was employed as a political appointee by DHS's ICE. I was an Assistant Director at ICE and headed the Office of Regulatory Affairs and Policy from September 2021 to November 2022. From November 2022 until November 2023, I served as the Acting ICE Chief of Staff.

3. As the Assistant Director for the Office of Regulatory Affairs and Policy, I spearheaded policy and regulatory initiatives for the agency, with a significant focus on immigration enforcement, detention, and removal. In that position, I worked on a number of enforcement and detention policies, including Secretary Alejandro Mayorkas' enforcement priorities, the DHS sensitive locations and courthouse enforcement policies, and policies relating to the detention of pregnant people, crime victims, and parents. As the Assistant Director, I was very engaged in the ICE activities at the Guantanamo Migrant Operations Center (MOC) and spent five days

in 2022 on the military base in an effort to understand the needs and challenges of the ICE mission there.

4. As the Acting ICE Chief of Staff and senior agency political appointee, I oversaw agency-wide activities, including the approximately $8 billion budget and 8,000 employees across law enforcement and immigration services. This included significant work on ICE removal flights and the removal flight contract, as well as immigration enforcement and detention. I continued to work on the ICE mission at the Guantanamo Bay Naval Station and joined a high-level administration visit to the Naval Base in 2022.

5. As part of my role, I collaborated extensively with the leadership of ICE Enforcement and Removal Operations (ERO).

6. I provide this declaration based on my personal knowledge and experience as well as review of the documents referenced below.

7. Based on my experience, I have been asked to assess the government's decision to transfer immigration detainees to Guantanamo. I have reviewed the following publicly available statements by the government explaining their justifications for transferring detainees to Guantanamo:

    a. "U.S. Immigration and Customs Enforcement is taking this measure to ensure the safe and secure detention of these individuals until they can be transported to their country of origin or other appropriate destination." Dep't of Def., Department of Defense Announces Arrival of High-Threat Illegal Aliens at Guantánamo Bay Detention Facility (Feb. 5, 2025).[1]

---

[1] *Available at* https://perma.cc/Y3BN-ATA7.

2

    b. "The use of NSGB [Naval Station at Guantanamo Bay] is deemed necessary to complete ongoing removal operations due to the number of illegal aliens present in the United States and the current and ever-evolving availability of detention space in ICE detention facilities or other contracted detention facilities to house aliens for civil immigration purposes. Available detention space fluctuates due to, for example, contracting issues, state laws, and injunctions issued by federal district courts." *Las Americas Immigr. Advoc. Ctr. v. Noem*, 1:25-cv-418, Dkt. No. 14-1 (Feb. 20, 2025).

8. My conclusions are set forth below.

9. The government has offered essentially three explanations for transferring detainees to Guantanamo: (1) to meet capacity needs; (2) to facilitate removals by temporarily staging individuals at Guantanamo; and (3) to ensure safe and secure detention of detainees whom the government describes as "high threat illegal aliens" while the government finalizes arrangements for removal.

10. In my view, none of these rationales hold up. This conclusion is based on my extensive knowledge of immigration detention – including the kind of capacity, staging and security concerns referenced by the government – as well as my review of relevant data.

*Meeting Capacity Needs*

11. The government claims that using Guantanamo is necessary to meet ICE's capacity needs.[2] That is wrong.

---

[2] *See, e.g.*, Dep't of Def., *Department of Defense Announces Arrival of High-Threat Illegal Aliens at Guantanamo Bay Detention Facility* (Feb. 5, 2025), *available at*

3

12. There is no shortage of detention capacity in the United States that ICE could use, obtain, or develop at lower cost and with fewer logistical issues than by using Guantanamo.

13. Many of the detention facilities across the country with which ICE has signed agreements or access via the U.S. Marshals Service are not being utilized by ICE at any given time.

14. In many other facilities with which ICE has contracts, ICE has access to additional capacity that it is not using.

15. ICE can utilize many more detention facilities that have agreements with the U.S. Marshals Service. In the past ICE has also used facilities belonging to the U.S. Bureau of Prisons, and this month it began to do so again.[3] To the extent that these facilities meet health, welfare, and safety needs for ICE detainees, they provide additional detention capacity.

16. ICE can also expand to detention facilities that neither ICE nor the U.S. Marshals Services have previously used. It can enter into new Intergovernmental Service Agreements (IGSAs) with state and local detention facilities, or contractor operated facilities, for detention space. It can also enter into agreements with contractors or localities to construct new detention facilities.

---

https://perma.cc/Y3BN-ATA7 (Guantanamo will "provide additional detention space"); *Las Americas*, 1:25-cv-418, Dkt. No. 14-1 (Guantanamo is "necessary" to ensure "available detention space").

[3] Michael Sisak, *Federal Prisons Being Used to Detain People Arrested in Trump's Immigration Crackdown*, AP News (Feb. 7, 2025), *available at* https://apnews.com/article/immigration-federal-prisons-trump-25d676a6ebbff139ae04a75cd91be7e8.

4

17. Finally, ICE could use federal land to adapt existing structures or to quickly build new detention options with portable housing units or sprung structures. New temporary or permanent construction in the United States would be far easier than launching similar construction projects at Guantanamo.

18. ICE has over the years used these methods to establish a system for detaining, transporting and removing noncitizens. Operational considerations, like cost and logistics, weigh in favor of using these traditional methods to expand capacity, rather than detaining people on Guantanamo.

19. Detaining noncitizens at Guantanamo is far more costly and logistically burdensome than holding them in ICE detention facilities within the United States.

20. First and foremost, the military base is located on a remote island. Thus, everything from food to medical supplies to basic equipment, not to mention the detainees and the detention staff, must be brought in at substantial cost. Unlike employees at ICE detention centers, the United States must pay for housing, food, and transportation for personnel assigned to Guantanamo.

21. Because of its remote location, Guantanamo also requires more personnel to support the mission than a typical ICE detention center within the United States, which magnifies the cost discrepancies. It would not take nearly as many people to operate an ICE detention facility of similar size in the United States.

22. So far, the government has reportedly sent somewhere around 200 detainees to Guantanamo. That is less than 1% of ICE's current detained population, and a miniscule number when considering ICE's overall detention capacity. ICE could readily have detained those individuals in the United States.

23. The government has, however, announced it ultimately intends to use Guantanamo to house 30,000 detainees. But it would take a great deal of time and resources before it could develop the infrastructure for doing so. Guantanamo currently has two relatively small detention facilities. Guantanamo has nothing else to offer other than open land and an airstrip, something that can be found in abundance in the United States. In comparison to the very limited detention capacity currently available at Guantanamo, ICE can relatively quickly absorb an increased detainee population within the United States; the only limitation is availability of funds—but holding detainees at Guantanamo would require even greater funds than in the United States.

24. Given the additional expense and logistical burden of detention on Guantanamo, it is not surprising that ICE has never before transferred immigration detainees from the United States to Guantanamo. Indeed, to my knowledge, ICE has never previously seriously considered using Guantanamo to detain immigrants who have already entered the United States. The only migrants previously housed at the MOC are migrants apprehended at sea outside of U.S. territorial waters who have been deemed refugees and are in the process of being resettled.

*Facilitating Removals*

25. The government has also stated that use of Guantanamo is necessary to facilitate ongoing removals, but it makes no operational sense to funnel detainees through Guantanamo en route to their final destinations. The goal of removal planning is to make removals as simple and cost-effective as possible. Using Guantanamo as a

6

waystation for removals is completely contrary to those typical priorities for coordinating this process.

26. Sending people to Guantanamo adds an additional layer of expense and complexity to the removal process as detainees are transferred first to a U.S. staging area, and then to Guantanamo for a second layer of staging before their removal flights.

27. There is no need for this additional layer since ICE has plenty of detention options in close proximity to the removal hubs from which ICE Air operates ICE's chartered removal flights. Moreover, the costs per detainee at these facilities in the United States (the "per diem" cost) are much less expensive than detention at Guantanamo.

28. For example, one of the main ICE Air removal hubs is in Alexandria, Louisiana. There are a number of large detention facilities near Alexandria, including the Winn Correctional Center, Jackson Parish Correctional Center, Central Louisiana ICE Processing Center, South Louisiana Detention Center, and Adams County Detention Center, among others. ICE also has contracts with nearby jails that provide additional detention capacity.

29. The other advantage of these domestic detention facilities is that they can be reached by ground transportation, a significant cost saving over the expense of a flight.

30. Relatedly, when removal flights are manifested, often not everyone will get on the plane for various reasons, such as legal issues or medical concerns. Returning those individuals via ground transportation to nearby detention facilities is much easier and cheaper than returning them from Guantanamo to the United States.

31. In the case of the detainees who were recently flown from Fort Bliss, Texas to Guantanamo, then removed to Venezuela, ICE could have skipped sending them to

7

Guantanamo and instead detained them in one of the many detention facilities near an ICE Air hub in Texas, then put them directly on a flight to Venezuela.

32. Notably, on February 10, that is exactly what happened with another group of 190 Venezuelan detainees. ICE removed them to Venezuela from detention within the ERO El Paso Field Office's Area of Responsibility.[4] No transfer to Guantanamo was required. Yet on this very same day, ICE transferred 15 Venezuelan detainees from Fort Bliss (near El Paso) to Guantanamo.[5] And during the following week the government flew dozens more Venezuelans from Fort Bliss to Guantanamo—despite the government's acknowledgement that Venezuela had agreed to accept the return of its nationals, and that removals could be effectuated from Texas.[6]

33. Finally, in addition to the cost of the physical transfer, unnecessary transfers to Guantanamo are costly and burdensome for the agency due to increased demands on ICE staff and contractors.

34. Each transfer requires that someone book the detainee out of the transferring facility, book the detainee into the new facility, ensure that all paperwork and medical files are properly transferred with the detainee, conduct a new custody classification for the detainee upon transfer, and conduct a medical, dental and mental health screening of the detainee upon arrival at the new facility.

35. In sum, the government's explanation that transferring detainees to Guantanamo is a way to facilitate removals does not hold up.

---

[4] *Las Americas*, 1:25-cv-418, Dkt. No. 14-1 ¶ 11.
[5] *Id.* ¶ 8.
[6] *Id.* ¶¶ 7-8.

8

*Guantanamo Is Not Necessary to Ensure Detainee Safety and Security*

36. The government has also justified transferring detainees to Guantanamo, stating that it is to ensure safe and secure detention of individuals who they have described as gang members and highly dangerous.

37. But this rationale does not hold up either.

38. ICE detention facilities in the United States are adequately prepared to detain any noncitizen, regardless of their security risk level.

39. ICE has a clear custody classification system. Detainees are assessed a custody level and detained at that level. The custody classification system allows ICE facilities to separate non-criminal detainees from those with a history of violence. ICE facilities also have "Special Management Units" designed to house the highest risk and most violent detainees in a secure manner.

40. All but a handful of ICE detention facilities are able to manage all levels of detainees in a safe and secure manner, and it is not difficult for ICE to ensure that higher risk detainees are housed in appropriately secure facilities.

41. In fact, Guantanamo presents unique safety and security challenges that are not present in typical ICE detention facilities. If ICE plans to substantially expand bedspace at Guantanamo, it will have to use tent camps.[7] The soft-sided tents do not allow for direct observation unless a guard is placed in each one, which would be unlikely and extremely expensive. That might be acceptable for housing the lowest

---

[7] The government has recently halted plans to expand tent camps at Guantanamo. But it is unclear how it will be able to reach its goal of holding 30,000 detainees on Guantanamo without tents.

9

    risk detainees, but the risk of violence would be much more likely if the detainees housed in such a facility truly were dangerous.

42. In sum, none of the government's justifications for using Guantanamo to detain noncitizens withstand scrutiny. It is an inefficient, expensive, and illogical choice when considering ICE's detention and operational objectives.

Executed on this 28th day of February, 2025 in Washington D.C.

*Deborah T. Fleischaker*       2/28/2025 | 5:37 PM EST

Deborah Fleischaker