### DECLARATION OF JONATHAN ALEJANDRO ALVIARES ARMAS

I, Jonathan Alejandro Alviares Armas, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I make this declaration based on my own personal knowledge, and if called to testify, I could and would do so competently and truthfully to these matters.

2. My name is Jonathan Alejandro Alviares Armas. I believe ICE registered me in their system as Jhonatan, but that spelling of my name is incorrect. I am 29 years old and from Venezuela. I am the father of a one-year-old son who currently lives in the United States with his U.S. citizen mother.

3. I entered the United States on December 2, 2024, with my son, by way of a CBP One appointment. My son was very sick and required serious medical attention. Despite following the legal process, I was detained at the El Paso Processing Center immediately upon entry and I remained there for about two months.

4. I expressed fear and was scheduled for a Credible Fear Interview (CFI). During the interview, the officer did not have any concern for my fear and safety but rather believed I was a gang member because I am Venezuelan and have tattoos. I got this impression because the officer asked me several questions about Tren de Aragua, with which I have no association. As a result, I asked the officer to pause the interview partway through so that I could secure an attorney to represent me. The next day, an ICE officer presented a paper to me and asked me to sign it. I asked them to read it to me in Spanish because it is written in English, and I do not understand English. The officer told me it was to sign my deportation but did not read the document to me in Spanish, nor was a Spanish translation provided to me. I signed the document because I did not think I would get a fair CFI process after my initial CFI and after hearing from other Venezuelans in my unit that they were all being interrogated and accused of being gang members and terrorists. Some days before my transfer to Guantánamo, I managed to secure an attorney and as a result, I requested a new CFI via the tablet and also by written letter to my deportation officer, but I did not receive a response. I never had the opportunity to complete my CFI or see a judge.

5. On the night of February 3, 2025, I was woken up, told to get dressed, and pack up because I was going to be deported. Several hours later, nine other people and I were put on a military plane, and I began to suspect that I was not being taken to Venezuela because of the kind of plane I was on and because I was shackled, including to the floor. I began to panic because I did not know where I was going. After many hours of flying, we landed, were photographed, and were met with vans and about seven guards per person. I felt like a circus animal.

6. I learned shortly upon arriving at the destination that I was at Guantánamo Bay, Cuba, but not because anyone told me. Rather, I saw a rug that had Guantánamo written on it as I was entering. I was ordered to strip in the bathroom and show the officers all my body

parts, including my penis. I was given five minutes to shower. I was not given a toothbrush or clothing.

7. The whole transfer operation seemed unprepared and improvised to me because it was apparent that the facility was not ready for use. The place appeared to have been abandoned. There were cobwebs, a lot of dust, missing light fixtures, and some cells did not have beds. The bathroom did not have any light and the staff needed to bring a light fixture. I was the first to be taken there.

8. We were held in very small individual cells with no windows. My tiny cell contained a bed with a very thin foam pad, a sink, a bench, a table, and a toilet. There was a camera in every room. The lights were kept on, which made it very difficult to tell what time of day it was and generally hard to keep track of the days. I could only tell the days by the last meal of the day. It also made it very challenging to sleep. I am still having trouble sleeping because of my time there. Although the natural temperature of the place seemed to be warm and humid, it was very cold in the cells due to the air conditioning, and I was given only one thin blanket to keep myself warm. It was insufficient. After some days, we were provided with bibles.

9. Prior to my time at Guantánamo, I had never been held in solitary confinement, including while detained at the El Paso Processing Center. It was psychologically taxing to be forced to stay in a cell for days at end. After some days of being there, we were provided an option for "recreation time," but I was disheartened by that experience. I had hoped to see the sun and socialize with others during recreation. Instead, I and a few others were placed in a cage within a cage where we finally managed to speak with each other for a short time. There was no sunlight or view of the outside world.

10. Desperate for socialization, the other people who were detained and I yelled at each other through the cell walls to speak. We also tried to communicate with the outside world. We asked to make calls repeatedly and were not allowed to make any. On one occasion, an officer told us they would allow us to make a call in three days, but they never did. I wanted to speak with my loved ones and an attorney to tell them where I was and what I was experiencing, but I never had the opportunity. We did not have access to telephones or mail and were told that this was, at least in part, because we were on an island. It was especially difficult to be separated from my partner and young child.

11. During my entire time there, I wore the same clothing because we were never provided with clothing. We were only allowed to shower every three to four days. It was uncomfortable because there were cameras in the bathroom and the guards watched us shower. When I first arrived, there was warm water in the shower but then there were only cold showers.

12. Within the first three days of our arrival, the other detained people and I began a hunger strike. This was our way of protesting the inhumane conditions we were forced to endure there, including a lack of sufficient and quality food. The food rations we were given were hardly sufficient for a five-year-old-child and it was of terrible quality, somehow

worse than the food at the El Paso Processing Center. The food improved slightly after our strike, but it was still not enough, and I often felt hungry.

13. Generally, we were provided with drinking water whenever we asked the guards for it. However, deprivation or limitation of drinking water was sometimes used as a punishment. The psychological effects of our mistreatment manifested quickly and some of the people began starting to hurt themselves, including cutting themselves, and expressing that they wanted to commit suicide. One person tried to hang himself. When one person expressed wanting to kill himself, the officers punished him by halting and limiting the provision of water to him.

14. I witnessed physical mistreatment by officers while at Guantánamo. When we were finally provided with toothbrushes, it was only temporarily, while we brushed our teeth and then we had to return them to the guards. One day, I saw something happen to the person who had been deprived of sufficient water because he expressed intent to commit suicide. When it was time for him to return his toothbrush, he tried to negotiate with the guard and told him he would return the toothbrush once the guard gave him water. The guard agreed to swap the items at the same time. When it came time to provide the water bottle, the guard would not let go of the bottle as agreed to and slammed a radio onto the man's hand, seriously hurting his hand. I am not aware of this person receiving medical treatment for the injury.

15. In addition, some of us were tied up in a chair outside our cells for up to several hours, as a form of punishment for protesting our conditions and trying to assert our rights. The chair seemed like the kind of chair you see in movies used to restrain crazy people. We called this the chair of punishment.

16. We also experienced verbal and psychological mistreatment at Guantánamo. When ICE arrived at Guantánamo, we asked them why we were transferred, and they told us we were criminals and would pay for our entire lives. Officers told us we were terrorists and would be treated as such. I am not a criminal or a terrorist. One officer told us that if it were up to him, he would shoot us and throw us in the water. After some time, one of the Spanish-speaking officers told us, "none of you seem like terrorists." However, the treatment did not get better after that.

17. I suffer from nightmares due to my time at Guantánamo and I often feel like I'm shackled while awake even though I am no longer.

18. Although my detention at El Paso Processing Center was difficult. It does not compare to what I lived through at Guantánamo. The conditions at Guantánamo are insufferable. At least at El Paso Processing Center, I was able to socialize with other people, communicate with loved ones and attorneys, and receive basic necessities. I feel like I have been to hell after being detained at Guantánamo and I do not wish the experience of being detained at Guantánamo on anyone.

19. I am a different person after my detention at Guantánamo. The conditions there wore me down both physically and mentally. I have been out of Guantánamo for some days now

and I still feel very dysregulated and unable to fully integrate back into society. I am in the process of seeking psychological treatment to help me overcome my experiences there. Never did I imagine that traveling to the United States to seek safety for myself and medical treatment for my child would result in the worst experiences of my life. I have done nothing wrong and it is unjust for the government to baselessly accuse me of gang membership and terrorism and detain me incommunicado with no rights at Guantánamo.

20. Guantánamo is a living hell. No one should be subjected to this kind of treatment.

21. Because I am in transit through Venezuela without stable internet, I could not sign this declaration myself but gave consent to Jennifer Reyes to sign on my behalf.

Executed on the 28th day of February, 2025.

/s/ Jonathan Alejandro Alviares Armas
Jonathan Alejandro Alviares Armas

## ATTESTATION AND CERTIFICATE OF TRANSLATION

I, Jennifer Reyes, certify that I am fluent in both English and Spanish. On February 28, 2025, I personally spoke with Jonathan Alejandro Alviares Armas and read the foregoing declaration to him, translated into Spanish faithfully and accurately, over the phone. Mr. Alviares Armas affirmed that he understood my translation and that the information in the above declaration is true and accurate.

Due to Mr. Alviares Armas being currently in transit in Venezuela, it was not possible to obtain a written signature on the above declaration. In addition to confirming that the information in the above declaration is true, Mr. Alviares Armas also gave me verbal consent to sign on his behalf.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Jennifer Reyes
Paralegal
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
(212) 549-2635
jreyes@aclu.org