YAAKOV M. ROTH
*Acting Assistant Attorney General*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
AUGUST FLENTJE
*Acting Director*
SARAH WILSON
*Assistant Director*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 532-4700
Email: sarah.s.wilson@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ESPINOZA ESCALONA, *et al*., | ) Civil Action No. 25-0604 |
|  | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) |
| KRISTI NOEM, Secretary of the U.S. | ) |
| Department of Homeland Security, | ) |
| *et al.*, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## RESPONDENTS' OPPOSITION TO MOTION
## FOR STAY OF TRANSFER

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

LEGAL STANDARD ..................................................................................................... 6

ARGUMENT .................................................................................................................. 7

      I.      Plaintiffs lack standing to bring this suit and to seek the relief sought in their Motion. ..................................................................................................... 7

      II.     Plaintiffs' APA claims are not cognizable. ......................................................... 16

            A.     Plaintiffs do not challenge any final agency action. ............................... 16

            B.     Plaintiffs' APA claims also fail because transfer and removal decisions are committed to agency discretion by law. .............................. 18

            C.     The Court lacks jurisdiction to stay the government's exercise of discretion to transfer an alien ordered removed to an appropriate place of detention. .................................................................................... 20

      III.    To the extent Plaintiffs have any cognizable claims, they are improperly venued in the District Court for the District of Columbia. .................................. 23

      IV.    Plaintiffs are not likely to prevail on the merits of their claims............................ 24

            A.     The Secretary has the statutory authority to transfer immigration detainees to NSGB. .................................................................................. 25

            C.     Plaintiffs are unlikely to succeed on the merits of their substantive due process claims. .............................................................................. 33

      V.     Plaintiffs have not established that they are likely to suffer irreparable harm ..................................................................................................................... 38

      VI.    The balance of harms and equities favor denial of emergency injunctive relief. ................................................................................................................... 38

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Aamer v. Obama,*
  742 F.3d 1023 (D.C. Cir. 2014) ............................................................................... 6

*Abdullah v. Obama,*
  753 F.3d 193 (D.C. Cir. 2014) ................................................................................. 6

*Adams v. Vance,*
  570 F.2d 950 (D.C. Cir. 1978) ............................................................................... 40

*Americans for Immigrant Just. v. U.S. Dep't of Homeland Sec.,*
  No. CV 22-3118 (CKK), 2023 WL 1438376 (D.D.C. Feb. 1, 2023) ..................... 37

*Arizona v. United States,*
  567 U.S. 387 (2012) ............................................................................................... 18

*Bell v. Wolfish,*
  441 U.S. 520 (1979) ......................................................................................... 35, 37

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................................................................... 16

*Block v. Rutherford,*
  468 U.S. 576 (1984) ............................................................................................... 37

*Boumediene v. Bush,*
  553 U.S. 723 (2008) ................................................................................... 28, 29, 30

*Braden v. 30th Jud. Cir. Ct.,*
  410 U.S. 484 (1973) ............................................................................................... 24

*Carlson v. Landon,*
  342 U.S. 524 (1952) ............................................................................................... 33

*Castaneda-Lugo v. Mukasey,*
  263 F. App'x 164 (2d Cir. 2008) ........................................................................... 30

*Chamber of Com. of U.S. v. E.P.A.,*
  642 F.3d 192 (D.C. Cir. 2011) ................................................................................. 9

*Chatman–Bey v. Thornburgh,*
  864 F.2d 804 (D.C. Cir. 1988) ............................................................................... 24

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) ................................................................................................. 15

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ................................................................................................... passim

*Container Corp. of America v. Franchise Tax Bd.,*
463 U.S. 159 (1983) ............................................................................................................ 5

*De Leon v. Holder,*
761 F.3d 336 (4th Cir. 2014) ............................................................................................ 31

*Delgado v. Quarantillo,*
643 F.3d 52 (2d Cir. 2011) ............................................................................................... 22

*Demore v. Kim,*
538 U.S. 510 (2003) .......................................................................................................... 33

*DHS v.Thuraissigiam,*
591 U.S. 103 (2020) ..................................................................................................... 3, 31

*Doe v. Kelly,*
878 F.3d 710 (9th Cir. 2017) ............................................................................................ 37

*Dorfmann v. Boozer,*
414 F.2d 1168 (D.C. Cir. 1969) .......................................................................................... 7

*Dufur v. U.S. Parole Comm'n,*
34 F.4th 1090 (D.C. Cir. 2022) ........................................................................................ 24

*E.O.H.C. v. Sec'y United States Dep't of Homeland Sec.,*
950 F.3d 177 (3d Cir. 2020) ............................................................................................. 31

*Edison C. F. v. Decker,*
No. 2-cv-15455-SRC, 2021 WL 1997386 (D.N.J. May 19, 2021) ......................................... 19

*Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington,*
566 U.S. 318 (2012) .......................................................................................................... 35

*Flytenow, Inc. v. FAA,*
808 F.3d 882 (D.C. Cir. 2015) .......................................................................................... 16

*Gandarillas-Zambrana v. Bd. Immigration Appeals,*
44 F.3d 1251 (4th Cir. 1995) ............................................................................................ 23

*Garcia v. Green Fleet Sys., LLC,*
No. CV 14–6220, 2014 WL 5343814 (C.D. Cal., Oct. 10, 2014) ........................................... 38

*Greater New Orleans Hous. Action Ctr. v. HUD,*
639 F.3d 1078 (D.C. Cir. 2011) .......................................................................................... 6

*Guangzu Zheng v. Decker,*
No 14-cv-4663-MHD, 2014 WL 7190993 (S.D.N.Y. Dec. 12, 2014) ................................... 21

*Handa v. Crawford,*
312 F. Supp. 2d 1367 (W.D. Wash. 2004) ......................................................................... 30

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952) ............................................................................................. 19, 36

*Holder v. Humanitarian L. Project*,
    561 U.S. 1 (2010) .......................................................................................................... 36

*Innovation Law Lab v. McAleenan*,
    924 F.3d 503 (9th Cir. 2019) ....................................................................................... 40

*INS v. Abudu*,
    485 U.S. 94 (1988) ........................................................................................................ 34

*INS v. Aguirre-Aguirre*,
    526 U.S. 415 (1999) ...................................................................................................... 34

*Jacquet v. Hodgson*,
    No. CIV.A. 03-11568RWZ, 2003 WL 22290360 (D. Mass. Oct. 6, 2003) ............... 21

*Jama v. Immigration and Customs Enforcement*,
    543 U.S. 335 (2005) ...................................................................................................... 17

*Jennings v. Rodriguez*,
    583 U.S. ................................................................................................................... 4, 21

*Jimenez v. Holder*,
    338 F. App'x 194 (3d Cir. 2009) .................................................................................. 22

*Kaplan v. Tod*,
    267 U.S. 228 (1925) ...................................................................................................... 31

*Kerry v. Din*,
    576 U.S. 86 (2015) ........................................................................................................ 19

*Keystone Shipping Co. v. United States*,
    729 F. Supp. 136 (D.D.C. 1990) .................................................................................. 11

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ...................................................................................................... 20

*Landon v. Plasencia*,
    459 U.S. 21 (1982) ........................................................................................................ 40

*Lawyers Ass'n v. Reno*,
    (*AILA*), 199 F.3d 1352 (D.C. Cir. 2000) ...................................................................... 3

*Lin Zhong v. DOJ*,
    480 F.3d 104 (2d Cir. 2007) ......................................................................................... 31

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................................ 8

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ...................................................................................................... 16

iv

*Mancho v. Chertoff,*
    480 F. Supp. 2d 160 (D.D.C. 2007) ........................................................................... 23

*Mathews v. Diaz,*
    426 U.S. 67 (1976) ............................................................................... 18, 34, 36

*Matter of G-N-C,*
    22 I. & N. Dec. 281 (BIA 1998) ........................................................................... 29

*Matter of T,*
    6 I. & N. Dec. 638 (BIA 1955) ........................................................................... 30

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ........................................................................... 6

*Mendoza-Linares v. Garland,*
    51 F.4th 1146 (9th Cir. 2022) ........................................................................... 24

*Nasrallah v. Barr,*
    590 U.S. 573 (2020) ........................................................................... 22

*Newman–Green, Inc. v. Alfonzo–Larrain,*
    490 U.S. 826 (1989) ........................................................................... 8

*Nicursor-Remus v. Sessions,*
    902 F.3d 895 (9th Cir. 2010) ........................................................................... 31, 32

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................... 6, 39

*O'Lone v. Est. of Shabazz,*
    482 U.S. 342 (1987) ........................................................................... 35

*Office v. FERC,*
    949 F.3d 8 (D.C. Cir. 2020) ........................................................................... 9

*Padilla-Ramirez v. Bible,*
    882 F.3d 826 (9th Cir. 2017) ........................................................................... 17

*Pension Benefit Guaranty Corporation v. LTV Corp.,*
    496 U.S. 633 (1990) ........................................................................... 5

*Pharm. Rsch. & Manufacturers of Am. v. HHS,*
    656 F. Supp. 3d 137 (D.D.C. 2023) ........................................................................... 9, 11, 14

*Privacy Info. Ctr. v. Dep't of Justice,*
    15 F. Supp. 3d 32 (D.D.C. 2014) ........................................................................... 7

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.,*
    489 F.3d 1279 (D.C. Cir. 2007) ........................................................................... 12

*R.I.L-R v. Johnson,*
    80 F. Supp. 3d 164 (D.D.C. 2015) ........................................................................... 36, 37

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n,*
    324 F.3d 726 (D.C. Cir. 2003) ................................................................. 16

*Reno v. American-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999) ............................................................... 19, 21, 22, 39

*Reno v. Flores,*
    507 U.S. 292 (1993) ............................................................................. 34

*Rhodes v. Chapman,*
    452 U.S. 337 (1981) ............................................................................. 37

*RJR Nabisco, Inc. v. European Cmty.,*
    579 U.S. 325 (2016) ............................................................................. 26

*Rubin ex rel. N.L.R.B. v. Vista Del Sol Health Services, Inc.,*
    80 F. Supp. 3d 1058 (C.D. Cal. 2015) ................................................... 38

*S. Poverty L. Ctr. v. DHS,*
    No. CV 18-760 (CKK), 2020 WL 3265533 (D.D.C. June 17, 2020) ....................... 37

*Saba Cap. Cef Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund,*
    88 F.4th 103 (2d Cir. 2023) .................................................................. 14

*Saba Cap. Master Fund, Ltd. v. BlackRock Mun. Income Fund, Inc.,*
    710 F. Supp. 3d 213 (S.D.N.Y. 2024) ..................................................... 14

*Sale v. Haitian Centers Council, Inc.,*
    509 U.S. 155 (1993) ............................................................................. 27

*Sheldon v. Sill,*
    49 U.S. 441 (1850) ............................................................................. 20

*Sherley v. Sebelius,*
    644 F.3d 388 (D.C. Cir. 2011) ................................................................ 6

*Spokeo,*
    578 U.S. ............................................................................... passim

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ..................................................................... 7, 9, 15

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) .......................................................................... 9, 10

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ............................................................................. 36

*Turner v. Safley,*
    482 U.S. 78 (1987) ............................................................................. 35

*United States ex rel. Knauff v. Shaughnessy,*
    338 U.S. 537 (1950) ............................................................................. 2

*United States v. Al-Imam*,
  373 F. Supp. 3d 247 (D.D.C. 2019) ................................................................ 26

*United States v. Argueta-Rosales*,
  819 F.3d 1149 (9th Cir. 2016) ...................................................................... 29

*United States v. Sanchez*,
  604 F.3d 356 (7th Cir. 2010) ....................................................................... 32

*United States v. Texas*,
  599 U.S. 670 (2023) ................................................................................... 21

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981) ..................................................................................... 7

*Van Dinh v. Reno*,
  197 F.3d 427 (10th Cir. 1999) ............................................................... 19, 23

*Veitch v. Danzig*,
  135 F. Supp. 2d 32 (D.D.C. 2001) ................................................................. 7

*Vetcher v. Sessions*,
  316 F. Supp. 3d 70 (D.D.C. 2018) ..................................................... 18, 22, 24

*Vote Forward v. DeJoy*,
  No. CV 20-2405 (EGS), 2021 WL 1978805 (D.D.C. May 18, 2021) ....................... 9

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ................................................................................... 36

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ................................................................................... 10

*Winter v. NRDC*,
  555 U.S. 7 (2008) .................................................................................... 2, 39

*Wong Wing v. United States*,
  163 U.S. 228 (1896) ................................................................................... 34

*Wood v. United States*,
  175 F. App'x 419 (2d Cir. 2006) ................................................................... 23

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) ............................................................................ 4, 5, 25

**Statutes**

28 U.S.C. § 1406(a) ....................................................................................... 24

28 U.S.C. § 2241 ........................................................................................ 1, 21

5 U.S.C. § 701(a)(1) ...................................................................................... 20

5 U.S.C. § 701(a)(2) ...................................................................................... 18

5 U.S.C. § 704 ................................................................................................ 16, 17

5 U.S.C. § 706(2)(A) ............................................................................................ 1

6 U.S.C. § 202(5) ................................................................................................. 2

6 U.S.C. § 251 ................................................................................................... 19

6 U.S.C. § 291 ................................................................................................... 19

8 U.S.C § 1103(a) .............................................................................................. 25

8 U.S.C § 1231(b)(2) .......................................................................................... 31

8 U.S.C. § 1101(a)(38) ....................................................................................... 28

8 U.S.C. § 1103(a)(1) ......................................................................................... 19

8 U.S.C. § 1103(a)(3) ........................................................................................... 2

8 U.S.C. § 1182(a)(6)(C) ...................................................................................... 3

8 U.S.C. § 1182(d)(5)(A) ...................................................................................... 4

8 U.S.C. § 1182(f) .............................................................................................. 10

8 U.S.C. § 1225(b)(1) ........................................................................................... 3

8 U.S.C. § 1225(b)(1)(B)(iii)(IV) .......................................................................... 3

8 U.S.C. § 1229a ............................................................................................... 3, 4

8 U.S.C. § 1231(a) ................................................................................................ 4

8 U.S.C. § 1231(a)(1)(A) .................................................................................... 17

8 U.S.C. § 1231(a)(6) ......................................................................................... 25

8 U.S.C. § 1231(b) ................................................................................. 17, 28, 29

8 U.S.C. § 1231(b)(1)(A) .................................................................................... 29

8 U.S.C. § 1231(b)(1)(C) .................................................................................... 29

8 U.S.C. § 1231(e)(3)(A) .................................................................................... 25

8 U.S.C. § 1231(f) .............................................................................................. 25

8 U.S.C. § 1231(g) ................................................................................ 17, 21, 25, 26

8 U.S.C. § 1252 .............................................................................................. 19, 20

8 U.S.C. § 1252(a)(1) ........................................................................................... 4

8 U.S.C. § 1252(a)(5) ............................................................................. 17, 20, 22

8 U.S.C. § 1252(b)(9) ......................................................................................... 22

8 U.S.C. § 1252(g) ............................................................................................. 21

8 U.S.C. §§ 1103(a)(3), 1225(b)(1)(B)(iii)(IV), 1231(a)(6), and 1231(g) ....................................... 2

**Rules**

Fed. R. Evid. 801(c) ............................................................................................... 38

**Regulations**

8 C.F.R. § 208.30(f) ............................................................................................... 3

8 C.F.R. § 233.15(b)(4) .......................................................................................... 3

**Other Authorities**

*INS Issues New Procedures for Entry of Aliens Granted Advance Parole*,
   70 Interpreter Releases 1675 (Dec. 20, 1993) ........................................... 30

**INTRODUCTION**

Plaintiffs, ten individuals with final orders of removal detained in immigration detention facilities located in Texas, Arizona, and Georgia, filed this emergency motion seeking an order to prevent their potential transfer to the Naval Station Guantanamo Bay (NSGB). In support of their motion, Plaintiffs contend that they are at imminent risk of transfer because they "heard" that the Department of Homeland Security (DHS) is transferring immigration detainees with final orders of removal to NSGB and believe they share one or more characteristics of some of the transferred detainees. If actually transferred, Plaintiffs claim that their detention at NSGB would be inconsistent with the Secretary of Homeland Security's authority under the Immigration and Nationality Act (INA), and would result in the Plaintiffs being subject to unconstitutional conditions of confinement. They assert these challenges under both the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), and through a writ of habeas corpus, 28 U.S.C. § 2241. ECF No. 1 at ¶¶ 64-80.

Plaintiffs' request for emergency relief fails on multiple levels. First, Plaintiffs lack standing to challenge their prospective detention at NSGB as they are only ten of the tens of thousands of immigration detainees in DHS custody and lack any reasonable basis to claim they are at imminent risk of transfer. Second, Plaintiffs fail to show that their claims—all challenging the (hypothetical) legality of their detention and their (hypothetical) conditions of confinement if transferred to NSGB—are cognizable under the APA. They also are not cognizable as Plaintiffs challenge presidential orders, non-final actions, and matters subject to the Secretary's discretion and statutory review bars. In reality, at best, Plaintiffs' claims sound in habeas, and to the extent any of the claims survive a motion to dismiss, they should be severed into individual habeas cases and transferred to the Plaintiffs' respective jurisdictions of confinement.

1

Plaintiffs' claims also fail on the merits. The Secretary of Homeland Security has the authority to detain individuals with final orders of removal in overseas U.S. Government facilities consistent with 8 U.S.C. §§ 1103(a)(3), 1225(b)(1)(B)(iii)(IV), 1231(a)(6), and 1231(g). Defendants have acted in a manner consistent with that authority as well as the President's Memorandum, Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity (Jan. 29, 2025). In addition, Plaintiffs' allegations regarding the conditions of confinement are inconsistent with current DHS procedures and do not support entry of an order prohibiting transfers to NSGB.

Finally, Plaintiffs fail to show that the remaining equitable factors support the entry of temporary injunctive relief. Notably, Plaintiffs cannot show that "irreparable injury is *likely* in the absence of" preliminary relief, which is a bedrock requirement. *Winter v. NRDC*, 555 U.S. 7, 22 (2008). For all the reasons that Plaintiffs have failed to establish that their transfer to NSGB is imminent, they cannot establish it is likely either.  In addition, Plaintiffs are not presently subject to the challenged conditions, are represented by counsel, and would have the ability to challenge any unlawful detention should their predictions prove correct. Conversely, an order restricting the government's ability to transfer detainees with final orders of removal will interfere with the government's ability to plan, stage, and carry out removal operations, which would be contrary to the public interest. The Court should deny the motion.

## BACKGROUND

**A. *Legal Background.*** The Executive Branch has extensive constitutional authority in the field of immigration, and Congress has further conferred broad statutory discretion over the administration and enforcement of the nation's immigration laws. *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see, e.g.*, 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a)(3). Prior

to January 20, 2025,[1] applicants for admission who were intercepted at entry or shortly after unlawfully entering the United States could be subject to an expeditious process to remove them from the United States under 8 U.S.C. § 1225(b)(1), as described herein. Under this process—known as expedited removal—applicants for admission arriving in the United States (as designated by the Secretary of Homeland Security) who entered illegally and lack valid entry documentation or make material misrepresentations shall be "order[ed] . . . removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i); *see* 8 U.S.C. § 1182(a)(6)(C), (a)(7); *see also DHS v. Thuraissigiam*, 591 U.S. 103, 107-110 (2020) (discussing expedited removal); *Am. Immigr. Lawyers Ass'n v. Reno* (*AILA*), 199 F.3d 1352, 1354-55 (D.C. Cir. 2000) (same). They will remain subject to a final order of expedited removal if they do not manifest a fear of return, or if they manifest fear but are unable to show that the fear is credible. *See* 8 U.S.C. §§ 1225(b)(1)(A)(ii), 1225(b)(1)(B)(v); 8 C.F.R. § 233.15(b)(4). Individuals subject to a final order of expedited removal can be lawfully detained until they are removed from the United States. 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). Individuals subject to final orders of expedited removal have very limited due process rights with respect to their admission to the United States. *See Thuraissigiam*, 591 U.S. at 138-40.

  If the applicant for admission manifests a fear of return and the asylum officer determines that the applicant has a credible fear, the officer will issue a Notice to Appear, placing the applicant in removal proceedings under 8 U.S.C. § 1229a. 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f). These removal proceedings provide more extensive procedures than expedited removal, *compare*

---

[1] *See* Protecting the American People Against Invasion, https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/ (Jan. 20, 2025).

8 U.S.C. § 1229a *with* § 1225(b)(1), including a right to appeal to the Board of Immigration Appeals (Board) and a federal appellate court. 8 U.S.C. § 1252(a)(1). An applicant for admission who demonstrates a credible fear "shall be detained for further consideration of the application for asylum."[2] 8 U.S.C. § 1225(b)(1)(B)(ii); *Jennings*, 583 U.S. at 297 ("Read most naturally, §§ 1225(b)(1) and (b)(2) . . . mandate detention of applicants for admission until certain proceedings have concluded.").

For anyone with a final order of removal entered following removal proceedings held under 8 U.S.C. § 1229a, Congress has authorized detention under 8 U.S.C. § 1231(a) while the government works to execute the removal order. Section 1231(a)(6), as interpreted by the Supreme Court in *Zadvydas v. Davis*, 533 U.S. 678, 699-701 (2001), limits post-final-order detention to the period reasonably necessary to accomplish removal. 533 U.S. at 701. The Court determined that six months is a presumptively reasonable period of time to allow the government to complete removal after the removal period has commenced. *Id*. at 701.

Once the six-month period has run, and "the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, [then] the Government must respond with evidence sufficient to rebut that showing." *Id*. "This 6–month presumption, of course, does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701. In making this assessment, the Supreme Court has counseled immigration habeas

---

[2] The only exception to § 1225(b)(1)'s detention mandate is found in 8 U.S.C. § 1182(d)(5)(A), which allows DHS to parole applicants for admission into the United States for "urgent humanitarian reasons or significant public benefit." *See Jennings*, 583 U.S. at 300 (holding that the existence of § 1182(d)(5)(A)'s "express exception to detention implies that there are no other circumstances under which aliens detained under § 1225(b) may be released").

courts to apply "[o]rdinary principles of judicial review" in order to "give expert agencies decisionmaking leeway in matters that invoke their expertise" and "recognize [the] Executive Branch['s] primacy in foreign policy matters." *Id.* at 700 (citing *Pension Benefit Guaranty Corporation v. LTV Corp.*, 496 U.S. 633, 651-652 (1990); *Container Corp. of America v. Franchise Tax Bd.*, 463 U.S. 159, 196 (1983)). Specifically, the Supreme Court instructed habeas courts to "listen with care when the Government's foreign policy judgments, including, for example, the status of repatriation negotiations, are at issue, and to grant the Government appropriate leeway when its judgments rest upon foreign policy expertise." *Zadvydas*, 533 U.S. at 700.

**B. *Factual Background.*** On January 29, 2025, the President issued a Memorandum ordering DHS and the Department of Defense (DoD) to take all necessary steps to expand the Migrant Operations Center (MOC) in NSGB to allow for the housing of "high-priority criminal aliens unlawfully present in the United States." DoD acted swiftly to comply with the President's Order by creating the Joint Task Force Southern Guard (JTF-SG) to work with DHS to operationalize the Memorandum. Declaration of Lieutenant Colonel Robert Green at ¶¶ 2-3.

The detainees are housed in two areas of the base, with the higher-threat immigration detainees housed in Camp VI and the lower-threat detainees housed at the MOC. Green Decl. at ¶¶ 3-4, 16-17. As of March 7, 2025, there are a total of 40 immigration detainees located at NSGB, 23 are housed at Camp VI and 17 are housed at the MOC. Declaration of Deputy Field of Director Juan Lopez Vega at ¶ 8. A total of 290 immigration detainees have transited through NSGB since the start of the mission. Lopez Vega Decl. at ¶ 7. All of these detainees have final orders of removal, and have been from 27 different countries. Lopez Vega Decl. at ¶ 8. They have been

transferred to NSGB as a staging point in route to completing their removals. Lopez Vega Decl. at ¶ 8.

DHS has developed procedures applicable to immigration detainees at NSGB, and DoD is following and supporting DHS procedures. Lopez Vega Decl. at ¶¶ 9-38; Green Decl. at ¶¶ 3, 6-10, 12-13, 18-19, 21-31.  Defendants are providing immigration detainees access to counsel, the opportunity to make calls to family and friends, communal living, recreation time, nutrition, and medical care, and are handling searches and behavioral issues consistent with the Departments' practices. Lopez Vega Decl. at ¶¶ 9-38; Green Decl. at ¶¶ 5-6, 8, 10, 13, 19, 22.

## LEGAL STANDARD

A plaintiff seeking a temporary restraining order "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alteration in original) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)); *Abdullah v. Obama*, 753 F.3d 193, 197–98 (D.C. Cir. 2014) (same). The last two factors merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).  A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948 (2d ed. 1995)). The Court of Appeals has emphasized that the "first and most important factor" is whether the moving party has "established a likelihood of success on the merits." *Aamer*, 742 F.3d at 1038. "[W]hen a plaintiff has not shown a likelihood of success on the merits, [the court] need not consider the other factors." *Greater New Orleans Hous. Action*

*Ctr. v. HUD*, 639 F.3d 1078, 1088 (D.C. Cir. 2011).

The D.C. Circuit has expressly cautioned that "[t]he power to issue a preliminary injunction should be 'sparingly exercised.'" *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (citation omitted). Heeding this caution, where, as here, the requested injunction is "mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act," the Court requires the moving party to "meet a higher standard than in the ordinary case by showing a clear entitlement to relief to avoid extreme or very serious damage." *See, e.g., Elec. Privacy Info. Ctr. v. Dep't of Justice*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014) ("*EPIC II*") (collecting cases); *Veitch v. Danzig*, 135 F. Supp. 2d 32, 35 & n.2 (D.D.C. 2001) (holding that where "a ruling would alter, not preserve, the *status quo*," the plaintiff "must meet a higher standard than were the injunction he sought merely prohibitory," in light of the Supreme Court's holding that "'[t]he purpose of a preliminary injunction is merely to preserve the relative position of the parties until a trial on the merits can be held'" (alteration in original) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981))).

## ARGUMENT

## I.      Plaintiffs lack standing to bring this suit and to seek the relief sought in their Motion.

Article III of the U.S. Constitution limits the jurisdiction of federal courts to "cases" and "controversies." U.S. Const. art. III, § 2. "One element of the case-or-controversy requirement is that [Plaintiffs] must establish that they have standing to sue." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (cleaned up). "To seek injunctive relief, a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

In particular, "[t]o establish Article III standing, an injury must be concrete, particularized, and actual or imminent," *Clapper*, 568 U.S. at 409 (quotations omitted), at the time the action is filed. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n.4 (1992) (citing *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 830 (1989)). The injury must demonstrate that the individual "suffered an invasion of a legally protected interest" that is not "conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (internal quotations omitted). Here, Plaintiffs fail to establish a requisite injury in fact. Plaintiffs' claimed "injuries" here are (1) the very type of hypothetical and conjectural claims that the Supreme Court has cautioned against and (2) neither actual nor imminent. *See id.*

Plaintiffs allege two primary "layers" of speculative, future injuries (from which additional injuries allegedly flow). First, they allege that they will be transferred to NSGB by virtue of certain risk factors, including their nationality, final orders of removal, tattoos, allegations made against them of criminality (which they allege are false), or alleged statements that they would be transferred to NSGB. *See* Mot. at 10–11. Second, Plaintiffs allege that upon transfer to NSGB, their rights will be violated. *See id.* at 34–36. Neither of these conjectural layers qualify as "actual" or "imminent" injury. *Clapper*, 568 U.S. at 409. Plaintiffs thus lack Article III standing.

### 1.    *Lack of Concrete and Particularized Injury*

An injury in fact must be "concrete and particularized." *See Spokeo*, 578 U.S. at 339. "For an injury to be particularized, it must affect the Plaintiff in a personal and individual way." *Id.* (internal quotations omitted). "A concrete injury must be *de facto*; that is, it must actually exist." *Id.* at 340 (internal quotations omitted). Under this analysis, Plaintiffs cannot demonstrate an actual injury, and plaintiffs have effectively admitted as much. *See* Mot. at 1, 10. Plaintiffs have not been

transferred to NSGB. *See id.* at 1. As a result, Plaintiffs' alleged injury arising from their hypothetical transfer to and confinement at NSGB does not "actually exist" and cannot be "concrete" for that very reason. *See Spokeo*, 578 U.S. at 340. Neither can their claimed injury be "particularized" since Plaintiffs have not been, and, presently, cannot, be affected in a personal and individual way by the legality of a transfer to NSGB or the conditions in that facility. *See id.* at 339. Simply put, neither the existence of immigration detention at NSGB nor the conditions there has yet affected *these particular Plaintiffs* in a single concrete way. And the prospect that it might is simply the sort of "conjectural or hypothetical" injury that does not establish standing. *Summers*, 555 U.S. at 493.

Plaintiffs are, therefore, unable to show an actual injury that is concrete and particularized. *See id.* 339–40; *Vote Forward v. DeJoy*, No. CV 20-2405 (EGS), 2021 WL 1978805, at *23 (D.D.C. May 18, 2021) ("Standing to seek . . . forward-looking injunctive relief requires [Plaintiffs] to show that [they are] suffering an *ongoing* injury." (emphasis added) (citing *Office v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020))).

### 2.    *Lack of Imminent Injury*

Where, as here, a party is alleging future injuries, the "burden to establish standing [] is 'significantly more rigorous.'" *Pharm. Rsch. & Manufacturers of Am. v. HHS*, 656 F. Supp. 3d 137, 150 (D.D.C. 2023) (quoting *Chamber of Com. of U.S. v. E.P.A.*, 642 F.3d 192, 200 (D.C. Cir. 2011)). To demonstrate a cognizable future injury, Plaintiffs must show that (1) the "'threatened injury' is 'certainly impending,' rather than merely 'possible,'" *id.* (citing *Clapper*, 568 U.S. at 409), or (2) that "there is a substantial risk that the harm will occur." *Id.* (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Plaintiffs cannot make either showing for the same reason: their alleged injuries are far too speculative to be cognizable. Put differently, Plaintiffs

have not shown there is a "substantial risk" that they will be transferred to NSGB and subjected to violations of their rights there. *See id.* Neither have Plaintiffs shown that transfer to NSGB and abuses there are "certainly impending." *See id.* None of the facts alleged are sufficient to permit the Court to find that Plaintiffs allege an imminent injury.

Plaintiffs' claim of imminent injury is belied by the sheer number of detainees who have been repatriated (i.e., removed, returned, or expelled pursuant to a legal authority such as 8 U.S.C. § 1182(f)) without ever transiting through NSGB. That number, which in 2024 ranged from 47,490 to 74,360 monthly repatriations, simply dwarfs the small number of detainees—290 as of March 7, 2025—who have been transferred to NSGB since the Memorandum was issued more than a month ago. Office of Homeland Security Statistics, *Immigration Enforcement and Legal Processes Monthly Tables*, https://ohss.dhs.gov/topics/immigration/immigration-enforcement/immigration-enforcement-and-legal-processes-monthly (last updated Jan. 16, 2025); Lopez Vega Decl. at ¶¶ 7, 8. Plaintiffs may argue that the reference group should be more limited because the majority of them are Venezuelan nationals. But three of the Plaintiffs are not Venezuelan and instead hail from different parts of the world. Compl. ¶¶ 20–22 (identifying Plaintiffs of Afghan, Pakistani, and Bangladeshi nationality). Further, there are currently no Venezuelans detained at NSGB, with the 40 current detainees being from 27 distinct countries. Lopez Vega Decl. at ¶ 8.

Plaintiffs are unable to point to anything in the Memorandum that would suggest the government has plans to route Venezuelan detainees exclusively or even primarily through NSGB, or even at a materially higher rate than other detainees over a sustained period of time. Instead, they are simply projecting that all future transfers to NSGB will be similar to the first wave without offering any evidence to support their assumption. In any case, even if Plaintiffs were to base their estimation of the likelihood of being transferred to NSGB using strictly Venezuelan cases as a

baseline, they would still be hard-pressed to show that their transfer is "certainly impending to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). Indeed, the government has completed removals to Venezuela from the United States, including the 190 Venezuelans who were removed from El Paso on February 10, 2025. *Las Americas v. Noam, No. 25-cv-418*, at ECF No. 14-1 (Agudelo Declaration) at ¶ 11.

In the face of these limited odds, Plaintiffs contend that there still is an imminent injury because of their risk factors, *i.e.*, the "risk of being transferred to [NSGB] because of a combination of their final orders, nationality, and/or ICE's frequently false allegations of gang membership and criminality based on their tattoos." *See* Mot. at 11. In addition, Plaintiffs note that some of them were familiar with alleged threats made by "ICE officers [who] threatened multiple Venezuelans with transfer to [NSGB] if they [did] not agree to deportation to Mexico." *Id.* Plaintiffs' risk factors could demonstrate—at *very* best—some possibility that they could be transferred to NSGB. But that is simply not enough to meet the "significantly more rigorous" burden of showing imminent injury. *Pharm. Rsch.*, 656 F. Supp. 3d at 150 (quotations omitted); *see id.* And for the reasons below, Plaintiffs' factual allegations and risk factors fall short of demonstrating a likelihood of imminent injury.

*First*, the declarations submitted by Plaintiffs states that Plaintiffs "heard" that the government is transferring Venezuelans with final orders of removal who ICE believes to be criminals to NSGB as a basis for their belief that they may also be transferred. *See generally* ECF Nos. 2-4 through 2-13. But rumors cannot form the basis of a cognizable injury for purposes of Article III standing. *See Keystone Shipping Co. v. United States*, 729 F. Supp. 136, 140 (D.D.C. 1990) (finding that plaintiffs lacked standing based in part on the fact that they only provided broad allegations of injury based off rumors of an event yet to occur). And, here, the rumor does not

connect the dots on Plaintiffs' transfer, leaving Plaintiffs to supply their own speculations about what the rumor means for them. Plaintiffs' assertions that they "fit the profile of people that the government has targeted for transfers—individuals with final orders of removal, including Venezuelans" (Mot. at 10) is far too "abstract," "conjectural," and "hypothetical" to adequately demonstrate imminent injury. *See Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007). Indeed, under this theory, any detainee with a final order of removal could claim an imminent injury by asserting a risk of transfer to NSGB—regardless of their country of origin[3] or other factors. This does not set Plaintiffs apart from any other detainee with a final order of removal and falls short of the requirement that an injury in fact be "concrete," because Plaintiffs' theory indicates that the risk of transfer is not material. *See Spokeo*, 578 U.S. at 340.

*Second,* Plaintiffs' contentions about the combination of risk factors Plaintiffs allege might lead to imminent transfer to NSGB lacks coherence and internal consistency—further indicating that their alleged injury is "abstract," "conjectural," and "hypothetical." *See Pub. Citizen, Inc.*, 489 F.3d at 1292. For example, Plaintiff Escalona declares that he is at risk of being transferred to NSGB because he is a Venezuelan national, has a final order of removal, and has tattoos. ECF No. 2-4, Escalona Decl. ¶ 5. But these first two qualities do not equate to a certainty of impending transfer to NSGB. Indeed, Ms. Fleischaker declares that "190 Venezuelan detainees" were removed "to Venezuela" without "transfer to Guantanamo." *See* ECF No. 2-14, Fleischaker Decl. ¶ 32. These 190 Venezuelan detainees are ostensibly Venezuelan nationals—like Plaintiff

---

[3] The fact that three of the Plaintiffs in this action are not Venezuelan undercuts an implicit theme in Plaintiffs' action: that if an individual is Venezuelan with a final order of removal, they are at a heightened risk of transfer to NSGB. *See* Compl. ¶¶ 20–22 (stating that three of the Plaintiffs are either Afghan, Pakistani, or Bangladeshi nationals, respectively); *but see, e.g.,* Mot. at 10 n.17 ("the only criteria to be sent to the base were being Venezuelan with final removal order").

Escalona—and they certainly had final orders of removal—also like Plaintiff Escalona. But these detainees were not transferred to NSGB, despite Plaintiffs' claim that Venezuelan nationals with final orders of removal are subject to increased risk of transfer to NSGB. *See* Mot. 10–11. This, again, demonstrates that Plaintiffs do not face any "certainly impending" injury here. *See Clapper*, 568 U.S. at 409 ("Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." (emphasis in original) (quotations omitted)).

Plaintiff Escalona, and similarly situated Plaintiffs, claim that their tattoos add to the risk of imminent transfer to NSGB is also unavailing. For example, Plaintiff Laguna also declares that he is at risk of transfer to NSGB as a Venezuelan national with a final order of removal, but he does not claim to have any tattoos. *See generally* ECF No. 2-7, Laguna Decl. Neither do Plaintiffs Sebrian, Salazar, Malik, Muhammad, and Rayhan. *See generally* ECF No. 2-9, Sebrian Decl.; ECF No. 2-10, Salazar Decl.; ECF No. 2-11, Malik Decl.; ECF No. 2-12, Muhammad Decl.; ECF No. 2-13, Rayhan Decl. What Plaintiffs really argue, then, is that tattoos demonstrate risk of imminent injury, but also that injury is still imminent despite a lack of tattoos. This is not concrete. *See Spokeo*, 578 U.S. at 340.

*Finally,* Plaintiffs argue that they are at risk of being transferred to [NSGB] because (1) the government is targeting individuals it believes to be involved with gangs or other criminality and ICE has alleged some Plaintiffs' involvement in gangs or other forms of criminality and (2) ICE threatened "multiple Venezuelans with transfer to [NSGB] if they do not agree to deportation to Mexico." *See* Mot. at 11. But not every Plaintiff has been accused of criminality or allegedly threatened with transfer to NSGB. *See, e.g.*, ECF No. 2-12, Malik Decl. More importantly, these

13

allegations are insufficient to support their conclusion that transfer to NSGB is imminent. "When an Article III injury hinges on a party's intent to take some future action, the Constitution requires more than mere 'some day' intentions. A plaintiff's few words of general intent, without substantial evidence of plans, do not support a finding of an actual or imminent injury." *Saba Cap. Master Fund, Ltd. v. BlackRock Mun. Income Fund, Inc.*, 710 F. Supp. 3d 213, 220–21 (S.D.N.Y. 2024), *aff'd sub nom. Saba Cap. Master Fund, LTD. v. Blackrock ESG Cap. Allocation Tr.*, No. 23-8104, 2024 WL 3174971 (2d Cir. June 26, 2024) (cleaned up) (citing *Saba Cap. Cef Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund*, 88 F.4th 103, 111 (2d Cir. 2023)).

Even if alleged statements of low-level ICE employees—filtered through Plaintiffs' hearsay—established a genuine intent by Defendants to transfer them to NSGB, any such intent expressed to these few Plaintiffs is at best understood as a "mere some day intention"—and the Constitution demands more. *See id.* Plaintiffs have failed to demonstrate "substantial evidence of plans" by Defendants to transfer them to NSGB. *Id.* In fact, Plaintiffs' allegations do not demonstrate any consistent pattern that would indicate imminent injury. At best, Plaintiffs unite in their concerns of transfer to NSGB and their purportedly heightened risk of imminent transfer given the (dissonant) "combination"[4] of their different risk factors. *See* Mot. at 11. But again, that is not enough to show an imminent injury. None of the allegations advanced by Plaintiffs demonstrate why "there is a substantial risk" of transfer to NSGB or that such transfer is "certainly

---

[4] At least one Plaintiff claims they are at risk of transfer because they possess all the risk factors stated in the Motion. That is, they are a Venezuelan national with a final order of removal, have tattoos, have been allegedly questioned by ICE as to their gang affiliation, and have allegedly been told that they would be sent to NSGB. *See* ECF No. 2-6, Cerrano Decl. ¶¶ 2, 10–12. At the same time, other Plaintiffs claim they are at risk of transfer only because they have a final order of removal but are from a country other than Venezuela. *See, e.g.,* ECF No. 2-13, Rayhan Decl. As stated previously, the only unifying characteristic of all these Plaintiffs is that they have a final order of removal. That is not enough to demonstrate that imminent injury. *See, e.g, Spokeo*, 578 U.S. at 340.

impending," as to Plaintiffs themselves. *See Pharm. Rsch.*, 656 F. Supp. 3d at 150. If anything, Plaintiffs' discussion of putative risk factors underscores that there is no imminent injury. Accordingly, Plaintiffs' even more speculative injury—that their rights will be violated while at NSGB—fails because they are unable to show that they will be imminently transferred to NSGB in the first place.

In the end, this case is much like *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), *Clapper*, and *Summers*. In each case, the plaintiffs identified some factors that might elevate the possibility that they would be exposed to the conduct at issue (chokeholds, wire taps, or encountering logged forests) might the baseline of the general populace. *Clapper*, 568 U.S. at 409; *Summers*, 555 U.S. at 493; *Lyons*, 461 U.S. at 106. But in each case, that potential injury still was neither likely nor imminent and insufficient to support standing. *Clapper*, 568 U.S. at 410-11 ("[R]espondents merely speculate and make assumptions about whether their communications with their foreign contacts will be acquired."); *Summers*, 555 U.S. at 496 ("Accepting an intention to visit the national forests as adequate to confer standing to challenge any Government action affecting any portion of those forests would be tantamount to eliminating the requirement of concrete, particularized injury in fact."); *Lyons*, 461 U.S. at 105 ("That Lyons may have been illegally choked by the police . . . does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part."). So too here. Because Plaintiffs' injury cannot possibly be "actual or imminent" or "*certainly* impending." *See Clapper*, 568 U.S. at 409 (emphasis in original). Plaintiffs' "allegations of *possible* future injury are not sufficient," and thus fail to show injury in fact. *See id.* (emphasis in original) (internal quotations omitted).

## II.    Plaintiffs' APA claims are not cognizable.

### A.    Plaintiffs do not challenge any final agency action.

Plaintiffs also fail to identify any final agency action to support their APA claims. The APA limits judicial review to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Although the requirement of finality is not jurisdictional, without final agency action, "there is no doubt that [a plaintiff] would lack a cause of action under the APA." *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003); *Flytenow, Inc. v. FAA*, 808 F.3d 882, 888 (D.C. Cir. 2015). Agency actions are final if two independent conditions are met: (1) the action "mark[s] the consummation of the agency's decisionmaking process" and is not "of a merely tentative or interlocutory nature;" and (2) it is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks omitted).

To the extent Plaintiffs challenge the "implementation" of the President's operational directives in the Memorandum, that is not a discrete, identifiable "agency action" subject to challenge. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890-91 (1990) (holding that a plaintiff cannot challenge "the continuing (and thus constantly changing) operations" of the agency in carrying out a program, but must instead "direct its attack against some particular 'agency action' that causes it harm"). The Supreme Court was clear that the APA precludes challenges to "the entirety" of an administrative program, whereby plaintiffs seek "*wholesale* improvement" of an agency's operations "by court decree"—"rather than in the offices of [agencies] or the halls of Congress, where programmatic improvements are normally made." *Id.* at 891. Removal operations—including the considerations that go into determining where an alien under a removal order is detained, transferred, or removed—"implicate our relations with foreign powers and

16

require consideration of changing political and economic circumstances." *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 348 (2005) (internal quotation marks omitted). Accordingly, courts should decline to hear any challenge that would interfere with the complex, delicate, and considered process by which removal decisions are made in light of the particularized facts within the agency's command.

Nor is the implementation of the President's memorandum—even if it were a discrete agency action—"final" so as to be reviewable under the APA. 5 U.S.C. § 704. Although Plaintiffs' removal orders are final actions, any challenge to those decisions are limited to "a petition for review filed with an appropriate court of appeals." *See* 8 U.S.C. § 1252(a)(5). That leaves the individual determinations they purportedly fear the agency might make to transfer them to appropriate detention facilities as part of the execution of their final removal orders. But those operational determinations have not happened and, even when they do, they do not trigger the "legal consequences" of the removal efforts nor mark the "consummation" of the removal process. Instead, any legal consequences are the direct outcome of the removal order itself, and at this point nothing appears to hold back the execution of those orders other than "potential individualized determinations that [they] cannot be removed to specific countries." *Padilla-Ramirez v. Bible*, 882 F.3d 826, 833 (9th Cir. 2017); *see generally* 8 U.S.C. § 1231(b) (setting out countries to which aliens may be removed); 8 U.S.C. § 1231(a)(1)(A); *see id.* § 1231(a)(1)(B)(i) (providing that the removal period generally begins on the "date the order of removal becomes administratively final").Furthermore, the use of a particular detention site as a temporary staging point en route to completing a removal to a designated country is purely an operational choice made entirely in the agency's discretion and attendant to the determinative final removal order, and is not a final agency action subject to any court's review. *See* 8 U.S.C. § 1231(g).

17

Similarly, Plaintiffs' claims about initial steps taken after the Memorandum was issued and the conditions of confinement at NSGB are not based on any identifiable final agency action. Mot. at 19-23. *See Vetcher v. Sessions*, 316 F. Supp. 3d 70, 79 (D.D.C. 2018) (dismissing conditions of confinement claims as failing to challenge a final agency action). Although in some jurisdictions Plaintiffs may be able to challenge conditions of confinement through a writ of habeas corpus, Plaintiffs are not detained in this jurisdiction, and therefore, must plead a valid APA claim in order to maintain their challenge in this court. *Id*. at 78 (holding the jurisdiction of confinement is "the only circuit under which [the detainee] may bring a *habeas* petition"). Plaintiffs' allegations fall well short of the applicable pleading standard as they amount to little more than a list of (speculative, future) grievances about implementation steps, conditions they have not been subjected to, and unexhausted claims. Accordingly, the Court should deny the motion on the basis that Plaintiffs have not identified a final agency action to support their APA claims. *See id*. at 78-79.

### B.    Plaintiffs' APA claims also fail because transfer and removal decisions are committed to agency discretion by law.

Even if APA review was generally available for residential actions, it would not be available here. The APA does not permit review of actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Thus, even if Plaintiffs could credibly argue that the delegation of responsibility contained in the President's internal memorandum is an agency action, it would still be barred from review, where the execution of removal orders is a process over which the Executive Branch enjoys largely unfettered discretionary control.

"A principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012); *see id*. at 409 (holding that decisions "touch[ing] on foreign relations . . . must be made with one voice"); *Mathews v. Diaz*, 426 U.S.

67, 81 (1976) (removal decisions "are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary"). Indeed, "any policy *toward aliens* is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (emphasis added). Here, decisions made to transfer immigration detainees to NSGB are grounded in the President's "broad power over the creation and administration of the immigration system," which necessarily includes discretion to determine where individuals will be detained to execute their removal orders. *Kerry v. Din*, 576 U.S. 86, 106 (2015) (Kennedy, J., concurring in judgment).

The Executive's discretionary authority to administer the removal process is further reinforced by the statute that governs judicial review of removal orders—8 U.S.C. § 1252, as well as § 1231(g), which gives the Secretary of Homeland Security[5] broad latitude to "arrange for *appropriate* places of detention for aliens detained pending removal or a decision on removal." *See Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 486 (1999). Indeed, in interpreting § 1231(g), courts throughout the country have recognized that determinations regarding the location of confinement for individuals subject to removal orders are within the discretion of the Executive Branch. *See, e.g.*, *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999); *Edison C. F. v. Decker*, No. 2-cv-15455-SRC, 2021 WL 1997386, at *6 (D.N.J. May 19,

---

[5] Although the statute and regulations refer to the "Attorney General," these references should, in light of the Homeland Security Act of 2002, be read as references to the Secretary of Homeland Security. *See* Homeland Security Act § 471, 6 U.S.C. § 291 (abolishing the former Immigration and Naturalization Service); *id.* § 441, 6 U.S.C. § 251 (transferring immigration enforcement functions from the Department of Justice to the Department of Homeland Security); 8 U.S.C. § 1103(a)(1) ("The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens . . . .").

2021) ("Congress has provided the Government with considerable discretion in determining where to detain aliens pending removal or the outcome of removal proceedings." (citing § 1231(g)(1))). To the extent a stay of a transfer (particularly one not even shown to be imminent) would interfere with that discretion to arrange for the detention of individuals who are subject to final removal orders—and who do not otherwise challenge the legitimacy of those removal orders, *see* 8 U.S.C. § 1252(a)(5)—the APA provides no basis for judicial review.

The APA also does not permit judicial review in cases where statute precludes it. 5 U.S.C. § 701(a)(1). As discussed below, 8 U.S.C. § 1252 plainly bars review of discretionary agency actions, actions taken to remove an individual, or actions to execute a removal order. 8 U.S.C. §§ 1252(a)(2)(B)(ii), (b)(9), (g). The statute allows for review in certain specified circumstances and subject to specified limitations and prerequisites. *See, e.g.*, 8 U.S.C. §§ 1252(a)(5), (b)(9), (e). None of those provisions, however, apply to Plaintiffs' APA claims here, which seek to constrict how the Executive can exercise its broad powers under § 1231(g) and otherwise thwart its ability to promptly execute final removal orders. Section 701(a)(1) thus bars APA review here as well.

C.    **The Court lacks jurisdiction to stay the government's exercise of discretion to transfer an alien ordered removed to an appropriate place of detention.**

The Court lacks jurisdiction to enter any stay or other equitable relief regarding Plaintiffs' removal orders. The jurisdiction of the federal courts is presumptively limited. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). They "possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen*, 511 U.S. at 377 (citations omitted); *see also Sheldon v. Sill*, 49 U.S. 441, 449 (1850) ("Courts created by statute can have no jurisdiction but such as the statute confers."). The Immigration and Nationality Act deprives this Court of jurisdiction over Plaintiffs' request for a stay of (or injunction against) the detainees' removal orders for three independent reasons.

20

*First*, 8 U.S.C. § 1252(g) deprives the Court of jurisdiction to review claims arising from any decision or action to "execute removal orders." *See Jennings v. Rodriguez*, 583 U.S. 281, 292-95 (plurality) (concluding the district court lacked jurisdiction over a challenge to a "decision to . . . seek removal"). Congress spoke clearly, providing that "no court" has jurisdiction over "any cause or claim" arising from the execution of removal orders, "notwithstanding any other provision of law," whether "statutory or nonstatutory," including habeas, mandamus, or the All Writs Act. 8 U.S.C. § 1252(g). By its terms, this jurisdiction-stripping provision precludes habeas review under 28 U.S.C. § 2241, as well as review under the APA, of claims arising from a decision or action to "execute" a final order of removal. *See AAADC*, 525 U.S. at 482; *cf. United States v. Texas*, 599 U.S. 670, 680 (2023) ("In light of inevitable resource constraints and regularly changing public-safety and public-welfare needs, the Executive Branch must balance many factors when devising arrest and prosecution polices. That complicated balancing process in turn leaves courts without meaningful standards for assessing those policies."). The discretionary determination to transfer a detainee to an appropriate place of detention as part or a removal effort pursuant to the government's authority under 8 U.S.C. § 1231(g) is just such an unreviewable "action" taken to execute a final removal order. *See AAADC*, 525 U.S. at 485 (noting that § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the base for separate rounds of judicial intervention outside the streamlined process that Congress has designed"); *Guangzu Zheng v. Decker*, No 14-cv-4663-MHD, 2014 WL 7190993, at *16 (S.D.N.Y. Dec. 12, 2014) (holding that § 1231(g) transfer authority "is among the [Secretary of Homeland Security's] discretionary powers" (internal quotation marks omitted)); *Jacquet v. Hodgson*, No. CIV.A. 03-11568RWZ, 2003 WL 22290360, at *1 (D. Mass. Oct. 6, 2003) (holding

that a court is "without power to prevent transfer of a plaintiff" because the "[Secretary of Homeland Security] shall arrange for appropriate places of detention" under § 1231(g), and "no court shall have jurisdiction" under § 1252(g) "to hear any cause or claim" arising from the discretion granted to the Secretary).

*Second*, any challenge, even an indirect one, to Plaintiffs' removal orders themselves are improper in district court. 8 U.S.C. § 1252(b)(9) (providing that "[j]udicial review of *all questions of law and fact*, including interpretation and application of constitutional and statutory provisions, *arising from any action taken or proceeding brought to remove an alien from the United States* . . . shall be available only in judicial review of a final [removal] order.") (emphases added); *see also* 8 U.S.C. § 1252(a)(5) (providing that "the sole and exclusive means for judicial review of an order of removal" is a "petition for review filed with an appropriate court of appeals."); *Nasrallah v. Barr*, 590 U.S. 573, 580 (2020) ("The REAL ID Act clarified that final orders of removal may not be reviewed in district courts, even via habeas corpus, and may be reviewed only in the courts of appeals." (citation omitted)); *AADC*, 525 U.S. at 482-83; *Vetcher*, 316 F. Supp. 3d at 76 (D.D.C. 2018) (noting that 8 U.S.C. § 1252(a)(5) and (b)(9) "streamline all issues arising from removal proceedings into a petition for review that must be filed with a court of appeals after a final order of removal from the [Board of Immigration Appeals]"); *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011) (a claim that amounts to an "indirect challenge" to a removal order is barred by § 1252, and the distinction between the two "will turn on the substance of the relief that a plaintiff is seeking."); *Jimenez v. Holder*, 338 F. App'x 194, 196 (3d Cir. 2009) (concluding district court lacked jurisdiction over habeas petition that, "though not explicitly styled as a challenge to his removal order, calls for vacating the BIA's decision upholding the order"). It follows, then, that the Court lacks jurisdiction under the INA to enter a stay of (or injunction against) Plaintiffs'

removal orders. *See* 8 U.S.C. §§ 1252(a)(2)(B)(ii), (a)(5), (b)(9), (g); *Mancho v. Chertoff*, 480 F. Supp. 2d 160, 162 (D.D.C. 2007) ("A request to stay an order of removal based on a pending collateral claim does not escape the jurisdiction stripping provisions of the REAL ID Act.").

*Third*, 8 U.S.C. § 1252(a)(2)(B)(ii) similarly strips the Court of jurisdiction to grant Plaintiffs' request, where it bars review of "any other decision or action of the [Executive] the authority for which is specified under this subchapter to be in the discretion of the [Executive]." 8 U.S.C. § 1252(a)(2)(B)(ii). Here, the Executive's authority under § 1231(g) to decide the location of detention for individuals detained pending removal falls within the scope of the review bar in § 1252(a)(2)(B)(ii). That is because, under § 1231(g), DHS "necessarily has the authority to determine the location of detention of an alien in deportation proceedings," including to transfer detainees from one detention site to another. *Gandarillas-Zambrana v. Bd. Immigration Appeals*, 44 F.3d 1251, 1256 (4th Cir. 1995). The Executive's broad discretion to determine appropriate places of detention pending removal has repeatedly been recognized by federal courts after careful review of § 1231(g). *See, e.g.*, *Van Dinh*, 197 F.3d at 433; *Wood v. United States*, 175 F. App'x 419, 420 (2d Cir. 2006) (holding that the Secretary "was not required to detain [Plaintiff] in a particular state" given the Secretary's "statutory discretion" under § 1231(g)).

### III.   To the extent Plaintiffs have any cognizable claims, they are improperly venued in the District Court for the District of Columbia.

As demonstrated above, Plaintiffs fail to shoehorn their claims into ones cognizable under the APA. At best, Plaintiffs have pled habeas claims that, if they survive dismissal, would need to be severed and transferred to other jurisdictions. Accordingly, these claims do not confer upon this Court authority to enter temporary relief both because the Court lacks jurisdiction over the claims and Plaintiffs are unable to show that they are likely to prevail on them in this Court.

Plaintiffs have never been held in this district. Plaintiffs are detained at various facilities in Texas, Arizona, and Georgia. Any habeas claims must be brought against the custodians of those facilities (the "immediate custodian rule") and in the venues in which the custodians reside (the "habeas venue rule"). *See Dufur v. U.S. Parole Comm'n*, 34 F.4th 1090, 1097 (D.C. Cir. 2022); *Vetcher,* 316 F. Supp. 3d at 78 (identifying the district of confinement as the only appropriate venue for a habeas petition); *see also Braden v. 30th Jud. Cir. Ct.*, 410 U.S. 484, 494-95 (1973) ("The writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody."); *Chatman–Bey v. Thornburgh*, 864 F.2d 804, 810 (D.C. Cir. 1988).[6] Unless Plaintiffs are transferred within the authority of this district, this case should be dismissed for a lack of venue. *See* 28 U.S.C. § 1406(a); *see also Mendoza-Linares v. Garland*, 51 F.4th 1146, 1157 (9th Cir. 2022) (dismissing challenge to expedited removal order in part for failing to follow the requirement under Federal Rule of Appellate Procedure 22 to file in the district of confinement).

Because Plaintiffs' claims, to the extent any remain following a motion to dismiss, will need to be severed and transferred as individual habeas petitions to other federal district courts, this Court lacks jurisdiction to enter emergency relief on those claims.

**IV.    Plaintiffs are not likely to prevail on the merits of their claims.**

In addition to all of the threshold defects discussed above, Plaintiffs' claims fail on the merits because: (1) the Secretary has statutory authority to transfer detainees to NSGB,

---

[6] Venue is therefore limited to the U.S. District Court for the Western District of Texas, El Paso Division, for Plaintiffs Escalona, Wilhelm, Cerrano, and Castellano. For Plaintiffs Laguna and Sebrian, the proper venue would be in the U.S. District Court for the Western District of Texas, Austin Division. For Plaintiff Salazar, venue should be in the U.S. District Court for the Northern District of Georgia. And for Plaintiffs Malik, Muhammad, and Rayhan, their habeas claims should be brought in the U.S. District Court for the District of Arizona, Phoenix Division.

(2) Defendants have strong rationales for their decisions, thus defeating Plaintiffs' arbitrary-and-capricious claims, and (3) Plaintiffs have not identified any violation of substantive due process that would justify a bar on transfers.

> **A.    The Secretary has the statutory authority to transfer immigration detainees to NSGB.**

Plaintiffs have failed to establish that it would be unlawful to detain them at NSGB. As a result, their statutory claims fail. Plaintiffs are lawfully in the custody of the Secretary as individuals subject to final orders of removal. *See* Compl. at ¶¶ 13-22. Sections 1231(a)(6) and 1225(b)(1)(B)(iii)(IV) authorize the Secretary to detain individuals who are, respectively, subject to final orders of removal and expedited removal orders. The Secretary's authority under these provisions begins upon entry of the removal order and extends until the Secretary relinquishes custody of the detainee. *See* 8 U.S.C. § 1231(a)(6); 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). Detention authority under § 1231(a)(6) is limited to the amount of time reasonably necessary to execute the removal order and will terminate if (after six months) the removal is not significantly likely to occur in the reasonably foreseeable future. *Zadvydas*, 533 U.S. at 701. In addition to having authority to detain individuals subject to final orders of removal, the Secretary also has broad statutory authority to "arrange for appropriate places of detention for aliens pending removal" at "United States Government facilities," 8 U.S.C § 1231(g), and to "perform such other acts as [she] deems necessary for carrying out [her] authority" under the INA, 8 U.S.C § 1103(a).

Sections 1231(a)(6) and 1225(b)(1)(B)(iii)(IV) afford the Secretary extraterritorial authority to manage international removal operations. Congress understands that the execution of removal orders typically require the Secretary—by definition—to exercise extraterritorial authority. *See, e.g.*, 8 U.S.C. § 1231(e)(3)(A) (specifying funding source for costs associated with removal); 8 U.S.C. § 1231(f) (authorizing caregiver travel for removal trip); U.S. Immigration and

Customs Enforcement Budget Overview 2023 at 169, (Congress allocated more than $400 million per year for ICE's Transportation and Removal Program, a program with a mission that includes providing "transportation to the noncitizen's final destination.").[7] The overwhelming majority of removals carried out under sections 1231 and 1225 are escorted removals—that is, removals where ICE officers maintain custody of the individual who are being removed from the United States and transport them to their country of removal. DHS OIG Report, OIG-19-28, ICE Faces Barriers in Timely Repatriation of Detained Aliens, at 11 (Mar. 2019) (approximately 84,000 of the 90,000 removals in fiscal year 2017 were escorted removals).

Section 1231(g) also affords the Secretary more narrow extraterritorial authority to select appropriate places for removal to include any "United States Government facilities." 8 U.S.C. § 1231(g); *see also RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 340 (2016) (holding that "an express statement of extraterritoriality is not essential," and "'context can be consulted as well,'" to establish the extraterritorial effect of a statute). NSGB is a "United States Government facility." Indeed, this Court, in considering a different federal statute, has previously defined "federal facility" to mean "a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties"—the definition encompassing both "diplomatic missions" and "component structures of military bases." *United States v. Al-Imam*, 373 F. Supp. 3d 247, 264 (D.D.C. 2019) (citing 18 U.S.C. § 930(g)). In line with the meaning of "federal facility," the Court in that case found the federal statute applied extraterritorially where the law had "foreseeable extraterritorial applications." *Id*.

---

[7] Available at https://www.dhs.gov/sites/default/files/2022-03/U.S.%20Immigration%20and%20Customs%20Enforcement_Remediated.pdf (last visited Mar. 3, 2025).

Along with § 1231(g), § 1103(a)(3)'s sweeping grant of authority for the Secretary to take any action "deemed necessary" to the exercise of her other statutory authorities is also naturally read as conferring extraterritorial authority when exercised in support of her extraterritorial removal responsibilities. *Cf. Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 171 (1993) (assuming 8 U.S.C. § 1103(a)(1) applies extraterritorially but finding exercise to be within section 1103(a)(1)'s exception).

Therefore, §§ 1103(a)(3), 1225(b)(1)(B)(iii)(IV),1231(a)(6), and 1231(g) together confer broad extraterritorial authority for ICE to carry out Congress's removal mandate. The Secretary has the authority to detain individuals subject to final orders of removal in U.S. government facilities as part of an ongoing removal operation. For individuals detained under § 1231(a)(6), that authority extends only so long as removal remains significantly likely to occur in the reasonably foreseeable future. The immigration detainees at NSGB fall squarely within this authority: they are subject to final orders of removal, have been taken to NSGB as part of the government's efforts to facilitate their removals, and can be held for only so long as their removal remains significantly likely to occur in the reasonably foreseeable future.

Plaintiffs argue that the government lacks the authority to transfer and detain them at NSGB because the base is outside of the United States for purposes of the INA. Mot. at 13-14. Defendants acknowledge NSGB's status for purposes of the INA. However, the cited provisions overcome the presumption against extraterritorial application. *Sale*, 509 U.S. at 173. Removal operations are inherently extraterritorial missions and therefore necessarily require the Secretary to exercise detention authority outside of the U.S. As noted above, many of ICE's removal operations are conducted by ICE transporting the detainee to their country of removal. As a result, ICE routinely exercises its §§ 1231 and 1225 detention authority outside of the United States.

27

Plaintiffs' contrary arguments simply blink the reality of how removal operations have operated for decades. Section 1103(a)(3) works in conjunction with these provisions to give the Secretary all necessary authority to conduct the removal operation in her preferred manner, including to plan the removal mission and arrange for appropriate staging points to support that mission. Indeed, it would lead to an impossible situation if the government's broad removal and detention powers under the INA were held to instantly terminate as soon as the detainee's flight left U.S airspace. Detainees placed on ICE-operated removal missions must remain subject to ERO custody and adhere to ICE transfer and transportation policies until they have arrived at the country of removal, only at which point custody can be relinquished. *See* 8 U.S.C. § 1231(b) (setting out the categories of countries to which aliens may be removed). None of that would be possible unless the government's authority to execute removal operations has an extraterritorial component.

Plaintiffs next argue that the immigration detainees at NSGB have been removed to Cuba based on Plaintiff's view that removal occurs as soon the individual leaves the United States without regard to whether he continues to be in the Secretary's custody or has reached his country of removal. Plaintiffs' theory is not supported by law or common sense for three reasons.

*First*, although NSGB is not in the United States for purposes of the INA, 8 U.S.C. § 1101(a)(38), the United States "exercises complete jurisdiction and control" over the naval station. *Boumediene v. Bush*, 553 U.S. 723, 753-55 (2008) (finding "the United States, by virtue of its complete jurisdiction and control over the base, maintains *de facto* sovereignty over this territory"). There is no Cuban government presence at NSGB and no way for Cuban authorities to exercise any control over the detainees. Plaintiffs notably concede that the detainees transferred to NSGB have not lawfully been admitted to Cuba, Mot. 2-3, and that they have they reached their country of removal. Therefore, while they may have physically departed the United States and

transited through NSGB while remaining under ERO custody, DHS has not completed the removal and have certainly not surrendered them to the control of the Cuban government.  Detainees held at NSGB remain in United States' custody pending the completion of the removal operation.

*Second*, Plaintiffs ignore that "removal" as contemplated by the INA is a legal term of art that refers to a circumscribed, multi-step process that often involves detention, transfer, and travel. *Matter of G-N-C*, 22 I. & N. Dec. 281, 296-97 (BIA 1998) ("'Removal'" is a term of art that was coined in the enactment of the IIRIRA"); *cf. United States v. Argueta-Rosales*, 819 F.3d 1149, 1155 (9th Cir. 2016) (noting that under the INA "enter" can have "a narrower meaning than its colloquial usage). Just as a detainee who, while being escorted, has a layover en route to their final destination is not removed "to" that location, the immigration detainees have not been removed to NSGB. Conversely, by Plaintiffs' logic, if a removal flight in route to Romania were to make a refueling stop in Germany, DHS would be compelled to release the detainees in Germany as the agency would lack authority to continue the removal operation to the final destination after having already "removed" the detainees "to" Germany. But that has never been the law and makes little sense as a practical matter. Here, the term "removal" as it is used in section 1231(a)(6) is not intended as a limitation or termination point on the Secretary's detention authority. *See* 8 U.S.C. § 1231(a)(6) ("An alien . . . may be detained beyond the removal period"). Therefore, Plaintiffs' narrow understanding of the term "removal" should not have any impact on the Secretary's authority to detain through to completion of the multi-step removal process.

*Third*, courts recognize a distinction between a "physical" departure and a "legal" departure. *See Handa v. Crawford*, 312 F. Supp. 2d 1367, 1370 (W.D. Wash. 2004), *aff'd sub nom. Handa v. Clark*, 401 F.3d 1129 (9th Cir. 2005). To that end, the fact that an alien is physically on foreign soil is not alone sufficient to establish that he has legally departed the United States.

*Id.*; *Matter of T*, 6 I. & N. Dec. 638, 640 (BIA 1955) (holding that a person who leaves the United States but does not lawfully enter another country, does not "enter" the United States upon his return); *INS Issues New Procedures for Entry of Aliens Granted Advance Parole*, 70 Interpreter Releases 1675, 1676 (Dec. 20, 1993) ("The mere fact that the alien has been physically present on foreign soil is not sufficient to establish that the alien has departed from . . . the United States"). To effectuate a departure or removal, the alien must lawfully enter another country. *Handa*, 312 F. Supp. 2d at 1370 ("Because Dr. Handa had not legally entered Canada, Dr. Handa did not legally depart from the United States."); *cf. Boumediene*, 553 U.S. at 769 (indicating NSGB "[i]n every practical sense . . . [is] not abroad" but rather "within the constant jurisdiction of the United States"); *see also Castaneda-Lugo v. Mukasey*, 263 F. App'x 164, 165 (2d Cir. 2008).

Just as an alien "on the threshold" of entry when he is detained after arriving at United States port, an alien detained in the process of being removed to the country designated in his removal order is "on the threshold" of removal—in both cases, physical presence or location is not allowed to dictate the individual's legal status or situation. *Thuraissigiam*, 591 U.S. at 140; 8 U.S.C § 1231(b)(2); *cf. De Leon v. Holder*, 761 F.3d 336, 338 (4th Cir. 2014) (holding that "entry" into the United States for immigration purposes requires *"*freedom from official restraint," which is present when "the alien who is attempting entry is no[t] under constraint emanating from the government that would otherwise prevent [him] from physically passing on"); *Kaplan v. Tod*, 267 U.S. 228, 230 (1925) (entrant was "in theory of law at the boundary line and had gained no foothold in the United States" even after committed to the custody of aid society). Indeed, the removal process is not complete until the individual reaches the final destination. *See E.O.H.C. v. Sec'y United States Dep't of Homeland Sec.*, 950 F.3d 177, 184 (3d Cir. 2020) (*citing Lin Zhong v. DOJ*, 480 F.3d 104, 108 n.3 (2d Cir. 2007).

Even the cases cited by Plaintiffs acknowledge that removal is not dichotomous and should be evaluated with more nuance and based on the government's intent to effectuate the removal order. For example, Plaintiffs cite *Nicursor-Remus v. Sessions,* 902 F.3d 895 (9th Cir. 2010), for the proposition that any departure is sufficient to execute a removal order, but there the Court noted that at least one "exception" exists. 902 F.3d at 895, 899-900 (finding the "alien in *Handa* never 'left the United States'" because, *inter alia*, he was denied admission to the country of removal). The *Nicursor-Remus* court found it consequential that "the FBI and ICE agents clearly intended for the alien's brief departure to execute the removal order" in determining whether the detainee had been removed pursuant to the INA. *Id.* at 900. So too, in *United States v. Sanchez*, the court found that the detainee was removed when he was "was escorted over the Mexican border" by authorities who *intended* to effectuate his final order of removal but did so erroneously. 604 F.3d 356, 359-60 (7th Cir. 2010).

No such circumstances are present here. The government has not relinquished custody of the detainees and has explicitly stated that the removal operation is ongoing. Plaintiffs' reliance on *Nicursor-Remus* and *Sanchez* is thus misplaced.

**B**.    **Plaintiffs are not likely to succeed on the merits of their claims that Defendants acted arbitrarily or capriciously in the implementation of the Presidential Memorandum.**

Plaintiffs are also unlikely to succeed on the merits of their three claims that the government acted arbitrarily or capriciously in implementing the President's Memorandum.

First, Plaintiffs argue that Defendants' actions are inconsistent with the Memorandum because detainees are being held at Camp VI and Plaintiffs allege some of the detainees at NSGB are low-risk. Mot. at 17-18. Plaintiffs' argument incorrectly assumes that Defendants' authority to hold immigration detainees is based solely on the Memorandum. But, as discussed above, the Secretary has broad discretion to take the same actions by statute, both independent of and

consistent with, the Memorandum. *See supra* Argument II.A. Moreover, none of the Plaintiffs are presently held at NSGB, and have no basis to speculate whether they would be held at Camp VI. *See supra* Argument I.A.2.

Plaintiffs next argue that Defendants acted arbitrarily by moving too quickly to comply with the President's Memorandum. Mot. at 19-20. Notably, none of the Plaintiffs were part of the initial group of NSGB detainees, and indeed, are not there now. Plaintiffs thus lack standing to challenge this purportedly "early" implementation. It is further not reviewable under the APA, as explained above. S*ee supra* Argument II.A-B. In addition, operating procedures have been continuously updated since the first immigration detainees arrived, and are outlined at https://www.ice.gov/detain/detention-facilities/naval-station-guantanamo-bay. *See* Lopez Vega Decl. at ¶¶ 12, 14, 17; Green Decl. at ¶¶ 10-13, 22. And, in any event, failure to operate with typical bureaucratic lethargy is not an APA violation. *See Asylumworks v. Mayorkas*, No. 20-cv-3815-BAH, 2023 WL 2733722, at *8 (Mar. 31, 2023) ("Administrative delay in the many-level review at agencies is routine such that a seemingly simple task … requires multiple steps and various input.").

Finally, Plaintiffs argue Defendants' failure to explain the reasons for transferring immigration detainees to NSGB is arbitrary and capricious. As explained above, *see supra* Argument II.D., and below, *see supra* Argument IV.C., Defendants have wide discretion to detain individuals with final orders of removal, to plan and carry out removal missions, and to select appropriate places of detention. Plaintiffs have not identified any instance in which a Court required the government to justify using a particular detention facility or its removal path.

To the extent the APA calls for any further justification, Defendants have explained that are using NSGB due to limited detention capacity available elsewhere, making it desirable to add

the capacity already available at NSGB to accomplish the President's priority of completing the removal of individuals with final orders of removal. Lopez Vega Decl. at ¶ 6. at ¶¶ 5, 6. Utilizing unused detention capacity is rational response to limited resources and not arbitrary and capricious. Plaintiffs' policy-laden disagreements with Defendants' reasons for transferring detainees to NSGB is not sufficient to show a likelihood of success on the merits or to merit a stay on future transfers.

C.    **Plaintiffs are unlikely to succeed on the merits of their substantive due process claims.**

The Supreme Court has repeatedly held that civil immigration detention is lawful exercise of executive authority. *See, e.g.*, *Demore v. Kim*, 538 U.S. 510, 531 (2003) ("Detention during removal proceedings is a constitutionally permissible part of that process."); *Carlson v. Landon*, 342 U.S. 524, 538 (1952) ("Detention is necessarily a part of this deportation procedure."); *Wong Wing v. United States*, 163 U.S. 228, 235 (1896) ("We think it clear that detention or temporary confinement, as part of the means necessary to give effect to the provisions for the exclusion or expulsion of aliens, would be valid."); *see also Reno v. Flores*, 507 U.S. 292, 294-95 (1993) (concluding the executive has "broad discretion to determine whether, and on what terms" an individual can be detained or released pending deportation). Applied here, the government has amply supported its basis for detaining individuals with final orders of removal at NSGB. Plaintiffs' allegations regarding the government's motivations and the conditions at NSGB do not support an injunction against future transfers. Plaintiffs have therefore failed to show a likelihood of success on these claims to support their requested relief.

1.    ***Defendants have amply supported the decision to hold immigration detainees at NSGB.***

Plaintiffs suggest that the Court should set aside precedent and require the government to justify its decision to detain final-order detainees in a particular facility prior to permitting their

33

transfer. Plaintiffs have not cited any authority to suggest that the due process analysis imposes that level of scrutiny on immigration officials. Congress has given the Executive Branch great flexibility in the immigration context, with which the Courts are reluctant to interfere. *See, e.g.*, *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) ("[W]e have recognized that judicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'" (quoting *INS v. Abudu*, 485 U.S. 94, 110 (1988))); *Mathews v. Diaz*, 426 U.S. 67, 81 (1976) ("[S]uch decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary. . . . Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution.").

Nonetheless, the government has explained its detention decision as related to its efforts to effect a removal mission. Lopez Vega Decl. at ¶¶ 6, 8. That decision was made consistent with its discretion to allocate and marshal its limited detention resources in support of that high-level Executive priority. Defendants do not need to show that NSGB is essential to that plan, logistically uncomplicated, or that it is the least expensive option. *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 350 (1987) ("By placing the burden on prison officials to disprove the availability of alternatives, the approach articulated by the Court of Appeals fails to reflect the respect and deference that the United States Constitution allows for the judgment of prison administrators."); *Turner v. Safley*, 482 U.S. 78, 90-91 (1987) ("[P]rison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint."); *see also Bell v. Wolfish*, 441 U.S. 520, 540 (1979) ("[T]he operation of our [detention] facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the

Judicial."); *see also Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 328 (2012) ("The task of determining whether a policy is reasonably related to legitimate security interests is peculiarly within the province and professional expertise of corrections officials." (cleaned up)).

Plaintiffs point to statements from the President and other high-level officials in support of their allegation that the decision to hold immigration detainee at NSGB is unlawfully driven by a desire to stop illegal immigration. *See* Mot. at 24-27. As an initial matter, Plaintiffs cannot establish any substantive due process right to detention unmotivated by considerations of deterrence. To do so they would need to show such a right was "'deeply rooted in this Nation's history and tradition,'" and "'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). Plaintiffs have made no such showing here.

The government does not dispute that the mass removal efforts are intended in part to deter illegal migration, and, separately, that the efforts to find bedspace to stage removal operations is related to that removal effort. That does not mean, however, that the decision to use NSGB is based on an improper deterrence rationale. The Executive "is not required to conclusively link all the pieces in the puzzle." *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 35 (2010); *see also Trump v. Hawaii*, 585 U.S. 667, 699-702 (2018) (evaluating the significance of President's statements in the face of an otherwise neutral Presidential directive "addressing a matter within the core of executive responsibility").

Plaintiffs are also mistaken when they suggest that deterrence is categorically an impermissible purpose for an immigration detention policy. Mot. at 27 (citing *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015)). However, *R.I.L-R*, cannot be squared with the Supreme Court's

longstanding recognition that immigration detention is defined by a particular set of executive powers, legitimate interests, and mitigating factors (including that aliens can always terminate detention by returning to their country of nationality) that render it unique and insusceptible to the restrictions Plaintiffs seek to impose. *See, e.g.*, *Mathews v. Diaz*, 426 U.S. 67, 80 (1976) ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens."); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government."). Furthermore, the court in that case admitted that "[i]t is certainly possible that this bar on employing general deterrence does not apply in the civil immigration context—i.e., that some sort of immigration carve-out exists." *R.I.L-R*, 80 F. Supp. 3d at 189. Thus, the relationship between the government's immigration policies and its detention decisions are simply too intertwined for courts to interfere.

   2. ***Plaintiffs are unlikely to show that the conditions at NSGB merit an injunction against transfers.***

   Ordinarily, when it is alleged that a detainee in immigration detention has been deprived of liberty without due process, "the dispositive inquiry is whether the challenged condition, practice, or policy constitutes punishment." *S. Poverty L. Ctr. v. DHS*, No. CV 18-760 (CKK), 2020 WL 3265533, at *18 (D.D.C. June 17, 2020) (quoting *Block v. Rutherford*, 468 U.S. 576, 583 (1984)). To prevail on such a claim, the detainee must establish either a "subjective intent to punish" or "that a restriction is unreasonable or excessive relative to the Government's proffered justification." *Americans for Immigrant Just. v. U.S. Dep't of Homeland Sec.*, No. CV 22-3118 (CKK), 2023 WL 1438376, at *11 (D.D.C. Feb. 1, 2023); *Doe v. Kelly*, 878 F.3d 710, 714 (9th

Cir. 2017). Plaintiffs attempt to meet that standard by asserting that the conditions at NSGB are sub-par, but the Constitution "does not mandate comfortable" detention facilities. *Rhodes v. Chapman*, 452 U.S. 337, 345-50 (1981). Detention may be subject to conditions that relate to legitimate non-punitive governmental objectives, such as "maintain[ing] security and order at the institution and mak[ing] certain no weapons or illicit drugs reach detainees" without raising constitutional concerns. *Bell v. Wolfish*, 441 U.S. 520, 540 (1979). If the detainee can establish that his conditions of confinement are equal to or worse than conditions experienced by inmates convicted of a criminal offense, the burden shifts to the government to establish that the conditions are "rationally related to a non-punitive purpose and . . . not excessive." *Americans for Immigrant Just.*, No. CV 22-3118 (CKK), 2023 WL 1438376, at *12.

Plaintiffs have not cited any relevant case law to show how courts should evaluate a prospective conditions of confinement claim. Assuming Plaintiffs have standing and are able to bring such a claim under the APA, that the relevant legal inquiry should be directed to the procedures in place at the challenged facility, rather than on allegations by non-parties.[8] *See supra* Argument II.B. As detailed in the attached declarations and summarized below, Defendants have core procedures in place to ensure detainees needs are appropriately met while detained at NSGB. *See generally* Lopez Vega Decl.; Green Decl.

Immigration detainees are housed in a communal living setting, and are afforded daily recreation time, three daily meals, and access to medical care. Lopez Vega Decl. at ¶¶ 21, 26, 27,

---

[8] Plaintiffs' declarations contain significant amounts of inadmissible hearsay testimony. *See* Fed. R. Evid. 801(c). While the Court may consider inadmissible evidence for the purposes of deciding a preliminary injunction motion, its inadmissibility may be considered in determining what weight to give such evidence. *See Rubin ex rel. N.L.R.B. v. Vista Del Sol Health Services, Inc.*, 80 F. Supp. 3d 1058, 1073 (C.D. Cal. 2015) (quoting *Garcia v. Green Fleet Sys., LLC*, No. CV 14–6220, 2014 WL 5343814, *5 (C.D. Cal., Oct. 10, 2014)). The government's declaration outlining detention practices at NSGB are the best evidence on these questions.

28, 33, 36; Green Decl. at ¶¶ 4, 8, 10. Immigration detainees have access to counsel, the ability to make and receive unmonitored calls to their lawyers, and the ability to make a receive calls to obtain representation. Lopez Vega Decl. at ¶¶ 1-15, 17-18, 31, 36-37; Green Decl. at ¶ 22. Detainees have the opportunity to make short calls to family and friends. Lopez Vega Decl. at ¶¶ 20, 31, 37; Green Decl. at ¶ 22. They are subject to searches and behavior correction in a manner not inconsistent with the Departments' practices. Lopez Vega Decl. at ¶ 23; Green Decl. at ¶¶ 23-28. These procedures offer sufficient safeguards and eliminate any basis for enjoining transfer based on conditions allegations.

## V.    Plaintiffs have not established that they are likely to suffer irreparable harm

The Supreme Court has repeatedly held that "plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. A mere "'possibility' standard is too lenient." *Id.*

For all of these reasons set forth above for why Plaintiffs' harms are not imminent, they also are unlikely. Plaintiffs' speculation that some combination of Venezuelan nationality, tattoos, and criminal history etc. might lead to their transfer to NSBG at best shows a mere "possibility" of injuries from such a transfer—not that such harms are "likely." *Id.* And without likely irreparable harm, preliminary relief must be denied. *See id.*

## VI.    The balance of harms and equities favor denial of emergency injunctive relief.

The balance of equities and public interest factors merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The harm to the Plaintiffs is minimal as Plaintiffs are not presently detained at NSGB, and do not allege that they are currently subject to any adverse conditions of confinement or being held outside of the authority of the INA. Further, the Plaintiffs are all represented by counsel in this case, and, in the event they are transferred to NSGB, they

will have ready access to their lawyers and the ability to file a habeas petition challenging their detention. *See* Lopez Vega Decl. at ¶ 38. Conversely, the requested relief would undermine the government's discretion to manage its limited detention resources to execute final removal orders.

"There is always a public interest in prompt execution of removal orders: The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings [Congress] established, and 'permit[s] and prolong[s] a continuing violation of United States law.'" *Nken*, 556 U.S. at 436 (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999)). Here, an order limiting the government's transfer and staging authority would necessarily undermine the Executive's discretion to allocate and marshal its limited detention resources in support of a high-level Executive priority. Given the evidence that access protocols are in place, the allegations here should not outweigh the harm that would be imposed by "injunctive relief [that] deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), including the "efficient administration of the immigration laws at the border," like the enforcement of expedited removal orders. *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019) (citing *Landon v. Plasencia*, 459 U.S. 21, 34 (1982)). The Court should therefore deny Plaintiffs' request for emergency relief.

**CONCLUSION**

The Court should deny the motion for a temporary restraining order.


Dated: March 10, 2025        Respectfully submitted,


        YAAKOV M. ROTH
        *Acting Assistant Attorney General*
        DREW ENSIGN
        *Deputy Assistant Attorney General*
        AUGUST FLENTJE
        *Acting Director*

By: /s/ *Sarah Wilson*
        SARAH WILSON
        *Assistant Director*
        U.S. Department of Justice, Civil Division
        Office of Immigration Litigation
        P.O. Box 878, Ben Franklin Station
        Washington, DC 20044
        Tel: (202) 532-4700
        Email: sarah.s.wilson@usdoj.gov

        *Counsel for Respondents*

## CERTIFICATE OF SERVICE

I hereby certify that March 10, 2025, I electronically filed this brief with the Clerk of the Court for the United States Court of for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By:  */s/ Sarah Wilson*
      SARAH WILSON
      United States Department of Justice

41