## SUPPLEMENTAL DECLARATION OF DEBORAH FLEISCHAKER

I, Deborah Fleischaker, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

1. Between 2011 and 2023, I worked on immigration, including immigration detention issues, through various positions within the U.S. Department of Homeland Security (DHS), as described in my original declaration, submitted at ECF No. 2-14, *Espinoza Escalona v. Noem*, No. 25-cv-604 (D.D.C. Mar. 1, 2025). Most recently, I served as an Assistant Director at ICE, heading the Office of Regulatory Affairs and Policy, and as the Acting Chief of Staff of U.S. Immigration and Customs Enforcement (ICE). In those capacities, I worked extensively with the leadership of ICE Enforcement and Removal Operations (ERO).

2. I have reviewed the government's brief in opposition to the motion for a stay in the *Espinoza Escalona* case, as well as the declarations from Lieutenant Colonel Robert Green and Acting Field Office Director Juan Lopez-Vega. *See* ECF Nos. 14, 14-1, 14-2.

3. I provide this declaration to supplement my original declaration, based on my personal knowledge and experience as well as review of the documents referenced above.

4. The government continues to justify the transfer of immigration detainees from the United States to the military base at Guantanamo Bay, Cuba on operational grounds. Specifically, the government repeats the same justifications that I previously

addressed,[1] essentially, that these transfers are necessary to meet detention capacity needs, facilitate removals, and ensure safe and secure detention of "high threat illegal aliens." However, the government has provided no response to any of my prior explanations of how none of these rationales hold up. The government has not addressed why ICE is unable to use existing detention capacity or use its many tools to expand detention facilities within the United States; how much more costly and logistically burdensome it is to detain noncitizens at Guantanamo; how it makes no operational sense to send people to Guantanamo as an additional layer of expense and complexity prior to removal; nor why detention facilities in the United States are insufficient to ensure detainee safety and security.

5. In short, the government has failed to justify the need to engage in such expensive, logistically complicated, and unnecessary transfers to Guantanamo.

6. The government also argues that the Immigration and Nationality Act (INA) authorizes these transfers to Guantanamo because it authorizes "broad extraterritorial authority" to carry out removals and therefore provides the government extraterritorial authority to detain in any "United States Government facilit[y]." ECF No. 14 at 25-28. But the government is conflating two very different components of the immigration lifecycle, removal and detention. As I explain below, removal is an

---

[1] Both declarations state in conclusory fashion: "The use of NSGB [Naval Station at Guantanamo Bay] is deemed necessary to complete ongoing removal operations due to the number of illegal aliens present in the United States and the current and ever-evolving availability of detention space in ICE detention facilities or other contracted detention facilities to house aliens for civil immigration purposes. Available detention space fluctuates due to, for example, contracting issues, state laws, and injunctions issued by federal district courts." *Compare* Decl. of Juan Lopez-Vega, ECF No. ¶ 6, *with Las Americas Immigr. Advoc. Ctr. v. Noem*, 1:25-cv-418, ECF No. 14-1, ¶ 5 (D.D.C. Feb. 20, 2025).

Docusign Envelope ID: F285579A-803D-4259-AE6D-E41A4GC608BC

entirely different process separate from detention as authorized by the INA. Detention is not necessary for removal, but where someone is detained for a removal, the detention occurs prior to removal and is not part of the removal process. This is confirmed by ICE's own guidelines, policy, appropriations, and practice. Prior to February 2025, ICE never claimed that it was detaining extraterritorially, at Guantanamo or elsewhere; for individuals interdicted on the high seas and held at Guantanamo, the government has consistently and explicitly stated that it is *not* detaining them.

7. Below, I will explain how ICE conducts its removal operations; how the transfers to Guantanamo completely deviate from this practice and therefore are not steps in an ongoing lawful removal process; how detention at Guantanamo is unlawful and unprecedented extraterritorial detention; and how the conditions that detainees experience at Guantanamo are below the standard for conditions in U.S. detention facilities.

***ICE's Removal Policy and Practice***

8. ICE ERO is organized into several divisions, including enforcement (responsible for arrests), custody management (detention operations), and removal (coordinates, manages and facilitates efforts to remove noncitizens from the United States).[2] Those three divisions are managed differently, organized independently, and funded by

---

[2] U.S. Immigr. & Customs Enf't, Enforcement and Removal Operations (last updated Feb. 4, 2025), https://www.ice.gov/about-ice/ero.

different streams of appropriations.³ The government's brief tries to conflate detention and removals, but they are two structurally different operations.

9. For instance, the government argues that the budget for ICE's Transportation and Removal Program, which funds removal operations, includes funding for extraterritorial activity. ECF No. 14 at 25-26. But ICE's detention activities are funded separately from removal activities,⁴ and the government cannot bootstrap detention activities to removal activities by using that funding source.

10. Detention is authorized while ICE is making arrangements for removal. ICE cannot begin to effectuate a removal until the noncitizen has a final order of removal and certain requirements are met. Where ICE is effectuating removal by air, it must (1) obtain any necessary travel documents to the country of final destination, and (2) secure travel arrangements, including the flight manifest (which is a document that lists all passengers and crew on a flight) and any permission necessary to travel through transit countries. In some instances, it may take many months to meet these requirements. Immigration laws authorize detention during that period. However, ICE does not begin to effectuate a removal while waiting for travel documents or without a complete travel itinerary. Once those details are confirmed and ICE begins to effectuate removal, the authorized detention for removal ends and the removal begins. Removal flights departing a staging facility to an international destination also require

---

³ *Compare* Dep't of Homeland Sec., *Immigration and Customs Enforcement Budget Overview Fiscal Year 2023 Congressional Justification* 131 (2023), https://www.dhs.gov/sites/default/files/2022-03/U.S.%20Immigration%20and%20Customs%20Enforcement_Remediated.pdf [https://perma.cc/TP6C-VVQ5] (describing budget and activities for custody operations), *to id.* at 169 (describing budget for Transportation and Removal Program, which funds removals).
⁴ *See supra* n.3.

4

the completion of a Form I-205 (Warrant of Removal confirming departure) or I-296 (Notice to Alien Ordered Removed/Departure Vertification) to verify departure of an aircraft from a staging location for removal missions.[5]

11. To use the example that the government raises: a noncitizen may be escorted from the United States to Romania with a refueling stop in Germany. ECF No. 14 at 29. In that scenario, ICE would not take the noncitizen out of the United States without obtaining any necessary travel documents to Germany and Romania, confirming the travel itinerary, or obtaining permission from Romania for the brief layover. Indeed, ICE's Removal Guidelines provide factors that must be considered when determining and selecting the date of a departure, including "country clearance timeframes from each specific country and/or countries, if [the] itinerary has multiple transit stops."[6]

12. The government tries to analogize the transfers to Guantanamo to the refueling stop in Germany but, as illustrated below, that is not what is occurring because, as the government admits, it is transferring people to Guantanamo while still making arrangements to remove them to their presumed final destination. In other words, ICE transfers people to Guantanamo *without* having removal plans in place as is required before initiating removal.[7]

---

[5] ICE ERO, ICE Air Operations Handbook, at 10-11 (Feb. 20, 2024), https://www.ice.gov/doclib/foia/policy/iceAirOpsHandbookEd2_02202024.pdf [https://perma.cc/6VGL-RPA6].
[6] *Id.* at 25-26.
[7] *See, e.g.*, Dep't of Def., *First Flight of Illegal Aliens Arrives at Guantanamo,* (Feb. 5, 2025), https://www.defense.gov/News/News-Stories/Article/Article/4055497/first-flight-of-illegal-aliens-arrives-at-guantanamo/ [https://perma.cc/X69L-VULY] ("[W]here it may take longer to reach agreements or process those individuals' return to their nations of origin, DOD needs a place to house them before they return home."); Sarah Fortinsky, *Hegseth touts Guantanamo Bay as 'perfect spot' to house migrants*, The Hill (Jan. 29, 2025),

5

13. The government also claims that people are "detained" during the course of this removal process and thus that ICE "routinely exercises" its detention authority outside of the United States. But that is not the case. Once ICE initiates the removal process by putting detainees on a flight departing the United States, the detention ends and removal process begins.

14. There are legally significant and practical reasons why detention ends when removal begins. Noncitizens subject to detention by ICE must be afforded certain minimal protections like access to counsel, medical care, and disciplinary procedures. These are reflected in ICE's various detention standards, which apply to facilities where people are held for 72 hours or more.[8] After travel documents are procured and travel arrangements confirmed, ICE may then transfer people to "staging facilities," like the Alexandria Staging Facility in Louisiana, where they are held for a short period of time (generally under 72 hours) before departing the United States; those facilities still have protections that apply since people are still in detention at that point. After that, however, although those noncitizens may be on an ICE charter flight or escorted by ICE on a commercial flight, they are not in detention. The standard of care for noncitizens during the course of the removal is different from the standards required for noncitizens in detention.

---

https://thehill.com/policy/defense/5115256-hegseth-guantanamo-bay-migrants/ ("'We don't want illegal criminals in the United states any — not a minute longer than they have to be,' [Hegseth] continued. 'Move them off to Guantanamo Bay, where they can be safely maintained until they are deported to their final location, their country of origin, where they are headed.'").

[8] *See generally* U.S. Immigr. & Customs Enf't, Performance-Based National Detention Standards 2011 (revised Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf [https://perma.cc/KD8X-W8FE] (hereinafter "PBNDS").

6

15. This is the case even if a noncitizen has an extended layover. For instance, they may have a long layover in a transit country or a mechanical issue may cause a delay in getting to the next leg of an itinerary. In those situations, because it is mechanically necessary to effectuate the removal, the ICE escort may house the noncitizen at a motel or hotel for the night, but that is still not considered a detention.

***Guantanamo Transfers Are Unlawful Removals, Not Part of an Ongoing Lawful Removal Process***

16. The government claims that the immigration detainees have not been removed to Guantanamo because their transfer are part of an ongoing removal process that remains to be completed. But as I have explained above, that is not the case. Detention at Guantanamo is not equivalent to a stopover for refueling or other mechanical reasons. Nor is it a step in the ongoing process of removal. In transferring detainees to Guantanamo, the government has not identified a final destination other than Guantanamo, let alone obtained travel documents or made arrangements for travel to that presumed final destination. In contrast, layovers that are part of an ongoing removal process are brief, limited only to as long as necessary, and pre-arranged in advance with the rest of the itinerary confirmed. Thus, transfers to Guantanamo are unlawful removals since Guantanamo is outside the United States and, pursuant to the statute, 8 U.S.C. § 1101(g), when someone who is subject to a final order departs the United States, they have been removed.

17. The government also claims that detainees' transfer to Guantanamo are not removals because to effectuate removal, the noncitizen must lawfully enter another country. However, that is completely contrary to ICE's policy and practice. As explained in a 2004 Notice of Proposed Rulemaking, removals do not require acceptance by the

7

receiving country.[9] For example, ICE has carried out removals in a number of ways, including by escorting someone to the border and watching them cross into the foreign country; by escorting them to board a commercial or ICE charter plane and ensuring the plane leaves U.S. territory; or, by escorting a noncitizen to a transit country and placing them on a commercial or charter carrier through to the final destination.[10] In all those scenarios, while ICE may coordinate with the final destination, the removal is effectuated by the individual's physical departure from the United States, regardless of any "legal entry."[11]

18. In sum, the policy, practice, and guidance of ICE confirms that the removal process is only initiated after certain steps are taken, and the transfer of detainees to Guantanamo is not part of a lawful ongoing removal process.

***Extraterritorial Detention at Guantanamo is Illegal and Unprecedented***

19. To my knowledge, this is the first time that ICE has detained a noncitizen who was previously inside the United States at a location outside of the United States. The government has not pointed to any prior instances of extraterritorial detention since the INA authorized immigration detention. Rather, for decades, the government has taken the position that migrants who were interdicted at sea and are housed at the Migrant Operations Center (MOC) are *not* detained.[12] They enjoyed some freedoms

---

[9] 69 Fed. Reg. 42,901, 42,903-04 (July 19, 2004).
[10] *Id*. at 42,903-04.
[11] *Id*. at 42,904.
[12] Int'l Refugee Assistance Project, Offshoring Human Rights: Detention of Refugees at Guantánamo Bay 16, 31, 33 (Sept. 2024), https://refugeerights.org/wp-content/uploads/2024/09/Offshoring-Human-Rights-Guantanamo-Bay-English-Report-September-2024-1.pdf [https://perma.cc/ZG4W-AYEV] (excerpt of Instruction 5500.1D stating "[m]igrants are not detained or incarcerated . . . ."); *id*. at 37 ("Migrants are not detained at this facility[, the MOC].")..

not typically available in detention, such as freedom of movement, going to the grocery store, and holding jobs.

20. The people being transferred to and detained at Guantanamo by ICE currently are not similarly situated and are, as the government freely admits, in detention. *See, e.g.*, ECF No. 14 at 26-28. Indeed, since the transfers began in February 2025, ICE has added "Naval Station Guantanamo Bay (JTF Camp Six and Migrant Ops Center)" in its list of detention facilities on the ICE website.[13]

21. This is another way in which the transfers to Guantanamo are completely different from the layover scenario discussed by the government. In the scenario discussed above, where an ICE charter carrier transports a group of noncitizens from the United States to Romania with a refueling stop in Germany, those noncitizens generally never even step foot off the plane. They only stop for as long as necessary to continue effectuating the removal. In other words, these layovers are brief, limited to as long as necessary, and pre-arranged in advance with the rest of the itinerary confirmed.

22. At Guantanamo, however, people are not only being taken off the flight, they are being shackled, strip searched, and processed for intake at what are clearly detention facilities at Guantanamo. People are also spending from several days to as long as two weeks or more at Guantanamo—something that would not occur during an ICE removal.

23. The detention at Guantanamo is also distinguishable from what occurs at staging facilities for removal in the United States. Instead, the transfers to Guantanamo look

---

[13] U.S. Immigr. & Customs Enf't, Naval Station Guantanamo Bay (JTF Camp Six and Migrant Ops Center Main A) (updated Mar. 4, 2025), https://www.ice.gov/detain/detention-facilities/naval-station-guantanamo-bay [https://perma.cc/V3V2-Y4XP].

9

more like a lateral transfer from one detention facility to another, the difference being that Guantanamo is outside the United States.

24. There are public reports how multiple individuals who were initially transferred from within the United States to Guantanamo were subsequently transferred back to the United States, either directly to a staging facility like Alexandria or first to a different detention center and then onto a staging facility for removal.[14] Thus, in practice, Guantanamo is not being used to stage removals.

25. As I explained in my previous declaration, this is a colossal waste of resources and it makes no operational sense to add additional flights to and from Guantanamo, when those individuals were ultimately staged for removal out of the United States.

26. If the government continues this practice and anticipates scaling up transfers to Guantanamo, they will likely have to send even more people back to the United States to actually effectuate their removals. This is not only costly and inefficient, it makes no sense from an operational standpoint.

**Guantanamo Transfers are Statistically Significant**

27. The government claims that the transfers to Guantanamo—290 people as of March 7, 2025—are insignificant compared to the number of detainees repatriated without ever transiting through Guantanamo. ECF No. 14 at 10. But those statistics are misleading.

28. The government points to the number of monthly repatriations in 2024, ranging from 47,490 to 74,360. *Id*. But as ICE's own publication confirms, "repatriation" covers

---

[14] *See, e.g.*, Carol Rosenberg, What We Know About the Month-Old Migrant Mission at Guantanamo Bay, NY Times, Mar. 10, 2025, https://www.nytimes.com/2025/03/10/us/politics/deportations-migrants-guantanamo.html?unlocked_article_code=1.3E4.dBRC.OBMNvDg_m3Yd&smid=url-share [https://perma.cc/98SJ-V9S6].

10

any instance when ICE sends a noncitizen "back to their country of citizenship or third country," which can include a "removal," a "return", or an "expulsion."[15] In other words, "repatriations" are not limited to the removal of detained individuals by flights. ICE's statistics reflect that the number of *removals* ranged from 21,020 to 35,940 a month (so half of all repatriations).[16] And that statistic is also overinclusive because it includes removals by CBP—essentially removals at the border into a contiguous foreign territory like Mexico or Canada.

29. ICE's annual report reflects that of the total 271,484 removals conducted in 2024, 223,752 (nearly 82.5%) were conducted by CBP.[17] Thus, extrapolating from the remaining 17.5%, or 47,732 removals, that averages out to just under 4,000 removals conducted by ICE per month in 2024.[18]

30. I also understand from public reporting that flights to Guantanamo have exclusively or nearly exclusively come from Fort Bliss, Texas,[19] meaning that individuals first transferred to the El Paso Processing Center in Texas are more likely to be transferred onto Guantanamo. Flights from El Paso only make up a small portion of the total ICE removal flights nationwide. The government appears to have thus far targeted men with final orders; because men make up the majority of people removed on a monthly basis, that would still reduce the baseline comparison rate.

---

[15] Off. of Homeland Sec. Statistics, Immigration Enforcement and Legal Processes Monthly Tables (last updated Jan. 16, 2025), https://ohss.dhs.gov/topics/immigration/immigration-enforcement/immigration-enforcement-and-legal-processes-monthly [https://perma.cc/223F-S35V].
[16] *Id.*
[17] *Supra* n. 15 at 33.
[18] *Id.*
[19] *See supra* n.14.

11

31. Further, as President Trump's memorandum states, the government plans to build capacity to hold up to 30,000 detainees at Guantanamo—a massive scale that would, naturally, lead to even more transfers.

*Conditions at Guantanamo Are Inadequate*

32. The government asserts that there are procedures for immigration detainees at Guantanamo that are "following and supporting DHS procedures." ECF No. 14 at 6. However, there are major gaps between the procedures set at Guantanamo and those at U.S. detention facilities.

33. For instance, in U.S. detention facilities, detainees may only be placed in segregation, also known as Special Management Units (SMU), in limited circumstances subject to specific procedures. Detainees can only be placed in administrative segregation for administrative reasons or protective custody; if they are awaiting investigation for a violation of facility rules; if they pose a threat to the security of the facility; based on specific misconduct; or if they require protection.[20] Detainees may only be placed in disciplinary segregation conditions only after a hearing and order of a disciplinary panel.[21] Although it appears that the government has now established a separate special housing unit designated for administrative segregation, it appears not to have been used. Decl. of Robert Green ¶ 12. However, it appears that detainees at Unit 6 are held in segregation (solitary) conditions akin to such special housing units, without the procedural protections required for placement in such units. *Id*. ¶¶ 4, 10 n.2.

---

[20] PBNDS § 2.12.V.A.1 (Special Management Units).
[21] PBNDS § 2.12.V.B (Placement in Disciplinary Segregation).

12

34. The government also acknowledges that individuals should receive regular opportunities for outdoor recreation, but that those have been discontinued for "safety and security issues." *Id*. ¶ 10 n.2. However, in the United States, individuals in special management units (solitary confinement units), would still be afforded an hour of recreation each day. That does not seem to be the policy at the facility known as Camp 6. *Id*. Further, while the government states that "[t]he MOC also provides regular opportunities for recreation and personal hygiene," it does not specify what minimum amount of time is provided for recreation and showers, in contrast to ICE detention standards for U.S. facilities. *Compare id*. ¶ 19, *and* Lopez-Vega Decl. ¶ 28 ("Aliens at the MOC are afforded outdoor recreation time daily. The allotted outdoor recreation time for each alien may vary depending on certain factors . . . ."), *with* PBNDS § 5.4.II.2 (Recreation) (specifying that "[d]etainees shall have at least four hours a day access, seven days a week, to outdoor recreation," and that detainees in a Special Management Unit shall receive "at least one hour" of outdoor recreation each day).

35. Another major gap is in communication and attorney access. The government states that written notice of the right to contact counsel is posted at both Camp 6 and the MOC, Lopez-Vega Decl. ¶ 12, but the posting does not ensure actual notice to each individual, as compared to U.S. detention facilities, where noncitizens should be provided with an outgoing call and a handbook explaining their rights upon intake at each facility.[22] Moreover, it is not currently possible for attorneys to physically visit

---

[22] PBNDS § 2.1.II.11 (Admission and Release) ("Detainees shall have access to one free telephone call during the admissions process"); *id*. § 2.1.V.A (requiring each new arrival to be oriented to facility operations in the form of an ICE National Detention Handbook).

13

detainees at Guantanamo, Lopez-Vegas Decl. ¶ 20, whereas attorneys can visit client in U.S. detention facilities as well as military detainees at Guantanamo.[23]

36. The government states that starting March 2, 2025, detainees are authorized one five-minute personal phone call per day Green Decl. ¶ 22. This is far below the amount of communication access that detainees have in the United States, even those in administrative segregation.[24] In addition, although ICE detention standards allow facilities to place reasonable restrictions on the hours, frequency, and duration of phone calls, the standards do not provide for any restrictions on the allowable content of communications in detainee calls, including restrictions on communicating with others, via telephone, the detainee's location.[25]

37. Lastly, the government states that staff are using a "restraint chair" to prevent self-harm and for disciplinary purposes. *Id*. ¶ 15. But ICE detention standards in the U.S. provide that "[u]nder no circumstances shall staff use force or apply restraints to punish a detainee."[26]

**Conclusion**

38. In conclusion, the government's rationales for its Guantanamo transfer and detention policy simply do not withstand any scrutiny. The recent transfers of people to Guantanamo and back to the United States to effectuate their removals underscore the

---

[23] PBNDS § 5.7.V.J (Visits by Legal Representatives and Legal Assistants) (requiring each facility to permit in-person legal visitation seven days a week).
[24] PBNDS §§ 5.6.V.D.1-E.2 (Telephone Access) (requiring telephone access at least during eight "waking hours" each day and permitting only "reasonable limitations on the duration and number of calls per detainee."); *id.* § 2.12.V.H (specifying that detainees in administrative segregation shall "receive the same privileges available to detainees in the general population.").
[25] PBND. § 5.6.V.D (outlining allowable restrictions on detainee telephone use.).
[26] PBNDS § 2.15.B.2 (Principles Governing the Use of Force and Application of Restraints).

14

illogical and costly nature of these transfers, in addition to undercutting the government's own justifications for this entire operation. The government has already transferred 290 people from 27 distinct countries to Guantanamo, illustrating how expansive this policy has grown. And yet the government seems far from prepared or capable of detaining noncitizens at Guantanamo in accordance to ICE's own detention standards.

Executed on this 12th day of March, 2025, in Washington, DC.

DocuSigned by:

*Deborah T. Fleischaker*
8AA70A96D4E74C5...

3/12/2025 | 11:14 PM EDT

Deborah Fleischaker