# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


LAS AMERICAS IMMIGRANT ADVOCACY
CENTER, et al.,
                                        Civil Action
            Plaintiffs,                 No. 1:25-cv-00418-CJN

     vs.                                March 14, 2025

KRISTI NOEM, et al.,

            Defendants.                 Washington, D.C.
_____

MAIKER ALEJANDRO ESPINOZA ESCALONA,
et al.,
                                        Civil Action
            Plaintiffs,                 No. 1:25-cv-00604-CJN

     vs.                                March 14, 2025

KRISTI NOEM, et al.,

            Defendants.                 Washington, D.C.
_____

     TRANSCRIPT OF THE HEARING FOR TEMPORARY RESTRAINING ORDER
          BEFORE THE HONORABLE CARL J. NICHOLS
               UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:        LEE GELERNT, ESQ.
                           American Civil Liberties Union
                           125 Broad St.
                           18th Floor
                           New York, NY 10004

For the Defendants:        DREW C. ENSIGN, ESQ.
                           U.S. Department of Justice
                           950 Pennsylvania Avenue
                           Washington, DC 20004

Court Reporter:            Stacy Johns, RPR, RCR
                           Official Court Reporter

     Proceedings recorded by mechanical stenography, transcript
          produced by computer-aided transcription

# P R O C E E D I N G S

DEPUTY CLERK:  Good afternoon, Your Honor.  These are civil cases year 2025-418, Las Americas Immigrant Advocacy Center, et al., versus Kristi Noem, et al., and civil case year 2024-604 Maiker Alejandro Espinoza Escalona, et al., versus Kristi Noem, et al.

Counsel, please come forward to introduce yourselves for the record, beginning with the plaintiff.

MR. GELERNT:  Good afternoon, Your Honor.  Lee Gelernt from the ACLU for plaintiffs.

THE COURT:  Mr. Gelernt.

MS. CHO:  Good morning.  Eunice Cho on behalf of the plaintiffs; thank you.

THE COURT:  Ms. Cho.

MR. AZMY:  Good afternoon.  Baher Azmy from The Center for Constitutional Rights on behalf of the plaintiff.

THE COURT:  Mr. Azmy.

MS. ALAGESAN:  Good afternoon, Your Honor.  Deepa Alagesan from the International Refugee Assistance Project.

THE COURT:  Ms. Alagesan.

MR. ENSIGN:  Good afternoon, Your Honor.  Drew Ensign, Deputy Assistant Attorney General for the defendants.

THE COURT:  Mr. Ensign.

MS. WILSON:  Sarah Wilson for the defendants.

THE COURT:  Ms. Wilson.

MR. FLENTJE:  August Flentje for the defendant.

THE COURT:  Mr. Flentje.

We are here -- let me just ask if everyone who is, I believe, counsel or associated with a party participating by phone to please put your phone on mute.  We are getting some feedback in the courtroom.  Thank you, very much.

We're here on the motions for temporary restraining orders, slash stays in both cases.

Let me just state what I have done to prepare for today:  Reviewed what I believe to be basically the entire record; that is to say, the parties' various briefs and all of the declarations and supporting materials submitted in both matters through and including those submitted yesterday by plaintiffs.  So I have a decent handle on the facts.

What I'd like to do is basically deal with the cases together; that is to say, start with plaintiffs, have plaintiffs argue in support of their motions in both cases. And I'll turn it to defense counsel to argue against the motions in both cases, and then I'll turn it back to the plaintiffs for a rebuttal as warranted and perhaps even a surrebuttal for the defendants as required.

Okay.  So with that, Mr. Gelernt, will you be taking the lead?

MR. GELERNT:  Yes, sir.

THE COURT:  You may approach.

MR. GELERNT:  Thank you, Your Honor.

I'll start with the access cases.  As we informed the Court, the parties have narrowed the issues significantly since we first filed this case, and I believe that there are only a few issues remaining.  And perhaps even less than that if the government has made progress in the last 24 hours since we've had a meet and confer.

The main issue I think that still is outstanding is the inability to have in-person visits, and we believe that that is critical for the lawyers and the clients, to see the conditions, to understand what's going on, to understand their rights.  It's very difficult on the phone, even to the extent that we can reach them on the phone.  And, of course, in U.S. ICE facilities, it's self-evident that there is access, in-person access.  There is even access to the law of war detainees at Guantanamo.  And, of course, there's access to prisoners in BOP facilities.

So we have not seen a justification for not allowing us in-person access, especially since the law of war detainees are allowed to go there.

Now, the government has said that they haven't come to a full decision on that.  We understand that, but on the other hand, it's been going on a while now.  And we would like an answer from them one way or the other.  And maybe the Court will be able to get an answer from them about that.

And we recognize, you know, at full acknowledgment that there is nobody at GTMO now, and that seems to be a pattern every time we're going to come before Your Honor, it seems to be emptying out.

And so while it may not be necessary this second to have that resolved, I think unless the government is willing to tell the Court this is when we're sending people back, it may be necessary for the Court to resolve this before other people are sent back.

THE COURT:  Are there any other changes to the access practices at Guantanamo that you seek beyond in-person that haven't been resolved through the discussions with government or the government's own unilateral decisions?

MR. GELERNT:  So, Your Honor.  I think there are a couple of things I just wanted to mention, but it may be that the government can stand up and say we have dealt with those even since --

THE COURT:  Well, just make sure I understand from your perspective.

MR. GELERNT:  Absolutely, absolutely.

So one is that originally as Your Honor knows, they were only sending Venezuelan men.  Now the declarations say they have sent people from 27 different nationalities, but they're only providing forms in English and Spanish.  And so that's obviously going to be a problem.

They haven't told us all the 27 nationalities or all the different languages, but I think it's fair to assume that they don't all speak Spanish. And so in ICE facilities they translate into ten different languages. We would expect them, at a minimum, to do the 10, and we're certainly happy to assist in the translation. But that, that is a significant issue.

The other issue may not really be an issue. It's that we are hearing from detainees to the extent that they're able to call out the family, that they're being told they can't say where they are, that they're at Guantanamo. The government has said -- I don't want to put words in their mouth. I mean, I'll let the government speak for itself.

The government is saying that's not true, that's not a policy. So I think maybe that's more in the nature of the government will hopefully clarify with the guards there, that while the detainees can't say specifically what the layout of the base is, that seems to be what the government is concerned about, they can at least say we're at Guantanamo, we're no longer at the U.S. facility that you were previously calling us at.

So I think that rounds out the access issues. And the most important, obviously, where we really have no meeting of the mind is the in-person visit.

THE COURT: Right. So I'll ask the government about these three points, but just staying on the access cases, given

the facts as I understand them, what is the irreparable harm currently being suffered by any plaintiff in the access case as a result of one or more of those issues?

MR. GELERNT:  You mean because there's nobody there now?

THE COURT:  Yeah.

MR. GELERNT:  Right.  So I think, Your Honor --

THE COURT:  Put differently --

MR. GELERNT:  Right.

THE COURT:  -- there is no one to visit in person?

MR. GELERNT:  Right.

THE COURT:  There is no one who would need a ten language notice, and there's no one who is prohibited from saying where they are, if that's even happening?

MR. GELERNT:  Right.

THE COURT:  So there is no current harm in these three ways being suffered imminently; and therefore, not irreparably?

MR. GELERNT:  Right.  So, Your Honor, I take the point.  The problem for us is that we get no notice.  We've asked the government for notice, but we get no notice.  So people are sent immediately to Guantanamo with zero notice.  Counsel doesn't know about it, and so by the time we can try and come back to this Court, they keep moving people off of Guantanamo.  It's happened twice now.

THE COURT:  Maybe there's a capable repetition yet

evading review issue lurking in this case in the future in the event it's not dismissed, but the hallmark of a TRO is the plaintiff's ability to establish irreparable -- immediate, imminent irreparable harm absent the TRO.  And I'm trying to figure out who is affected in any way by these three practices right now.

MR. GELERNT:  Right.  I mean, because there's nobody at Guantanamo, I understand it's a fair point, Your Honor.  But I think we're in one of those catch-22 situations --

THE COURT:  How could I possibly enter a TRO with no current irreparable harm?

MR. GELERNT:  Well, I think Your Honor can, given the unique circumstances where the government is moving people there without any notice and then quickly taking them off.  And so I think there's a little bit of gamesmanship going on here, and so I think what the Court can do if it's concerned about that is ask the government that it at least alert you, even if it's not willing to alert us, we are bringing people back; and therefore, once people get back, we can be in court immediately.  But the problem for us has been continuously that the government says there's no irreparable harm, there's nobody there.

The next day they bring people, we come back to you, and then all of a sudden, they're gone.  And each time they file their papers and then all of a sudden have moved everyone

off, and so I think at a minimum Your Honor could insist that the government at least give you notice.  Because otherwise, I think it's a sort of a gamesmanship with the court as well.

THE COURT:  So this discussion you and I have been having is predicated on your sense that there is no alien detainee at Guantanamo in the cohort that is relevant here. I'm not sure that's in the record, but that, I take it, is your understanding or at least your proffer to me today?

MR. GELERNT:  That's my proffer.  I'm happy for the government to say that's incorrect.  I don't think they will, and I think the public -- you know, the public reporting, obviously the media could be wrong.  But there are reporters at Guantanamo, and apparently there's no one there.  And I would be happy for the government to say that that's not true, but I also think the government will not say that they are not going to send people back there in the future.

They've also said to us they will not give notice, and so I think we'll be back here again.  And the Guantanamo detainees would have been moved right after the filing, and they'll be back here saying the same thing to you, that there's no irreparable harm because there's no one there.

THE COURT:  Okay.  So now let's turn to the second case.

MR. GELERNT:  So we have three basic claims.  One is we don't think there's statutory authority to send these

individuals to Guantanamo.  We secondly say that it's arbitrary
and capricious under the APA.  And third, that there's a
substantive due process violation.

Just as an overview and as the Court is obviously
aware from reading the papers, this is unprecedented.  The
government has never taken a position that they can detain
people at Guantanamo, never has done so.  The President's
memorandum actually said just start building capacity and
specifically at the MOC and only for high-level --

THE COURT:  Well, the government has detained certain
aliens at Guantanamo in the past.  I'm not talking about law of
war.

MR. GELERNT:  Right.

THE COURT:  I'm talking about Migrant Operations
Center.

MR. GELERNT:  That's fair, Your Honor.

THE COURT:  As I understand it, those are aliens
picked up, generally speaking, say in the Caribbean, and they
are put in the Migrant Operations Center.  So, in fact, the
government has detained at Guantanamo certain aliens in the
past.

MR. GELERNT:  Right.  And so just to be clear, those
are exclusively people who were picked up outside of U.S.
territory.  And the government has actually said we are not
detaining them.  There is -- I don't think the government will

dispute that.

THE COURT:  Yes.  I wasn't meaning detained there, in a term of art sense.  Yes.  It's colloquial, yes.

MR. GELERNT:  Right.  And so I think that makes all the difference from our standpoint, is that they never were on U.S. soil.

And so our two statutory arguments are first that this constitutes a removal.  They have removed people to Cuba.  The government says, no, we didn't intend to do that, but the subjective intent is not part of the statute under 1103(g).  It's have you departed, and the cases suggest that.

So I don't think the government can get away with simply saying, well, we didn't intend to remove them.

But alternatively, if it's not a removal, I think the government will concede that they are detaining immigrants there, and we are not aware of any statutory authority, extraterritorial detention authority, for people who were once on U.S. soil.

THE COURT:  Right.  The INA gives the Attorney General pretty broad authority to detain and to determine where it's appropriate to do so, but your argument is that that butts up against the presumption against extraterritoriality?

MR. GELERNT:  Exactly.  And I think, you know, to be clear, the government has consistently for decades taken a position that the INA doesn't apply extraterritorially, told

the Supreme Court in the *Sale* decision involving Haitians, it doesn't apply extraterritorially.  That's been their position consistently, and so the way they're trying to get around that is now all of the sudden saying well, yes, the detention statutes don't mention extraterritoriality, but they're really part and parcel of the removal process, but that's a contrived argument, respectfully.

The government has never understood detention and removal to be the same thing.  We have a declaration from an ICE officer who was there for a long, long time saying detention and removal were always understood to be different.  And the statute they're relying on, in particular, 1231(g) says detention...appropriate places of detention...pending removal.

And so the government has now tried to analogize it to a stopover to refuel in Germany on the way to Romania.  That is an inapt analogy.  That is not detention in the same way that sending people to Guantanamo for days on end.  This is a classic detention.  The government has never understood detention and removal to be the same thing, and given the presumption and given coercive nature of detention, we don't see how the Court can find that these detention provisions apply extraterritorially.

THE COURT:  Do you agree that if the government decided that for whatever reason for aliens who have removal orders and have exhausted all of their claims that they're

going to build a new facility in Key West and put folks there,

that that would fit within this -- and put people there pending

their removal, that would fit within this authority, the (g)

authority?

          MR. GELERNT:  Yes, Your Honor.  Unless I'm missing

something about the hypothetical about Key West, in particular.

          THE COURT:  No, no.

          MR. GELERNT:  Okay.

          THE COURT:  I was just trying to pick something --

          MR. GELERNT:  Yeah.

          THE COURT:  -- that's geographically somewhat

proximate to Cuba --

          MR. GELERNT:  Okay, I understand.

          THE COURT:  -- but it's within the territory of the

United States.

          MR. GELERNT:  I apologize, Your Honor.

          THE COURT:  Yeah.

          MR. GELERNT:  We have no objection.  I mean, there

could be other objections for whatever reasons -- in

particular, counsel could have objections to moving their

client.  But no, and I want to be clear about that.

          We are not saying these individuals are entitled to

get out of detention or that they have any right to stop

detention moving within facilities, and the government does

that all the time.  And generally speaking, you can't challenge

that.  I mean, again, there may be particular people who can
challenge it.

            THE COURT:  Okay.  So to go back to where I started in
the other case --

            MR. GELERNT:  Right.

            THE COURT:  -- which is irreparable harm.

            MR. GELERNT:  Right.

            THE COURT:  What is the imminent irreparable harm for
the plaintiffs in this case?

            MR. GELERNT:  Yeah.  Again, without belaboring the
point too much, we don't know that these individuals, the
minute we walk out of court, will not be at Guantanamo.  And
that's --

            THE COURT:  So let's imagine hypothetically --

            MR. GELERNT:  Yeah.

            THE COURT:  -- that were to happen, that one or more
of the individual plaintiffs does get to GTMO.  This is going
to be a question for government counsel, but so long as I have
a case in front of me involving -- that hasn't been dismissed
involving individual plaintiffs, I'm going to assume for
present purposes the government would likely notify me of a
change of circumstances that is relevant to their TRO
opposition.

            One of their arguments in their TRO opposition is that
none of these plaintiffs can establish imminent irreparable

injury, slash Article III injury, because they can't establish they're going to GTMO.  Well, at least part of that argument would disappear if they were to move one of the plaintiffs to GTMO while the case is pending.  That would seem to me a material change in facts the government should tell me about.

Imagine that happened, so at least I get notice, and since it doesn't seem like that's the world's biggest secret, it seems like perhaps that could be filed publicly.  But imagine either that happens or because of the counsel access issues that you and I were discussing earlier, that person who's represented now in this case could let you know.

At that point the imminence would be satisfied.  Why couldn't I take up, then, whether there is sufficient harm, likelihood of success on the merits and the like?  And essentially why couldn't I cure at that time, if warranted, any purported harm?

MR. GELERNT:  Right.  And so you're saying if one of them is transferred you would want that notice, and even if the other nine --

THE COURT:  Well, imagine if I got --

MR. GELERNT:  Yeah, yeah, yeah.  I understand.

THE COURT:  We learn that plaintiff 1 --

MR. GELERNT:  Right.

THE COURT:  -- is now in GTMO.

MR. GELERNT:  Right.

THE COURT:  There isn't a TRO, hypothetically --

MR. GELERNT:  Right.

THE COURT:  -- to prevent that.

MR. GELERNT:  Right.

THE COURT:  Now, all of the government's arguments about imminence of going to GTMO are water under the bridge.

MR. GELERNT:  Right.

THE COURT:  We litigate at that point whether all of the lawfulness stuff that we've been talking about, and as to irreparable harm, why couldn't that be essentially repaired through an order from me, if I were to conclude that you're right about all of the things you're saying now?

MR. GELERNT:  Right.

THE COURT:  And that order would be, sure, he's at GTMO now, but you're order to return him to Texas, Arizona, or otherwise.

MR. GELERNT:  Right.  So I think a couple of things. One is, we don't see why -- playing along with the Court's hypothetical -- we don't see why they couldn't alert you before he's actually sent to Guantanamo.

THE COURT:  Maybe.  Yes, but --

MR. GELERNT:  And the reason I say that is because there is harm by going to Guantanamo. I mean, there's the normal harm as Your Honor has pointed out in your *TikTok* decision that when a statute is being enforced unlawfully, that

is harm.  That is irreparable harm, but I think there's also serious conditions questions at Guantanamo.

So I don't think this is a question of, well, they may spend a few days at Guantanamo, and they can be brought back. There's no question we think Your Honor would retain jurisdiction and could bring them back, but I do think this is serious enough --

THE COURT:  Again, just to be very clear --

MR. GELERNT:  Yeah.

THE COURT:  -- about the hypothetical.  I'm hypothesizing a world in which, right, I've taken up the initial question at the beginning of this case about whether to enjoin the transfer of these plaintiffs --

MR. GELERNT:  Right.

THE COURT:  -- but the case brought by these plaintiffs is still in front of me.  The government hasn't moved to dismiss.  I still have jurisdiction --

MR. GELERNT:  Right.

THE COURT:  -- and the like.

MR. GELERNT:  No, absolutely.  I understand, Your Honor.

And I would say that if the transfer was just from one U.S. facility to another and that's what we were challenging and the facilities were, sort of, of equal conditions, we would be saying that would be fine, Your Honor.

THE COURT:  So your view is someone who's transferred to Guantanamo and spends one day there suffers irreparable enough harm that I should order a TRO now, even though we don't know if any of them is going to go there, any of the ten plaintiffs here, and that an order -- a hypothetical order requiring that person to be moved back from GTMO couldn't undo that one or two days of irreparable harm?

MR. GELERNT:  That's our view, Your Honor, in light of --

THE COURT:  So what's the harm exactly?  Put some specificity around it.

MR. GELERNT:  Yeah.  So I think that what we're hearing is that the people that are going to Camp VI are being shackled.  Sometimes there's a confinement chair, there is solitary, and so there's all those things plus the trauma of being sent to a military base.  And so we do think that that's a significant amount of harm even for a day or two.

And on the other side of the ledger, we don't think it's really burdensome for the government to say we've decided we're going to send these people to Guantanamo, Your Honor. Can we come back into court before we do it?

You know, this sort of understanding that Your Honor may be hesitant right now, or potentially hesitant right now, to do it, I think the solution is maybe not to send them to Guantanamo and have them be subjected to those conditions at

Guantanamo but the government to say, look, we've decided that we're going to send these individuals.  Can we get back before Your Honor and have this argument?

I don't see the burden to the government to doing that; and otherwise, I think the government will hold people --

THE COURT:  The government will likely say -- or may say -- no, it doesn't seem that burdensome when you're talking about ten specific plaintiffs, but if you apply the rule more broadly, that means we're basically giving the world notice of who we intend to send to Guantanamo, and there's harm there.

MR. GELERNT:  Yeah.  I would -- well, first of all, I think the way Your Honor is framing the case, which is correct here, obviously, is that these are ten individuals.  So we could be having a different discussion.

And if the government is concerned about what's going to actually happen with the 30,000, I think they would probably need to get up and say that right now they are intending to send thousands and thousands.

THE COURT:  Right.  We'll see.

MR. GELERNT:  But I think at some point, Your Honor, it may be that we're going to have to file some type of more systemic challenge, but for these ten individuals we do think that it's not burdensome for the government to let you know.

If the government is coming in here and saying don't bother with a TRO, there's no problem, and then all of a sudden

we hear that they're at Guantanamo, I don't think there's any reason why they couldn't have told you in advance and get back before you.

THE COURT:  Can we go back?  So thank you, I understand all that.

I think -- two things I just wanted to address real quick.

MR. GELERNT:  Yeah.

THE COURT:  You know, I was focused more on the government perhaps voluntarily informing me if one of these ten plaintiffs --

MR. GELERNT:  Right.

THE COURT:  -- is going or ends up at Guantanamo.  You know, obviously alternatively I could -- maybe I would impose that as a requirement.  But in any event, it's also the case, I think, that as a result of the access case and the developments there that whether it's one of these ten plaintiffs or someone else, those potential future detainees at Guantanamo have the ability to reach out to counsel and ask to initiate -- assuming it's not one of these ten, like, someone else, could initiate a new suit.  And if it's one of these ten, to inform you of that and to have you come back and say this thing that we speculated is imminent has happened.  So to the extent that you denied the TRO, Judge Nichols, on imminence grounds, that's gone by the wayside.

MR. GELERNT:  Right.

THE COURT:  So that is still at least possible, yes?

MR. GELERNT:  That is possible.  And, you know, I don't want to repeat myself, but I do think there is real harm, given what we're hearing about what's going on at Guantanamo of sending these individuals --

THE COURT:  No, no, I was getting to the -- I was --

MR. GELERNT:  Whether we're going to hear about it?

THE COURT:  Yeah, that there are, like, different mechanisms of that.

MR. GELERNT:  Right.

THE COURT:  Yeah.

MR. GELERNT:  So I would say that we may not hear about it immediately.  So that I don't know that within ten minutes we're going to know they went to Guantanamo.  There are problems, as the APA has noted in their declaration and other declarations by the attorney from Las Americas, of how quickly you can reach detainees and how quickly they can make calls out, and it's taking days.  So we could be looking at more than just a half a day, a day.  We could be looking at far more, and then we'd have to get back before Your Honor.

The other thing is I think the government could send the people anywhere from Guantanamo and try and moot it again like that.  So there are all those concerns.

And I hear Your Honor, and I don't want to sort of

belabor the point.  We do think that if Your Honor feels like he can't issue a TRO now, we would respectfully urge the Court to ask the government to give you notice before they're sent --

THE COURT:  Well, obviously, I'll see what the government is --

MR. GELERNT:  Right.

THE COURT:  -- prepared to do --

MR. GELERNT:  Right.

THE COURT:  -- perhaps without an order.

MR. GELERNT:  Right.

THE COURT:  So now let's just circle back for a second to the merits.

MR. GELERNT:  Yeah.

THE COURT:  On the question of whether the INA authority in 1231(g) that says:  The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal.  That's the universe of the people we're talking about --

MR. GELERNT:  Right.

THE COURT:  -- the ten plaintiffs here.

For the proposition or for the question of whether that applies extraterritorially, just the pure statutory interpretation question, is any deference due, in your view, to the executive branch's position, I guess that it does, that this is a grant of authority, at least part of the grant of

authority that's relevant here?

MR. GELERNT:  Right.  So I think after *Loper Bright*, there's real questions about what kind of deference is owed to the executive branch or the agencies.  But I would actually flip it and say that in here, to the extent that the executive branch's view of the statute is relevant, real skepticism should be brought under the utility case and the other recent *Biden v. Nebraska*.  Because the government has never taken the position that they have extraterritorial authority to detain and has never detained outside this country.  So I think that alone, the unprecedented nature of this should give the Court --

THE COURT:  Is this the kind of statute to which the presumption against extraterritorial application kicks in?

MR. GELERNT:  I think it is, Your Honor.  I don't see any reason why it wouldn't.  And I would note that the government has consistently told the Supreme Court and the D.C. courts that the INA does not apply extraterritorially, and that was the basis for the court's decision in the *Sale v. Haitian Centers* case.

THE COURT:  Has it been that general as opposed to saying this provision of the INA that's at issue in front of you does not apply extraterritorially?

MR. GELERNT:  I think the government -- there's no question Your Honor can proceed provision by provision under

the --

  THE COURT:  I'm just talking about what the
government's --

  MR. GELERNT:  Right.

  THE COURT:  -- prior representation is.

  MR. GELERNT:  I will obviously let the government say,
but we understand the government's representations from looking
at the briefs and going back and being involved in cases that
it has been a general statement.  Obviously the removal
statutes apply extraterritorially.  That's inherent.

  THE COURT:  In a way, yes, right.

  MR. GELERNT:  But the government has never taken the
position that detention in facilities like 1231(g) talks about
is part and parcel of the removal.  I think that would just
blow open the whole concept of removal, and I think that's why
the declaration from Deborah Fleischaker is so important to
talk about the history of how the agency has always understood
it.

  And so I think for that reason, this is an enormous
step for the agency to take.  I know you were focused on the
statutory question now, but it does bleed into our arbitrary
and capricious claim.

  THE COURT:  I wanted to explore --

  MR. GELERNT:  Yeah.

  THE COURT:  -- just a little bit more the statute.

MR. GELERNT:  Yeah.

THE COURT:  So I guess your view would be if, for example -- I hope this isn't a terrible example.  The government said we want to move -- I'm not using that as a -- it's not a term of art here -- move some detainees with final orders of removal to the Air Force base at Keflavik, Iceland, the government would or would not have the authority to do that?

MR. GELERNT:  Unless I'm missing something about Iceland, that would be extraterritorial.  The INA is very specific about the places that are considered the United States, and we think that would be equally unlawful because it's extraterritorial --

THE COURT:  I was just posing --

MR. GELERNT:  Yeah, no.

THE COURT:  -- another country with another military base --

MR. GELERNT:  Yeah.

THE COURT:  -- that is ours but --

MR. GELERNT:  No.  There's no question, Your Honor, that the atmospherics of Guantanamo, the conditions there and the military aspect of it play into the various -- but for the matter of statutory interpretation, you're right, Your Honor --

THE COURT:  Okay.

MR. GELERNT:  Our position would be the same whether

it's Iceland or somewhere else.

       THE COURT:  Okay.  So now walk me through the arbitrary -- so there's the question of obviously acting with statutory authority, and there's the statutory questions here --

       MR. GELERNT:  Right.

       THE COURT:  -- but then, obviously, you have your APA arbitrary and capricious claim.

       MR. GELERNT:  Right.  So the government, to begin with, has departed significantly from the President's memorandum.  The President's memorandum did not actually even say start transferring people.  It just said build up the MOC, and it said -- and then send high-level criminal aliens to the MOC.

       And so right away what we have are people being sent to Camp VI where the conditions are horrendous.  I mean, it's a military camp, and whether they're horrendous for purposes of law of war detainees, that's a separate question.  They certainly are for immigration detainees, and they are not -- and I think they would concede this -- that they are not sending all high-level criminal alien detainees.  I think many, many of them just have straight immigration violations.  We don't even know if any of them are high-level criminals.

       THE COURT:  I know you say that --

       MR. GELERNT:  Right.

THE COURT: -- and I'm not suggesting it's not true, but does the record reflect that? In other words, does the record presently reflect that the nature of post removal ordered detainees at GTMO, the nature of that detention --

MR. GELERNT: Yeah.

THE COURT: -- is substantially worse than the nature of the detention at a facility in El Paso?

MR. GELERNT: I think it does from declarations of detainees, from the declarations of the people -- the attorneys who have talked to them, I think it does. And I don't think the government is really disputing that there is shackling going on, that there is strip searches going on.

They have said that they will try not to use their confinement chair any longer, but, you know, they have conceded that they have done that. And so I think there's no question that it's worse, and perhaps that's why the President didn't say send people to Camp VI.

It was very specific in the memorandum, build up the MOC. It wasn't even saying send people there, but build up the MOC. It didn't mention Camp VI. Obviously the President knew that there are different parts of --

THE COURT: So is your argument that the agency acts arbitrarily and capriciously if it goes beyond the President's memorandum on a question?

MR. GELERNT: Not per se arbitrary and capricious, but

I think it's definitely relevant, because then I think the agency can't fall back on the idea that, well, we're just following the President's wishes.  The agency is now saying we're responsible for this.  We have statutory authority to do it.  Yes, we didn't follow the President's memorandum, but we think we're going to do this.

So I think it was relevant in that sense that -- as precluding the government from falling back on it.

The other -- sort of the second part of it is that we cannot find any rationale based on the declarations from Fleischaker and others -- and I think the government's own sort of concessions -- about why they would hold people at Guantanamo, and certainly not these 290.  There's a conclusory, and it really is conclusory.  It's all of a sentence saying we need this for detention capacity.  But as the Fleischaker declaration points out, there's plenty of space now for the minimum number of people they're sending.

It is far cheaper as well to build new facilities in the U.S.  The complexity of sending people to Guantanamo has been enormous, and, in fact, now they are not even removing people from Guantanamo.  They tried to say it's a staging area, but what's happening now is they're sending everyone back to the U.S. for removal.  So there seems to be no rationale for sending people to Guantanamo.  There's been a lot of publicity around it.  Secretary of Homeland Security has --

THE COURT:  What does the record reflect about that point you just made?  That's coming from news reports?

MR. GELERNT:  That's from news reports.  I don't think the government will deny that everyone has been sent back from Guantanamo --

THE COURT:  I don't know what they would say about the reason for that.

MR. GELERNT:  I think that they are going to -- I hope that they will concede that they are having trouble removing people from Guantanamo, but I don't know what rationale there could be for sending people to Guantanamo for a few days and then sending them back.  I mean, that just makes it that much more illogical.

The cost is enormous.  The complexity of sending people to Guantanamo is enormous, and so we're at a loss.  And I think more importantly, the experts are of rationale for sending people to Guantanamo other than sort of a feeling of we're going to send a message.

And as the civil detention cases make unmistakably clear, that is not a permissible basis for civil detention; and so, in many ways the arbitrary and capricious claim may be the easiest thing for the Court to rule on because you're not saying they don't have statutory authority.

I mean, we would like you to rule on the statutory question, but obviously on the arbitrary and capricious

question, if the agency can come back and justify the enormous
expense, logistical complexity, and why they're sending people
to Guantanamo and then sending them right back to the U.S., I
think then we would have -- you know, we could come back on all
the other claims, including the arbitrary and capricious claim.

But right now I don't think that the government has
offered any logical reason for it other than, again, literally
a sentence, we're doing this for detention capacity.

So for that reason, I do think this is a very serious
arbitrary and capricious claim.  I don't think the government
is fully engaged with it on the merits.  They're trying to say
there's no final agency action, but, of course, there is, or
that we're having a programmatic challenge.  We are not.  It's
a very discrete challenge to a particular policy of sending
people to Guantanamo.

As Your Honor pointed out, if they were sending people
to West Palm, would that be different?  Yes, that would be
different.  We're not saying any transfer anywhere, but the
government is up for challenge.  So in many ways --

THE COURT:  No, but there is a question here which is,
imagine West Palm, Key West, whatever it is, if a detainee with
a final order of removal wanted to challenge his transfer from
Texas to West Palm, what is the nature of the cause of action
that detainee would rely on?

MR. GELERNT:  I think people have tried various

claims, due process claims, right to counsel, if they're moved
far from their counsel --

        THE COURT:  You can grab some water, if you like.

        MR. GELERNT:  I am sorry?

        THE COURT:  You can grab some water, if you like.

        MR. GELERNT:  Yes, thank you.  Sorry about that, Your
Honor.

        THE COURT:  No problem.

        MR. GELERNT:  You know, frankly I will just say that
those cases have not prevailed.  People have tried --

        THE COURT:  Why isn't the nature of the cause of
action identical?  In other words --

        MR. GELERNT:  Well, I think --

        THE COURT:  -- do you have an APA claim, yes, no?

        MR. GELERNT:  Well, I think the claims would be -- I
mean, our statutory claim would obviously be different --

        THE COURT:  It would.

        MR. GELERNT:  -- because it's extraterritorial.

        THE COURT:  It would, but do you have a cause of
action?  What's the cause of action that you assert?

        MR. GELERNT:  I think the APA would be our cause of
action.  I think also equitable -- this Court's equitable
authority.  I think both of them would be cause of action.  I
think they may be the same cause of action for a transfer from
Texas to West Palm.  I just don't think that those cases have

succeeded on the merits except in rare situations, but those would be our causes of action.

THE COURT:  Very well.  Do you want to say a word or two about the constitutional claim?

MR. GELERNT:  Yeah.  So on the substantive due process, I think it boils down to the question of this is civil immigration detention.  The government doesn't dispute that, and the law has been clear for a long time that the conditions and the purposes for civil immigration detention cannot be the same as for -- in the criminal context.  And the conditions need to be at least as good or better; otherwise, there's a presumption of unconstitutionality.

And so I think here we have two parts to it.  One is that we don't think there's a legitimate purpose, and that sort of dovetails with our arbitrary and capricious claim that they haven't put forth a proper rationale.  And they've conceded that at least one of their purposes is general deterrence, and that has not been held to be a proper motive.

The other part of it is the conditions which we have --

THE COURT:  I know you said they conceded that, but I went back and looked at the government's brief and I don't think their concession is quite as clear as you suggest.

They, they do say -- the government doesn't dispute that mass removal efforts are intended, in part, to deter

illegal migration. And that separately, the efforts to find bed space to stage removal operations is related to the removal effort. Then that does not mean, however -- this is the quote -- that the decision to use GTMO is based on an improper deterrence rationale.

So they're not conceding in their brief, at least that --

MR. GELERNT: That it's improper.

THE COURT: -- that it's deterrence.

MR. GELERNT: Right.

THE COURT: They're saying mass removal has a deterrent component. This is part of the mass removal effort, but that's not the same as saying we're conceding that sending people to GTMO is for deterrence purposes by itself.

MR. GELERNT: Right. So I think that's fair, Your Honor. It's a little bit tricky the way they're phrasing it. I'm not sure why they're making that point if they're not trying to justify the detention at Guantanamo along those lines. And if you say every piece of detention is ultimately about removal in some ancillary way, then, of course, you can get around the case law by saying you can't detain for a punitive purpose.

THE COURT: Right.

MR. GELERNT: So I think, you know, it probably proves too much the government's argument. And then they obviously

fall back on the detention capacity.  Again, I don't belabor
that point.

So we don't think they've put forward a proper
purpose, and I think Your Honor can take notice of how much
publicity they've done around the Guantanamo.  And those do not
seem to be focused on detention capacity.

The second part of it is, again, the conditions.  That
the conditions have to be -- there's a presumption that if
they're as bad or worse than conditions in prisons, and here
the conditions are far worse than in ICE facilities where they
don't remotely do shackling, they won't strip search you absent
a good reason, there's no confinement chair.

For all those reasons we think there's a due process
violation.

THE COURT:  Anything you'd like to add, counsel,
before I turn it over to the government?

MR. GELERNT:  No, Your Honor.  I'll step down now.
Thank you.

THE COURT:  Thank you very much.

Counsel?

MR. ENSIGN:  Good afternoon, Your Honor.  I'll be
handling the second case relating to the authorities issues
that you were just talking about, and Ms. Wilson will be
handling the first action.

THE COURT:  Okay.

MR. ENSIGN:  Plaintiffs request for a TRO should be denied most obviously because plaintiffs lack standing.  This is not a close case.  Much like the plaintiffs in *Lyon*, *Clapper* --

THE COURT:  I get the argument.

MR. ENSIGN:  Yeah.

THE COURT:  I get the cases.

So what's the government's view on whether -- there are ten plaintiffs here.  They're all in the United States.  Unless and until this case is dismissed, and the government hasn't moved to dismiss it yet, there are plaintiffs in front of me.

The government's argument is the plaintiffs presently lack standing and don't suffer irreparable harm because we don't know whether they're going to be transferred to GTMO.  If that changed while the case was still pending, is the government prepared to notify me of that change?

MR. ENSIGN:  We are certainly prepared to notify the Court that our submissions have changed.  I believe -- I can't commit that we would do so before doing that.  I would need to speak to DHS, but if changed circumstances caused our submissions to this Court to change, then we would provide notice to this Court of changed circumstances.

THE COURT:  So in other words, at a minimum, in the event that one of the plaintiffs here were sent to GTMO, the

government would notify me of that fact at a minimum after it had happened?

     MR. ENSIGN:  Yes, Your Honor.  I think we could further agree that plaintiffs could have standing leave to amend if any of them were at Guantanamo in order to challenge in that circumstance, and then the standing issues presented would be, I think, very different in that context.

     THE COURT:  Okay.

     MR. ENSIGN:  And so, you know, if they want to come with an amended or a supplemental complaint, I think we can consent to leave so that they could raise it at that time.

     THE COURT:  Okay.  Thank you.

     MR. ENSIGN:  More than just standing, Your Honor, I think -- and you've already recognized this as well. Plaintiffs have failed to establish likely irreparable harm here.  *Winter* specifically requires that, and it expressly rejects a mere possibility standard as insufficient.

     If you look at page 25 of their reply brief, they don't even argue that irreparable harm is likely, and nor do they respond to the *Winter* point whatsoever.  They don't cite *Winter* a single time in their reply brief at all, in fact.

     So I think perhaps the simplest way to resolve this TRO here is that there's no likely irreparable harm, particularly in the short window of time that you're talking about with the TRO.

THE COURT:  Right.  And do you agree relatedly with the thrust of the questions that I was asking plaintiffs' counsel; which is, again, to use the hypothetical, one of the ten plaintiffs perhaps is transferred to Guantanamo Bay.  Let's just assume that the only commitment the government is willing to give me is that it will tell me thereafter.

Plaintiffs can amend.  Plaintiffs can renew the TRO.  We would have at least a plaintiff in a different factual setting for purposes of standing and alleged irreparable harm, and that to the extent there is irreparable harm at that point, it would be reparable, potentially, at least, through an order from me.

I know the government would likely take the position that I shouldn't enter that order, but just talking about reparability or not, if there were then irreparable harm, it would be remediable by me.

MR. ENSIGN:  I believe that's correct, Your Honor.  I mean, certainly we have a number of other defenses that would come in, including jurisdictional bars the merits, that whole panoply.  But if you held for plaintiffs on all those bases, I don't see any restrictions on the authority of this Court to provide such relief.

THE COURT:  Right.

MR. ENSIGN:  And I'd note further that that is not particularly hypothetical.  The plaintiffs in the first case

here were, in fact, in Guantanamo and sued about that, and we did not --

THE COURT:  Well, not exactly.  Their next friends sued, and the advocacy groups sued.  The actual plaintiffs were not Guantanamo detainees.

MR. ENSIGN:  That's correct, Your Honor.  And I apologize for that.

THE COURT:  No, no, I think it's a not unimportant distinction, because the plaintiffs say, well, this could be relatively fleeting detention, and even if notice occurred and even if there was an amendment and a change of the way one thinks about these cases, it could get mooted out from under you.  And that's what happened in the other case in their -- you know, or one could think of it that way, at least.

MR. ENSIGN:  Your Honor, Article III courts have developed doctrines such as the capable of repetition yet evading review doctrine that might have some applicability in that circumstance, but there are not exceptions to Article III just because plaintiffs think that their case is extraordinary.

THE COURT:  So I think I have a pretty good handle on the interplay between harm and imminence and irreparability and the like.

What about on the merits?  One of the questions I obviously was asking plaintiffs' counsel is whether the authority under 1231(g) extends extraterritorially.  What's the

government's position on that?

MR. ENSIGN: Yes, Your Honor. Our position is that it does; and, in fact, that it's effectively impossible to carry out the government's duties as congress intended without such authority.

So let me take that in a couple of different steps because I think it shows how plaintiffs' argument doesn't work. You know, in particular, the crux of their argument is on page 14 of their TRO, and it goes like this, and it's an absolutist position that "a noncitizen with a removal order who departs from the United States, whether voluntarily or by the government's actions, has been removed."

So just to begin with, a flight that transferred detainees with removal orders from Hawaii to the Continental United States would have effectuated a removal, and the government would have lost its ability to detain them further. I mean, such a flight goes over thousands of miles of international waters, and if their position is the second you leave the United States that a removal has been affected, the government's authority to detain you has evaporated, that's the first illogical consequence.

There's also a flight -- you know, a flight from Miami to El Paso, for example, also flies over international waters. That would, apparently would be the end of the government's capacity to do anything further to effectuate the removal

because apparently the removal was affected somewhere on the plane.

Let me, let me give additional examples as well. A really interesting one comes from the Supreme Court's case in *Jama v. ICE*, where there Justice Scalia for the majority noted: "Removing an alien from Somalia apparently involves no more than putting an alien on one of the regularly-scheduled flights from Dubai or Nairobi and has been accomplished a number of times since petitioner's removal began." That's 543 U.S. at 344 to 45.

So under plaintiffs' theory, once those people, the detainees that landed in Kenya or the UAE, under their theory, you effectuated a removal to Kenya or the UAE, the government has lost all capacity to detain you further. You've been removed to those countries, and we could never get you to that further step to Somalia. But that's simply not the law; and, in fact, that proposition in the *Jama* case was apparently so uncontroversial that no one thought to raise it even though it's squarely presented on the facts as described by the Supreme Court itself.

THE COURT: So departure from Continental United States does not always equate to removal?

MR. ENSIGN: And further -- not just departure but stepping foot on foreign soil does not effectuate a removal. And so once you accept that, that necessarily demonstrates the

government has the capacity to continue to detain you under 1231(g). And, in fact, it would be impossible to effectuate a system of removals, which are inherently extraterritorial in nature. I mean, you can't have a removal to a foreign country without extraterritorial action. It just -- by its very nature, and --

THE COURT: Tell me if the following is generally correct. Imagine you have, hypothetically, an extremely dangerous drug kingpin from somewhere or could be an alleged terrorist, whatever, who's removed, final order of removal. And I'm going to say government because I don't want to suggest there's some narrow view of whose agency is relevant here, what agency, but FBI and some other folks are involved in the transport back home, so to speak.

And they get on a flight, and the flight goes to that foreign country. And again, we're talking about a dangerous person, just hypothetically. And the U.S. government agents stay with that person for some period of time until there could be a safe transfer of the person to the foreign country. Imagine it takes a day, two, three, four.

What is that person's status when in the custody of the United States government, in a sense, but physically present in another country?

MR. ENSIGN: Your Honor, and I think --

THE COURT: And my hypothetical might be off. It

might be a little bit too generic.  I'm happy to hear

corrections, but how do you think about how we think of the

person in that period of time overseas?

          MR. ENSIGN:  Your Honor, the way I would conceptualize

that is that they aren't removed until the United States

government officials essentially release them.  And I think

much like the stopover to refuel in Germany example that we had

before, it seemed to turn at least, in some part, on intent.

          One of plaintiff's cases too involve someone that

briefly got free, crossed the Canadian border before they were

retrieved; and in part, that was not a removal because the

United States government never intended for it to be removal.

          THE COURT:  So let me just --

          MR. ENSIGN:  Yeah.

          THE COURT:  -- play this out a little bit more.

          Government intends to have this hypothetical person

returned to his or her home country, goes there.  Agents of the

United States government go with that person, they're in the

capitol city.  They're with that person -- dangerous person --

and for whatever reason the deal breaks down.

          And then the foreign government refuses to take the

person.  The United States government returns the person.  I'm

not using that as a term of art, just brings the person back to

the United States because that foreign government won't take

the person.

Imagine this has taken five days.  There's a flight out, a couple days of negotiations, things break down, people aren't happy, they're in a hotel somewhere, and then they fly back.  And now they're back -- just make this Continental United States.  It's El Paso, or whatever.

I take it the government's position is there has not been a removal because there wasn't enough that happened to give the person over to the other country; and correspondingly, that person remained detained by the United States during that period.  Do I have that right?

MR. ENSIGN:  I believe that's an accurate statement of the United States' position.  I'd note too that -- and certainly there are examples where -- that for whatever reason the removal doesn't work and has to be essentially be reattempted.  There is an important limitation.  1231(g) recognizes that removal may take some time, and the Supreme Court in *Zadvydas* has recognized a presumptive six-month limit where that happens then --

THE COURT:  Right.

THE DEFENDANT:  So there are potential limits that come into play.  So if the government for whatever reason continually was unable to remove you, there are other limitations that may come into play.

THE COURT:  It seems pretty clear to me that there are certain circumstances in which the government can operate in

the immigration space, so to speak, extraterritorially,
including what we just talked about, but in the hypothetical I
just mentioned, is the government exercising its -- forgive me,
1231(g) authority?

MR. ENSIGN:  That's our position, Your Honor, yes.

THE COURT:  The authority is to arrange for
appropriate places of detention, and is it your view that by
sitting with a detainee in Capitol City X, awaiting a removal,
that that's having -- that's an arranging for an appropriate
place of detention?  It seems like a stretch, putting aside
extraterritoriality, just asking whether that's what's going
on.

MR. ENSIGN:  Your Honor, I think perhaps that's too
narrow, that it would be looking to 1231 more generally, which
refers to basically the government's coercive authority to
detain and move you in order to effectuate a removal.

We think 1231(g) answers specifically the question of,
you know, can you have overseas facilities by just defining it
as the United States government facility in 1231(g).

Furthermore, given the inherently extraterritorial
nature of removal operations, we don't think the presumption of
extraterritoriality applies.  The Supreme Court's case in *RJR
Nabisco* notes that it can be -- it either doesn't apply or is
rebutted by context.  Here the context is quite clearly, it's
impossible to effectuate removal sometimes without

extraterritorial detention capacity.

I could point, Your Honor, too to the countries of Monaco and Liechtenstein, which have no airports, and so it would be essentially impossible unless the government has this sort of extraterritorial detention capacity, to remove them to their home countries aside from, you know, some strange example of parachuting them in.

THE COURT:  Right.I published -- or not published.  I issued an opinion in the last week in a case called *MIA* that deals with, among other things, the extraterritorial application of the TVPA.  So I get the general way of thinking about extraterritoriality.

Is the presumption against extraterritoriality a presumption that applies to all statutes?  Obviously it can be overcome in context and language, but is it a presumption that applies across the board?

MR. ENSIGN:  Your Honor, I think it's both a presumption that wouldn't apply, and if it applied does not -- you know, is rebutted here.

Removal operations are inherent -- like, are inherently extraterritorial in nature and also inherently involve the United States government's ability to conduct foreign policy.  Where you're in that context where things are inherently extraterritorial, we don't think the presumption has any application.  But if it did --

THE COURT:  But even if it did, it would make less sense here than in other contexts.

MR. ENSIGN:  That's correct, Your Honor.  And I think it has less application here for the additional reason that the rationale for the presumption is to keep private parties from unexpectedly encountering regulatory requirements that they're not expecting and to avoid friction with foreign countries.  But that's -- it's not to limit the authority of the United States government, particularly where it engages in activities that are inherently extraterritorial.

THE COURT:  Right, and the TVPA context is the question of whether the cause of action applies to extraterritorial conduct, and one of the concerns there is if you allow private cause of actions to apply extraterritorially, it could affect or have an effect on the U.S. government's foreign policy or just general way in which it interacts with foreign governments.

MR. ENSIGN:  That's correct, Your Honor.  And I believe the Supreme Court has recognized that for the Alien Tort Claims Act as well.

And so for all of those reasons, that rationale of the presumption against extraterritoriality, is just not -- has no applicability.

THE COURT:  So just to keep playing it out, that means that there is -- for whatever reason from the government's

perspective, there's no presumption against extraterritoriality in either the INA or 1231 or at least 1231(g).  Net-net, that means that 1231(g) gives the Attorney General the authority to arrange for appropriate places of detention, including extraterritorially?

MR. ENSIGN:  Yes, and then, in particular, United States government facilities, which 1231(g) expressly acknowledges.

And this Court, too, had a case construing the very closely related language of -- excuse me, just a second -- of the federal facility, and this is the al-Imam case, to mean a building or part thereof, or at least by the federal government.  And then specifically this Court found it to include component structures of military bases and diplomatic missions.

So those are obviously extraterritorial locations, and there's no reason that United States government facilities should be read any differently than a federal facility.

THE COURT:  So let's just assume hypothetically that the government has the authority to -- or the Attorney General, really, has the authority under this provision to arrange for detention at a military facility overseas.  The plaintiffs say, well, okay, but it still has to be done in a nonarbitrary and capricious manner.

MR. ENSIGN:  Well, Your Honor, several reactions to

that, I think.

First of all, once their argument that you can't categorically use Guantanamo because it's extraterritorial is rejected, then you're talking about the selection of different detention facilities which are all lawful. That is squarely committed to the discretion of the Attorney General or DHS, rather -- then transferred to DHS. And hence on the merits, that would fail. But it would also encounter numerous and overlapping jurisdictional bars that would certainly prevent this Court from hearing it.

Because staging at Guantanamo is an action to effectuate removal, 1252(b)(9) kicks in. It provides that all questions of law providing for -- it provides for exclusive review in the Courts of Appeals for "all questions of law and fact...arising from any action taken or proceeding to remove an alien from the United States."

Because Guantanamo is being used as a staging ground to effectuate removals, the 1252(b)(9) -- it's often called the zipper clause -- kicks in. So to the extent that any federal court has jurisdiction to hear such a claim, it would be vested in the Courts of Appeals and not the U.S. District Courts.

That's further supplemented by 1252(b), which provides that notwithstanding any other provision of law...no court shall have jurisdiction to hear any cause or claim on behalf -- by or on behalf of any alien arising from the decision or

action of the Attorney General...to execute removal orders against any alien under this chapter.

And then a third jurisdictional bar kicks in as well, and these are all overlapping within Section 1252, but it makes clear Congress really, really wanted to be clear about this. Section 1252(a)(2)(B)(ii) further bars reviews of discretionary actions by the Attorney General.

And so as an APA claim rather than a statutory -- is an arbitrary and capricious claim, we would be in that committed agency discretion land. It failed both on jurisdictional and APA committed agency discretion grounds.

THE COURT: And so let me just make sure I understand it. I think I have it.

If it's the case that the INA allows the government to, in the language of 1231(g), arrange for an appropriate place of detention to include a military base overseas, if that statutory authority exists, and then we're just asking whether there's an APA claim about the -- put it this way, the choice of a particular military facility --

UNIDENTIFIED SPEAKER: (Indiscernible comment and laughter on the public telephone line.)

THE COURT: I didn't think it was that funny. Can somebody on the phone please mute? Thank you.

Once we're at that point, your view is, so if there's authority to do this, and now we're talking about the decision

about a particular military facility, then you start to run into INA preclusion of review and the like provisions because you've staked that you can do this, and now it's just a question of whether and how?

            MR. ENSIGN:  That's correct, Your Honor.  And then there's the additional potential APA bar that this Court recognized in the *Vetcher* case, which is that to the extent that something might sound in habeas and the concept of, like, you have no authority to hold me here whatsoever does, or you have no authority to hold me here because it's arbitrary and capricious.  This Court recognized that where a habeas claim is available, that's adequate alternative relief, and Section 702, therefore, doesn't allow APA review.

            THE COURT:  What about on the merits of the -- so, I get your position that these APA claims are not cognizable for various reasons, but the plaintiffs say just on standard arbitrary and capricious review, the government's reasons for opening Guantanamo are not nonarbitrary.  They're not non capricious.  What's your response to that?

            MR. ENSIGN:  Your Honor, and certainly we don't have the administrative record yet.  This is being presented in highly truncated accelerated form, but the simple answer is that detention capacity is incredibly necessary in order to effectuate removals, and it also incredibly scarce.

            There is available detention capacity at Guantanamo

because as Your Honor noted, it used to be used for principally Haitians that were interdicted on high seas, and so there was available detention capacity that was otherwise being unused.

There's nothing about the APA that would suggests that you would have to fill every other detention bed everywhere else in the United States before you could use Guantanamo. That's simply not something the APA imposes.

And furthermore, there's a very good reason to leave other detention capacity available, such that, you know, if you have a sudden surge, you have capacity to deal with that. And so how you manage detention capacity is one of those highly discretionary decisions, but there's an obvious rationale. We needed more detention capacity, and some was lying there unused.

Their declarant, for example, said you shouldn't use Guantanamo. You should, instead, build new facilities. Even if you accept that at face value, we are less than 60 days into this administration. You cannot build new facilities in that sort of time, but yet, their declarant apparently believes that we should have stood them up overnight rather than using Guantanamo, which was already stood up and that it was arbitrary and capricious not to do so. And that's simply not a requirement that the APA imposes.

THE COURT: Is your understanding the same as plaintiffs' counsel, which is that there are not presently any

aliens with removal orders presently detained in Guantanamo?

MR. ENSIGN:  That's correct, Your Honor.  That is not currently in the record, but that is the understanding that we have.

THE COURT:  So the parties agree on that proposition; that is to say, there are not presently any alien post-removal-ordered detainees at Guantanamo?

MR. ENSIGN:  Yes, Your Honor, and the parties further seem to agree that the most recent wave, there were 27 different nationalities there, and not a single one of them was Venezuelan.

THE COURT:  Are the plaintiffs right, generally speaking, that those 40-ish people from those 27-ish nationalities were returned to the Continental United States, at least for a period of time?

MR. ENSIGN:  Your Honor, I don't know that for certain.  That's what's been reported.  I don't have any basis to contradict that, but I don't know that definitively.

THE COURT:  Okay.  Do you want to respond to the substantive due process claim?

MR. ENSIGN:  Certainly, Your Honor, a couple things. As Your Honor noted, we are not using -- we have not admitted that this is being used for general deterrence.  Instead, this is merely a component of the President's agenda to effectuate removals at a much greater rate to which adding detention

capacity is essential.

In addition, too, the cases that plaintiffs cite for the proposition that general deterrence is not available do not actually hold that.  In particular, one of their cases merely holds that it was inconsistent with the then extant -- I think it was the Morton Directive.

And the Court found it unnecessary to reach that question of general deterrence because it was contrary to then extant authority.  For whatever reason, I believe because it's no longer in force, plaintiffs have not renewed that argument that the general deterrence is contrary to DHS policy as a matter -- as opposed to the constitution.

Furthermore, I think perhaps this isn't quite the merits, but to the extent that they're complaining about conditions, I'll first note this is probably the weirdest prison conditions case that Your Honor is ever likely to encounter.  It's a prison conditions case in which people have not been to the prison and have not encountered any of the conditions.

I use prison only in a colloquial sense.  This is detention, but that's very weird.  But to the extent that it would be that, this Court in the *Vetcher* case recognized that those claims sound in habeas and hence cannot be raised through the APA.

And for the similar reasons when I think habeas

applies, this Court should not imply a cause of action at
equity to hear such claim when habeas is available.

But, of course, habeas would require them to sue their
current -- the people currently detaining them.  And those
people are not in the District of Columbia.

THE COURT:  Anything else you'd like to add before I
turn it back to plaintiff -- excuse me, to turn it to your
colleague to talk about the access case?

MR. ENSIGN:  Just one further thing on the conditions.

I think it's fair to say that plaintiffs challenge
essentially every possible condition and policy in Guantanamo,
or very much nearly so, and so this very much is the sort of
action desiring whole scale changes that the Supreme Court in
the *Lujan* one 1990 case recognized is not final agency action
and it is not within the jurisdiction of these courts.

THE COURT:  Thank you, counsel.

MR. ENSIGN:  Thank you, Your Honor.

THE COURT:  Ms. Wilson.

MS. WILSON:  Good afternoon.

THE COURT:  Good afternoon.

MS. WILSON:  As Mr. Gelernt said, we've already
managed to significantly narrow the issues for the access to
counsel's TRO, so I'll just speak briefly on the three
remaining points.

So the first and the primary dispute is the in-person

access to counsel.  I'll direct the Court to the declaration,
the Lopez Vega declaration, Paragraph 20.  I think that sets
out in pretty sufficient detail the government's position on
why we haven't reached a conclusion on providing the in-person
access to counsel, that part of the declaration speaks to there
being significant security concerns.

Specifically, there's a question of whether counsel
would need to have security clearance in order to access the
detainees or to access the base.  There's also just a huge
number of logistical issues that have to be managed.  It can
take time to schedule those visits.

In light of those security concerns and the logistical
issues and in light of the current mission which has so far
resulted in the individuals being detained for a very short
period of time, it just hasn't been something that's made
available.

The declaration also makes clear that that's something
the government is willing to continue to revisit and evaluate
as that mission develops and as they can see how the access to
counsel procedures that they've now put in place, how those
work to resolve the issues that might be called for for
in-person access.

There was a reference to the law of war detainees.  I
just want to make clear that that's a very different set of
circumstances.  Those are folks that were there for a much

longer period of time, and it was, as you're familiar, it took a lot of time to negotiate and get that in place.  So we are now still less than a month in to this operation and just simply not in a place to make that available for this group of individuals.

THE COURT:  So obviously a person sent to Guantanamo might want to litigate that question, the detention at Guantanamo, but might also want to press litigation on some issue that he or she would have pressed if in the Continental United States.

So I get that these folks all have final orders of removal, but someone in El Paso with a final order of removal might want to file a habeas petition, might want to do some other -- take some other run at the adjudication that's already occurred.

How able, from the government's perspective, would someone at Guantanamo who wishes to conduct that other kind of litigation, right, the kind that one might do from El Paso. How able is one able to do that compared to doing it from El Paso?

MS. WILSON:  Your Honor, the record speaks to a comparison, but I do think the record lays out a clear path for those individuals to bring those claims.  So if they have counsel already prior to being transferred from El Paso to Guantanamo, then they would be able to have access to that

counsel.

They could do that themselves by filling out the form and making a request for a telephone call; and alternatively, their counsel would be able to search for them within the detainee locator on ICE's website, figure out where their person was located, and then use the access procedures on ICE's website. That would allow the attorney to email directly and schedule a time for them to speak about their new claims -- new or old claims.

THE COURT: Do you happen to know whether any of the detainees in the two cases -- so by that I mean the ten plaintiffs who are in the Continental United States right now who brought the second case, and then those people who were detained in Guantanamo as relevant to the first case, whether any of them had pending or has filed this other kind of litigation that I've been talking about for the non-Guantanamo filing or anything like that?

MS. WILSON: We're not aware of anyone who's filed anything. I believe the first set of declarations indicated that someone was returned to the United States because their removal case was reopened, but I don't think we have any indication about whether that was based on something that happened while they were being held at Guantanamo.

THE COURT: Okay.

MS. WILSON: But the record does show that there's

been successful communications.  I think the most recent

declarations were filed last night, indicate that there was an

email sent that -- on a Friday afternoon, and there was a

counsel visit arranged on the following Monday.  So I think

there is some indication that the policies are working as

they're intended to, even if they weren't able to result in

successful filing.

I would submit that that's probably more -- has more

to do with the fact that we have very small lengths of time

that folks are spending there so far, and so it's just

simply -- although this case suggests otherwise, it's hard to

get a filing on record within two weeks and certainly not for

it to reach its final conclusions.

THE COURT:  That's in person?

MS. WILSON:  That's in person.

The other two points I think were more minor, the

discussion about the forms in other languages.  Again, I think

our declaration, the Lopez Vega declaration at Paragraph 12

indicates that we are open to providing more access or more

translations as necessary.  That simply wasn't necessary with

the first group of folks, but it would be something that we

continue to evaluate as necessary.

And then the final one was the discussion about

whether they are able to reveal their location to their

families on the telephone calls.  I mentioned previously that

the detainee locator now has that information.  So it's certainly not something that we're attempting to hide from family members, and we're not aware of any such restriction. We can certainly look into that further, though.

I'm able to share that we haven't had any issues as far as we've known with detainees sharing information that they weren't supposed to share.  So to the extent that's a concern, it's not one that we've encountered.

So I would just say altogether the available procedures certainly suggest that we've been able to go a long way to resolving the irreparable harm here.  Existing procedures would provide ample ways for individuals to then challenge these additional procedures that they might want because they've given -- they provide that sort of baseline access that would be necessary to bring them to court to make additional requests to change our procedures.

THE COURT:  Thank you, counsel.

MS. WILSON:  Thank you.

THE COURT:  Mr. Gelernt, rebuttal?  Just one second.

DEPUTY CLERK:  Just wanted to remind everyone on the phone to mute your line.  If there are any other disruptions, the call will be disconnected.

MR. GELERNT:  Thank you, Your Honor.  Let me just start with one brief point about in person and security clearances.  A number of our counsel do have security

clearances, but the dispute with the government hasn't been they're going to allow us to come and we're complaining of how long it's going to take or the transportation or the security clearances.

Right now there's just a flat ban. So if the government feels like it's a matter of showing them that they have security clearances or those type of base security clearances, that's a different kind of conversation. But we do think there's no reason for them to bar us, especially since the law of war detainees have in-person visits from counsel.

Let me just, I guess, go to the statutory -- unless the Court has specific questions? Okay.

On the statutory point I think what it boils down to is this. The government is saying it would be impossible for us to remove people if we didn't have detention authority extraterritorially because once the plane gets out of U.S. air space, we may have to detain people, we may have to refuel for a day, your hypothetical about maybe it's going to be two days, that's a very different thing than detention. That's never been understood to be detention. That's inherent in the transportation, that you have custody. The government can't seriously --

THE COURT: No, but isn't there a slightly different point, which is that means that the grants of authority here in the statute have to be viewed as potentially extraterritorial,

maybe not necessarily 1231(g), but there are all these ways in which immigration has extraterritorial conduct?

        MR. GELERNT:  Right.

        THE COURT:  And so once you recognize that, then you ask yourself, well, does the presumption against extraterritoriality really make sense here or -- either does it not make sense or does it fall by the wayside when you think about all the ways that we normally analyze extraterritoriality?  And then you go look at 1231(g), and if there's no presumption against extraterritoriality, then perhaps it does grant affirmative authority to the Attorney General, DHS to do detention at a U.S. facility overseas.

        MR. GELERNT:  Right.  So let me, let me take both parts of it.  And as Your Honor pointed out, there's one question about whether the presumption even applies and then another question of whether it's rebutted.

        THE COURT:  Right.

        MR. GELERNT:  We think it has to apply to the INA. And we grant you that it would be provision-by-provision.  But, I mean, the government, itself, has said that the presumption applies to the INA in *Sale*, and the fact that immigration generally has extraterritorial application, I think that would prove too much to say therefore we don't apply the presumption to anything within the INA.  And that would run counter to the *Sale* decision and the government's position in *Sale* and in

other cases.

So I think -- and it's a matter of separation of powers, as Your Honor knows, to use the presumption, but I think the presumption applies.

And then what the government's really saying is, well, because some provisions in the INA necessarily have extraterritorial application, i.e. removal, it necessarily means that detention does.  I think that's the crux of the dispute here:  Is detention really part and parcel of removal.  And it has never been understood that way.

The government, of course, has inherent authority to have custody of someone on the plane or the refueling, but they don't actually apply the traditional detention standards to those people.  And we know it's not -- detention is where there's a physical holding.  When you have removal, you have documents, clearing the way, manifest.  This is -- the people being sent to Guantanamo are not in any sense in the process of removal, and that's never been how the INA has been understood or the government, itself, has understood the difference between detention and removal.

So I think the fact that they're saying if these particular detention statutes which deal with physical detention don't apply, then we lose all our authority to send people abroad because we can't hold them on the plane, that's just never been the way the government's understood their

authority or the way it necessarily needs to be understood.

At this point because the government's argument doesn't have any stopgap, they could hold people at Guantanamo for the whole six months until someone brought a constitutional challenge that it was getting too long. They can't seriously say, well, we don't have a country where we're going to send them, there's no manifest, there's no travel documents, but we're just going to put them in Guantanamo and that's part of removal; if that's the only way the government is getting around this is by saying every detention is part and parcel of removal -- and that's simply not true. And, obviously, if our position was they can't hold people in custody on the plane going abroad, then we would have a real problem. That's, of course, not our position.

On the APA claim, I would say two things. One is, I want to address the jurisdictional issues if Your Honor would like me to.

THE COURT: Yes.

MR. GELERNT: But on the APA claim, I think there's a part of what is going on is the government lawyer is supplying reasons that weren't in the declaration. They say, well, we haven't been able to produce an administrative record.

It's been a while now since they've started sending people to Guantanamo. The memorandum didn't say they needed to do it immediately; it just said start building up the MOC.

Rather than building up the MOC, they send people to the MOC even before it was ready, and they also started sending people to Camp VI just so they could say they were doing it quickly.

So in the detention capacity space, I think to say that the minimal number of people they're sending to Guantanamo now is because of detention capacity I think sort of blinks reality and the factual reality of what's going on.  And at a minimum, that one sentence is not sufficient in the government's declarations to satisfy arbitrary and capricious review.

The government is, I think, putting most of their weight on the fact that they don't think this is reviewable.  I just want to tick through a couple of --

THE COURT:  Sure.

MR. GELERNT:  -- provisions.

THE COURT:  Yeah.

MR. GELERNT:  (B)(9) says you bring removal challenges in the Court of Appeals -- it's a channeling provision -- but you don't bring claims that couldn't be brought in the Court of Appeals by petition for review challenging your removal in that manner.  You bring them in District Court because your removal order has already been entered so there's no way to do it through the petition for review process.  That's fairly standard.

And that's why cases like *Jama* in the Supreme Court,

Wynn in District Court.  That's why *Jennings* challenged the
detention in the Supreme Court, was by District Court review.
This is also not discretionary.

A and C review is still available even if there's some
amount of discretion.  You still can always -- the Court still
can always under the APA test the rationales.  And I think
maybe the government comes back and supplies real rationales at
some point with administrative record, but right now they
haven't.

And they rushed so quickly to do it.  There was no
reason for them to rush to send these 290 there, especially
because the President was not asking them to do that.

The President was, in fact, fairly limited in his
request saying, get the MOC ready, build MOC capacity; not send
people right now, send low-level people right now and send them
to Camp VI.  So I think that is a significant, significant
difference.

On the conditions, I think the government ultimately
is falling back on what Your Honor has been asking about:  Is
there irreparable harm.  But there's really no way to justify
the shackling, the strip searches, the confinement chair under
basic INS detention standards, ICE detention standards.  So I
think that's where we sort of are on the merits.

Circling back to Your Honor's question that's been on
your mind.  I hear the government saying they will allow --

they will alert us, or they will alert you after someone is
sent to Guantanamo.  I don't think they've said how quickly
they'll do it.

        They've also suggested that people can get in touch
with their lawyers right away.  That's doubtful based on the
record if you look at the declarations that we've submitted
with our reply brief.  But I still come back to the point that
there is harm being sent to Guantanamo, especially if you're
going to be sent to Camp VI.

        THE COURT:  Thank you, counsel.

        MR. GELERNT:  Thank you, Your Honor.

        THE COURT:  Here's what I'm going to do.  I'm going to
take a recess, and I'm going to come back and provide my
thoughts and possibly oral resolution of both TROs.  I probably
need something like 20 minutes.  So why don't we take at least
a recess until 3:45.  In the event it's a little bit longer,
Ms. Moore will know that and can let everybody know.  Thank you
all.

        DEPUTY CLERK:  All rise.

     (A recess was taken at 3:27 p.m.)

        DEPUTY CLERK:  Your Honor, we are now back on the
record.

        THE COURT:  Thank you, Ms. Moore.

        Upon reflection and after the recess, I have decided
that I am, in fact, going to decide the motions in both cases

orally today.

Today's hearing obviously consolidates two cases linked, at minimum, by a common background:  The United States' recent policy of holding aliens with final removal orders at Guantanamo Bay Naval Station in Cuba.

Plaintiffs in *Las Americas Immigrant Advocacy Center v. Noem*, 25-cv-418 are immigration legal service providers and next friends of aliens held relatively briefly at Guantanamo before being sent to Venezuela.  We've been calling that the access case.

Plaintiffs in *Espinoza Escalona v. Noem*, 25-cv-604, in turn, are ten aliens with orders of final removal currently being detained in the Continental United States who fear that their transfer to Guantanamo may be imminent.

I think it is helpful to lay out some of the background facts, at least briefly.

Guantanamo Bay Naval Station in Cuba -- I'm just going to call that Guantanamo for the rest of this hearing -- is a U.S. military base and the site of a U.S. military prison.  On January 29, 2025, President Trump issued a memorandum directing the Secretary of Defense and the Secretary of Homeland Security, "to take all appropriate actions to expand the Migrant Operations Center at Naval Station Guantanamo Bay to full capacity and to provide additional detention space for high priority criminal aliens unlawfully present in the United

States."

On February 4, 2025, the government transferred ten immigration detainees from Fort Bliss, Texas to Guantanamo. Over the next two weeks, give or take, that number grew to 178. All of the detainees, or at least almost all, in this first wave were Venezuelan nationals.

*Las Americas* was the first lawsuit filed against this backdrop; plaintiffs sought a temporary restraining order on the grounds that they were unable to communicate with the first wave of detainees, alleging that the government was restricting -- if not wholly preventing -- access to counsel. That TRO sought various forms of relief that I will not repeat now.

On February 20th, while the parties were briefing that TRO motion according to the schedule laid out by this Court, the government removed the approximately 180 first wave detainees from Guantanamo. All but one was repatriated to their native Venezuela.

*Espinoza Escalona*, in turn, was filed on March 1st. Plaintiffs there seek an emergency motion to stay their transfer to Guantanamo. Again, these ten plaintiffs are all aliens with final orders of removal who are currently detained in the Continental United States, but plaintiffs fear that they fit a specific profile that makes them prime candidates for Guantanamo transfer. That's because they say of specific

attributes they share, a majority are from Venezuela, all have tattoos, and many have immigration-related criminal violations. Plaintiffs thus argue that they are at a heightened risk of transfer to GTMO.

According to declarations submitted by the government, it intends to employ facilities at Guantanamo to house, "high priority criminal aliens unlawfully present in the United States."

To that end, the Department of Defense assembled the Joint Task Force Southern Guard, an operation consisting of approximately 985 personnel.  It assists DHS.  Aliens housed at Guantanamo reside in one of two areas:  Camp VI, which houses higher-threat detainees and the aforementioned Migrant Operation Center, which houses lower-threat detainees.

Also, according to those declarations and their supporting documents, DHS has posted written notice, in English and Spanish, of the procedure for making a request to speak to counsel.  For Camp VI detainees, counsel calls are conducted in an adjacent building with six telephones in six separate rooms. The building is a short walk from Camp VI, and two security personnel escort detainees from the camp to the building.

For detainees housed at the Migrant Operations Center, counsel calls occur from an on-premises private room.  Counsel that detainees have already retained may make requests for phone calls to their clients, and detainees have the ability to

send and receive legal mail.

DHS, the government, further represents that it will continue to assess the operational needs of the Guantanamo detention operation and make adjustments to procedures as needed.

As everyone heard earlier, at present the parties agree that there are currently zero aliens with final removal orders housed at Guantanamo after being sent there from the Continental United States.

I'll now go case-by-case, beginning with *Las Americas*, and decide the TRO motions at issue. I'm not going to repeat this, but as always, to obtain a TRO, quote, The moving party must show, (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if an injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction, end quote.

Those are well-known factors, but that quote is from a D.C. Circuit case called *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 at 297 from 2006.

Also, where, as here, the requested temporary relief would run against the government, the final two factors balancing the equities and the public interest merge.

That TRO standard I just laid out is basically

identical for an emergency stay.

Turning to *Las Americas*, because irreparable harm is the touchstone of preliminary injunctive relief and plaintiffs' allegations of irreparable harm necessarily inform the relief that I could conceivably order at this time, it's helpful to begin the analysis with this factor.

The standard for irreparable harm is high.  To meet it, a plaintiff must demonstrate that it faces injuries that are, "certain, great, actual, and imminent."  As well as, "beyond remediation, period."

Again, same case from the D.C. Circuit, *Chaplaincy of Full Gospel Churches*.

Here, in light of the parties' representations and the discussions that occurred, the irreparable harm to plaintiffs would flow from the three remaining possible points of dispute. One, the lack of in-person counsel meetings.  Two, the posting of notices in English and Spanish only and not other languages. And three, the detainees are told they can't tell other people, such as family members, that they are at Guantanamo.

But because there are no detainees currently at Guantanamo, I cannot see how these differences -- that is to say, these remaining points of dispute -- can cause anyone, and especially the plaintiffs in this case, irreparable harm.

As for the family member plaintiffs -- that is family members of aliens who previously were briefly held at

Guantanamo -- their harms, if any, have already subsided.
Their family members are no longer housed at Guantanamo, and
these three potential problems with counsel access no longer
apply.

In other words, because the detention at Guantanamo of
their family members is over, the family member plaintiffs are
suffering no irreparable harm from these three points of
dispute, and neither are their family member detainees
themselves, such that there would be no irreparable harm even
if they, the detainees themselves, were the plaintiffs.

The legal advocacy plaintiffs are in a somewhat
different position.  These plaintiffs do not attach themselves
necessarily to particular detainees but rather to the
open-ended universe of any aliens who may be detained at
Guantanamo Bay.  So the fact that certain aliens were detained,
but no longer are, doesn't necessarily end the inquiry.

But again, because there are no detainees currently at
GTMO, the legal advocacy plaintiffs cannot establish how these
three points of contention, those that I've already laid out,
can imminently and irreparably harm anyone, let alone them.

To be sure, as I said, the legal advocacy plaintiffs
attempt to tie themselves to the broad class of plaintiffs
through next-friend and third-party standing.  But in my view,
they have no significant relationship with the real party in
interest as required for next-friend standing, and to establish

third-party standing, they must establish their own injury in fact to give them a sufficiently concrete interest in the outcome.

They have failed to demonstrate this is likely; they make much of the fact that it is now more difficult for them to obtain clients, forcing them to divert additional resources to reaching detainees at Guantanamo.  But diverting those resources is their decision; the government's actions that allegedly make it more difficult to reach particular clients did not force the advocacy plaintiffs here to seek to represent them.

The cases make clear that a plaintiff cannot manufacture its own standing by directing money towards a problem after that problem is already underway.

So for that reason and the ones I've already discussed, in my view, the advocacy plaintiffs have failed to demonstrate that they will suffer irreparable harm absent the TRO sought here because neither party -- or no party can show irreparable harm absent a TRO.  This first factor cuts against one.

Turning to the likelihood of success on the merits, the first question is whether it is likely that I have jurisdiction.  For the reasons I've just discussed, the legal advocacy plaintiffs likely lack Article III standing to bring this case.

As for the next-friend plaintiffs, since their relatives

are no longer experiencing the claimed harms at issue, those plaintiffs would not be able to establish injury in fact for standing purposes, and/or their claims would be moot.

I've already walked through some of the unique things about third-party standing, but here with respect to the next-friend standing alleged by the family plaintiffs, they must present an adequate explanation, such as inaccessibility, mental incompetence, or other disability why the real party in interest cannot appear on his own behalf to prosecute this action.

There is no reason at this point why the family member detainees that have now been sent out of GTMO could not contact attorneys and litigate this matter on their own behalf, should they wish.

Accordingly, in my view, it seems highly unlikely that these family member plaintiffs could establish next-friend standing.

Thus, because no party has demonstrated that the Court likely has jurisdiction over its claims, no party has demonstrated that it is likely to succeed on the merits. That's the second factor.

The final factor requires me to weigh the hardship to the plaintiffs if the TRO is not granted against the harm to the government if it is, together with the public interest; again, as I said before, these factors merge where the government is

the defendant.

But because plaintiffs have not carried their burden on irreparable harm and likelihood of success, there's no need to examine the balance of the hardships in detail.

I'm going to say something about this balance when I get to the next case, but there I'm citing *Davis v. Pension Benefit Guarantee Corp.*, 571 F.3d 1288, D.C. Circuit, 2009.

Turning to the second case, *Espinoza Escalona*. Again, I'll begin with irreparable harm; where again, a plaintiff must demonstrate to get a TRO, that it faces injuries that are "certain, great, actual, and imminent." As well as "beyond remediation."

Plaintiffs argue that a loss of constitutional or statutory freedoms or rights, even for minimal periods of time, unquestionably constitutes irreparable injury. They also argue that GTMO detainees or Guantanamo detainees have suffered harsh conditions while there, and they contend that a Guantanamo transfer will cause them irreparable reputational harm.

The problem with each of these theories is that no alien with a final order of removal who was previously in the United States is currently detained at Guantanamo Bay. That includes these ten plaintiffs. In other words, none of these ten plaintiffs is currently detained at Guantanamo Bay.

They argue, of course, that they may be sent there. But they have failed to demonstrate with the appropriate level of

certainty that they are actually bound for Guantanamo.  After all, "plaintiffs seeking preliminary relief must demonstrate that irreparable injury is likely in the absence of an injunction."  That's the *Winter* case, 555 U.S. at 22.

A mere "possibility standard is too lenient."  Same case.

Here, plaintiffs transfer to Guantanamo is purely a possibility; they base the likelihood primarily on the fact that they are men with final orders of removal, and for some their nationalities, physical appearance, and accusations of gang membership.  These attributes certainly render the plaintiffs' transfer within the realm of possibility, but they do not cross the threshold to likelihood.

Moreover, as I explored with counsel for both parties, any harm from a transfer to Guantanamo, were to happen to any one of the ten plaintiffs, is largely not irreparable.

In light of the practices in place for access to counsel, any transferred plaintiff would be able to contact the lawyers here who represent them and seek renewed injunctive relief.

Moreover, the government has represented today that it will inform me if any fact in its briefs changes in a material way, which in my view would include the transfer to Guantanamo of any one or more of the ten plaintiffs.

In the event that such a development were to occur and a renewed motion -- and the government has said it wouldn't oppose both amendment of the pleadings and at least the

renewing of a motion for injunctive relief -- and were I to find a renewed TRO motion or PI meritorious, in my view I could fashion relief at that time that would cure all, or just about all, alleged irreparable harm.

Put differently, in my view, plaintiffs have failed to establish that they are presently suffering irreparable harm that needs to be redressed at present through a TRO rather than at some future potential date.

Turning to likelihood of success on the merits, as in *Las Americas*, I conclude that this factor cuts against a TRO as well because plaintiffs have failed to establish they are likely to have Article III standing.

Again, not to go through the law, but the injury for injury in fact "must be concrete, particularized, and actual or imminent."  For the reasons I've already stated, it is difficult to conclude that transfer to Guantanamo is imminent for any of the ten plaintiffs here.  There is no official administration policy, as far as I can tell and certainly not in the record, targeting Venezuelan nationals for such transfer or individuals with tattoos.

Indeed, it is not even the case that all ten plaintiffs are Venezuelan nationals.  Their circumstantial observations, without more cannot, in my view, create Article III injury.

Without that imminence, plaintiffs have failed to establish they are likely at this time to suffer any concrete,

particularized injury.

As a result, just as in the other matter, plaintiffs likely lack standing to bring their claims, at least until they're actually transferred to Guantanamo.

And, of course, a lack of standing would mean a lack of jurisdiction, and a lack of jurisdiction would mean a failure to establish a likelihood of success on the merits. But plaintiffs' claims may have other deficiencies on the quote/unquote merits.

I think there's a serious question whether the government's authority to open detention facilities under the statute that we discussed earlier -- my apologies, I don't have the cite -- whether the government's authority to open detention facilities under the statute we discussed earlier extends to military bases overseas.

As for their APA claims, plaintiffs' hypothetical future transfer to Guantanamo is not yet obviously a final agency action. That is obviously true when, as here, the transfer hasn't happened; but even if it had, it's not clear to me that the action would be final in the APA sense because in transfer to a temporary holding facility en route to some other destination is not necessarily the consummation of the removal process.

And, in any event, many transfer and removal and detention decisions are committed to agency discretion by law, which

could preclude APA review in this matter.

As to the constitutional claims which are directed at the nature of the detention, it is almost impossible based on this record to conclude that the plaintiffs are likely to succeed on them when none of the plaintiffs is actually detained; and therefore, none of the plaintiffs can actually articulate the nature of the detention and the exact constitutional problem.

For those reasons, while I think irreparable harm in both cases is by far the most important factor, I believe that in the second case, as well, that the plaintiffs have failed to establish that they are likely to succeed on the merits.

Finally, turning to the final TRO/emergency stay factors that require me to weigh the hardship to the plaintiffs if relief is not granted against the harm to the government if it is, together with the public interest, all of which sort of blends together.

Again, because plaintiffs have not carried their burden on irreparable harm and likelihood of success, there's no need to examine the balance of hardships in detail.

This is what I mentioned earlier.  I was going to briefly discuss these questions here.  In my view, these factors do not cut substantially in plaintiffs' favor in either case.

As to the plaintiffs in the second case, a Guantanamo transfer is a purely speculative harm for these plaintiffs, and in the other case, there is no likelihood that those plaintiffs

will suffer irreparable harm, given that they are no longer at Guantanamo, and, in fact, have been sent to their home countries, so to speak.

Plaintiffs in the second case raise no objections to their current living state in government custody. And in the second case, unlike the detainees in *Las Americas*, the plaintiffs in the second case have already retained counsel and will, thus, have advocates at the ready to make additional filings if and when the need arises.

I therefore think that -- well, I think there is no irreparable harm that would occur, absent an injunction here. To the extent one were to disagree with that, the irreparable harm to the plaintiffs would be, at best, very modest.

On the other hand, as the Supreme Court stated in a case called *Nken* -- perhaps that's how you pronounce it, N-K-E-N. "There is always a public interest in prompt execution of removal orders: The continued presence, as the court put it, of an alien lawfully deemed removable undermines the streamlined removal proceeding congress established and permits and prolongs a continuing violation of United States law." That's a quote, and I'll just say end quote.

The public, likewise, has an interest in the preservation of congressionally mandated executive discretion and authority and fundamentally executive matters regarding immigration. At the very least here, these factors do not cut significantly in

plaintiffs' favor in either case.

As a result, for all these reasons, I conclude that the plaintiffs in both cases before me today have not demonstrated that they will suffer irreparable injury absent a TRO or emergency stay; have not demonstrated they are likely to succeed on the merits as the cases are currently teed up, or that the balance of the hardships or public interest cuts significantly in their favor.

I will accordingly deny the motion for a TRO in *Las Americas*, that's ECF 3, and the *Espinoza Escalona* plaintiffs' motion for an emergency stay of transfer in that case, which is ECF 2.

Why don't we start with plaintiff counsel. Happy to hear any objection you'd like to raise, but really what I'd like to do is talk about next steps.

          MR. GELERNT:  Thank you, Your Honor.

          THE COURT:  I know you'd like to, as always, probably be able to digest what I've said and to reflect on whether and to what extent you would like to challenge it or otherwise take additional steps.  I get that.

          MR. GELERNT:  So this is your ruling today, though?

          THE COURT:  It is.

          MR. GELERNT:  Yeah, right.

          THE COURT:  So what I'm going to do is I'm going to enter an order that will deny the TRO motions in both cases for

the reasons stated on the record today.

MR. GELERNT:  So we appreciate Your Honor telling the government or getting the government's concession that they will let you know if anything changes.

The only thing I would say is if -- I don't think there's any reason for the government to wait a day or two when they get to Guantanamo.  And once they're on the plane, it would be, I think, appropriate for the government to let you know immediately and for us, subject to your schedule, to be able to come back very quickly.

THE COURT:  Thank you, counsel.

Okay, I'll hear from the government on that question.  Counsel?

MR. ENSIGN:  Thank you, Your Honor.  In terms of proceeding next, we anticipate that we would file a motion to dismiss at the appropriate time, and we can brief the remaining issues.

As to that, I'll have to talk to DHS.  I don't know how quickly they would let us know.  I mean, certainly within DOJ we are not going to delay providing that information to this Court, and we'll reach out to them to let them know that they should let us know promptly if they were to transfer any of these detainees to Guantanamo.

I believe, I think it's paragraph 38 of one of the declarations explains that it wasn't imminent.  That continues

to be the case to the best of my knowledge, but we will do so certainly quickly.  I'm not prepared to offer realtime information.

THE COURT:  Let's do the following.  I'm not presently ordering the government to tell me if one of the ten plaintiffs is or has gone to Guantanamo by a particular time.  I'm not doing that today.

What I would like to know is the government's position, and why don't we say by Wednesday of next week, you can submit a notice that tells me or the plaintiffs here essentially how early in the process the government would be prepared to tell me if a transfer occurs or has occurred.

And then depending on what I hear from the government, I will think through whether I want to order something that is quicker, earlier, or different.  But I'm not imposing that until I hear from you about what DHS is prepared basically to -- or the government is prepared to do absent an order.  Okay?

MR. ENSIGN:  Understood, Your Honor.  And we will certainly provide you our position by that time.

THE COURT:  You can just file on the public record a notice of government position or something like that.  Okay?

MR. ENSIGN:  Sounds good, Your Honor.

THE COURT:  Anything else you'd like to discuss today?

MR. ENSIGN:  No, Your Honor.

THE COURT:  Okay.  Thank you all.

(Proceedings concluded at 4:18 p.m.)


C E R T I F I C A T E


I, Stacy Johns, certify that the foregoing is an

accurate transcription of the proceedings in the

above-entitled matter.



/s/ Stacy Johns                Date: March 18, 2023

Stacy Johns, RPR, RCR
Official Court Reporter

| | | | | |
|---|---|---|---|---|
| **DEPUTY CLERK: [4]** 2/2 59/20 66/19 66/21 **MR. AZMY: [1]** 2/15 **MR. ENSIGN: [37]** 2/21 34/21 35/1 35/6 35/18 36/3 36/9 36/13 37/17 37/24 38/6 38/15 39/2 40/23 41/24 42/4 42/14 43/11 44/5 44/13 45/17 46/3 46/18 47/6 47/25 50/5 50/20 52/2 52/8 52/16 52/21 54/9 54/17 82/14 83/18 83/22 83/24 **MR. FLENTJE: [1]** 3/1 **MR. GELERNT: [107]** 2/18 **MS. ALAGESAN: [1]** 2/18 **MS. CHO: [1]** 2/12 **MS. WILSON: [8]** 2/24 54/19 54/21 56/21 57/18 57/25 58/15 59/18 **THE COURT: [159]** **THE DEFENDANT: [1]** 43/20 **UNIDENTIFIED SPEAKER: [1]** 49/20 | **2023 [4]** 1/5 1/11 67/20 68/2 **2025-418 [1]** 2/3 **20th [1]** 68/14 **22 [2]** 8/9 76/4 **24 [1]** 4/6 **25 [1]** 36/18 **25-cv-418 [1]** 67/7 **25-cv-604 [1]** 67/11 **27 [3]** 5/23 6/1 52/9 **27-ish [1]** 52/13 **29 [1]** 67/20 **290 [3]** 28/13 65/11 70/21 **297 [1]** 70/21 **3** **30,000 [1]** 19/16 **344 [1]** 40/10 **38 [1]** 82/24 **3:27 [1]** 66/20 **3:45 [1]** 66/16 **4** **40-ish [1]** 52/13 **418 [2]** 2/3 67/7 **45 [1]** 40/10 **454 [1]** 70/21 **4:18 [1]** 84/1 **5** **543 [1]** 40/9 **555 [1]** 76/4 **571 [1]** 75/7 **6** **60 [1]** 51/17 **604 [2]** 2/5 67/11 **7** **702 [1]** 50/12 **9** **950 [1]** 1/22 **985 [1]** 69/11 **A** **ability [5]** 8/3 20/19 39/16 45/22 69/25 **able [16]** 4/25 6/8 56/16 56/19 56/19 56/25 57/4 58/6 58/24 59/5 59/10 63/22 74/2 76/17 81/18 82/10 **about [68]** 4/25 6/18 6/24 7/22 8/16 10/11 10/14 13/6 13/6 13/21 15/5 16/6 16/9 16/12 17/10 17/12 19/8 19/15 21/5 21/8 21/14 22/18 23/3 24/2 24/13 24/17 25/9 25/11 28/12 29/1 29/6 31/6 32/4 33/20 34/23 36/25 37/14 38/1 38/12 38/23 41/16 42/2 44/2 45/12 48/4 49/5 49/18 49/25 50/1 50/14 51/4 53/14 54/8 57/8 | **58/23 59/24 60/18 61/8 61/15 65/19 74/4 75/5 77/3 81/15 83/16 above [1]** 84/8 **above-entitled [1]** 84/8 **abroad [2]** 62/24 63/13 **absence [1]** 76/3 **absent [7]** 8/4 34/11 73/17 73/19 80/11 81/4 83/17 **absolutely [3]** 5/20 5/20 17/20 **absolutist [1]** 39/10 **accelerated [1]** 50/22 **accept [2]** 40/25 51/17 **access [28]** 4/2 4/14 4/15 4/15 4/16 4/19 5/10 6/21 6/25 7/2 15/9 20/16 54/8 54/22 55/1 55/5 55/8 55/9 55/19 55/22 56/25 57/6 58/19 59/15 67/10 68/11 72/3 76/16 **accomplished [1]** 40/8 **according [3]** 68/15 69/5 69/15 **accordingly [2]** 74/15 81/9 **accurate [2]** 43/11 84/7 **accusations [1]** 76/9 **acknowledges [1]** 47/8 **acknowledgment [1]** 5/1 **ACLU [1]** 2/10 **across [1]** 45/16 **Act [1]** 46/20 **acting [1]** 26/3 **action [23]** 1/4 1/10 30/12 30/23 31/12 31/20 31/20 31/22 31/23 31/24 32/2 34/24 41/5 46/12 48/11 48/15 49/1 54/1 54/13 54/14 74/10 78/18 78/20 **actions [5]** 39/12 46/14 49/7 67/22 73/8 **activities [1]** 46/9 **acts [1]** 27/22 **actual [4]** 38/4 71/9 75/11 77/14 **actually [12]** 10/8 10/24 16/20 19/16 23/4 26/11 53/4 62/13 76/1 78/4 79/5 79/6 **add [2]** 34/15 54/6 **adding [1]** 52/25 **addition [1]** 53/2 **additional [9]** 40/3 46/4 50/6 59/13 59/16 67/24 73/6 80/8 81/20 **address [2]** 20/6 63/16 **adequate [2]** 50/12 74/7 **adjacent [1]** 69/19 **adjudication [1]** 56/14 **adjustments [1]** 70/4 **administration [2]** 000085 | **administrative [3]** 50/21 63/22 65/8 **admitted [1]** 52/22 **advance [1]** 20/2 **advocacy [10]** 1/3 2/3 38/4 67/6 72/11 72/18 72/21 73/10 73/16 73/23 **advocates [1]** 80/8 **affect [1]** 46/15 **affected [3]** 8/5 39/19 40/1 **affirmative [1]** 61/11 **aforementioned [1]** 69/13 **after [8]** 9/19 23/2 36/1 66/1 66/24 70/8 73/13 76/1 **afternoon [9]** 2/2 2/9 2/15 2/18 2/21 34/21 54/19 54/20 58/3 **again [19]** 9/18 14/1 14/10 17/8 21/23 30/7 34/1 34/7 37/3 41/16 58/17 68/21 71/11 72/17 74/24 75/8 75/9 77/13 79/17 **against [16]** 3/18 11/22 11/22 23/14 45/13 46/22 47/1 49/2 61/5 61/10 68/7 70/23 73/19 74/23 77/10 79/14 **agencies [1]** 23/4 **agency [14]** 24/17 24/20 27/22 28/2 28/3 30/1 30/12 41/12 41/13 49/10 49/11 54/14 78/17 78/25 **agenda [1]** 52/24 **agents [2]** 41/17 42/17 **agree [6]** 12/23 36/4 37/1 52/5 52/9 70/7 **aided [1]** 1/25 **air [2]** 25/6 60/16 **airports [1]** 45/3 **al [9]** 1/3 1/6 1/9 1/12 2/4 2/4 2/5 2/6 47/11 **al-Imam [1]** 47/11 **Alagesan [2]** 2/19 2/20 **ALEJANDRO [2]** 1/9 2/5 **alert [5]** 8/17 8/18 16/19 66/1 66/1 **alien [11]** 9/5 26/21 40/6 40/7 46/19 48/16 48/25 49/2 52/6 75/19 80/18 **aliens [18]** 10/11 10/17 10/20 12/24 22/16 26/13 52/1 67/4 67/8 67/12 67/25 68/22 69/7 69/11 70/7 71/25 72/14 72/19 **all [52]** 3/11 6/1 6/1 6/3 8/24 8/25 11/4 12/4 12/25 13/25 16/5 16/8 16/12 18/15 19/11 | **19/25 20/5 21/24 26/21 28/14 30/4 34/13 35/9 36/21 37/20 40/14 45/14 46/21 46/21 48/2 48/5 48/12 48/14 49/4 56/11 61/1 61/8 62/23 66/18 66/19 67/22 68/5 68/5 68/17 68/21 69/1 76/2 77/3 77/4 77/21 79/15 81/2 83/25 allegations [1]** 71/4 **alleged [4]** 37/9 41/9 74/6 77/4 **allegedly [1]** 73/9 **alleging [1]** 68/10 **allow [5]** 46/14 50/13 57/7 60/2 65/25 **allowed [1]** 4/20 **allowing [1]** 4/18 **allows [1]** 49/14 **almost [2]** 68/5 79/3 **alone [2]** 23/11 72/20 **along [2]** 16/18 33/18 **already [19]** 36/14 51/21 54/21 56/14 56/24 64/22 69/24 72/1 72/19 73/14 73/15 74/4 77/15 80/7 **also [19]** 9/15 9/17 17/1 20/15 31/22 39/22 39/23 45/21 48/8 50/24 55/9 55/17 56/8 64/2 65/3 66/4 69/15 70/22 75/15 **alternative [1]** 50/12 **alternatively [3]** 11/14 20/14 57/3 **although [1]** 58/11 **altogether [1]** 59/9 **always [8]** 12/11 24/17 40/22 65/5 65/6 70/12 80/16 81/17 **am [2]** 31/4 66/25 **amend [2]** 36/5 37/7 **amended [1]** 36/10 **amendment [2]** 38/11 76/25 **American [1]** 1/18 **AMERICAS [10]** 1/3 2/3 21/17 67/6 68/7 70/10 71/2 77/10 80/6 81/10 **among [1]** 45/10 **amount [2]** 18/17 65/5 **ample [1]** 59/12 **analogize [1]** 12/14 **analogy [1]** 12/16 **analysis [1]** 71/6 **analyze [1]** 61/8 **ancillary [1]** 33/20 **another [5]** 17/23 25/16 25/16 41/23 61/16 **answer [3]** 4/24 4/25 50/22 **answers [1]** 44/17 **anticipate [1]** 82/15 **any [53]** 5/10 7/2 8/5 8/14 11/16 13/23 15/15 | **/** **/s [1]** 84/11 **1** **10 [1]** 6/5 **10004 [1]** 1/20 **1103 [1]** 11/10 **12 [1]** 58/18 **1231 [17]** 12/12 22/15 24/13 38/25 41/2 43/15 44/4 44/14 44/17 44/19 47/2 47/2 47/3 47/7 49/15 61/1 61/9 **125 [1]** 1/19 **1252 [5]** 48/12 48/18 48/22 49/4 49/6 **1288 [1]** 75/7 **14 [3]** 1/5 1/11 39/9 **178 [1]** 68/4 **18 [1]** 84/11 **180 [1]** 68/16 **18th [1]** 1/19 **1990 [1]** 54/14 **1:25-cv-00418-CJN [1]** 1/4 **1:25-cv-00604-CJN [1]** 1/10 **1st [1]** 68/19 **2** **20 [1]** 55/2 **20 minutes [1]** 66/15 **20004 [1]** 1/22 **2006 [1]** 70/21 **2009 [1]** 75/7 **2023 [1]** 84/11 **2024-604 [1]** 2/5 |

## A

any... **[46]** 18/4 18/4 20/1 20/15 22/23 23/16 26/23 27/14 28/10 30/7 30/18 36/5 37/21 45/25 47/18 48/15 48/19 48/23 48/24 48/25 49/2 51/25 52/6 52/17 53/18 57/10 57/15 57/21 59/3 59/5 59/21 62/17 63/3 72/1 72/14 76/13 76/4 76/17 76/20 76/22 77/17 77/25 78/24 81/14 82/6 82/22
**anyone [3]** 57/18 71/22 72/20
**anything [8]** 34/15 39/25 54/6 57/17 57/19 61/24 82/4 83/23
**anywhere [2]** 21/23 30/18
**APA [21]** 10/2 21/16 26/7 31/14 31/21 49/8 49/11 49/18 50/6 50/13 50/15 51/4 51/7 51/23 53/24 63/15 63/19 65/6 78/16 78/20 79/1
**apologies [1]** 78/12
**apologize [2]** 13/16 38/7
**apparently [6]** 9/13 39/24 40/1 40/6 40/17 51/19
**Appeals [4]** 48/14 48/21 64/18 64/20
**appear [1]** 74/9
**appearance [1]** 76/9
**APPEARANCES [1]** 1/17
**applicability [2]** 38/17 46/23
**application [6]** 23/14 45/11 45/25 46/4 61/22 62/7
**applied [1]** 45/18
**applies [9]** 22/22 44/22 45/14 45/16 46/12 54/1 61/15 61/21 62/4
**apply [15]** 11/25 12/2 12/22 19/8 23/18 23/23 24/10 44/23 45/18 46/14 61/18 61/23 62/13 62/23 72/4
**appreciate [1]** 82/2
**approach [1]** 3/25
**appropriate [10]** 11/21 22/16 44/7 44/9 47/4 49/15 67/22 75/25 82/8 82/16
**approximately [2]** 68/16 69/11
**arbitrarily [1]** 27/23
**arbitrary [15]** 10/1 24/21 26/3 26/8 27/25 29/21 29/25 30/5 30/10 32/15 49/9 50/10 50/17 51/22 64/9

## are [119]

**area [1]** 28/21
**areas [1]** 69/12
**aren't [2]** 42/5 43/3
**argue [7]** 3/17 3/18 36/19 69/3 75/13 75/15 75/24
**argument [13]** 11/21 12/7 15/2 19/3 27/22 33/25 35/5 35/13 39/7 39/8 48/2 53/10 63/2
**arguments [3]** 11/7 14/24 16/5
**arises [1]** 80/9
**arising [1]** 48/25
**Arizona [1]** 16/15
**around [6]** 12/3 18/11 28/25 33/21 34/5 63/10
**arrange [5]** 22/16 44/6 47/4 47/21 49/15
**arranged [1]** 58/4
**arranging [1]** 44/9
**art [3]** 11/3 25/5 42/23
**Article [6]** 15/1 38/15 38/18 73/23 77/12 77/23
**articulate [1]** 79/6
**as [92]**
**aside [2]** 44/10 45/6
**ask [6]** 3/3 6/24 8/17 20/19 22/3 61/5
**asked [1]** 7/20
**asking [6]** 37/2 38/24 44/11 49/17 65/12 65/19
**aspect [1]** 25/22
**assembled [1]** 69/9
**assert [1]** 31/20
**assess [1]** 70/3
**assist [1]** 6/5
**Assistance [1]** 2/19
**Assistant [1]** 2/22
**assists [1]** 69/11
**associated [1]** 3/4
**assume [4]** 6/2 14/20 37/5 47/19
**assuming [1]** 20/19
**atmospherics [1]** 25/21
**attach [1]** 72/12
**attempt [1]** 72/22
**attempting [1]** 59/2
**attorney [11]** 2/22 11/19 21/17 22/15 47/3 47/20 48/6 49/1 49/7 57/7 61/11
**attorneys [2]** 27/9 74/13
**attributes [2]** 69/1 76/10
**August [1]** 3/1
**authorities [1]** 34/22
**authority [40]** 9/25 11/16 11/17 11/20 13/3 13/4 22/15 22/25 23/1 23/9 25/7 26/4 28/4 29/23 31/23 37/21 38/25 39/5 39/20 44/4

4/6 44/13 46/8 47/3 47/20 47/21 47/21 49/17 49/25 50/9 50/10 53/9 60/15 60/24 61/11 62/11 62/23 63/1 78/11 78/13 80/23
**available [10]** 50/12 50/25 51/3 51/9 53/3 54/2 55/16 56/4 59/9 65/4
**Avenue [1]** 1/22
**avoid [1]** 46/7
**awaiting [1]** 44/8
**aware [4]** 10/5 11/16 57/18 59/3
**away [4]** 11/12 26/15 66/5
**Azmy [2]** 2/15 2/17

## B

**back [44]** 3/19 5/7 5/9 7/23 8/18 8/19 8/23 9/16 9/18 9/20 14/3 17/4 17/6 18/6 18/21 19/2 20/2 20/4 20/22 21/21 22/11 24/8 28/2 28/8 28/22 29/4 29/12 30/1 30/3 30/4 32/22 34/1 41/14 42/23 43/4 43/4 54/7 65/7 65/19 65/24 66/7 66/13 66/21 82/10
**backdrop [1]** 68/8
**background [2]** 67/3 67/16
**bad [1]** 34/9
**Baher [1]** 2/15
**balance [4]** 75/4 75/5 79/19 81/7
**balancing [1]** 70/24
**ban [1]** 60/5
**bar [3]** 49/3 50/6 60/9
**bars [3]** 37/19 48/9 49/6
**base [9]** 6/17 18/16 25/6 25/17 49/16 55/9 60/7 67/19 76/7
**based [5]** 28/10 33/4 57/22 66/5 79/3
**baseline [1]** 59/14
**bases [3]** 37/20 47/14 78/15
**basic [1]** 9/24 65/22
**basically [6]** 3/10 3/15 19/9 44/15 70/25 83/16
**basis [3]** 23/19 29/20 52/17
**Bay [7]** 37/4 67/5 67/17 67/23 72/15 75/21 75/23
**be [124]**
**because [50]** 7/4 8/7 9/2 9/21 15/1 15/9 16/22 23/8 25/12 28/1 29/22 31/18 35/2 35/14 38/9 38/19 39/7 40/1 41/11 42/11 42/24 43/7 48/3 48/11 48/17 50/2

000086

56/10 57/1 53/8 59/9 57/20 59/14 60/16 62/6 62/24 63/2 64/6 64/21 65/12 68/25 71/2 71/20 72/5 72/17 73/18 74/18 75/2 77/11 78/20 79/17 77/1 78/20 79/1
**bed [2]** 33/2 51/5
**been [40]** 4/23 5/12 8/20 9/4 9/19 12/2 14/19 16/9 23/21 24/9 28/20 28/24 29/4 32/8 32/18 39/12 39/19 40/8 40/14 43/7 52/17 53/18 55/15 57/16 58/1 59/10 60/1 60/20 62/10 62/18 62/18 62/25 63/22 63/23 64/22 65/19 65/24 67/9 74/12 80/2
**before [19]** 1/15 5/3 5/8 16/19 18/21 19/2 20/3 21/21 22/3 34/16 35/20 42/8 42/10 51/6 54/6 64/2 67/9 74/25 81/3
**began [1]** 40/9
**begin [4]** 26/9 39/13 71/6 75/9
**beginning [3]** 2/8 17/12 70/10
**behalf [5]** 2/12 2/16 48/24 48/25 74/9 74/13
**being [21]** 6/9 7/2 7/17 16/25 18/13 18/16 24/8 26/15 48/17 50/21 51/3 52/23 55/6 55/14 56/24 57/23 62/17 66/8 67/9 67/13 70/8
**belabor [2]** 22/1 34/1
**belaboring [1]** 14/10
**believe [12]** 3/4 3/10 4/4 4/9 35/19 37/17 43/11 46/19 53/9 57/19 79/9 82/24
**believes [1]** 51/19
**Benefit [1]** 75/6
**best [2]** 80/13 83/1
**better [1]** 32/11
**between [2]** 38/21 62/20
**beyond [4]** 5/11 27/23 71/10 75/11
**Biden [1]** 23/8
**biggest [1]** 15/7
**bit [6]** 8/15 24/25 33/16 42/1 42/15 66/16
**bleed [1]** 24/21
**blends [1]** 79/16
**blinks [1]** 64/6
**Bliss [1]** 68/3
**blow [1]** 24/15
**board [1]** 45/16
**boils [2]** 32/6 60/13
**BOP [1]** 4/17
**border [1]** 42/10
**both [15]** 3/8 3/12 3/17 3/19 31/23 45/17 49/10 61/13 66/14 66/25 76/13 76/25 79/8 81/3 81/25

**bother [1]** 19/25
**bound [1]** 76/1
**branch [1]** 23/4
**branch's [2]** 22/24 23/6
**break [1]** 43/2
**breaks [1]** 42/20
**bridge [1]** 16/6
**brief [7]** 32/22 33/6 36/18 36/21 59/24 66/7 82/16
**briefing [1]** 68/14
**briefly [6]** 42/10 54/23 67/8 67/16 71/25 79/20
**briefs [3]** 3/11 24/8 76/20
**Bright [1]** 23/2
**bring [9]** 8/23 17/6 56/23 59/15 64/17 64/19 64/21 73/23 78/3
**bringing [1]** 8/18
**brings [1]** 42/23
**broad [3]** 1/19 11/20 72/22
**broadly [1]** 19/9
**brought [6]** 17/4 17/15 23/7 57/13 63/4 64/19
**build [8]** 13/1 26/12 27/18 27/19 28/18 51/16 51/18 65/14
**building [7]** 10/8 47/12 63/25 64/1 69/19 69/20 69/21
**burden [3]** 19/4 75/2 79/17
**burdensome [3]** 18/19 19/7 19/23
**butts [1]** 11/21

## C

**call [4]** 6/9 57/3 59/22 67/18
**called [5]** 45/9 48/18 55/21 70/20 80/15
**calling [2]** 6/19 68/19
**calls [5]** 21/19 58/25 69/18 69/23 69/25
**camp [12]** 18/13 26/16 26/17 27/17 27/20 64/3 65/16 66/9 69/12 69/18 69/20 69/21
**Camp VI [1]** 69/18 69/20
**can [48]** 4/13 5/16 6/18 7/22 8/12 8/16 8/19 10/6 11/12 12/21 14/1 14/25 17/4 18/21 19/2 20/4 21/18 21/18 23/25 30/1 31/3 31/5 33/20 34/4 36/10 37/7 37/7 43/25 44/18 44/23 45/14 49/22 50/3 55/10 55/19 59/4 65/5 65/6 66/4 66/17 71/22 72/20 73/18 77/18 79/6 82/16 83/10 83/20
**can't [15]** 6/9 6/16 13/25 15/1 22/2 28/2 33/21 35/19 41/4 48/2

can't... [5] 60/21 62/24 63/5 63/12 71/18
Canadian [1] 42/10
candidates [1] 68/24
cannot [9] 28/10 32/9 51/18 53/23 71/21 72/18 73/12 74/9 77/23
capable [1] 7/25 38/16
capacity [22] 10/8 28/15 30/8 34/1 34/6 39/25 40/14 41/1 45/1 45/5 50/23 50/25 51/3 51/9 51/10 51/11 51/13 53/1 64/4 64/6 65/14 67/24
capitol [2] 42/19 44/8
capricious [16] 10/2 24/22 26/8 27/25 29/21 29/25 30/5 30/10 32/15 47/24 49/9 50/11 50/17 50/19 51/22 64/9
capriciously [1] 27/23
Caribbean [1] 10/18
CARL [1] 1/15
carried [2] 75/2 79/17
carry [1] 39/3
case [65] 2/4 4/4 7/2 8/1 9/23 14/4 14/9 14/19 15/4 15/11 17/12 17/15 19/12 20/15 20/16 23/7 23/20 33/21 34/22 35/3 35/10 35/16 37/25 38/13 38/19 40/4 40/17 44/22 45/9 47/9 47/11 49/14 50/7 53/16 53/17 53/22 54/8 54/14 57/13 57/14 57/21 58/11 67/10 70/10 70/10 70/20 71/11 71/23 73/24 75/6 75/8 76/4 76/5 77/21 79/10 79/22 79/23 79/25 80/4 80/6 80/7 80/14 81/1 81/11 83/1
cases [27] 2/3 3/8 3/15 3/17 3/19 4/2 6/25 11/11 24/8 29/19 31/10 31/25 35/7 38/12 42/9 53/2 53/4 57/11 62/1 64/25 66/25 67/2 73/12 79/9 81/3 81/6 81/25
catch [1] 8/9
catch-22 [1] 8/9
categorically [1] 48/3
cause [13] 30/23 31/11 31/19 31/20 31/21 31/23 31/24 46/12 46/14 48/24 54/1 71/22 75/18
caused [1] 35/21
causes [1] 32/2
CENTER [9] 1/3 2/4 2/15 10/15 10/19 67/6 67/23 69/14 69/22
Centers [1] 23/20
certain [7] 10/10 10/20

75/25 52/11 71/9 72/13 75/11
certainly [18] 6/5 26/19 28/13 35/18 37/18 43/13 48/9 50/20 52/21 58/12 59/2 59/4 59/10 76/10 77/18 82/19 83/2 83/19
certainty [1] 76/1
certify [1] 84/6
chair [4] 18/14 27/14 34/12 65/21
challenge [12] 13/25 14/2 19/22 30/13 30/14 30/19 30/22 36/5 54/10 59/13 63/5 81/19
challenged [1] 65/1
challenges [1] 64/17
challenging [2] 17/23 64/20
change [6] 14/22 15/5 35/17 35/22 38/11 59/16
changed [4] 35/16 35/19 35/21 35/23
changes [4] 5/10 54/13 76/20 82/4
channeling [1] 64/18
Chaplaincy [2] 70/20 71/11
chapter [1] 49/2
cheaper [1] 28/18
Cho [2] 2/12 2/14
choice [1] 49/18
Churches [2] 70/20 71/12
circle [1] 22/11
Circling [1] 65/24
Circuit [3] 70/20 71/11 75/7
circumstance [2] 36/6 38/18
circumstances [6] 8/13 14/22 35/21 35/23 43/25 55/25
circumstantial [1] 77/22
cite [3] 36/20 53/2 78/12
citing [1] 75/6
city [2] 42/19 44/8
civil [9] 1/4 1/10 1/18 2/3 2/4 29/19 29/20 32/6 32/9
CJN [2] 1/4 1/10
claim [19] 24/22 26/8 29/21 30/5 30/10 31/14 31/16 32/4 32/15 48/20 48/24 49/8 49/9 49/18 50/11 52/20 54/2 63/15 63/19
claimed [1] 74/1
claims [19] 9/24 12/25 30/5 31/1 31/1 31/15 46/20 50/15 53/23 56/23 57/8 57/9 64/19 74/3 74/19 78/3 78/8 78/16 79/2

Clapper [1] 35/4
clarify [1] 6/15
class [1] 72/22
classic [1] 12/18
clause [1] 48/19
clear [15] 10/22 11/24 13/21 17/8 29/20 32/8 32/23 43/24 49/5 49/5 55/17 55/24 56/22 73/12 78/19
clearance [1] 55/8
clearances [5] 59/25 60/1 60/4 60/7 60/8
clearing [2] 62/16
clearly [1] 44/24
client [1] 13/21
clients [4] 4/10 69/25 73/6 73/9
close [1] 35/3
closely [1] 47/10
coercive [2] 12/20 44/15
cognizable [1] 50/15
cohort [1] 9/6
colleague [1] 54/8
colloquial [2] 11/3 53/20
COLUMBIA [2] 1/1 54/5
come [17] 2/7 4/21 5/3 7/23 8/23 18/21 20/22 30/1 30/4 36/9 37/19 43/21 43/23 60/2 66/7 66/13 82/10
comes [2] 40/4 65/7
coming [2] 19/24 29/2
comment [1] 49/20
commit [1] 35/20
commitment [1] 37/5
committed [4] 48/6 49/10 49/11 78/25
common [1] 67/3
communicate [1] 68/9
communications [1] 58/1
compared [1] 56/19
comparison [1] 56/22
complaining [2] 53/14 60/2
complaint [1] 36/10
complexity [3] 28/19 29/14 30/2
component [1] 33/12 47/14 52/24
computer [1] 1/25
computer-aided [1] 1/25
concede [3] 11/15 26/20 29/9
conceded [3] 27/14 32/16 32/21
conceding [2] 33/6 33/13
conceivably [1] 71/5
concept [2] 24/15 50/8
conceptualize [1] 42/4
concern [1] 59/7
concerned [3] 6/17

6/18 19/15
concerns [4] 21/24 46/13 55/6 55/12
concession [2] 32/23 82/3
concessions [1] 28/12
conclude [5] 16/11 77/10 77/16 79/4 81/2
concluded [1] 84/1
conclusion [1] 55/4
conclusions [1] 58/13
conclusory [2] 28/13 28/14
concrete [3] 73/2 77/14 77/25
condition [1] 54/11
conditions [20] 4/11 17/2 17/24 18/25 25/21 26/16 32/8 32/10 32/19 34/7 34/8 34/9 34/10 53/15 53/16 53/17 53/19 54/9 65/18 75/17
conduct [4] 45/22 46/13 56/17 61/2
conducted [1] 69/18
confer [1] 4/7
confinement [4] 18/14 27/14 34/12 65/21
congress [3] 39/4 49/5 80/19
congressionally [1] 80/23
consent [1] 36/11
consequence [1] 39/21
considered [1] 25/11
consistently [3] 11/24 12/3 23/17
consisting [1] 69/10
consolidates [1] 67/2
constitutes [1] 11/8 75/15
constitution [1] 53/12
constitutional [6] 2/16 32/4 63/4 75/13 79/2 79/7
construing [1] 47/9
consummation [1] 78/22
contact [2] 74/12 76/17
contend [1] 75/17
contention [1] 72/19
context [7] 32/10 36/7 44/24 44/24 45/15 45/23 46/11
contexts [1] 46/2
Continental [9] 39/14 40/21 43/4 52/14 56/9 57/12 67/13 68/23 70/9
continually [1] 43/22
continue [4] 41/1 55/18 58/22 70/3
continued [1] 80/17
continues [1] 82/25
continuing [1] 80/20
continuously [1] 8/20
contradict [1] 52/18
contrary [2] 53/8 53/11
contrived [1] 12/6

6/18 19/15
conversation [1] 60/8
Corp [1] 75/7
correct [8] 19/12 37/17 38/6 41/8 46/3 46/18 50/5 52/2
corrections [1] 42/2
correspondingly [1] 43/8
cost [1] 29/14
could [36] 8/10 9/1 9/12 13/19 13/20 15/8 15/11 17/6 19/14 20/14 20/20 21/19 21/20 21/22 29/11 30/4 36/3 36/4 36/11 38/9 38/12 38/14 40/15 41/9 41/18 45/2 46/15 51/6 57/2 63/3 64/3 71/5 74/12 74/16 77/2 79/1
couldn't [7] 15/13 15/15 16/10 16/19 18/6 20/2 64/19
counsel [41] 2/7 3/4 3/18 7/22 13/20 14/18 15/9 20/19 31/1 31/2 34/15 34/20 37/3 38/24 51/25 54/16 55/1 55/5 57/4 58/4 59/17 59/25 60/10 66/10 68/11 69/18 69/18 69/23 69/23 71/16 72/3 76/13 76/16 80/7 81/13 82/11 82/13
counsel's [1] 54/23
counter [1] 61/24
countries [5] 40/15 45/2 45/6 46/7 80/3
country [9] 23/10 25/16 41/4 41/16 41/19 41/23 42/17 43/8 63/6
couple [6] 5/15 16/17 39/6 43/2 52/21 64/13
course [9] 4/13 4/16 30/12 33/20 54/3 62/11 63/14 75/24 78/5
court [55] 1/1 1/23 1/24 4/3 4/24 5/7 5/8 7/23 8/16 8/19 9/3 10/4 12/1 12/21 14/12 18/21 22/2 23/12 23/17 29/22 35/19 35/22 35/23 37/21 40/20 43/17 46/19 47/9 47/13 48/10 48/20 48/23 50/6 50/11 53/7 53/22 54/1 54/13 55/1 59/15 60/12 64/18 64/19 64/21 64/25 65/1 65/2 65/2 65/5 68/15 74/18 80/14 80/17 82/21 84/12
court's [5] 16/18 23/19 31/22 40/4 44/22
courtroom [1] 3/6
courts [6] 23/18 38/15 48/14 48/21 48/21 54/15
create [1] 77/23

**C**

criminal [6] 26/13 26/21 32/10 67/25 69/2 69/7
criminals [1] 26/23
critical [1] 4/10
cross [1] 76/12
crossed [1] 42/10
crux [2] 39/8 62/8
Cuba [4] 11/8 13/12 67/5 67/17
cure [2] 15/15 77/3
current [5] 7/16 8/11 54/4 55/13 80/5
currently [11] 7/2 52/3 54/4 67/12 68/22 70/7 71/20 72/17 75/21 75/23 81/6
custody [5] 41/21 60/21 62/12 63/12 80/5
cut [2] 79/22 80/25
cuts [2] 73/19 77/10 81/7
cv [4] 1/4 1/10 67/7 67/11

**D**

D.C [5] 1/7 1/13 23/17 70/20 75/7
D.C. [1] 71/11
D.C. Circuit [1] 71/11
dangerous [3] 41/9 41/16 42/19
date [2] 77/8 84/11
Davis [1] 75/6
day [8] 8/23 18/2 18/17 21/20 21/20 41/20 60/18 82/6
days [9] 12/17 17/4 18/7 21/19 29/11 43/1 43/2 51/17 60/18
DC [1] 1/22
deal [4] 3/15 42/20 51/10 62/22
deals [1] 45/10
dealt [1] 5/16
Deborah [1] 24/16
decades [1] 11/24
decent [1] 3/14
decide [2] 66/25 70/11
decided [4] 12/24 18/19 19/1 66/24
decision [9] 4/22 12/1 16/25 23/19 33/4 48/25 49/25 61/25 73/8
decisions [3] 5/13 51/12 78/25
declarant [2] 51/15 51/19
declaration [11] 12/9 21/16 24/16 28/16 55/1 55/2 55/5 55/17 58/18 58/18 63/21
declarations [13] 3/12 5/22 21/17 27/8 27/9 28/10 57/19 58/2 64/9 66/6 69/5 69/15 82/25

**deemed [1]** 80/19
Deepa [1] 2/18
defendant [2] 3/1 75/1
defendants [6] 1/7 1/13 1/21 2/22 2/24 3/21
defense [3] 3/18 67/21 69/9
defenses [1] 37/18
deference [2] 22/23 23/3
deficiencies [1] 78/8
defining [1] 44/18
definitely [1] 28/1
definitively [1] 52/18
delay [1] 82/20
demonstrate [6] 71/8 73/4 73/16 75/10 75/25 76/2
demonstrated [4] 74/18 74/20 81/3 81/5
demonstrates [1] 40/25
denied [2] 20/23 35/2
deny [3] 29/4 81/9 81/25
departed [2] 11/11 26/10
Department [2] 1/21 69/9
departs [1] 39/11
departure [2] 40/21 40/23
depending [1] 83/13
Deputy [1] 2/22
described [1] 40/19
desiring [1] 54/13
destination [1] 78/22
detail [3] 55/3 75/4 79/19
detain [10] 10/6 11/20 23/9 33/21 39/16 39/20 40/14 41/1 44/16 60/17
detained [16] 10/10 10/20 11/2 22/16 23/10 43/9 52/1 55/14 57/14 67/13 68/22 72/14 72/15 75/21 75/23 79/5
detainee [6] 9/6 30/21 30/24 44/8 57/5 59/1
detainees [45] 4/16 4/19 6/8 6/16 9/19 20/18 21/18 25/5 26/18 26/19 26/21 27/4 27/9 38/5 39/14 40/12 52/7 55/9 55/23 57/11 59/6 60/10 68/3 68/5 68/10 68/17 69/13 69/14 69/18 69/21 69/22 69/24 69/25 71/18 71/20 72/8 72/10 72/13 72/17 73/7 74/12 75/16 75/16 80/6 82/23
detaining [3] 10/25 11/15 54/4
detention [69] 11/17 12/4 12/8 12/11 12/16 12/18 12/19 12/20

detention...appropriate [1] 12/13
detention...pending [1] 12/13
deter [1] 32/25
determine [1] 11/20
deterrence [8] 32/17 33/5 33/9 33/14 52/23 53/3 53/8 53/11
deterrent [1] 33/12
developed [1] 38/16
development [1] 76/23
developments [1] 20/16
develops [1] 55/19
DHS [10] 35/21 48/6 48/7 53/11 61/12 69/11 69/16 70/2 82/18 83/16
did [5] 26/11 38/2 45/25 46/1 73/10
didn't [8] 11/9 11/13 17/16 27/20 28/5 49/22 60/15 63/24
difference [3] 11/5 62/19 65/17
differences [1] 71/21
different [21] 5/23 6/2 6/4 12/11 19/14 21/9 27/21 30/17 30/18 31/16 36/7 37/8 39/6 48/4 52/10 55/24 60/8 60/19 60/23 72/12 83/15
differently [3] 7/8 47/18 77/5
difficult [4] 4/12 73/5 73/9 77/16
digest [1] 81/18
diplomatic [1] 47/14
direct [1] 55/1
directed [1] 79/2
directing [2] 67/20 73/13
Directive [1] 53/6
directly [1] 57/7
disability [1] 74/8
disagree [1] 80/12
disappear [1] 15/3
disconnected [1] 59/22
discrete [1] 30/14
discretion [6] 48/6

**C**
deemed [1] 80/19
49/7 49/11 63/9 63/23 80/23
discretionary [3] 49/6 51/12 65/3
discuss [2] 79/21 83/23
discussed [4] 73/15 73/22 78/12 78/14
discussing [1] 15/10
discussion [4] 9/4 19/14 58/17 58/23
discussions [2] 5/12 71/14
dismiss [3] 17/17 35/11 82/16
dismissed [3] 8/2 14/19 35/10
dispute [9] 11/1 32/7 32/24 54/25 60/1 62/9 71/15 71/22 72/8
disputing [1] 27/11
disruptions [1] 59/21
distinction [1] 38/9
DISTRICT [3] 1/1 1/1 1/16 48/21 54/5 64/21 65/1 65/2
divert [1] 73/6
diverting [1] 73/7
do [60] 3/15 6/5 8/16 11/9 11/21 12/23 17/6 18/16 18/21 18/24 19/22 21/4 22/1 22/7 25/7 28/4 28/6 30/9 31/14 31/19 32/3 32/24 34/5 34/11 35/20 36/19 37/1 39/25 42/2 43/10 49/25 50/3 51/22 52/19 53/3 56/13 56/18 56/19 56/22 57/2 57/10 58/9 59/25 60/8 61/12 63/25 64/22 65/10 65/12 66/3 66/12 72/12 76/12 79/21 80/25 81/15 81/24 83/1 83/4 83/17
doctrine [1] 38/17
doctrines [1] 38/16
documents [3] 62/16 63/7 69/16
does [23] 13/24 14/17 22/24 23/18 23/23 24/21 27/2 27/2 27/8 27/10 29/1 33/3 39/3 40/22 40/24 45/18 50/9 57/25 61/5 61/6 61/7 61/11 62/8
doesn't [13] 7/22 11/25 12/2 15/7 19/7 32/7 32/24 39/7 43/14 44/23 50/13 63/3 72/16
doing [6] 19/4 30/8 35/20 56/19 64/3 83/7
DOJ [1] 82/20
don't [61] 6/3 6/11 9/10 9/25 10/25 11/12 12/5 12/20 14/11 16/18 16/19 17/3 18/3 18/18 19/4 19/24 20/1 21/4 21/14 21/25 23/15

49/7 49/11 63/9 63/23 80/23
26/23 27/10 29/3 29/6 29/10 29/23 30/6 30/10 31/25 32/14 32/22 34/1 34/3 34/11 35/14 35/15 36/19 36/20 37/21 41/11 44/21 45/24 50/20 52/16 52/17 52/18 57/21 61/23 62/13 62/23 63/6 64/12 64/19 66/2 66/15 78/12 81/13 82/5 82/18 83/9
done [5] 3/9 10/7 27/15 34/5 47/23
doubtful [1] 66/5
dovetails [1] 32/15
down [5] 32/6 34/17 42/20 43/2 60/13
DREW [2] 1/21 2/21
drug [1] 41/9
Dubai [1] 40/8
due [6] 10/3 22/23 31/1 32/5 34/13 52/20
during [1] 43/9
duties [1] 39/4

**E**

each [2] 8/24 75/19
earlier [6] 15/10 70/6 78/12 78/14 79/20 83/15
early [1] 83/11
easiest [1] 29/22
ECF [2] 81/10 81/12
effect [1] 46/15
effectively [1] 39/3
effectuate [9] 39/25 40/24 41/2 44/16 44/25 48/12 48/18 50/24 52/24
effectuated [2] 39/15 40/13
effort [2] 33/3 33/12
efforts [2] 32/25 33/1
either [6] 15/9 44/23 47/2 61/6 79/22 81/1
El [7] 27/7 39/23 43/5 56/12 56/18 56/19 56/24
else [6] 20/18 20/20 26/1 51/6 54/6 83/23
email [2] 57/7 58/3
emergency [5] 68/20 71/1 79/12 81/5 81/11
employ [1] 69/6
emptying [1] 5/4
en [1] 78/21
encounter [2] 48/8 53/17
encountered [2] 53/18 59/8
encountering [1] 46/6
end [6] 12/17 39/24 69/9 70/17 72/16 80/21
ended [1] 72/14
ends [1] 20/13
enforced [1] 16/25
engaged [1] 30/11
engages [1] 46/9

**E**

England [1] 70/21
English [3] 5/24 69/16 71/17
enjoin [1] 17/13
enormous [5] 24/19 28/20 29/14 29/15 30/1
enough [1] 17/7 18/3 43/7
ENSIGN [3] 1/21 2/21 2/23
enter [3] 8/10 37/14 81/25
entered [1] 64/22
entire [1] 3/10
entitled [2] 13/22 84/8
equal [1] 17/24
equally [1] 25/12
equate [1] 40/22
equitable [2] 31/22 31/22
equities [1] 70/24
equity [1] 54/2
ESCALONA [5] 1/9 2/5 67/11 68/19 75/8 81/10
escort [1] 69/21
especially [5] 4/19 60/9 65/11 66/8 71/23
ESPINOZA [6] 1/9 2/5 67/11 68/19 75/8 81/10
ESQ [2] 1/18 1/21
essential [1] 53/1
essentially [7] 15/15 16/10 42/6 43/14 45/4 54/11 83/11
establish [14] 8/3 14/25 15/1 36/15 72/18 72/25 73/1 74/2 74/16 77/6 77/11 77/24 78/7 79/11
established [1] 80/19
et [8] 1/3 1/6 1/9 1/12 2/4 2/4 2/5 2/6
Eunice [1] 2/12
evading [1] 8/1 38/17
evaluate [2] 55/18 58/22
evaporated [1] 39/20
even [28] 3/20 4/5 4/12 4/15 5/17 7/14 8/17 15/18 18/3 18/17 26/11 26/23 27/19 28/20 36/19 38/10 38/11 40/18 46/1 51/16 58/6 61/15 64/2 65/4 72/9 75/14 77/21 78/19
event [6] 8/2 20/15 35/25 66/16 76/23 78/24
ever [1] 53/16
every [5] 5/3 33/19 51/5 54/11 63/10
everybody [1] 66/17
everyone [6] 3/3 8/25 28/22 29/4 59/20 70/6
everywhere [1] 51/5
evident [1] 4/14

exact [1] 79/7
exactly [5] 11/23 18/10 38/3
examine [2] 75/4 79/19
example [6] 25/3 25/3 39/23 42/7 65/6 51/15
examples [2] 40/3 43/13
except [1] 32/1
exceptions [1] 38/18
exclusive [1] 48/13
exclusively [1] 10/23
excuse [2] 47/10 54/7
execute [1] 49/1
execution [1] 80/16
executive [5] 22/24 23/4 23/5 80/23 80/24
exercising [1] 44/3
exhausted [1] 12/25
Existing [1] 59/11
exists [1] 49/17
expand [1] 67/22
expect [1] 6/4
expecting [1] 46/7
expense [1] 30/2
experiencing [1] 74/1
experts [1] 29/16
explains [1] 82/25
explanation [1] 74/7
explore [1] 24/23
explored [1] 76/13
expressly [2] 36/16 47/7
extant [1] 53/5 53/9
extends [2] 38/25 78/14
extent [12] 4/12 6/8 20/23 23/5 37/10 48/19 50/7 53/14 53/21 59/7 80/12 81/19
extraordinary [1] 38/19
extraterritorial [22] 11/17 23/9 23/14 25/10 25/13 31/18 41/3 41/5 44/20 45/1 45/5 45/10 45/21 45/24 46/10 46/13 47/16 48/8 60/25 61/2 61/22 62/7
extraterritoriality [11] 11/22 12/5 44/11 44/22 45/12 45/13 46/22 47/1 61/6 61/9 61/10
extraterritorially [12] 11/25 12/2 12/22 22/22 23/18 23/23 24/10 38/25 44/1 46/14 47/5 60/16
extremely [1] 41/8

**F**

F.3d [2] 70/21 75/7
face [1] 51/17
faces [2] 71/8 75/10
facilities [17] 4/14 4/17 6/3 13/24 17/24 24/13 28/18 34/10 44/18 47/7 47/17 48/5 51/16 51/18 69/6 78/11 78/13

facility [12] 6/15 15/14 17/23 27/7 44/19 47/11 47/18 47/22 49/19 50/1 61/12 78/21
fact [22] 10/19 28/20 36/1 36/21 38/1 39/3 40/17 41/2 58/9 61/21 62/21 64/12 65/13 66/25 72/15 73/2 73/5 74/2 76/7 76/20 77/14 80/2
fact...arising [2] 48/15 48/15
factor [6] 71/6 73/19 74/21 74/22 77/10 79/9
factors [6] 70/19 70/23 74/25 79/12 79/21 80/25
facts [5] 3/14 7/1 15/5 40/19 67/16
factual [2] 37/8 64/7
fail [1] 48/8
failed [9] 36/15 49/10 73/4 73/16 75/25 77/5 77/11 77/24 79/10
failure [1] 78/6
fair [5] 6/2 8/8 10/16 33/15 54/10
fairly [2] 64/23 65/13
fall [3] 28/2 34/1 61/7
falling [2] 28/8 65/19
familiar [1] 56/1
families [1] 58/25
family [12] 6/9 59/3 71/19 71/24 71/24 72/2 72/6 72/6 72/8 74/6 74/11 74/16
far [9] 21/20 28/18 31/2 34/10 55/13 58/10 59/6 77/18 79/9
fashion [1] 77/3
favor [3] 79/22 81/1 81/8
FBI [1] 41/13
fear [2] 67/13 68/23
February [2] 68/2 68/14
February 20th [1] 68/14
federal [4] 47/11 47/12 47/18 48/19
feedback [1] 3/6
feeling [1] 29/17
feels [2] 22/1 60/6
few [3] 4/5 17/4 29/11
figure [2] 8/5 57/5
file [5] 8/25 19/21 56/13 82/15 83/20
filed [7] 4/4 15/8 57/15 57/18 58/2 68/7 68/19
filing [4] 9/19 57/17 58/7 58/12
filings [1] 80/8
fill [1] 51/5
filling [1] 57/7
final [20] 25/5 30/12 30/22 41/10 54/14 56/11 56/12 58/3 58/23 67/4 67/12 68/22
000089

76/7 76/23 74/23 75/20 76/8 78/17 78/20 79/12
Finally [1] 79/12
find [2] 12/21 28/10 33/1 77/2
fine [1] 17/25
first [18] 4/4 11/7 19/11 34/24 37/25 39/21 48/2 53/15 54/25 57/14 57/19 58/21 68/5 68/7 68/9 68/16 73/19 73/21
fit [3] 13/2 13/3 68/24
five [1] 43/1
flat [1] 60/5
fleeting [1] 38/10
Fleischaker [3] 24/16 28/11 28/15
Flentje [2] 3/1 3/2
flies [1] 39/23
flight [7] 39/13 39/17 39/22 39/22 41/15 41/15 43/1
flights [1] 40/7
flip [1] 23/5
Floor [1] 1/19
flow [1] 71/15
fly [1] 43/3
focused [3] 20/9 24/20 34/6
folks [6] 13/1 41/13 55/25 56/11 58/10 58/21
follow [1] 28/5
following [4] 28/3 41/7 58/4 83/4
foot [1] 40/24
force [4] 25/6 53/10 69/10 73/10
forcing [1] 73/6
foregoing [1] 84/6
foreign [10] 40/24 41/4 41/16 41/19 42/21 42/24 45/23 46/7 46/16 46/17
forgive [1] 44/3
form [2] 50/22 57/2
forms [3] 5/24 58/17 68/12
Fort [1] 68/3
forth [1] 32/16
forward [2] 2/7 34/3
found [2] 47/13 53/7
four [1] 41/20
framing [1] 19/12
frankly [1] 31/9
free [1] 42/10
freedoms [1] 75/14
friction [1] 46/7
Friday [1] 58/1
friend [5] 72/23 72/25 73/25 74/5 74/16
friends [2] 38/3 67/8
front [4] 14/19 17/16 23/22 35/11
full [5] 4/22 5/1 67/24 70/20 71/12
fully [1] 30/11
fundamentally [1]

80/24
funny [1] 49/22
further [13] 36/4 37/24 39/16 39/25 40/14 40/16 40/23 48/22 49/6 52/8 54/9 59/4 70/2
furthered [1] 70/17
furthermore [3] 44/20 51/8 53/13
future [5] 8/1 9/16 20/18 77/8 78/16

**G**

gamesmanship [2] 8/15 9/3
gang [1] 76/10
GELERNT [6] 1/18 2/9 2/11 3/22 54/21 59/19
general [7] 2/22 11/19 22/15 23/21 24/9 32/17 45/11 46/16 47/3 47/20 48/6 49/7 52/23 53/3 53/8 53/11 61/12
General...to [1] 49/1
generally [6] 10/18 13/25 41/7 44/14 52/12 61/22
generic [1] 42/1
geographically [1] 13/11
Germany [2] 12/15 42/7
get [30] 4/25 7/19 7/20 8/19 11/12 12/3 13/23 14/17 15/6 19/2 19/17 20/2 21/21 33/21 35/5 35/7 38/12 40/15 41/15 45/11 50/15 56/2 56/11 58/12 65/14 66/4 75/5 75/10 81/20 82/7
gets [1] 9/6
getting [5] 3/5 21/7 63/5 63/9 82/3
give [9] 9/2 9/17 22/3 23/11 37/6 40/3 43/8 68/4 73/2
given [8] 6/25 8/12 12/19 12/20 21/5 44/20 59/14 80/1
gives [1] 11/19 47/3
giving [1] 19/9
go [10] 4/20 14/3 18/4 20/4 42/18 59/10 60/11 61/9 70/10 77/13
goes [5] 27/23 39/9 39/17 41/15 42/17
going [51] 4/11 4/23 5/3 5/25 8/15 9/15 13/1 14/17 14/20 15/2 16/6 16/23 18/4 18/13 18/20 19/2 19/15 19/21 20/13 21/5 21/8 21/15 24/8 27/12 27/12 28/6 29/8 29/18 35/15 41/11 44/11 60/2 60/3 60/10 63/6 63/8 63/13 63/20 64/7 66/9 66/12 66/12 66/13 66/25 67/17

**G**

**going...** [6] 70/11 75/5 79/20 81/24 81/24 82/20
**happening** [2] 7/14 28/22
**happens** [2] 15/9 43/18
**happy** [6] 6/5 9/9 9/14 42/1 43/3 81/13
**hard** [1] 58/11
**hardship** [2] 74/22 79/13
**hardships** [3] 75/4 79/19 81/7
**harm** [56] 7/1 7/16 8/4 8/11 8/21 9/21 14/6 14/8 15/13 15/16 16/10 16/23 16/24 17/1 17/1 18/3 18/7 18/10 18/17 19/10 21/4 35/14 36/15 36/19 36/23 37/9 37/10 37/15 38/21 59/11 65/20 66/8 71/2 71/4 71/7 71/14 71/23 72/7 72/9 72/20 73/17 73/19 74/23 75/3 75/9 75/18 76/14 77/4 77/6 79/8 79/14 79/18 79/24 80/1 80/11 80/13
**harms** [2] 72/1 74/1
**harsh** [1] 75/16
**has** [74] 4/6 4/21 6/10 8/20 10/6 10/7 10/10 10/20 10/24 11/24 12/8 12/14 12/18 16/24 20/23 21/16 23/8 23/10 23/17 23/21 24/9 24/12 24/17 26/10 28/19 28/25 29/4 30/6 32/8 32/18 33/11 39/12 39/19 39/20 40/8 40/14 41/1 43/1 43/6 43/14 43/17 45/4 45/24 46/4 46/19 46/22 47/20 47/21 47/23 48/20 55/13 57/15 58/8 59/1 60/12 61/2 61/18 61/20 61/22 62/10 62/11 62/18 62/19 64/22 65/19 69/16 74/18 74/19 74/19 76/19 76/24 80/22 83/6 83/12
**hasn't** [6] 14/19 17/16 35/11 55/15 60/1 78/19
**have** [135]
**haven't** [8] 4/21 5/12 6/1 32/16 55/4 59/5 63/22 65/9
**having** [5] 9/5 19/14 29/9 30/13 44/9
**Hawaii** [1] 39/14
**he** [2] 22/2 56/9
**he's** [2] 16/14 16/20
**hear** [13] 20/1 21/8 21/13 21/25 42/1 48/20 48/24 54/2 65/25 81/13 82/12 83/13 83/16
**heard** [1] 70/6
**hearing** [7] 1/15 6/8 18/13 21/5 48/10 67/2

**heightened** [1] 69/3
**held** [5] 32/18 37/20 57/23 67/8 71/25
**helpful** [2] 67/15 71/5
**hence** [2] 48/7 53/23
**her** [1] 42/17
**here** [46] 3/3 3/7 8/15 9/6 9/19 9/20 18/5 19/13 19/24 22/20 23/1 23/5 25/5 26/5 30/20 32/13 34/9 35/9 35/25 36/16 36/23 38/1 41/12 44/24 45/19 46/2 46/4 50/9 50/10 59/11 60/24 61/6 62/9 70/22 71/13 73/10 73/18 74/5 76/6 76/18 77/17 78/18 79/21 80/11 80/25 83/10
**Here's** [1] 66/12
**hesitant** [2] 18/23 18/23
**hide** [1] 59/2
**high** [8] 10/9 26/13 26/21 26/23 51/2 67/25 69/6 71/7
**high-level** [4] 10/9 26/13 26/21 26/23
**higher** [1] 69/13
**higher-threat** [1] 69/13
**highly** [3] 52/22 51/11 74/15
**him** [1] 16/15
**his** [4] 30/22 42/17 65/13 74/9
**history** [1] 24/17
**hold** [8] 19/5 28/12 50/9 50/10 53/4 62/24 63/3 63/12
**holding** [3] 62/15 67/4 78/21
**holds** [1] 53/5
**home** [4] 41/14 42/17 45/6 80/2
**Homeland** [2] 28/25 67/21
**Honor** [78] 2/2 2/9 2/18 2/21 4/1 5/3 5/14 5/21 7/7 7/18 8/8 8/12 9/1 10/16 13/5 13/16 16/24 17/5 17/21 17/25 18/8 18/20 18/22 19/3 19/12 19/20 21/21 21/25 22/1 23/15 23/25 25/20 25/23 30/16 31/7 33/16 34/4 34/17 34/21 36/3 36/13 37/17 38/6 38/15 39/2 41/24 42/4 44/5 44/13 45/2 45/17 46/3 46/18 47/25 50/5 50/20 51/1 52/2 52/8 52/16 52/21 52/22 53/16 54/17 56/21 59/23 61/14 62/3 63/16 65/19 66/11 66/21 81/16 82/2 82/14 83/18 83/22 83/24
000090

**Honor's** [1] 63/21
**HONORABLE** [1] 1/15
**hope** [2] 25/3 29/8
**hopefully** [1] 6/15
**horrendous** [2] 26/16 26/17
**hotel** [1] 43/3
**hours** [1] 4/6
**house** [1] 69/6
**housed** [4] 69/11 69/22 70/8 72/2
**houses** [2] 69/12 69/14
**how** [23] 8/10 12/21 21/17 21/18 24/17 34/4 39/7 42/2 42/2 50/4 51/11 55/19 55/20 56/16 56/19 60/2 62/18 66/2 71/21 72/18 80/15 82/19 83/11
**however** [1] 33/3
**huge** [1] 55/9
**hypothesizing** [1] 17/11
**hypothetical** [11] 13/6 16/19 17/10 18/5 37/3 37/25 41/25 42/16 44/2 60/18 78/16
**hypothetically** [5] 14/14 16/1 41/8 41/17 47/19

**I**

**I'd** [4] 3/15 37/24 43/12 81/14
**I'll** [16] 3/18 3/19 4/2 6/11 6/24 22/4 34/17 34/21 53/15 54/23 55/1 70/10 75/8 80/21 82/12 82/18
**I'm** [30] 8/4 9/7 9/9 10/11 10/14 13/5 14/20 17/10 24/2 25/4 25/9 27/1 33/17 41/11 42/1 42/22 59/5 66/12 66/12 66/13 67/17 70/11 75/5 75/6 81/24 83/14 83/22 83/4 83/6 83/15
**I've** [8] 17/11 57/16 72/19 73/15 73/22 74/4 77/15 81/18
**i.e** [1] 62/7
**ICE** [4] 4/14 6/3 12/10 34/10 40/5 65/22
**ICE's** [2] 57/5 57/6
**Iceland** [3] 25/6 25/10 26/1
**idea** [1] 28/2
**identical** [2] 31/12 71/1
**ii** [1] 49/6
**III** [6] 15/1 38/15 38/18 73/23 77/12 77/23
**illegal** [1] 33/1
**illogical** [2] 29/13 39/21
**imagine** [8] 14/14 15/6 15/9 15/20 30/21 41/8 42/10 43/1
**Imam** [1] 47/11

**immediate** [1] 8/3
**immediately** [5] 7/21 8/20 21/14 63/25 82/9
**IMMIGRANT** [3] 1/3 2/3 67/6
**immigrants** [1] 11/15
**immigration** [11] 26/19 26/22 32/7 32/9 44/1 61/2 61/21 67/7 68/3 69/2 80/24
**immigration-related** [1] 69/2
**imminence** [5] 15/12 16/6 20/24 38/21 77/24
**imminent** [10] 8/4 14/8 14/25 20/23 67/14 71/9 75/11 77/15 77/16 82/25
**imminently** [2] 7/17 72/20
**imply** [1] 54/1
**important** [4] 6/22 24/16 43/15 79/9
**importantly** [1] 29/16
**impose** [1] 20/14
**imposes** [2] 51/7 51/23
**imposing** [1] 83/15
**impossible** [6] 39/3 41/2 44/25 45/6 60/14 79/3
**improper** [2] 33/4 33/8
**INA** [14] 11/19 11/25 22/14 23/18 23/22 25/10 47/2 49/14 50/2 61/18 61/21 61/24 62/6 62/18
**inability** [1] 4/9
**inaccessibility** [1] 74/7
**inapt** [1] 12/16
**include** [3] 47/14 49/16 76/21
**includes** [1] 75/21
**including** [5] 3/13 30/5 37/19 44/2 47/4
**incompetence** [1] 74/8
**inconsistent** [1] 53/5
**incorrect** [1] 9/10
**incredibly** [2] 50/23 50/24
**Indeed** [1] 77/21
**indicate** [1] 58/2
**indicated** [1] 57/19
**indicates** [1] 58/19
**indication** [2] 57/22 58/5
**Indiscernible** [1] 49/20
**individual** [2] 14/17 14/20
**individuals** [12] 10/1 13/22 14/11 19/2 19/13 19/22 21/6 55/14 56/5 56/23 59/12 77/20
**inform** [3] 20/21 71/4 76/20
**information** [4] 59/1 59/6 82/20 83/3
**informed** [1] 4/2
**informing** [1] 20/10

**governments** [1] 46/17
**grab** [2] 31/3 31/5
**grant** [4] 22/25 22/25 61/11 61/19
**granted** [3] 70/15 74/23 79/14
**grants** [1] 60/24
**great** [2] 71/9 75/11
**greater** [1] 52/25
**grew** [1] 68/4
**ground** [1] 48/17
**grounds** [3] 20/24 49/11 68/9
**group** [2] 56/4 58/21
**groups** [1] 38/4
**GTMO** [17] 5/2 14/17 15/2 15/4 15/24 16/6 16/15 18/6 27/4 33/4 33/14 35/15 35/25 69/4 72/14 74/12 75/16
**Guantanamo** [111]
**Guarantee** [1] 75/7
**Guard** [1] 69/10
**guards** [1] 6/15
**guess** [3] 22/24 25/2 60/11

**H**

**habeas** [7] 50/8 50/11 53/23 53/25 54/2 54/3 56/13
**had** [4] 4/7 36/2 42/7 47/9 57/15 59/5 78/19
**Haitian** [1] 23/19
**Haitians** [2] 12/1 51/2
**half** [1] 21/20
**hallmark** [1] 8/2
**hand** [2] 4/23 80/14
**handle** [2] 3/14 38/20
**handling** [2] 34/22 34/24
**happen** [4] 14/16 19/16 57/10 76/14
**happened** [8] 7/24 15/6

**going** column continues... (G section):
**G**
**20/23 36/2 38/13 43/7 57/23 78/19** — (from going [6])

[Note: additional G-section sub-entries appear at the top-left, listed below:]
**going... [6]** 70/11 75/5 79/20 81/24 81/24 82/20
**gone** [3] 8/24 20/24 83/6
**good** [14] 2/2 2/9 2/12 2/15 2/18 2/21 32/11 34/12 34/21 38/20 51/8 54/19 54/20 83/22
**Gospel** [2] 70/20 71/12
**got** [2] 15/20 42/10
**government** [130]
**government's** [32] 5/13 16/5 24/3 24/7 28/11 32/22 33/25 35/8 35/13 39/1 39/4 39/12 39/20 39/24 43/6 44/15 45/22 46/15 46/25 50/17 55/3 56/16 61/25 62/5 62/25 63/2 64/9 73/8 78/10 78/13 82/3 83/8

**I**

**inherent [4]** 24/10 45/20 60/20 62/11
**inherently [6]** 41/3 44/20 45/21 45/21 45/24 46/10
**initial [1]** 17/12
**initiate [2]** 20/19 20/20
**injunction [5]** 70/15 70/15 70/17 76/4 80/11
**injunctive [3]** 71/3 76/18 77/1
**injure [1]** 70/16
**injuries [2]** 71/8 75/10
**injury [12]** 15/1 15/1 70/14 73/1 74/2 75/15 76/3 77/13 77/13 77/23 78/1 81/4
**inquiry [1]** 72/16
**INS [1]** 65/22
**insist [1]** 9/1
**instead [2]** 51/16 52/23
**insufficient [1]** 36/17
**intend [3]** 11/9 11/13 19/10
**intended [4]** 32/25 39/4 42/12 58/6
**intending [1]** 19/17
**intends [2]** 42/16 69/6
**intent [2]** 11/10 42/8
**interacts [1]** 46/16
**interdicted [1]** 51/2
**interest [10]** 70/17 70/24 72/25 73/2 74/9 74/24 79/15 80/16 80/22 81/7
**interested [1]** 70/16
**interesting [1]** 40/4
**international [3]** 2/19 39/18 39/23
**interplay [1]** 38/21
**interpretation [2]** 22/23 25/23
**introduce [1]** 2/7
**involve [2]** 42/9 45/22
**involved [2]** 24/8 41/13
**involves [1]** 40/6
**involving [3]** 12/1 14/19 14/20
**irreparability [1]** 38/21
**irreparable [46]** 7/1 8/3 8/4 8/11 8/21 9/21 14/6 14/8 14/25 16/10 17/1 18/2 18/7 35/14 36/15 36/19 36/23 37/9 37/10 37/15 59/11 65/20 70/14 71/2 71/4 71/7 71/14 71/23 72/7 72/9 73/17 73/18 75/3 75/9 75/15 75/18 76/3 76/15 77/4 77/6 79/8 79/18 80/1 80/11 80/12 81/4
**irreparably [2]** 7/17 72/20
**is [276]**
**ish [2]** 52/13 52/13
**isn't [5]** 16/1 25/3

**issue [10]** 4/8 6/6 6/7 6/7 8/1 22/2 23/22 56/9 70/11 74/1
**issued [2]** 45/9 67/20
**issues [4]** 4/3 4/5 6/21 7/3 15/10 34/22 36/6 54/22 55/10 55/13 55/21 59/5 63/16 82/17
**it [176]**
**it's [70]** 4/12 4/14 4/23 6/2 6/7 7/24 8/2 8/8 8/16 8/18 9/3 10/1 11/3 11/11 11/14 11/20 13/14 18/19 19/23 20/15 20/17 20/20 20/21 21/19 25/5 25/13 26/1 26/16 27/1 27/16 28/1 28/14 28/21 30/13 31/18 33/8 33/9 33/16 38/8 39/3 39/9 40/19 43/5 44/24 45/17 46/8 48/3 48/18 49/14 50/3 50/10 53/9 53/17 54/10 58/10 58/11 59/1 59/8 60/3 60/6 60/18 61/16 62/2 62/14 63/23 64/18 66/16 71/5 78/19 82/24
**its [7]** 39/16 41/5 44/3 58/13 73/13 74/19 76/20
**itself [5]** 6/12 33/14 40/20 61/20 62/19

**J**

**Jama [3]** 40/5 40/17 64/25
**January [1]** 67/20
**Jennings [1]** 65/1
**Johns [4]** 1/23 84/6 84/11 84/12
**Joint [1]** 69/10
**JUDGE [2]** 1/16 20/24
**jurisdiction [9]** 17/6 17/17 48/20 48/24 54/15 73/22 74/19 78/6 78/6
**jurisdictional [5]** 37/19 48/9 49/3 49/11 63/16
**just [76]** 3/3 3/9 5/15 5/18 6/25 10/4 10/8 10/22 13/9 17/8 17/22 20/6 21/20 22/11 22/22 24/2 24/14 24/25 25/14 26/12 26/22 28/2 29/2 29/12 31/9 31/25 34/23 36/13 37/5 37/14 38/19 39/13 40/23 41/5 41/17 42/13 42/23 43/4 44/2 44/3 44/11 44/18 46/16 46/22 46/24 47/10 47/19 49/12 49/17 50/3 50/16 54/9 54/23 55/9 55/15 55/24 56/3 58/10 59/9 59/19 59/20 59/23 60/5 60/11 62/25 63/8 63/25 64/3 64/13 67/17 70/25 73/12 75/9 78/2

**J** (cont) 80/21 63/20

**Justice [1]** 1/21 40/5
**justification [1]** 4/18
**justify [3]** 30/1 33/18 65/20

**K**

**keep [3]** 7/23 46/5 46/24
**Keflavik [1]** 25/6
**Kenya [2]** 40/12 40/13
**Key [3]** 13/1 13/6 30/21
**kicks [4]** 23/14 48/12 48/19 49/3
**kind [6]** 23/3 23/13 56/17 56/18 57/15 60/8
**kingpin [1]** 41/9
**knew [1]** 27/20
**know [48]** 5/1 7/22 9/11 11/23 14/11 15/11 18/4 18/22 19/23 20/9 20/14 21/3 21/14 21/15 24/20 26/23 26/24 27/14 29/6 29/10 30/4 31/9 32/21 33/24 35/15 36/9 37/13 38/14 39/8 39/22 44/18 45/6 45/19 51/9 52/16 52/18 57/10 62/14 66/17 66/17 81/17 82/4 82/9 82/18 82/19 82/21 82/22 83/8
**knowledge [1]** 83/1
**known [2]** 59/6 70/19
**knows [2]** 5/21 62/3
**KRISTI [4]** 1/6 1/12 2/4 2/6

**L**

**lack [8]** 35/2 35/14 71/16 73/23 78/3 78/5 78/5 78/6
**laid [3]** 68/15 70/25 72/19
**land [1]** 49/10
**landed [1]** 40/12
**language [4]** 7/13 45/15 47/10 49/15
**languages [4]** 6/2 6/4 58/17 71/17
**largely [1]** 76/15
**LAS [10]** 1/3 2/3 21/17 67/6 68/7 70/10 71/2 77/9 80/6 81/9
**last [3]** 4/6 45/9 58/2
**laughter [1]** 49/21
**law [14]** 4/15 4/19 10/11 26/18 32/8 33/21 40/16 48/13 48/14 55/23 60/10 77/13 78/25 80/20
**law...no [1]** 48/23
**lawful [1]** 48/5
**lawfully [1]** 80/18
**lawfulness [1]** 16/9
**lawsuit [1]** 68/7
**lawyer [1]** 63/20
**lawyers [1]** 4/10 66/5 76/17

**lay [1]** 37/15
**layout [1]** 6/16
**lays [1]** 56/22
**lead [1]** 3/23
**learn [1]** 15/22
**least [24]** 6/18 8/17 9/2 9/8 15/2 15/6 21/2 22/25 32/11 32/17 33/6 37/8 37/11 38/14 42/8 47/2 47/12 52/15 66/15 67/16 68/5 76/25 78/3 80/25
**leave [4]** 36/4 36/11 39/19 51/8
**ledger [1]** 18/18
**LEE [2]** 1/18 2/9
**legal [6]** 67/7 70/1 72/11 72/18 72/21 73/22
**legitimate [1]** 32/14
**lengths [1]** 58/9
**lenient [1]** 76/5
**less [5]** 4/5 46/1 46/4 51/17 56/3
**let [22]** 3/3 3/9 6/12 15/11 19/23 24/6 39/6 40/3 40/3 42/13 49/12 59/23 60/11 61/13 61/13 66/17 72/20 82/4 82/8 82/19 82/21 82/22
**let's [6]** 9/22 14/14 22/11 37/4 47/19 83/4
**level [6]** 10/9 26/13 26/21 26/23 65/15 75/25
**Liberties [1]** 1/18
**Liechtenstein [1]** 45/3
**light [5]** 18/8 55/12 55/13 71/13 76/16
**like [36]** 3/15 4/23 15/7 15/8 15/14 17/19 20/20 21/9 21/24 22/1 24/13 29/24 31/3 31/5 34/15 35/3 38/22 39/9 42/7 44/10 45/20 50/2 50/8 54/6 57/17 60/6 63/17 64/25 66/15 81/14 81/14 81/17 81/19 83/8 83/21 83/23
**likelihood [10]** 15/14 70/13 73/20 75/3 76/7 76/12 77/9 78/7 79/18 79/25
**likely [19]** 14/21 19/6 36/15 36/19 36/23 37/13 53/16 73/4 73/21 73/23 74/19 74/20 76/3 77/12 77/25 78/2 79/4 79/11 81/5
**likewise [1]** 80/22
**limit [2]** 43/17 46/8
**limitation [1]** 43/15
**limitations [1]** 43/23
**limited [1]** 65/13
**limits [1]** 43/20
**line [2]** 49/21 59/21
**lines [1]** 33/19
**linked [1]** 67/3

**literally [1]** 30/7
**litigate [3]** 16/8 56/7 74/13
**litigation [3]** 56/8 56/16 57/16
**little [6]** 8/15 24/25 33/16 42/1 42/15 66/16
**living [1]** 80/5
**located [1]** 57/6
**location [1]** 58/24
**locations [1]** 47/16
**locator [2]** 57/5 59/1
**logical [1]** 30/7
**logistical [3]** 30/2 55/10 55/12
**long [7]** 12/10 12/10 14/18 32/8 59/10 60/3 63/5
**longer [10]** 6/19 27/14 53/10 56/1 66/16 72/2 72/3 72/16 74/1 80/1
**look [5]** 19/1 36/18 59/4 61/9 66/6
**looked [1]** 32/22
**looking [4]** 21/19 21/20 24/7 44/14
**Loper [1]** 23/2
**Lopez [2]** 55/2 58/18
**lose [1]** 62/23
**loss [2]** 29/15 75/13
**lost [2]** 39/16 40/14
**lot [2]** 28/24 56/2
**low [1]** 65/15
**low-level [1]** 65/15
**lower [1]** 69/14
**lower-threat [1]** 69/14
**Lujan [1]** 54/14
**lurking [1]** 8/1
**lying [1]** 51/13
**Lyon [1]** 35/3

**M**

**made [3]** 4/6 29/2 55/15
**MAIKER [2]** 1/9 2/5
**mail [1]** 70/1
**main [1]** 4/8
**majority [2]** 40/5 69/1
**make [15]** 5/18 21/18 29/19 43/4 46/1 49/12 55/24 56/4 59/15 61/6 61/7 69/24 70/4 73/4 73/9 73/12 80/8
**makes [1]** 1/4 29/12
**making [3]** 33/17 57/3 69/17
**manage [1]** 51/11
**managed [2]** 54/22 55/10
**mandated [1]** 80/23
**manifest [2]** 62/16 63/7
**manner [2]** 47/24 64/21
**manufacture [1]** 73/12
**many [6]** 26/21 26/22 29/21 30/19 69/2 78/24
**March [4]** 1/5 1/11 68/19 84/11

**M**

**March 1st [1]** 68/19
**mass [3]** 32/25 33/11 33/12
**material [2]** 15/5 76/20
**materials [1]** 3/12
**matter [8]** 25/23 53/12 60/6 62/2 74/13 78/2 79/1 84/8
**matters [2]** 3/13 80/24
**may [22]** 3/25 5/5 5/7 5/15 6/7 14/1 17/3 18/23 19/6 19/21 21/13 29/21 31/24 43/16 43/23 60/17 60/17 67/14 69/24 72/14 75/24 78/8
**maybe [9]** 4/24 6/14 7/25 16/21 18/24 20/14 60/18 61/1 65/7
**me [43]** 3/3 3/9 9/8 14/19 14/21 15/4 15/5 16/11 17/16 20/10 26/2 35/12 35/17 36/1 37/6 37/6 37/12 37/16 39/6 40/3 40/3 41/7 42/13 43/24 44/3 47/10 49/12 50/9 50/10 54/7 59/23 60/11 61/13 61/13 63/17 74/22 76/20 78/19 79/13 81/3 83/5 83/10 83/12
**mean [20]** 6/11 7/4 8/7 13/18 14/1 16/23 26/16 29/12 29/24 31/16 33/3 37/18 39/17 41/4 47/11 57/11 61/20 78/5 78/6 82/19
**meaning [1]** 11/2
**means [5]** 19/9 46/24 47/3 60/24 62/8
**mechanical [1]** 1/25
**mechanisms [1]** 21/10
**media [1]** 9/12
**meet [2]** 4/7 71/7
**meeting [1]** 6/22
**meetings [1]** 71/16
**member [5]** 71/24 72/6 72/8 74/11 74/16
**members [5]** 59/3 71/19 71/25 72/2 72/6
**membership [1]** 76/10
**memorandum [8]** 10/8 26/11 26/11 27/18 27/24 28/5 63/24 67/20
**men [2]** 5/22 76/8
**mental [1]** 74/7
**mention [3]** 5/15 12/5 27/20
**mentioned [3]** 44/3 58/25 79/20
**mere [2]** 36/17 76/5
**merely [2]** 52/24 53/4
**merge [2]** 70/24 74/25
**meritorious [1]** 77/2
**merits [18]** 15/14 22/12 30/11 32/1 37/19 38/23

**message [1]** 29/18
**MIA [1]** 45/9
**Miami [1]** 39/22
**might [11]** 38/17 41/25 42/1 50/8 55/21 56/7 56/8 56/13 56/13 56/18 59/13
**Migrant [5]** 10/14 10/19 67/23 69/13 69/22
**migration [1]** 33/1
**miles [1]** 39/17
**military [2]** 18/16 25/16 25/22 26/17 47/14 47/22 49/16 49/19 50/1 67/19 67/19 78/14
**mind [2]** 6/23 65/25
**minimal [2]** 64/5 75/14
**minimum [7]** 6/5 9/1 28/17 35/24 36/1 64/8 67/3
**minor [1]** 58/16
**minute [1]** 14/12
**minutes [2]** 21/15 66/15
**missing [2]** 13/5 25/9
**mission [2]** 55/13 55/19
**missions [1]** 47/15
**MOC [10]** 10/9 26/12 26/14 27/19 27/20 63/25 64/1 64/1 65/14 65/14
**modest [1]** 80/13
**Monaco [1]** 45/3
**Monday [1]** 58/4
**money [1]** 73/13
**month [2]** 43/17 56/3
**months [1]** 63/4
**Moore [2]** 66/17 66/23
**moot [2]** 21/23 74/3
**mooted [1]** 38/12
**more [25]** 6/14 7/3 14/16 19/8 19/21 20/9 21/20 21/21 24/25 29/13 29/16 36/13 40/6 42/15 44/14 51/13 58/8 58/8 58/16 58/19 58/19 73/5 73/9 76/22 77/23
**Moreover [2]** 76/13 76/19
**morning [1]** 2/12
**Morton [1]** 53/6
**most [6]** 6/22 35/2 52/9 58/1 64/11 79/9
**motion [8]** 68/15 68/20 76/24 77/1 77/2 81/9 81/11 82/15
**motions [6]** 3/7 3/17 3/19 66/25 70/11 81/25
**motive [1]** 32/18
**mouth [1]** 6/11
**move [4]** 15/3 25/4 25/5 44/16
**moved [6]** 8/25 9/19

**moving [5]** 7/23 8/13 13/20 13/24 70/12
**Mr [1]** 2/17
**Mr. [6]** 2/11 2/23 3/2 3/22 54/21 59/19
**Mr. Ensign [1]** 2/23
**Mr. Flentje [1]** 3/2
**Mr. Gelernt [4]** 2/11 3/22 54/21 59/19
**Ms [1]** 2/14
**Ms. [6]** 2/20 2/25 34/23 54/18 66/17 66/23
**Ms. Alagesan [1]** 2/20
**Ms. Moore [2]** 66/17 66/23
**Ms. Wilson [2]** 2/25 34/23 54/18
**much [14]** 3/6 14/11 29/12 33/25 34/4 34/19 35/3 42/7 52/25 54/12 54/12 55/25 61/23 73/5 **must [7]** 70/13 71/8 73/1 74/6 75/9 76/2 77/14
**mute [3]** 3/5 49/23 59/21
**my [13]** 9/9 41/25 66/13 72/23 73/16 74/15 76/21 77/2 77/5 77/23 78/12 79/21 83/1
**myself [1]** 21/4

**N**

**N-K-E-N [1]** 80/15
**Nabisco [1]** 44/23
**Nairobi [1]** 40/8
**narrow [3]** 41/12 44/14 54/22
**narrowed [1]** 4/3
**nationalities [5]** 5/23 6/1 52/10 52/14 76/9
**nationals [3]** 68/6 77/19 77/22
**native [1]** 68/18
**nature [14]** 6/14 12/20 23/11 27/3 27/4 27/6 30/23 31/11 41/4 41/6 44/21 45/21 79/3 79/7
**Naval [3]** 67/5 67/17 67/23
**nearly [1]** 54/12
**Nebraska [1]** 23/8
**necessarily [9]** 40/25 61/1 62/6 62/7 63/1 71/4 72/13 72/16 78/22
**necessary [7]** 5/5 5/8 50/23 58/20 58/20 58/22 59/15
**need [10]** 7/12 19/17 28/15 32/11 35/20 55/8 66/15 75/3 79/18 80/9
**needed [3]** 51/13 63/24 70/5
**needs [3]** 63/1 70/3 77/7
**negotiate [1]** 56/2
**negotiations [1]** 43/2

**neither [2]** 72/9 73/13
**net [2]** 47/2 47/2
**Net-net [1]** 47/2
**never [14]** 10/6 10/7 11/5 12/8 12/18 23/8 23/10 24/12 40/15 42/12 60/19 62/10 62/18 62/25
**new [8]** 1/20 13/1 20/21 28/18 51/16 51/18 57/8 57/8
**news [2]** 29/2 29/3
**next [13]** 8/23 38/3 67/8 68/4 72/23 72/25 73/25 74/5 74/16 75/6 81/15 82/15 83/9
**next-friend [5]** 72/23 72/25 73/25 74/5 74/16
**NICHOLS [2]** 1/15 10/24
**night [1]** 58/2
**nine [1]** 15/19
**Nken [1]** 80/15
**no [81]** 1/4 1/10 6/18 6/22 7/10 7/12 7/13 7/16 7/19 7/20 8/10 8/21 9/5 9/13 9/21 9/21 11/9 13/7 13/7 13/18 13/21 17/5 17/20 19/7 19/25 21/7 21/7 23/24 25/15 25/20 25/20 25/25 27/15 28/23 30/12 30/20 31/8 31/14 34/12 34/17 36/23 38/8 38/8 40/6 40/18 45/3 46/22 47/1 47/17 50/9 50/10 53/10 60/9 60/23 61/10 63/7 63/7 64/22 65/10 65/20 71/20 72/2 72/3 72/7 72/9 72/16 72/17 72/24 73/18 74/1 74/11 74/18 74/19 75/3 75/19 77/17 79/18 79/25 80/1 80/4 80/10 83/24
**nobody [2]** 5/2 7/4 8/7 8/21
**NOEM [6]** 1/6 1/12 2/4 2/6 67/7 67/11
**non [2]** 50/18 57/16
**non-Guantanamo [1]** 57/16
**nonarbitrary [2]** 47/23 50/18
**noncitizen [1]** 39/10
**none [4]** 14/25 75/22 79/5 79/6
**normal [1]** 16/24
**normally [1]** 61/8
**not [141]**
**note [4]** 23/16 37/24 43/12 53/15
**noted [4]** 21/16 40/5 51/1 52/22
**notes [1]** 44/23
**nothing [1]** 51/4
**notice [18]** 7/13 7/19 7/20 7/20 7/21 8/14 9/2 15/2 15/6 15/18 19/9

**[2]** 34/4 35/23 38/10 69/16 83/10 83/21
**notices [1]** 71/17
**notify [4]** 14/21 35/17 35/18 36/1
**notwithstanding [1]** 48/23
**now [47]** 4/21 4/23 5/2 5/22 7/5 7/24 8/6 9/22 12/4 12/14 15/11 15/24 16/5 16/12 16/15 18/3 18/23 18/23 19/17 22/2 22/11 24/21 26/2 28/3 28/16 28/20 28/22 30/6 34/17 43/4 49/25 50/3 55/20 56/3 57/12 59/1 60/5 63/23 64/6 65/8 65/15 65/15 66/21 68/13 70/10 73/5 74/12
**number [7]** 28/17 37/18 40/8 55/10 59/25 64/5 68/4
**numerous [1]** 48/8
**NY [1]** 1/20

**O**

**objection [2]** 13/18 81/14
**objections [3]** 13/19 13/20 80/4
**observations [1]** 77/22
**obtain [2]** 70/12 73/6
**obvious [1]** 51/12
**obviously [24]** 5/25 6/22 9/12 10/4 19/13 20/14 22/4 24/6 24/9 26/3 26/7 27/20 29/25 31/16 33/25 35/2 38/24 45/14 47/16 56/6 63/11 67/2 78/17 78/18
**occur [3]** 69/23 76/23 80/11
**occurred [4]** 38/10 56/15 71/14 83/12
**occurs [1]** 83/12
**off [4]** 7/23 8/14 9/1 41/25
**offer [1]** 83/2
**offered [1]** 30/7
**officer [1]** 12/10
**official [3]** 1/24 77/17 84/12
**officials [1]** 42/6
**often [1]** 48/18
**okay [18]** 3/22 9/22 13/8 13/13 14/3 25/24 26/2 34/25 36/8 36/12 47/23 52/19 57/24 60/12 82/12 83/17 83/21 83/25
**old [1]** 57/9
**once [9]** 8/19 11/17 40/11 40/25 48/2 49/24 60/16 61/4 82/7
**one [57]** 4/24 5/21 7/3 7/10 7/12 7/13 8/9 9/13 9/21 9/24 14/16 14/24 15/3 15/17 16/18 17/22

000092

**O**

**one... [41]** 18/2 18/7 20/10 20/17 20/20 20/21 32/13 32/17 35/25 37/3 38/11 38/14 38/23 40/4 40/7 40/18 42/9 46/13 51/11 52/10 53/4 54/9 54/14 56/18 56/19 58/23 59/8 59/19 59/24 61/14 63/15 64/8 68/17 69/12 71/16 73/19 76/14 76/22 80/12 82/24 83/5
**ones [1]** 73/13
**only [9]** 4/4 5/22 5/24 10/9 37/5 53/20 63/9 71/17 82/5
**open [5]** 24/15 58/19 72/14 78/11 78/13
**open-ended [1]** 72/14
**opening [1]** 50/18
**operate [1]** 43/25
**operation [4]** 56/3 69/10 69/14 70/4
**operational [1]** 70/3
**operations [7]** 10/14 10/19 33/2 44/21 45/20 67/23 69/22
**opinion [1]** 45/9
**oppose [1]** 76/25
**opposed [2]** 23/21 53/12
**opposition [2]** 14/23 14/24
**oral [1]** 66/14
**orally [1]** 67/1
**order [25]** 1/15 16/11 16/14 16/15 18/3 18/5 18/5 22/9 30/22 36/5 37/11 37/14 39/10 41/10 44/16 50/23 55/8 56/12 64/22 68/8 71/5 75/20 81/25 83/14 83/17
**ordered [2]** 27/4 52/7
**ordering [1]** 83/5
**orders [13]** 3/8 12/25 25/6 39/14 49/1 52/1 56/11 67/4 67/12 68/22 70/8 76/8 80/17
**originally [1]** 5/21
**other [49]** 4/22 4/24 5/8 5/10 6/7 13/19 14/4 15/19 18/18 21/17 21/22 23/7 27/2 28/9 29/17 30/5 30/7 31/12 32/19 35/24 37/18 38/13 41/13 43/8 43/22 45/10 46/2 48/23 51/5 51/9 56/14 56/14 56/17 57/15 58/16 58/17 59/21 62/1 70/16 71/17 71/18 72/5 74/8 75/22 78/2 78/8 78/21 79/25 80/14
**others [1]** 28/11
**otherwise [7]** 9/2 16/16
9/9 32/11 31/3 58/1 81/19
**our [21]** 11/5 11/7 18/8 24/21 25/25 31/16 31/21 32/2 32/15 35/19 35/21 39/2 44/5 58/18 59/16 59/25 62/23 63/11 63/14 66/7 83/19
**ours [1]** 25/19
**out [28]** 5/24 6/9 6/21 8/5 13/23 14/12 16/24 20/19 21/19 28/16 30/16 38/12 39/4 42/15 43/2 46/24 55/3 56/22 57/2 57/5 60/16 61/14 67/15 68/15 70/25 72/19 74/12 82/21
**outcome [1]** 73/3
**outside [2]** 10/23 23/10
**outstanding [1]** 4/8
**over [7]** 34/16 39/17 39/23 43/8 68/4 72/6 74/19
**overcome [1]** 45/15
**overlapping [2]** 48/9 49/4
**overnight [1]** 51/20
**overseas [6]** 42/3 44/18 47/22 49/16 61/12 78/15
**overview [1]** 10/4
**owed [1]** 23/3
**own [6]** 5/13 28/11 73/1 73/13 74/9 74/13

**P**

**p.m [2]** 66/20 84/1
**page [2]** 36/18 39/9
**page 14 [1]** 39/9
**page 25 [1]** 36/18
**Palm [4]** 30/17 30/21 30/23 31/25
**panoply [1]** 37/20
**papers [2]** 8/25 10/5
**parachuting [1]** 45/7
**paragraph [3]** 55/2 58/18 82/24
**parcel [4]** 12/6 24/14 62/9 63/10
**part [18]** 11/10 12/6 15/2 22/25 24/14 28/9 32/19 32/25 33/12 34/7 42/8 42/11 47/12 55/5 62/9 63/8 63/10 63/20
**participating [1]** 3/4
**particular [14]** 12/12 13/6 13/20 14/1 30/14 39/8 47/6 49/19 50/1 53/4 62/22 72/13 73/9 83/6
**particularized [2]** 77/14 78/1
**particularly [3]** 36/24 37/25 46/9
**parties [8]** 4/3 46/5 52/5 52/8 68/14 70/6 70/16 76/13
**parties' [2]** 3/11 71/13
parts [3] 27/21 32/19 61/14
**party [11]** 3/4 70/12 72/23 72/24 73/1 73/18 73/18 74/5 74/8 74/18 74/19
**Paso [7]** 27/7 39/23 43/5 56/12 56/18 56/20 56/24
**past [2]** 10/11 10/21
**path [1]** 56/22
**pattern [1]** 5/3
**pending [5]** 13/2 15/4 22/17 35/16 57/15
**Pennsylvania [1]** 1/22
**Pension [1]** 75/6
**people [64]** 5/7 5/8 5/23 7/21 7/23 8/13 8/18 8/19 8/23 9/16 10/7 10/23 11/8 11/17 12/17 13/2 14/1 18/13 18/20 19/5 21/23 22/17 26/12 26/15 27/9 27/17 27/19 28/12 28/18 28/19 28/21 28/24 29/10 29/11 29/15 29/17 30/2 30/15 30/16 30/25 31/10 33/14 40/11 43/2 52/13 53/17 54/4 54/5 57/13 60/15 60/17 62/14 62/20 62/24 63/3 63/12 63/24 64/1 64/2 64/5 65/15 65/15 66/4 71/18
**per [1]** 27/25
**perhaps [12]** 3/20 4/5 15/8 20/10 22/9 27/16 36/22 37/4 44/13 53/13 61/11 80/15
**period [7]** 41/18 42/3 43/10 52/15 55/15 56/1 71/10
**periods [1]** 75/14
**permissible [1]** 29/20
**permits [1]** 80/19
**person [32]** 4/9 4/15 4/19 5/11 6/23 7/10 15/10 18/6 41/17 41/18 41/19 42/3 42/16 42/18 42/19 42/19 42/22 42/22 42/23 42/25 43/8 43/9 54/25 55/4 55/22 56/6 57/6 58/14 58/15 59/24 60/10 71/16
**person's [1]** 41/21
**personnel [2]** 69/11 69/21
**perspective [3]** 5/19 47/1 56/16
**petition [3]** 56/13 64/20 64/23
**petitioner's [1]** 40/9
**phone [7]** 3/5 3/5 4/12 4/13 49/23 59/21 69/25
**phrasing [1]** 33/16
**physical [3]** 62/15 62/22 76/9
**physically [1]** 41/22
pick [1] 13/9
**picked [2]** 10/18 10/23
**piece [1]** 33/19
**place [6]** 44/10 49/16 55/20 56/2 56/14 76/16
**places [5]** 12/13 22/16 25/11 44/7 47/4
**plaintiff [11]** 2/8 2/16 7/2 15/22 37/8 54/7 71/8 73/12 75/9 76/17 81/13
**plaintiff's [2]** 8/3 42/9
**plaintiffs [99]**
**plaintiffs' [12]** 37/2 38/24 39/7 40/11 51/25 71/3 76/11 78/8 78/16 79/22 81/1 81/10
**plane [6]** 40/2 60/16 62/12 62/24 63/12 82/7
**play [4]** 25/22 42/15 43/21 43/23
**playing [2]** 16/18 46/24
**pleadings [1]** 76/25
**please [3]** 2/7 3/5 49/23
**plenty [1]** 28/16
**plus [1]** 18/15
**point [21]** 7/19 8/8 14/11 15/12 16/8 19/20 22/1 29/2 33/17 34/2 36/20 37/10 45/2 49/24 59/24 60/13 60/24 63/2 65/8 66/7 74/11
**pointed [3]** 16/24 30/16 61/14
**points [8]** 6/25 28/16 54/24 58/16 71/15 71/22 72/7 72/19
**policies [1]** 58/5
**policy [8]** 6/14 30/14 45/23 46/16 53/11 54/11 67/4 77/18
**posing [1]** 25/14
**position [24]** 10/6 11/25 12/2 22/24 23/9 24/13 25/25 37/13 39/1 39/2 39/10 39/18 43/6 43/12 44/5 50/15 55/3 61/25 63/12 63/14 72/12 83/9 83/19 83/21
**possibility [4]** 36/17 76/5 76/7 76/11
**possible [4]** 21/2 21/3 54/11 71/15
**possibly [2]** 8/10 66/14
**post [2]** 27/3 52/7
**post-removal-ordered [1]** 52/7
**posted [1]** 69/16
**posting [1]** 71/16
**potential [5]** 20/18 43/20 50/6 72/3 77/8
**potentially [3]** 18/23 37/11 60/25
**powers [1]** 62/3
**practices [3]** 5/11 8/5 76/16
preclude [1] 79/1
**precluding [1]** 28/8
**preclusion [1]** 50/2
**predicated [1]** 9/5
**preliminary [2]** 71/3 76/2
**premises [1]** 69/23
**prepare [1]** 3/9
**prepared [7]** 22/7 35/17 35/18 83/2 83/12 83/16 83/17
**presence [1]** 80/17
**present [7]** 14/21 41/23 67/25 69/7 70/6 74/6 77/7
**presented [3]** 36/6 40/19 50/21
**presently [7]** 27/3 35/13 51/25 52/1 52/6 77/6 83/4
**preservation [1]** 80/22
**President [5]** 27/16 27/20 65/12 65/13 67/20
**President's [7]** 10/7 26/10 26/11 27/23 28/3 28/5 52/24
**press [1]** 56/8
**pressed [1]** 56/9
**presumption [21]** 11/22 12/20 22 13/14 32/12 34/8 44/21 45/13 45/14 45/15 45/18 45/24 46/5 46/22 47/1 61/5 61/10 61/15 61/20 61/23 62/3 62/4
**presumptive [1]** 43/17
**pretty [4]** 11/20 38/20 43/24 55/3
**prevailed [1]** 31/10
**prevent [2]** 16/3 48/9
**preventing [1]** 68/11
**previously [4]** 6/19 58/25 71/25 75/20
**primarily [1]** 76/7
**primary [1]** 54/25
**prime [1]** 68/24
**principally [1]** 51/1
**prior [2]** 24/5 56/24
**priority [2]** 67/25 69/7
**prison [5]** 53/16 53/17 53/18 53/20 67/19
**prisoners [1]** 4/17
**prisons [1]** 34/9
**private [3]** 46/5 46/14 69/23
**probably [6]** 19/16 33/24 53/15 58/8 66/14 81/17
**problem [10]** 5/25 7/19 8/20 19/25 31/8 63/13 73/13 73/14 75/19 79/7
**problems [2]** 21/16 72/3
**procedure [1]** 69/17
**procedures [7]** 55/20 57/6 59/10 59/12 59/13 59/16 70/4

94

**P**

proceed [1] 23/25
proceeding [3] 48/15 80/19 82/15
proceedings [3] 1/25 84/1 84/7
process [10] 10/3 12/6 31/1 32/6 34/13 52/20 62/17 64/23 78/23 83/11
produce [1] 63/22
produced [1] 1/25
proffer [2] 9/8 9/9
profile [1] 68/24
programmatic [1] 30/13
progress [1] 4/6
prohibited [1] 7/13
Project [1] 2/19
prolongs [1] 80/20
prompt [1] 80/16
promptly [1] 82/22
pronounce [1] 80/15
proper [3] 32/16 32/18 34/3
proposition [4] 22/21 40/17 52/5 53/3
prosecute [1] 74/9
prove [1] 61/23
proves [1] 33/24
provide [7] 35/22 37/22 59/12 59/14 66/13 67/24 83/19
providers [1] 67/7
provides [3] 48/12 48/13 48/22
providing [5] 5/24 48/13 55/4 58/19 82/20
provision [8] 23/22 23/25 23/25 47/21 48/23 61/19 61/19 64/18
provisions [4] 12/21 50/2 62/6 64/15
proximate [1] 13/12
public [11] 9/11 9/11 49/21 70/17 70/24 74/24 79/15 80/16 80/22 81/7 83/20
publicity [2] 28/24 34/5
publicly [1] 15/8
published [2] 45/8 45/8
punitive [1] 33/22
pure [1] 22/22
purely [2] 76/6 79/24
purported [1] 15/16
purpose [3] 32/14 33/22 34/4
purposes [7] 14/21 26/17 32/9 32/17 33/14 37/9 74/3
put [14] 3/5 6/11 7/8 10/19 13/1 13/2 18/10 32/16 34/3 49/18 55/20 63/8 77/5 80/17
putting [3] 40/7 44/10 64/11

**Q**

question [30] 14/18 17/3 17/5 17/12 22/14 22/21 22/23 23/25 24/21 25/20 26/3 26/18 27/15 27/24 29/25 30/1 30/20 32/6 44/17 46/12 50/4 53/8 55/7 56/7 61/15 61/16 65/24 73/21 78/10 82/12
questions [9] 17/2 23/3 26/4 37/2 38/23 48/13 48/14 60/12 79/21
quick [1] 20/7
quicker [1] 83/15
quickly [9] 8/14 21/18 21/18 64/3 65/10 66/2 82/10 82/19 83/2
quite [3] 32/23 44/24 53/13
quote [7] 33/3 70/12 70/18 70/19 78/9 80/21 80/21
quote/unquote [1] 78/9

**R**

raise [4] 36/11 40/18 80/4 81/14
raised [1] 53/23
rare [1] 32/1
rate [1] 52/25
rather [6] 48/7 49/8 51/20 64/1 72/13 77/7
rationale [9] 28/10 28/23 29/10 29/16 32/16 33/5 46/5 46/21 51/12
rationales [2] 65/6 65/7
RCR [2] 1/23 84/12
reach [7] 4/13 20/19 21/18 53/7 58/13 73/9 82/21
reached [1] 55/4
reaching [1] 73/7
reactions [1] 47/25
read [1] 47/18
reading [1] 10/5
ready [3] 64/2 65/14 80/8
real [8] 20/6 21/4 23/3 23/6 63/13 65/7 72/24 74/8
reality [2] 64/7 64/7
really [15] 6/7 6/22 12/5 18/19 27/11 28/14 40/4 47/21 49/5 49/5 61/6 62/5 62/9 65/20 81/14
realm [1] 76/11
realtime [1] 83/2
reason [22] 12/24 16/22 20/2 23/16 24/19 29/7 30/7 30/9 34/12 42/20 43/13 44/6 46/25 47/17 51/8 53/9 60/9 65/11 73/15 74/11

reasons [12] 13/19 34/13 46/21 50/16 50/17 53/25 63/21 73/22 77/15 79/8 81/2 82/1
reattempted [1] 43/15
rebuttal [1] 3/20 59/19
rebutted [3] 44/24 45/19 61/16
receive [1] 70/1
recent [4] 23/7 52/9 58/1 67/4
recess [4] 66/13 66/16 66/20 66/24
recognize [2] 5/1 61/4
recognized [7] 36/14 43/17 46/19 50/7 50/11 53/22 54/14
recognizes [1] 43/16
record [20] 2/8 3/11 9/7 27/2 27/3 29/1 50/21 52/3 56/21 56/22 57/25 58/12 63/22 65/8 66/6 66/22 77/19 79/4 82/1 83/20
recorded [1] 1/25
redressed [1] 77/7
reference [1] 55/23
refers [1] 44/15
reflect [4] 27/2 27/3 29/1 81/18
reflection [1] 66/24
refuel [3] 12/15 42/7 60/17
refueling [1] 62/12
Refugee [1] 2/19
refuses [1] 42/21
regarding [1] 80/24
regularly [1] 40/7
regularly-scheduled [1] 40/7
regulatory [1] 46/6
rejected [1] 48/4
rejects [1] 36/17
related [3] 33/2 47/10 69/2
relatedly [1] 37/1
relating [1] 34/22
relationship [1] 72/24
relatively [2] 38/10 67/8
relatives [1] 73/25
release [1] 42/6
relevant [8] 9/6 14/22 23/1 23/6 28/1 28/7 41/12 57/14
relief [11] 37/22 50/12 68/12 70/22 71/3 71/4 76/2 76/18 77/1 77/3 79/14
rely [1] 30/24
relying [1] 12/12
remained [1] 43/9
remaining [5] 4/5 54/24 71/15 71/22 82/16
remediable [1] 37/16

remediation [2] 41/10 75/12
remind [1] 59/20
remotely [1] 34/11
removable [1] 80/18
removal [72] 11/8 11/14 12/6 12/9 12/11 12/13 12/19 12/24 13/3 22/17 24/9 24/14 24/15 25/6 27/3 28/23 30/22 32/25 33/2 33/2 33/11 33/12 33/20 39/10 39/14 39/15 39/19 39/25 40/1 40/9 40/13 40/22 40/24 41/4 41/10 42/11 42/12 43/7 43/14 43/16 44/8 44/16 44/21 44/25 45/20 48/12 49/1 52/1 52/7 56/12 56/12 57/21 62/7 62/9 62/15 62/18 62/20 63/9 63/11 64/17 64/20 64/21 67/4 67/12 68/22 70/7 75/20 76/8 78/22 78/24 80/17 80/19
removals [4] 41/3 48/18 50/24 52/25
remove [5] 11/13 43/22 45/5 48/15 60/15
removed [6] 11/8 39/12 40/15 41/10 42/5 68/16
removing [3] 28/20 29/9 40/6
render [1] 76/10
renew [1] 37/7
renewed [4] 53/10 76/18 76/24 77/2
renewing [1] 77/1
reopened [1] 57/21
repaired [1] 16/10
reparability [1] 37/15
reparable [1] 37/11
repatriated [1] 68/17
repeat [3] 21/4 68/12 70/11
repetition [2] 7/25 38/16
reply [3] 36/18 36/21 66/7
reported [1] 52/17
Reporter [3] 1/23 1/24 84/12
reporters [1] 9/12
reporting [1] 9/11
reports [2] 29/2 29/3
represent [2] 73/10 76/18
representation [1] 24/5
representations [2] 24/7 71/13
represented [2] 15/11 76/19
represents [1] 70/2
reputational [1] 75/18
request [4] 35/1 57/3 65/14 69/17
requested [1] 70/22
requests [1] 59/16

**R**

require [2] 54/3 79/13
required [2] 3/21 72/25
requirement [2] 20/15 51/23
requirements [1] 46/6
requires [1] 36/16 74/22
requiring [1] 18/6
reside [1] 69/12
resolution [1] 66/14
resolve [3] 5/8 36/22 55/21
resolved [3] 5/6 5/12
resolving [1] 59/11
resources [2] 73/6 73/8
respect [1] 74/5
respectfully [2] 12/7 22/2
respond [2] 36/20 52/19
response [1] 50/19
responsible [1] 28/4
rest [1] 67/18
restraining [3] 1/15 3/7 66/8
restricting [1] 68/11
restriction [1] 59/3
restrictions [1] 37/21
result [5] 7/3 20/16 58/6 78/2 81/2
resulted [1] 55/14
retain [1] 17/5
retained [2] 69/24 80/7
retrieved [1] 42/11
return [1] 16/15
returned [3] 42/17 52/14 57/20
returns [1] 42/22
reveal [1] 58/24
review [12] 8/1 38/17 48/14 50/2 50/13 50/17 64/10 64/20 64/23 65/2 65/4 79/1
reviewable [1] 64/12
Reviewed [1] 3/10
reviews [1] 49/6
revisit [1] 55/18
right [70] 6/24 7/7 7/9 7/11 7/15 7/18 8/6 8/7 9/19 10/13 10/22 11/4 11/19 13/23 14/5 14/7 15/17 15/23 15/25 16/2 16/4 16/7 16/12 16/13 16/17 17/11 17/14 17/18 18/23 18/23 19/17 19/19 20/12 21/1 21/11 22/6 22/8 22/10 22/19 23/2 24/4 24/11 25/23 26/6 26/9 26/15 26/25 30/3 30/6 31/1 33/10 33/15 33/22 37/1 37/23 43/10 43/19 46/11 52/12 56/18 57/12 60/5 61/3 61/13 61/17 65/8 65/15 65/15 66/5 81/23

**R**

**Right.l** [1] 45/8
**rights** [3] 2/16 4/12 75/14
**rise** [1] 66/19
**risk** [1] 69/3
**RJR** [1] 44/22
**Romania** [1] 12/15
**room** [1] 69/23
**rooms** [1] 69/19
**rounds** [1] 6/21
**route** [1] 78/21
**RPR** [2] 1/23 84/12
**rule** [3] 19/8 29/22 29/24
**ruling** [1] 81/21
**run** [4] 50/1 56/14 61/24 70/23
**rush** [1] 65/11
**rushed** [1] 65/10

**S**

**safe** [1] 41/19
**said** [19] 4/21 6/11 9/17 10/8 10/24 25/4 26/12 26/13 27/13 32/21 51/15 54/21 61/20 63/25 66/2 72/21 74/25 76/24 81/18
**Sale** [5] 12/1 23/19 61/21 61/25 61/25
**same** [11] 9/20 12/9 12/16 12/19 25/25 31/24 32/10 33/13 51/24 71/11 76/5
**Sarah** [1] 2/24
**satisfied** [1] 15/12
**satisfy** [1] 64/9
**say** [53] 3/11 3/16 5/16 5/22 6/9 6/16 6/18 9/10 9/14 9/15 10/1 10/18 16/22 17/22 18/19 19/1 19/6 19/7 19/17 20/22 21/13 23/5 24/6 26/12 26/24 27/17 28/21 29/6 30/11 31/9 32/3 32/24 33/19 38/9 41/11 47/22 50/16 52/6 54/10 59/9 61/23 63/6 63/15 63/21 63/24 64/3 64/4 68/25 71/22 75/5 80/21 82/5 83/9
**saying** [26] 6/13 7/14 9/20 11/13 12/4 12/10 13/22 15/17 16/12 17/25 19/24 23/22 27/19 28/3 28/14 29/23 30/18 33/11 33/13 33/21 60/14 62/5 62/21 63/10 65/14 65/25
**says** [5] 8/21 11/9 12/12 22/15 64/17
**scale** [1] 54/13
**Scalia** [1] 40/5
**scarce** [1] 50/24
**schedule** [4] 55/11 57/8 68/15 82/9

**scheduled** [1] 40/7
**se** [1] 27/25
**search** [2] 34/11 57/4
**searches** [2] 27/12 65/21
**seas** [1] 51/2
**second** [17] 5/5 9/22 22/11 28/9 34/7 34/22 39/18 47/10 57/13 59/19 74/21 75/8 79/10 79/23 80/4 80/5 80/7
**secondly** [1] 10/1
**secret** [1] 15/7
**Secretary** [3] 28/25 67/21 67/21
**Section** [3] 49/4 49/6 50/12
**security** [11] 28/25 55/6 55/8 55/12 59/24 59/25 60/3 60/7 60/7 67/22 69/20
**see** [11] 4/10 12/21 16/18 16/19 19/4 19/19 22/4 23/15 37/21 55/19 71/21
**seek** [4] 5/11 68/20 73/10 76/18
**seeking** [1] 76/2
**seem** [5] 15/4 15/7 19/7 34/6 52/9
**seemed** [1] 42/8
**seems** [8] 5/2 5/4 6/17 15/8 28/23 43/24 44/10 74/15
**seen** [1] 4/18
**selection** [1] 48/4
**self** [1] 4/14
**self-evident** [1] 4/14
**send** [20] 9/16 9/25 18/20 18/24 19/2 19/10 19/18 21/22 26/13 27/17 27/19 29/18 62/23 63/6 64/1 65/11 65/14 65/15 65/15 70/1
**sending** [21] 5/7 5/22 12/17 21/6 26/21 28/17 28/19 28/22 28/24 29/11 29/12 29/14 29/17 30/2 30/3 30/14 30/16 33/13 63/23 64/2 64/5
**sense** [10] 9/5 11/3 28/7 41/22 46/2 53/20 61/6 61/7 62/17 78/20
**sent** [20] 5/9 5/23 7/21 16/20 18/16 22/3 26/15 29/4 35/25 56/6 58/3 62/17 66/2 66/8 66/9 67/9 70/8 74/12 75/24 80/2
**sentence** [3] 28/14 30/8 64/8
**separate** [2] 26/18 69/19
**separately** [1] 33/1
**separation** [1] 62/2
**serious** [4] 17/2 17/7 30/9 78/10

**seriously** [2] 60/22 63/5
**service** [1] 67/7
**set** [2] 55/24 57/19
**sets** [1] 55/2
**setting** [1] 37/9
**several** [1] 47/25
**shackled** [1] 18/14
**shackling** [3] 27/11 34/11 65/21
**shall** [2] 12/15 48/24
**share** [3] 59/5 59/7 69/1
**sharing** [1] 59/6
**she** [1] 56/9
**short** [3] 36/24 55/14 69/20
**should** [11] 15/5 18/3 23/7 23/11 35/1 47/18 51/16 51/20 54/1 74/13 82/22
**shouldn't** [2] 37/14 51/15
**show** [3] 57/25 70/13 73/18
**showing** [1] 60/6
**shows** [1] 39/7
**side** [1] 18/18
**significant** [6] 6/6 18/17 55/6 65/16 65/16 72/24
**significantly** [5] 4/3 26/10 54/22 80/25 81/8
**similar** [1] 53/25
**simple** [1] 50/22
**simplest** [1] 36/22
**simply** [8] 11/13 40/16 51/7 51/22 56/4 58/11 58/20 63/11
**since** [9] 4/3 4/6 4/19 5/17 15/7 40/9 60/9 63/23 73/25
**single** [2] 36/21 52/10
**sir** [1] 3/24
**site** [1] 67/19
**sitting** [1] 44/8
**situations** [2] 8/9 32/1
**six** [4] 43/17 63/4 69/19 69/19
**six-month** [1] 43/17
**skepticism** [1] 23/6
**slash** [2] 3/8 15/1
**slightly** [1] 60/23
**small** [1] 58/9
**so** [144]
**soil** [3] 11/6 11/18 40/24
**solitary** [1] 18/15
**solution** [1] 18/24
**Somalia** [2] 40/6 40/16
**some** [28] 3/5 18/10 19/20 19/21 25/5 31/3 31/5 33/20 38/17 41/12 41/13 41/18 42/8 43/16 45/6 51/13 56/8 56/13 56/14 58/5 62/6 65/4 65/8 67/15 74/4 76/8 77/8 78/21
000095

**somebody** [2] 48/23
**someone** [10] 18/1 20/17 20/20 42/9 56/12 56/17 57/20 62/12 63/4 66/1
**something** [14] 13/6 13/9 25/9 50/8 51/7 55/15 55/17 57/22 58/21 59/2 66/15 75/5 83/14 83/21
**sometimes** [2] 18/14 44/25
**somewhat** [2] 13/11 72/11
**somewhere** [4] 26/1 40/1 41/9 43/3
**sorry** [2] 31/4 31/6
**sort** [15] 9/3 17/24 18/22 21/25 28/9 28/11 29/17 32/14 45/5 51/19 54/12 59/14 64/6 65/23 79/15
**sought** [3] 68/8 68/12 73/17
**sound** [2] 50/8 53/23
**Sounds** [1] 83/22
**Southern** [1] 69/10
**space** [6] 28/16 33/2 44/1 60/17 64/4 67/24
**Spanish** [4] 5/24 6/3 69/17 71/17
**speak** [9] 6/3 6/12 35/21 41/14 44/1 54/23 57/8 69/17 80/3
**speaking** [3] 10/18 13/25 52/13
**speaks** [2] 55/5 56/21
**specific** [6] 19/8 25/11 27/18 60/12 68/24 68/25
**specifically** [6] 6/16 10/9 36/16 44/17 47/13 55/7
**specificity** [1] 18/11
**speculated** [1] 20/22
**speculative** [1] 79/24
**spend** [1] 17/4
**spending** [1] 58/10
**spends** [1] 18/2
**squarely** [2] 40/19 48/5
**St** [1] 1/19
**Stacy** [4] 1/23 84/6 84/11 84/12
**stage** [1] 33/2
**staging** [3] 28/21 48/11 48/17
**staked** [1] 50/3
**stand** [1] 5/16
**standard** [6] 36/17 50/16 64/24 70/25 71/7 76/5
**standards** [3] 62/13 65/22 65/22
**standing** [18] 35/2 35/14 36/4 36/6 36/13 37/9 72/23 72/25 73/1 73/13 73/23 74/3 74/5 74/6 74/17 77/12 78/3

**standpoint** [1] 11/5
**start** [8] 3/16 4/2 10/8 26/12 50/1 59/24 63/25 81/13
**started** [3] 14/3 63/23 64/2
**state** [2] 3/9 80/5
**stated** [3] 77/15 80/14 82/1
**statement** [2] 24/9 43/11
**STATES** [35] 1/1 1/16 13/15 25/12 35/9 39/11 39/15 39/19 40/22 41/22 42/5 42/12 42/18 42/22 42/24 43/5 43/9 44/19 45/22 46/9 47/7 47/17 48/16 51/6 52/14 56/10 57/12 57/20 67/13 68/1 68/23 69/8 70/9 75/21 80/20
**States'** [2] 43/12 67/3
**Station** [3] 67/5 67/17 67/23
**status** [1] 41/21
**statute** [9] 11/10 12/12 16/25 23/6 23/13 24/25 60/25 78/11 78/14
**statutes** [2] 12/5 24/10 45/14 62/22
**statutory** [17] 9/25 11/7 11/16 22/22 24/21 25/23 26/4 26/4 28/4 29/23 29/24 31/16 49/8 49/17 60/11 60/13 75/13
**stay** [6] 41/18 68/20 71/1 79/12 81/5 81/11
**staying** [1] 6/25
**stays** [1] 3/8
**stenography** [1] 1/25
**step** [3] 24/20 34/17 40/16
**stepping** [1] 40/24
**steps** [3] 39/6 81/15 81/20
**still** [11] 4/8 17/16 17/17 21/2 35/16 47/23 56/3 65/4 65/5 65/5 66/7
**stood** [2] 51/20 51/21
**stop** [1] 13/23
**stopgap** [1] 63/3
**stopover** [2] 12/15 42/7
**straight** [1] 26/22
**strange** [1] 45/6
**streamlined** [1] 80/19
**stretch** [1] 44/10
**strip** [3] 27/12 34/11 65/21
**structures** [1] 47/14
**stuff** [1] 16/9
**subject** [1] 82/9
**subjected** [1] 18/25
**subjective** [1] 11/10
**submissions** [2] 35/19 35/22

**S**

submit [2] 58/8 83/10
submitted [4] 3/12
3/13 66/6 69/5
subsided [1] 72/1
substantial [1] 70/13
substantially [3] 27/6
70/16 79/22
substantive [3] 10/3
32/5 52/20
succeed [4] 74/20 79/4
79/11 81/6
succeeded [1] 32/1
success [9] 74/14
70/13 73/20 75/3 77/9
78/7 79/18
successful [2] 58/1
58/7
such [13] 37/22 38/16
39/4 39/17 48/20 51/9
54/2 59/3 71/19 72/9
74/7 76/23 77/19
sudden [5] 8/24 8/25
12/4 19/25 51/10
sue [1] 54/3
sued [3] 38/1 38/4 38/4
suffer [6] 35/14 70/14
73/17 77/25 80/1 81/4
suffered [3] 7/2 7/17
75/16
suffering [2] 72/7 77/6
suffers [1] 18/2
sufficient [3] 15/13
55/3 64/8
sufficiently [1] 73/2
suggest [4] 11/11
32/23 41/11 59/10
suggested [1] 66/4
suggesting [1] 27/1
suggests [2] 51/4
58/11
suit [1] 20/21
supplemental [1]
36/10
supplemented [1]
48/22
supplies [1] 65/7
supplying [1] 63/20
support [1] 3/17
supporting [2] 3/12
69/16
supposed [1] 59/7
Supreme [11] 12/1
23/17 40/4 40/20 43/16
44/22 46/19 54/13
64/25 65/2 80/14
sure [7] 5/18 9/7 16/14
33/17 49/12 64/14
72/21
surge [1] 51/10
surrebuttal [1] 3/21
system [1] 41/3
systemic [1] 19/22

**T**

take [20] 7/18 9/7
15/13 24/20 34/4 37/13

39/8 42/21 42/24 43/6
43/15 55/11 56/14 60/3
61/13 66/13 66/15
67/22 68/4 81/19
taken [8] 10/6 11/24
17/11 23/8 24/12 43/1
48/15 66/20
takes [1] 41/20
taking [3] 3/22 8/14
21/19
talk [4] 24/17 54/8
81/15 82/18
talked [2] 27/10 44/2
talking [13] 10/11
10/14 16/9 19/7 22/18
24/2 34/23 36/24 37/14
41/16 48/4 49/25 57/16
talks [1] 24/13
targeting [1] 77/19
Task [1] 69/10
tattoos [2] 69/2 77/20
teed [1] 81/6
telephone [3] 49/21
57/3 58/25
telephones [1] 69/19
tell [8] 5/7 15/5 37/6
41/7 71/18 77/18 83/5
83/12
telling [1] 82/2
tells [1] 83/10
temporary [5] 1/15 3/7
68/8 70/22 78/21
ten [25] 6/4 7/12 18/4
19/8 19/13 19/22 20/10
20/17 20/20 20/21
21/15 22/20 35/9 37/4
57/11 67/12 68/2 68/21
75/22 75/22 76/15
76/22 77/17 77/21 83/5
ten minutes [1] 21/15
term [3] 11/3 25/5
42/23
terms [1] 82/14
terrible [1] 25/3
territory [2] 10/24
13/14
terrorist [1] 41/10
test [1] 65/6
Texas [4] 16/15 30/23
31/25 68/3
than [18] 4/5 21/20
27/6 29/17 30/7 34/9
34/10 36/13 40/7 46/2
47/18 49/8 51/17 51/20
56/3 60/19 64/1 77/7
thank [22] 2/13 3/6 4/1
20/4 31/6 34/18 34/19
36/12 49/23 54/16
54/17 59/17 59/18
59/23 66/10 66/11
66/17 66/23 81/16
82/11 82/14 83/25
that [535]
that's [84] 5/25 6/13
6/13 6/14 7/14 9/7 9/9
9/10 9/14 10/16 12/2
12/6 13/11 14/13 15/7
17/23 18/8 18/16 20/24

22/17 22/24 23/22 24/10
24/15 26/18 27/16 29/2
29/3 33/13 33/15 37/17
38/6 38/13 39/20 40/9
40/16 43/11 44/5 44/9
44/9 44/11 44/13 46/3
46/8 46/18 48/22 50/5
50/12 51/7 51/22 52/2
52/17 53/21 55/15
55/17 55/24 56/14 58/8
58/14 58/15 59/7 60/8
60/19 60/19 60/20 62/8
62/18 62/24 63/8 63/9
63/11 63/13 64/23
64/25 65/1 65/23 65/24
66/5 68/25 74/21 76/4
80/15 80/21 81/10
their [64] 3/17 4/11
6/11 8/25 12/2 12/25
13/3 13/20 14/22 14/24
14/24 21/16 27/13 31/12
32/17 32/23 33/6 36/18
36/21 38/3 38/13 38/19
39/8 39/9 39/18 40/12
45/6 48/2 51/15 51/19
53/4 54/3 57/4 57/5
57/8 57/20 58/24 58/24
62/25 64/11 66/5 67/14
68/18 68/20 69/15
69/25 72/1 72/2 72/6
72/8 73/1 73/8 73/25
74/3 74/13 75/2 76/9
77/22 78/3 78/16 79/17
80/2 80/4 81/8
them [52] 4/13 4/24
4/25 6/4 7/1 8/14 10/25
11/13 15/18 17/6 18/4
18/24 18/25 26/22
26/23 27/10 29/12 30/3
31/23 36/5 39/16 42/6
45/5 45/7 51/20 52/10
54/3 54/4 57/4 57/8
57/15 59/15 60/6 60/9
62/24 63/7 63/8 64/21
65/11 65/12 65/15
68/24 72/20 73/2 73/5
73/6 73/11 75/18 76/18
79/5 82/21 82/21
themselves [5] 57/2
72/9 72/10 72/12 72/22
then [45] 3/19 8/14
8/24 8/25 15/13 19/25
21/21 26/7 26/13 28/1
29/12 30/3 30/4 33/3
33/20 33/25 35/22 36/6
37/15 42/21 42/3 43/18
47/6 47/13 48/4 48/7
49/3 49/17 50/1 50/5
53/5 53/8 56/25 57/6
57/13 58/23 59/12 61/4
61/9 61/10 61/15 62/5
62/23 63/13 83/13
theories [1] 75/19
theory [2] 40/11 40/12
there [101]
there's [66] 4/16 7/4
7/13 7/25 8/7 8/15 8/21
8/21 9/13 9/20 9/21
000096

17/5 18/14 18/15 19/10
19/25 20/1 23/3 23/24
25/20 26/3 26/4 27/15
28/13 28/16 28/24
30/12 32/11 32/14 34/8
34/12 34/13 36/23
39/22 41/12 43/1 47/1
47/17 49/18 49/24 50/6
51/4 51/8 51/12 55/7
55/9 57/25 60/5 60/9
61/10 61/14 62/15 63/7
63/7 63/19 64/22 65/4
65/20 75/3 78/10 79/18
82/6
thereafter [1] 37/6
therefore [6] 7/17 8/19
50/13 61/23 79/6 80/10
thereof [1] 47/12
these [49] 2/2 6/25
7/16 8/5 9/25 12/21
13/22 14/11 14/25
17/13 17/15 18/20 19/2
19/13 19/22 20/10
20/17 20/20 20/21 21/6
28/13 38/12 49/4 50/15
54/15 56/11 59/13 61/1
62/21 65/11 68/21
71/21 71/22 72/3 72/7
72/12 72/18 74/16
74/25 75/19 75/22
75/22 76/10 79/21
79/21 79/24 80/25 81/2
82/23
they [130]
they'll [2] 9/20 66/3
they're [39] 5/24 6/8
6/9 6/10 8/24 12/3 12/5
12/12 12/25 15/2 20/1
22/3 26/17 28/17 28/22
30/2 30/11 31/1 33/6
33/11 33/16 33/17
33/17 34/9 35/9 35/15
42/18 42/19 43/3 43/4
46/6 50/18 53/14 58/6
60/2 62/21 64/5 78/3
82/7
they've [9] 9/17 32/16
34/3 34/5 55/20 59/14
63/23 66/2 66/4
thing [9] 9/20 12/9
12/19 20/22 21/22
29/22 54/9 60/19 82/5
things [11] 5/15 16/12
16/17 18/15 20/6 43/2
45/10 45/23 52/21
63/15 74/4
think [148]
thinking [1] 45/11
thinks [1] 38/12
third [5] 10/2 49/3
72/23 73/1 74/5
third-party [1] 72/23
73/1 74/5
this [106]
those [42] 3/13 5/16
7/3 8/9 10/17 10/22
18/15 18/25 20/18

2 7/24 31/10 31/25 32/1
33/18 34/5 34/13 37/20
40/11 40/15 46/21
47/16 51/11 52/13
52/13 53/23 54/4 55/11
55/12 55/20 55/25
56/23 56/23 57/13 60/7
62/14 69/15 70/19
72/19 73/7 74/1 79/8
79/25
though [4] 18/3 40/18
59/4 81/21
thought [1] 40/18
thoughts [1] 66/14
thousands [3] 19/18
19/18 39/17
threat [2] 69/13 69/14
three [11] 6/25 7/16 8/5
9/24 41/20 54/23 71/15
71/18 72/3 72/7 72/19
threshold [1] 76/12
through [13] 3/13 5/12
16/11 26/2 37/11 53/23
64/13 64/23 72/23 74/4
77/7 77/13 83/14
thrust [1] 37/2
thus [3] 69/3 74/18
80/7
tick [1] 64/13
tie [1] 72/22
TikTok [1] 16/24
time [28] 5/3 7/22 8/24
12/10 13/25 15/15 32/8
36/11 36/21 36/24
41/18 42/3 43/16 51/19
52/15 55/11 55/15 56/1
56/2 57/8 58/9 71/5
75/14 77/3 77/25 82/16
83/6 83/19
times [1] 40/9
today [9] 3/10 9/8 67/1
76/19 81/3 81/21 82/1
83/7 83/23
Today's [1] 67/2
together [4] 3/16 74/24
79/15 79/16
told [6] 6/1 6/9 11/25
20/2 23/17 71/18
too [12] 14/11 33/25
42/12 44/9 43/12 44/13
45/2 47/9 53/2 61/23
63/5 76/5
took [1] 56/1
Tort [1] 46/20
touch [1] 66/4
touchstone [1] 71/3
towards [1] 73/13
traditional [1] 62/13
transcript [2] 1/15 1/25
transcription [2] 1/25
84/7
transfer [25] 17/13
17/22 30/18 30/22
31/24 41/19 67/14
68/21 68/25 69/4 75/18
76/6 76/11 76/14 76/21
77/16 77/19 78/17
78/18 78/20 78/24

**T**

transfer... **[4]** 79/24 81/11 82/22 83/12
transferred **[10]** 15/18 18/1 35/15 37/4 39/13 48/7 56/24 68/2 76/17 78/4
transferring **[1]** 26/12
translate **[1]** 6/4
translation **[1]** 6/6
translations **[1]** 58/20
transport **[1]** 41/14
transportation **[2]** 60/3 60/21
trauma **[1]** 18/15
travel **[1]** 63/7
tricky **[1]** 33/16
tried **[4]** 12/14 28/21 30/25 31/10
TRO **[32]** 8/2 8/4 8/10 14/22 14/24 16/1 18/3 19/25 20/24 22/2 35/1 36/23 36/25 37/7 39/9 54/23 68/12 68/15 70/11 70/12 70/25 73/17 73/19 74/23 75/10 77/2 77/7 77/10 79/12 81/4 81/9 81/25
TRO/emergency **[1]** 79/12
TROs **[1]** 66/14
trouble **[1]** 29/9
true **[5]** 6/13 9/14 27/1 63/11 78/18
Trump **[1]** 67/20
truncated **[1]** 50/22
try **[3]** 7/22 21/23 27/13
trying **[5]** 8/4 12/3 13/9 30/11 33/18
turn **[3]** 3/18 3/19 9/22 34/16 42/8 54/7 54/7 67/12 68/19
turning **[5]** 71/2 73/20 75/8 77/9 79/12
TVPA **[2]** 45/11 46/11
twice **[1]** 7/24
two **[19]** 11/7 18/7 18/17 20/6 32/4 32/13 41/20 57/11 58/12 58/16 60/18 63/15 67/2 68/4 69/12 69/20 70/23 71/16 82/6
type **[2]** 19/21 60/7

**U**

U.S **[19]** 1/21 4/13 6/19 10/23 11/6 11/18 17/23 28/19 28/23 30/3 40/9 41/17 46/15 48/21 60/16 61/12 67/19 67/19 76/4
UAE **[2]** 40/12 40/13
ultimately **[2]** 33/19 65/18
unable **[2]** 43/22 68/9
unconstitutionality **[1]** 32/12

uncontroversial **[1]** 40/18
under **[16]** 10/2 11/10 16/6 23/7 23/25 38/12 38/25 40/11 40/12 41/1 47/21 49/2 65/6 65/21 78/11 78/14
undermines **[1]** 80/18
understand **[13]** 4/11 4/11 4/22 5/18 7/1 8/8 10/17 13/13 15/21 17/20 20/5 24/7 49/12
understanding **[4]** 9/8 18/22 51/24 52/3
understood **[11]** 12/8 12/11 12/18 24/17 60/20 62/10 62/18 62/19 62/25 63/1 83/18
underway **[1]** 73/14
undo **[1]** 18/6
unexpectedly **[1]** 46/6
unilateral **[1]** 5/13
unimportant **[1]** 38/8
Union **[1]** 1/18
unique **[2]** 8/13 74/4
UNITED **[37]** 1/1 1/16 13/15 25/11 35/9 39/11 39/15 39/19 40/21 41/22 42/5 42/12 42/18 42/22 42/24 43/5 43/9 43/12 44/19 45/22 46/8 47/6 47/17 48/16 51/6 52/14 56/10 57/12 57/20 67/3 67/13 67/25 68/23 69/7 70/9 75/20 80/20
universe **[2]** 22/17 72/14
unlawful **[1]** 25/12
unlawfully **[3]** 16/25 67/25 69/7
unless **[6]** 5/6 13/5 25/9 35/10 45/4 60/11
unlike **[1]** 80/6
unlikely **[1]** 74/15
unmistakably **[1]** 29/19
unnecessary **[1]** 53/7
unprecedented **[2]** 10/5 23/11
unquestionably **[1]** 75/15
unquote **[1]** 78/9
until **[7]** 35/10 41/18 42/5 63/4 66/16 78/3 83/16
unused **[2]** 51/3 51/14
up **[17]** 5/16 10/18 10/23 11/21 15/13 17/11 19/17 20/13 26/12 27/18 27/19 30/19 51/20 51/21 63/25 64/1 81/6
Upon **[1]** 66/24
urge **[1]** 22/2
us **[14]** 4/19 6/1 6/19 7/19 8/18 8/20 9/17 60/2 60/9 60/15 66/1 82/9 82/19 82/22

use **[9]** 27/13 35/4 37/9 48/3 51/6 51/15 53/20 57/6 62/3
used **[4]** 48/17 51/1 51/1 52/23
using **[4]** 25/4 42/23 51/20 52/22
utility **[1]** 23/7

**V**

value **[1]** 51/17
various **[5]** 3/11 25/22 30/25 50/16 68/12
Vega **[1]** 55/2 58/18
Venezuela **[3]** 67/9 68/18 69/1
Venezuelan **[5]** 5/22 52/11 68/6 77/19 77/22
versus **[2]** 2/4 2/5
very **[23]** 3/6 4/12 17/8 25/10 27/18 30/9 30/14 32/3 34/19 36/7 41/5 47/9 51/8 53/21 54/12 54/12 55/14 55/24 58/9 60/19 80/13 80/25 82/10
vested **[1]** 48/20
Vetcher **[2]** 50/7 53/22
VI **[10]** 18/13 26/16 27/17 27/20 64/3 65/16 66/9 69/12 69/18 69/20
view **[17]** 18/1 18/8 22/23 23/6 25/2 35/8 41/12 44/7 49/24 72/23 73/16 74/15 76/21 77/2 77/5 77/23 79/21
viewed **[1]** 60/25
violation **[3]** 10/3 34/14 80/20
violations **[2]** 26/22 69/2
visit **[3]** 6/23 7/10 58/4
visits **[3]** 4/9 55/11 60/10
voluntarily **[2]** 20/10 39/11
vs **[2]** 1/5 1/11

**W**

wait **[1]** 82/6
walk **[3]** 14/12 26/2 69/20
walked **[1]** 74/4
want **[19]** 6/11 13/21 15/18 21/4 21/25 25/4 32/3 36/9 41/11 52/19 55/24 56/7 56/8 56/13 56/13 59/13 63/16 64/13 83/14
wanted **[6]** 5/15 20/6 24/23 30/22 49/5 59/20
war **[6]** 4/15 4/19 10/12 26/18 55/23 60/10
warranted **[2]** 3/20 15/15
was **[51]** 12/10 13/9 17/22 20/9 21/7 21/7 23/19 25/14 27/18 28/7 000097

use **[5]** 35/4 37/9 38/1 39/8 40/1 40/17 42/11 43/22 49/22 51/2 51/3 51/13 51/21 51/21 52/10 53/5 53/6 53/8 55/23 56/1 57/6 57/20 57/21 57/22 58/2 58/3 58/23 63/5 63/12 64/2 65/2 65/10 65/12 65/13 66/20 68/7 68/10 68/17 68/19 75/20 79/20
Washington **[3]** 1/7 1/13 1/22
wasn't **[5]** 11/2 27/19 43/7 58/20 82/25
water **[3]** 16/6 31/3 31/5
waters **[2]** 39/18 39/23
wave **[4]** 52/9 68/6 68/10 68/16
way **[25]** 4/24 8/5 12/3 12/15 12/16 19/12 24/11 33/16 33/20 36/22 38/11 38/14 42/4 45/11 46/16 49/18 59/11 62/10 62/16 62/25 63/1 63/9 64/22 65/20 76/20
ways **[6]** 7/17 29/21 30/19 59/12 61/1 61/8
wayside **[2]** 20/25 61/7
we **[136]**
we'd **[1]** 21/21
we'll **[3]** 9/18 19/19 82/21
we're **[35]** 3/7 5/3 5/7 6/5 6/18 6/18 8/9 18/12 18/20 19/2 19/9 19/21 21/5 21/8 21/15 22/17 28/2 28/4 28/6 29/15 29/18 30/8 30/13 30/18 33/13 41/16 49/17 49/24 49/25 57/18 59/2 59/3 60/2 63/6 63/8
we've **[11]** 4/6 7/19 16/9 18/19 19/1 54/21 59/6 59/8 59/10 66/6 67/9
website **[2]** 57/5 57/7
Wednesday **[1]** 83/9
week **[2]** 45/9 83/9
weeks **[2]** 58/12 68/4
weigh **[2]** 74/22 79/13
weight **[1]** 64/12
weird **[1]** 53/21
weirdest **[1]** 53/15
well **[34]** 5/18 8/12 9/3 10/10 11/13 12/4 15/2 15/20 17/3 19/11 22/4 28/2 28/18 31/13 31/15 32/3 36/14 38/3 38/9 40/3 46/20 47/23 47/25 49/3 61/5 62/5 63/6 63/21 70/19 71/9 75/11 77/11 79/10 80/10
well-known **[1]** 70/19
went **[2]** 21/15 32/22
were **[42]** 5/22 6/19

10/23 11/5 11/17 12/11 14/16 15/3 15/10 16/11 17/23 17/24 24/20 30/16 34/23 35/25 36/7 37/15 38/1 38/4 42/10 51/2 52/9 52/14 55/25 57/13 57/23 58/2 58/16 64/3 68/6 68/9 68/14 70/15 71/25 72/10 72/15 76/14 76/23 77/1 80/12 82/22
weren't **[3]** 58/6 59/7 63/21
West **[7]** 13/1 13/6 30/17 30/21 30/21 30/23 31/25
what **[38]** 3/9 3/10 3/15 6/16 6/17 7/1 8/16 14/8 17/23 18/12 21/5 22/4 23/3 24/2 26/15 29/1 29/6 29/10 30/23 38/13 38/23 41/12 41/21 44/2 50/14 60/13 62/5 63/20 65/19 66/12 79/20 81/14 81/18 81/19 81/24 83/8 83/13 83/16
what's **[12]** 4/11 18/10 19/15 21/5 28/22 31/20 35/8 38/25 44/11 50/19 52/17 64/7
whatever **[10]** 12/24 13/19 30/21 41/10 42/20 43/5 43/13 43/21 46/25 53/9
whatsoever **[2]** 36/20 50/9
when **[13]** 5/7 16/25 19/7 41/21 53/25 54/2 61/7 62/15 75/5 78/18 79/5 80/9 82/6
where **[22]** 6/10 6/22 7/14 8/13 11/20 14/3 26/16 34/10 40/5 43/13 43/18 45/23 45/23 46/9 50/11 57/5 62/14 63/6 65/23 70/22 74/25 75/9
whether **[29]** 15/13 16/8 17/12 20/17 21/8 22/14 22/21 25/25 26/17 35/8 35/15 38/24 39/11 44/11 46/12 49/17 50/4 55/7 57/10 57/14 57/22 58/24 61/15 61/16 73/21 78/10 78/13 81/18 83/14
which **[31]** 14/6 17/11 19/12 23/13 30/20 32/19 37/3 41/3 43/25 44/14 45/3 46/16 47/7 48/5 48/22 50/7 51/21 51/25 52/25 53/17 55/13 60/24 61/2 62/22 69/12 69/14 76/21 78/25 79/2 79/15 81/11
while **[10]** 4/23 5/5 6/16 15/4 35/16 57/23 63/23 68/14 75/17 79/8

**W**

**who [22]** 3/3 7/12 7/13 8/5 10/23 11/17 12/10 12/24 14/1 19/10 27/10 39/10 56/17 57/12 57/13 57/13 67/13 68/22 71/25 72/14 75/20 76/18
**who's [4]** 15/11 18/1 41/10 57/18
**whole [4]** 24/15 37/19 54/13 63/4
**wholly [1]** 68/11
**whose [1]** 41/12
**why [21]** 15/12 15/15 16/10 16/18 16/19 20/2 23/16 24/15 27/16 28/12 30/2 31/11 33/17 55/4 64/25 65/1 66/15 74/8 74/11 81/13 83/9
**will [37]** 3/22 4/25 6/15 9/10 9/15 9/17 10/25 11/15 14/12 19/5 19/6 24/6 27/13 29/4 29/9 31/9 34/23 37/6 59/22 65/25 66/1 66/1 66/17 68/12 70/2 73/17 75/18 76/19 80/1 80/7 81/4 81/9 81/25 82/4 83/1 83/14 83/18
**willing [4]** 5/6 8/18 37/5 55/18
**Wilson [4]** 2/24 2/25 34/23 54/18
**window [1]** 36/24
**Winter [4]** 36/16 36/20 36/21 76/4
**wish [1]** 74/14
**wishes [2]** 28/3 56/17
**within [12]** 13/2 13/3 13/14 13/24 21/14 49/4 54/15 57/4 58/12 61/24 76/11 82/19
**without [8]** 8/14 14/10 22/9 39/4 41/5 44/25 77/23 77/24
**won't [2]** 34/11 42/24
**word [1]** 32/3
**words [6]** 6/11 27/2 31/12 35/24 72/5 75/22
**work [3]** 39/7 43/14 55/21
**working [1]** 58/5
**world [2]** 17/11 19/9
**world's [1]** 15/7
**worse [4]** 27/6 27/16 34/9 34/10
**would [115]**
**wouldn't [3]** 23/16 45/18 76/24
**written [1]** 69/16
**wrong [1]** 9/12
**Wynn [1]** 65/1

**Y**

**yeah [25]** 7/6 13/10 13/17 14/10 14/15 15/21 15/21 15/21 17/8 18/12 19/11 20/8 21/9 21/12 22/13 24/24 25/1 25/15 25/18 27/5 32/5 35/6 42/14 64/16 81/23
**year [2]** 2/3 2/4
**yes [19]** 3/24 11/2 11/3 11/3 12/4 13/5 16/21 21/2 24/11 28/5 30/17 31/6 31/14 36/3 39/2 44/5 47/6 52/8 63/18
**yesterday [1]** 3/13
**yet [6]** 7/25 35/11 38/16 50/21 51/19 78/17
**York [1]** 1/20
**you [144]**
**you'd [5]** 34/15 54/6 81/14 81/17 83/23
**you're [12]** 15/17 16/11 16/12 16/15 19/7 25/23 29/22 36/24 45/23 48/4 56/1 66/8
**you've [3]** 36/14 40/14 50/3
**your [104]**
**yourself [1]** 61/5
**yourselves [1]** 2/7

**Z**

**Zadvydas [1]** 43/17
**zero [2]** 7/21 70/7
**zipper [1]** 48/19